# COMPETITION IN CONTRACTING ACT OF 1984

## HEARINGS

BEFORE A

SUBCOMMITTEE OF THE

COMMITTEE ON

GOVERNMENT OPERATIONS

HOUSE OF REPRESENTATIVES

NINETY-EIGHTH CONGRESS

SECOND SESSION

ON

## H.R. 5184

TO REVISE THE PROCEDURES FOR SOLICITING AND EVALUATING BIDS AND PROPOSALS FOR GOVERNMENT CONTRACTS AND AWARDING SUCH CONTRACTS USING FULL AND OPEN COMPETITION, AND FOR OTHER PURPOSES

MARCH 27 AND 29, 1984

Printed for the use of the Committee on Government Operations

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1985

42-906 O

DEPOSITORY

Case 1:06-cv-00599-MBH Document 17-3 Filed 08/29/2006 Page 2 of 10



THE DEPARTMENT OF DEFENSE
STATEMENT ON
H.R. 5184
BY
MS. MARY ANN GILLEECE
DEPUTY UNDER SECRETARY OF DEFENSE
RESEARCH AND ENGINEERING
(ACQUISITION MANAGEMENT)

I APPRECIATE THE OPPORTUNITY TO DISCUSS H.R. 5184. THE BILL WOULD REVISE THE PROCEDURES FOR SOLICITING AND EVALUATING BIDS AND PROPOSALS FOR GOVERNMENT CONTRACTS AND AWARDING SUCH CONTRACTS USING FULL AND OPEN COMPETITION, AND FOR OTHER PURPOSES. BEFORE COMMENTING ON THE BILL, I WOULD LIKE TO GIVE A BRIEF ACCOUNT OF SOME OF OUR ACQUISITION REFORM EFFORTS.

THE MISSION OF THE DEPARTMENT OF DEFENSE HAS GROWN MORE COMPLEX IN THE PAST QUARTER CENTURY. DUE TO A QUANTUM LEAP IN TECHNOLOGY IN GENERAL AND MILITARY DEVELOPMENT IN SUCH SPECIFIC AREAS AS AEROSPACE, COMMUNICATIONS, ELECTRONICS, COMPUTERS, AND HIGH ENERGY WEAPONS, UNPRECEDENTED PROCUREMENT MANAGEMENT SKILLS ARE REQUIRED TODAY TO MAINTAIN AN ADEQUATE DEFENSE. OVER THE LAST 25 YEARS, WE HAVE ALSO SEEN THE PROCUREMENT MECHANISM USED AS A MEANS TO PROMOTE SOCIAL AND ECONOMIC GOALS. ALONG WITH THIS, RELIANCE ON THE PRIVATE SECTOR TO PROVIDE SUPPLIES AND SERVICES HAS BECOME THE CORNERSTONE OF NATIONAL POLICY.

IN FISCAL YEAR 1983, THE DOD PROCESSED ALMOST 15 MILLION PROCUREMENT ACTIONS FOR $140 BILLION. ALMOST 50,000 MEN AND WOMEN MAKE THE DEFENSE CONTRACTING SYSTEM INTO WHAT WE FEEL IS ONE OF THE MOST EFFICIENT OF ANY GOVERNMENT AGENCY. DESPITE THE IMPRESSION





GIVEN AT TIMES IN SENSATIONALIZED REPORTS OR BY CRITICS OF THE NATIONAL DEFENSE ESTABLISHMENT, MILLIONS OF ACTIONS TAKE PLACE AND BILLIONS OF DOLLARS ARE SPENT WITH EFFICIENCY AND A PROFOUND REGARD FOR SAFEGUARDING THE TAX DOLLARS ENTRUSTED TO PROCUREMENT PROFESSIONALS.

HOWEVER, TO IMPROVE THE EFFECTIVENESS OF THE ACQUISITION SYSTEM, THIS ADMINISTRATION, SHORTLY AFTER TAKING OFFICE, ESTABLISHED THE ACQUISITION IMPROVEMENT PROGRAM, FREQUENTLY REFERRED TO AS THE 32 CARLUCCI INITIATIVES. AS A RESULT OF A THOROUGH REVIEW OF THE ORIGINAL 32 INITIATIVES CONDUCTED LAST SPRING, THE DEPUTY SECRETARY OF DEFENSE DIRECTED THAT PRIORITY ATTENTION BE GIVEN TO SIX KEY MANAGEMENT AREAS:

- o IMPROVING PROGRAM STABILITY
- o EXPANDED MULTIYEAR PROCUREMENT
- o MORE ECONOMIC PRODUCTION RATES
- o MORE REALISTIC BUDGETING
- o IMPROVED SUPPORT AND READINESS
- o ENCOURAGING COMPETITION

SIX HIGH-LEVEL GROUPS HAVE BEEN MEETING REGULARLY DURING THE PAST YEAR TO MONITOR IMPLEMENTATION EFFORTS AND RECOMMEND ACTIONS NECESSARY TO ACHIEVE FULL IMPLEMENTATION. I SHOULD ADD THAT IMPLEMENTATION EFFORTS ALSO CONTINUE, AS NEEDED, ON OTHERS OF THE ORIGINAL 32 INITIATIVES WHICH HAVE NOT BEEN RESOLVED. THE SIX INITIATIVES OF THE DEPUTY SECRETARY, HOWEVER, ARE THE CRITICAL PROBLEM AREAS WHICH PROMISE THE GREATEST BENEFITS. LET ME BRIEFLY COMMENT ON THE ONE CONCERNING COMPETITION.

Case 1:06-cv-00599-MBH Document 17-3 Filed 08/29/2006 Page 3 of 10



COMPETITION HAS BEEN THE PREFERRED MEANS FOR ACQUIRING SUPPLIES AND SERVICES IN THE GOVERNMENT FOR GENERATIONS. FOR MANY YEARS, OBSERVERS HAVE WRONGLY EQUATED COMPETITION WITH THE METHOD OF PROCUREMENT; THAT IS, FORMAL ADVERTISING. THE COMMISSION ON GOVERNMENT PROCUREMENT HIGHLIGHTED THIS PROBLEM MORE THAN A DECADE AGO. THERE IS NO SUCH THING AS FORMAL ADVERTISING IN THE PRIVATE SECTOR. WE REQUIRE OUR PURCHASING ACTIVITIES TO SOLICIT COMPETITIVE OFFERS WHENEVER COMPETITION IS PRACTICABLE, WHETHER BY THE NEGOTIATION METHOD OR BY FORMAL ADVERTISING. HOWEVER, FORMAL ADVERTISING IS A METHOD UNIQUE TO GOVERNMENT AND UNSUITABLE FOR MOST OF OUR PROCUREMENT EFFORTS.

OBTAINING EFFECTIVE COMPETITION IS A LONG-STANDING OBJECTIVE. ALMOST ALL OF OUR MAJOR PROGRAMS, FOR INSTANCE, HAD COMPETITION AMONG PRIME AND SUBCONTRACTORS DURING THE DEVELOPMENT PHASE. THOSE WHICH WERE NOT COMPETED WERE SOLE SOURCE AS A FUNCTION OF NECESSITY, NOT CHOICE. FOR EXAMPLE, ONLY ONE SHIPYARD MAKES NUCLEAR AIRCRAFT CARRIERS. A FACT WHICH IS HARD TO AVOID.

NEVERTHELESS, A NUMBER OF ACTIONS ARE UNDERWAY TO IMPROVE OUR PERFORMANCE IN COMPETITION. THE SERVICES AND THE DEFENSE LOGISTICS AGENCY HAVE DESIGNATED ADVOCATES FOR COMPETITION WITHIN THEIR RESPECTIVE ORGANIZATIONS. COMPETITION GOALS HAVE BEEN ESTABLISHED BY EACH OF THE SERVICES AND DLA. WE ARE WORKING TO MAKE IT EASIER TO DETERMINE THE COSTS AND BENEFITS OF COMPETITION IN THE PRODUCTION PHASE AND CLARIFY POTENTIAL APPLICATION OF LEADER/FOLLOWER AND OTHER MEANS OF SECOND SOURCING FOR PROGRAMS BEING PLANNED OR ALREADY IN PRODUCTION. THE POTENTIAL FOR SAVINGS





IN THIS AREA IS HIGH, AND THE BENEFIT TO THE INDUSTRIAL BASE IS UNEQUIVOCAL. AS AN INDICATION OF OUR COMMITMENT TO IMPROVE COMPETITION, THE DEPARTMENT HAS REQUESTED A LEGISLATIVE CHANGE TO ESTABLISH A NEGOTIATION EXCEPTION FOR DEVELOPING A SECOND SOURCE. THE ACTION IS NOW IN THE HANDS OF CONGRESS.

SOME OTHER ACTIONS WE ARE TAKING TO ENHANCE COMPETITION ARE CENTERED IN THE INTERSERVICE HIGH LEVEL WORKING GROUP ON COMPETITION. THIS GROUP HAS RECOMMENDED TECHNIQUES FOR IDENTIFYING SECOND SOURCE OPPORTUNITIES, IMPROVING DATA ACQUISITION POLICIES, AND INCREASING THE EXTENT OF COMPETITION AT THE SUBCONTRACTOR LEVEL. THE DEPUTY SECRETARY OF DEFENSE HAS ACTED ON THESE RECOMMENDATIONS WITH A SERIES OF MEMORANDA TO DOD COMPONENTS DATED MARCH 12, 1984. THE GROUP HAS ALSO DEVELOPED A NEW DIRECTIVE ON COMPETITION WHICH IS BEING COORDINATED WITH THE DOD COMPONENTS. THIS DIRECTIVE WILL FIRMLY COMMIT ALL ELEMENTS OF THE DEPARTMENT TO PURSUING COMPETITION. IT WILL ACCENT EARLY PLANNING AND MARKET RESEARCH TO ENHANCE COMPETITIVE OPPORTUNITIES.

THE SERVICES HAVE ALSO PURSUED INDEPENDENT ACTIONS TO IMPROVE COMPETITION. FOR EXAMPLE, THE ARMY HAS STRESSED THE ROLE OF THE PROGRAM MANAGER IN PLANNING EARLY FOR COMPETITION IN MAJOR SYSTEMS, AND THE NAVY HAS SPONSORED A THREE-DAY TRAINING PROGRAM ON COMPETITION FOR OVER 300 NAVY PERSONNEL WITH CONTRACTING, TECHNICAL, AND LOGISTICS DISCIPLINES INVOLVED. TOPICS INCLUDED THE LEGAL BASIS FOR COMPETITION, TECHNIQUES FOR ENHANCING COMPETITION,

INDUSTRY PERCEPTIONS, AND AUDIT RESULTS. THE AIR FORCE IS EMPHASIZING PLANNING AT THE MAJOR COMMAND LEVEL FOR COMPETITION. THESE PLANS WILL LOOK AT MAJOR NONCOMPETITIVE PROBLEM AREAS AND ADDRESS PLANNED REMEDIAL ACTIONS TO ASSURE FUTURE COMPETITION.

THROUGH ACTIONS SUCH AS THESE, THE ENTIRE PROCUREMENT PROCESS IS FOCUSING ON INCREASING COMPETITION WHERE IT MAKES SENSE. PERHAPS THE MOST VIVID EXAMPLE OF WHAT CAN BE DONE WITH EARNEST CONGRESSIONAL SUPPORT IS THE RECENT ALTERNATE FIGHTER ENGINE COMPETITION CONDUCTED BY THE AIR FORCE. IT WAS NOT ONLY AN EFFECTIVE PROGRAM COMPETITION, BUT ONE THAT ASSURED FUTURE COMPETITION FOR OUR DOWN-STREAM SPARE PARTS REQUIREMENTS.

IN THE AREA OF SPARE PARTS ACQUISITION, WE ARE PURSUING MANY DETAILED INITIATIVES TO CORRECT PROBLEMS WE HAVE UNCOVERED.

AS A RESULT OF DISCLOSURES BY THE DOD INSPECTOR GENERAL, INTERNAL AUDIT ORGANIZATIONS, AND OTHER DOD PERSONNEL OF EXCESSIVE PRICES PAID FOR SPARE PARTS, THE SECRETARY OF DEFENSE, BY MEMORANDUM OF JULY 25, 1983, DIRECTED THAT ACTION BE TAKEN TO IMPROVE SPARE PARTS PROCUREMENT. THIS WAS FOLLOWED A MONTH LATER, ON AUGUST 29, 1983, BY MORE ENCOMPASSING DIRECTION AS TO ACTIONS AND INITIATIVES TO BE TAKEN TO REFORM SPARE PARTS ACQUISITION.

THIS IS NOT A NEW PROBLEM. IT HAS HAUNTED THE DEPARTMENT FOR SEVERAL DECADES. PAST ADMINISTRATIONS HAVE, AT TIMES, INITIATED



EFFORTS TO GET ON TOP OF THE PROBLEM BUT DID NOT SUCCEED. ACQUIRING AND MANAGING OUR INVENTORY OF NEARLY 4 MILLION ITEMS IS VERY PEOPLE INTENSIVE. AS I MENTIONED EARLIER, LAST YEAR ALONE WE HAD ALMOST 15 MILLION PROCUREMENT TRANSACTIONS. I KNOW OF NO ORGANIZATION THAT APPROACHES THE SIZE OF OUR INVENTORY OR THE VOLUME OF OUR PROCUREMENT TRANSACTIONS.

CLEARLY, SHORTFALLS IN RESOURCES HAVE CONTRIBUTED TO THE SPARE PARTS PROBLEM. BUT, MANAGEMENT ATTENTION WAS ALSO LACKING. EXPEDIENCIES AND SHORTCUTS WERE TAKEN TO MEET AN EVER INCREASING DEMAND FOR SUPPORT OF EQUIPMENT, WITH LITTLE CHANGE IN THE NECESSARY RESOURCES. THE SECRETARY OF DEFENSE HAS MOVED MOST AGGRESSIVELY TO IMPROVE THE POLICY GOVERNING THE ACQUISITION AND MANAGEMENT OF SPARE PARTS. WE ARE COMMITTED TO MAKING THESE IMPROVEMENTS PERMANENT AND INSTITUTIONALIZING THEM TO ASSURE THAT THE DEPARTMENT OF DEFENSE (DOD) AND AMERICAN TAXPAYER RECEIVE FULL VALUE FOR THE TAX DOLLAR.

THE MILITARY DEPARTMENTS AND THE DEFENSE LOGISTICS AGENCY (DLA), RESPONSIBLE FOR IMPLEMENTING THE IMPROVED PROCEDURES FOR THE ACQUISITION OF SPARE PARTS, ARE TAKING NECESSARY MEASURES. FOR EXAMPLE, THE ARMY TASK EFFORT, IDENTIFIED AS SPRINT (SPARE PARTS INITIATIVES), RECOMMENDED 67 INITIATIVES. THE NAVY TASK EFFORT, IDENTIFIED AS BOSS (BUY OUR SPARES SMART), RECOMMENDED 102 INITIATIVES. THE AIR FORCE MANAGEMENT ANALYSIS GROUP ISSUED THEIR REPORT LAST OCTOBER AND RECOMMENDED 178 INITIATIVES. DLA HAS ALSO

DEVELOPED INITIATIVES. EACH IS NOW IN THE PROCESS OF IMPLEMENTING THEIR INITIATIVES.

WE ARE CHALLENGING CONTRACTOR CLAIMS OF PROPRIETARY RIGHTS IN DATA AND CONTRACTORS ARE BEING COOPERATIVE. A NUMBER HAVE PROVIDED DATA PACKAGES AND RETURNED SOLICITATIONS STATING THAT THE PART CAN BE PROCURED FROM OTHER SOURCES. TO BETTER BENEFIT FROM THE DATA, WE ARE OBTAINING AUTOMATED SYSTEMS THAT ARE DESIGNED TO QUICKLY RETRIEVE AND UPDATE DATA. AT PRESENT OUR DATA PACKAGES ARE STORED IN LARGE DATA REPOSITORIES. TO OBTAIN INFORMATION, WE MUST MANUALLY RETRIEVE THE DATA PACKAGE, REPRODUCE IT, AND MAIL IT OUT. WITH COMPUTERIZED SYSTEMS WE ARE DEVELOPING, THE PROCEDURE WILL BE DONE AUTOMATICALLY. WE WILL EVEN BE ABLE TO DISTRIBUTE ENGINEERING DATA AND DRAWINGS OVER EXISTING TELECOMMUNICATIONS NETWORKS. THIS IS A LARGE EFFORT FOR OUR DATA MANAGEMENT PEOPLE.

AN ISSUE THAT HAS GIVEN RISE TO CONSIDERABLE CONTROVERSY IS PROPRIETARY RIGHTS TO TECHNICAL DATA. THE SECRETARY OF DEFENSE, IN HIS MEMORANDUM OF AUGUST 29, 1983, DIRECTED THE DOD COMPONENTS TO NEGOTIATE DATA PROVISIONS IN CONTRACTS WHICH, AS APPROPRIATE, REDUCE CONTRACTORS' PROPRIETARY RIGHTS IN DATA. FOR THE 2.2 MILLION ITEMS THAT HAVE BEEN SCREENED FOR BREAKOUT, LESS THAN .3 PERCENT ARE IDENTIFIED AS BEING RESTRICTED BECAUSE OF PROPRIETARY CLAIMS. WHILE THE INCIDENCE OF PROPRIETARY CLAIM APPEARS SMALL, THE DOD COMPONENTS HAVE BEEN EXAMINING METHODS THAT WOULD CARRY OUT THE SECRETARY'S DIRECTION.



ANOTHER EFFORT WHICH WE BELIEVE HAS PROMISE, IS TO REQUIRE THAT CONTRACTS FOR DEVELOPMENT INCORPORATE THE DOD PARTS CONTROL PROGRAM. THIS REQUIREMENT PROMOTES USE OF STANDARD PARTS IN THE DEVELOPMENT AND PRODUCTION OF A WEAPON SYSTEM. THIS ALLOWS US TO MAKE LARGER QUANTITY BUYS, REDUCING PARTS COST AND REDUCING THE NUMBER OF ITEMS IN OUR INVENTORY. IT ALSO SUPPORTS COMPETITION BECAUSE WE TYPICALLY HAVE TECHNICAL DATA AVAILABLE FOR THESE ITEMS. THE SECRETARY OF DEFENSE, IN HIS MEMORANDUM OF AUGUST 29, 1983, MANDATED THE APPLICATION OF THIS PROGRAM IN THE DEVELOPMENT OF NEW WEAPON SYSTEMS.

TO ENSURE REASONABLE PRICING OF PARTS AT THE TIME OF CONTRACTING, THE DOD COMPONENTS HAVE ALL TAKEN ACTION TO FLAG INCREASES IN PRICE THAT APPEAR OUT OF LINE WITH PAST PRICES. THESE ITEMS RECEIVE MORE INTENSE ANALYSIS TO ASSURE THAT THE PRICE IS REASONABLE. ALONG THESE LINES, WE ISSUED OUR IMPLEMENTATION OF SECTION 1215 OF THE DOD AUTHORIZATION ACT, 1984, IN DEFENSE ACQUISITION CIRCULAR 76-48 THIS MONTH. THE REGULATION PROHIBITS THE PURCHASE OF SPARE PARTS WHEN THE PRICE HAS INCREASED BY MORE THAN 25 PERCENT WITHIN THE MOST RECENT 12 MONTH PERIOD UNLESS THE HEAD OF THE CONTRACTING ACTIVITY CERTIFIES THE PRICE IS REASONABLE OR THAT NATIONAL SECURITY INTERESTS REQUIRE THE PART BE PURCHASED. OUR REGULATION ALSO EMPHASIZES THAT INCREASES OF LESS THAN 25 PERCENT IN NO WAY RELIEVES THE CONTRACTING OFFICER OF THE RESPONSIBILITY FOR OBTAINING A FAIR AND REASONABLE PRICE.

ANOTHER AREA WHERE WE FOUND A PROBLEM IN PRICING PARTICULARLY SMALL VALUE ITEMS, WAS IN CONTRACTOR COST ACCOUNTING PRACTICES. A NUMBER OF CONTRACTORS UTILIZE COST ACCOUNTING METHODS FOR COSTING PARTS ON AN ITEM BASIS RATHER THAN A VALUE BASIS. EACH ITEM (PART), REGARDLESS OF ITS MATERIAL AND DIRECT LABOR COST, IS ALLOCATED THE SAME COSTS FOR MATERIAL HANDLING, OVERHEAD, GENERAL AND ADMINISTRATIVE EXPENSE, ETC. A 50 CENT PART PURCHASED BY THE PRIME CONTRACTOR FROM A VENDOR AND SOLD TO THE GOVERNMENT WAS BURDENED WITH THE SAME COST AS A $1,000 PART PURCHASED BY THE PRIME CONTRACTOR FROM A VENDOR AND SOLD TO THE GOVERNMENT. THIS GIVES THE APPEARANCE OF LOW VALUE PARTS BEING OVERPRICED AND HIGHER VALUE PARTS BEING UNDERPRICED. THE NET TOTAL COST TO THE GOVERNMENT FOR ALL PARTS PURCHASED IS THE SAME.

WE HAVE DIRECTED THE MILITARY DEPARTMENTS, THE DEFENSE LOGISTICS AGENCY, AND THE DEFENSE CONTRACT AUDIT AGENCY TO UTILIZE VALUE BASED COST ALLOCATION METHODS THAT COMPORT WITH COSTING MORE IN LINE WITH THE INTRINSIC VALUE OF THE PART. WE HAVE ALSO DIRECTED THE USE OF A "MOST FAVORED CUSTOMER ASSURANCE" CLAUSE FOR PROCUREMENTS OF COMMERCIAL TYPE ITEMS. THIS WILL ASSURE THAT WE PAY NO MORE THAN THE CONTRACTOR'S MOST FAVORED CUSTOMER PAYS FOR LIKE ITEMS.

WE ARE ALSO EXPANDING THE SCOPE AND EMPHASIS ON VALUE ENGINEERING TO PROVIDE A VALUE ANALYSIS OF A PART WHEN ITS PRICE APPEARS TO BE EXCESSIVE. TO OBTAIN THIS EXPANDED EMPHASIS, WE HAVE





INCREASED THE NUMBER OF PERSONNEL ENGAGED IN VALUE ANALYSIS WITHIN THE DOD COMPONENTS. WE HAVE ALSO DIRECTED THE INCLUSION OF THE DAR VALUE ENGINEERING INCENTIVE CLAUSE IN ALL CONTRACTS FOR SPARE PARTS AND REPAIR KITS OF $25,000 OR MORE FOR OTHER THAN STANDARD COMMERCIAL PARTS.

ALONG WITH INCREASING OUR TRAINING FOR PERSONNEL, WE ARE REVISING PERFORMANCE EVALUATION CRITERIA TO REWARD ACTIONS THAT INCREASE COMPETITION AND EFFICIENCY AND PENALIZE LESSER PERFORMANCE. I SHOULD ALSO NOTE THAT TO FULLY IMPLEMENT THESE INITIATIVES EFFECTIVELY WILL REQUIRE ADDITIONAL PERSONNEL AND REPRIORITIZING OUR WORK FORCE.

THE SECRETARY OF DEFENSE HAS REQUESTED THE DEPUTY SECRETARY OF DEFENSE AS CHAIRMAN OF THE DEFENSE COUNCIL ON INTEGRITY AND MANAGEMENT IMPROVEMENT TO TAKE THE LEAD IN PROVIDING OVERALL GUIDANCE AND COORDINATING THE EFFORTS OF THE DOD COMPONENTS TO REFORM THE MANAGEMENT AND ACQUISITION OF SPARE PARTS. IN SUPPORT OF THIS MANAGEMENT OVERSIGHT, THE PRINCIPAL DEPUTY UNDER SECRETARY OF DEFENSE FOR RESEARCH AND ENGINEERING HAS BEEN HOLDING BIMONTHLY SESSIONS WITH THE DOD COMPONENTS TO TRACK THE PROGRESS OF THEIR EFFORTS AND TO PROVIDE A FORUM TO INTERCHANGE REFORM TECHNIQUES AND APPROACHES.

THERE ARE OTHER ONGOING REVIEWS AND STUDIES. AT THE REQUEST OF THE HOUSE GOVERNMENT OPERATIONS COMMITTEE, WE ARE INITIATING A

Case 1:06-cv-00599-MBH Document 17-3 Filed 08/29/2006 Page 7 of 10



STUDY OF THE FEASIBILITY OF ACQUIRING ALL RIGHTS IN TECHNICAL DATA. THE GENERAL ACCOUNTING OFFICE IS AGAIN REVIEWING SPARE PARTS ACQUISITION AND REVIEWING SEPARATELY, AT THE REQUEST OF THE SENATE GOVERNMENT AFFAIRS COMMITTEE, THE DOD REPLENISHMENT SPARES BREAKOUT PROGRAM REGULATION THAT WE ISSUED LAST SUMMER. THE SECRETARY OF DEFENSE HAS DIRECTED THE INSPECTOR GENERAL (IG) TO THOROUGHLY REVIEW THE ACQUISITION OF PARTS. CURRENTLY, THERE ARE OVER 300 DEFENSE AUDITORS ENGAGED IN THIS REVIEW. AS YOU KNOW, UNDER PUBLIC LAW 98-191, THE OFFICE OF FEDERAL PROCUREMENT POLICY (OFPP) IS REQUIRED TO REVIEW DOD SPARE PARTS PROCUREMENT PRACTICES AND SUBMIT A REPORT TO CONGRESS BY JUNE 1, 1984. MOST OF THE PERSONNEL RESOURCES TO PERFORM THIS REVIEW HAVE BEEN PROVIDED BY DOD. WE ARE REQUIRED BY SECTION 1216 OF THE DOD AUTHORIZATION 1984 TO PROVIDE A REPORT TO CONGRESS ON SOLUTIONS TO SPARE PARTS PROBLEMS BY JUNE 1, 1984. THE SENATE APPROPRIATIONS COMMITTEE REPORT ACCOMPANYING THE DOD APPROPRIATIONS BILL, 1984, ALSO REQUIRES A REPORT TO CONGRESS THIS SUMMER ON PLANS TO ACCELERATE MODERNIZATION OF SPARE PARTS REQUIREMENTS, PROCUREMENTS, AND TECHNICAL DOCUMENTATION SYSTEM.

I HAVE TAKEN TIME TO CATALOG SOME OF OUR ACQUISITION REFORM EFFORTS TO INDICATE THE DEPTH TO WHICH WE ARE COMMITTED TO OVERALL IMPROVEMENTS WHICH WILL HELP INCREASE COMPETITION. ALL OF OUR REFORMS ARE VERY PEOPLE INTENSIVE BUT WE FEEL THIS COMMITMENT OF RESOURCES IS WORTH THE EXPECTED BENEFITS. COUPLED WITH OUR MANAGEMENT INITIATIVES IS OUR SUPPORT FOR IMPROVEMENTS IN OUR BASIC PROCUREMENT LEGISLATION. WE SUPPORT THE CONCEPT OF S. 338 WITH





THE CHANGES WE HAVE RECOMMENDED. WE SUPPORT H.R. 2545. SOME RETRAINING OF THE PROCUREMENT WORK FORCE WOULD BE REQUIRED WITH THESE BILLS. WE HAVE SUGGESTED CHANGES IN S. 338 TO RETAIN PRESENT PROCUREMENT CONCEPTS WHERE THEY ENCOURAGE EFFICIENT AND EFFECTIVE CONTRACTING. IN SUCH A LARGE AND VITAL SYSTEM AS DEFENSE PROCUREMENT, CHANGES RADICALLY IMPOSED WILL JEOPARDIZE THE VERY MISSION OF THE DEFENSE DEPARTMENT-NATIONAL SECURITY. WE HAVE DETERMINED THAT CHANGES ARE NEEDED AND THEY ARE UNDERWAY BUT THESE CHANGES MUST BE CAREFULLY CONSTRUCTED.

YOU SHOULD ALSO KEEP IN MIND, WHEN PROPOSING CHANGES TO OUR PROCUREMENT SYSTEM, THAT IT IS ABOUT TO BE CHANGED ON APRIL 1, 1984. THIS IS THE DATE THE FEDERAL ACQUISITION REGULATION (FAR) TAKES EFFECT AFTER FIVE YEARS OF PLANNING AND HARD WORK. HUNDREDS OF PEOPLE HAVE WORKED ON THE WRITING TEAM TO DEVELOP A SIMPLIFIED, UNIFORM SYSTEM OF REGULATION. WE HAVE TRAINED ALMOST 50,000 PEOPLE IN THE WORKINGS OF THE NEW REGULATION. THE PRIVATE SECTOR HAS INVESTED TREMENDOUS AMOUNTS OF THEIR OWN TIME AND MONEY TO PREPARE FOR THIS LONG AWAITED PUBLICATION.

SUCH NEW AND UNCERTAIN CHANGES IN THE BASIC PROCUREMENT LAW, AS PROPOSED BY H.R. 5184, WOULD WASTE THIS EFFORT. JUST WHEN THE PROFESSIONAL ACQUISITION COMMUNITY SHOULD BE SETTLING DOWN TO OPERATING UNDER A NEW REGULATION, IT WOULD BE PUT INTO TURMOIL. THE TAXPAYERS WOULD NOT REAP THE BENEFITS OF THE PREVIOUS INVESTMENT IN DEVELOPING THE FAR.

H.R. 5184 TAKES, IN OUR VIEW, A DISJOINTED APPROACH TO GOVERNMENT PROCUREMENT REFORM. INSTEAD OF MODIFYING SPECIFIC PROVISIONS OF EXISTING LAW AS H.R. 2545 HAS ATTEMPTED, H.R. 5184 WILL WIPE OUT ALMOST 40 YEARS OF LEGAL PRECEDENTS AND BUSINESS PRACTICES. SECTION 201 OF TITLE II OF H.R. 5184 WOULD REQUIRE ALL FEDERAL PROCUREMENT TO BE CONDUCTED AS IT DESCRIBES, NOTWITHSTANDING THE ARMED SERVICES PROCUREMENT ACT OF 1947 OR THE FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT OF 1949. IT WOULD ALSO SUPERSEDE P.L. 98-72 ON PUBLICIZING PROCUREMENTS SIGNED INTO LAW ONLY LAST AUGUST. THIS APPROACH LEAVES IN QUESTION EXACTLY WHAT PORTIONS OF THESE EARLIER LAWS WOULD STILL BE EFFECTIVE. YEARS OF COURT CHALLENGES WOULD ENSUE TO DEFINE THE LIMITS OF THE EARLIER LAWS AND THE CHANGES INTENDED BY H.R. 5184.

SECTION 202 OF TITLE II WOULD INSTITUTE A NOVEL, THREE-TIERED DEFINITION OF COMPETITION. THE THREE CATEGORIES OF FULL AND OPEN COMPETITION, LESS RIGOROUS COMPETITION AND NONCOMPETITIVE PROCUREMENT WOULD UNNECESSARILY CONFUSE AND COMPLICATE PROCUREMENT FOR THE GOVERNMENT AS WELL AS THE PRIVATE SECTOR THAT PROVIDES THE SUPPLIES AND SERVICES.

SECTION 203 OF TITLE II WOULD REQUIRE PUBLICATION OF PROCUREMENTS IN A MANNER DIFFERENT FROM P.L. 98-72, WHICH HAS JUST BEEN IMPLEMENTED IN THE FEDERAL ACQUISITION REGULATION. IT WOULD BE EXTREMELY DISRUPTIVE TO ONCE AGAIN CHANGE THIS ASPECT OF PROCUREMENT ESPECIALLY WITHOUT THE BENEFIT OF TIME TO JUDGE THE EFFECTIVENESS OF P.L. 98-72.



SECTION 204 OF TITLE II IS PRIMARILY ADDRESSED TO THE GENERAL ACCOUNTING OFFICE AND ITS ROLE OF ADJUDICATING, ON A BASIS OF NONEXCLUSIVE JURISDICTION, PROTESTS INVOLVING ALLEGED VIOLATIONS OF THE BILL'S PROVISIONS. WE SUPPORT THE ROLE THE COMPTROLLER GENERAL HAS ASSUMED IN RENDERING TIMELY AND IMPARTIAL DECISIONS ON PROTESTS UNDER PRESENT LAW AND PROCEDURES. WE FIND NO NEED FOR FURTHER STATUTORY UNDERPINNING FOR THE COMPTROLLER GENERAL OF THE U.S. TO CARRY OUT THIS FUNCTION.

ALSO IN SECTION 204 IS A PROVISION TO REQUIRE THE GENERAL SERVICES ADMINISTRATION BOARD OF CONTRACT APPEALS TO REVIEW ANY DETERMINATION BY A CONTRACTING OFFICER CALLED INTO QUESTION IF THE PROCUREMENT WAS CONDUCTED UNDER AUTHORITY PROVIDED BY SECTION 111 OF THE FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT OF 1949. THIS WOULD CONCENTRATE REVIEW OF MOST PROCUREMENTS INVOLVING AUTOMATIC DATA PROCESSING EQUIPMENT. WE FEEL THIS WOULD CREATE AN UNNECESSARY BACKLOG AND EXTEND PROCUREMENT LEADTIME WITHOUT ANY BENEFIT SINCE THE ARMED SERVICES BOARD OF CONTRACT APPEALS IS PERFECTLY CAPABLE OF SETTLING FAIRLY DISPUTES THAT MAY ARISE.

SECTION 205 OF TITLE II WOULD REQUIRE THE ADMINISTRATOR OF THE OFFICE OF FEDERAL PROCUREMENT POLICY TO MODIFY AND CONFORM EXISTING REGULATIONS TO THIS TITLE. THIS WOULD APPEAR TO EXTEND THE ADMINISTRATOR'S AUTHORITY BEYOND THAT NOW CONTAINED IN P.L. 98-191. THIS AUTHORITY AND THE CHANGES ARE NOT REQUIRED TO CONTINUE IMPROVEMENT IN FEDERAL PROCUREMENT.

SECTION 3 OF THE BILL WOULD MANDATE AN EFFECTIVE DATE OF OCTOBER 1, 1984. THIS DATE IS JUST NOT FEASIBLE DUE TO THE EXTENSIVE AND FUNDAMENTAL CHANGES REQUIRED BY THE PROVISIONS IN THE BILL.

ACQUISITION REFORM EFFORTS SUCH AS THOSE OF THE DEFENSE DEPARTMENT ARE ALSO BEING PUT IN PLACE IN OTHER GOVERNMENT AGENCIES UNDER EXECUTIVE ORDER 12352, FEDERAL PROCUREMENT REFORM. EXTENSIVE INVESTMENTS OF PEOPLE, MONEY, AND TIME HAVE BEEN MADE BY ALL OF US TO CORRECT THE PROBLEMS IN A SPEEDY BUT CAREFUL MANNER. IN THIS WAY, THE PROCUREMENT REFORMS OF TODAY ARE LESS LIKELY TO BE THE PROCUREMENT PROBLEMS OF TOMORROW.

PASSAGE OF H.R. 5184 WOULD SEVERELY HANDICAP THESE REFORM EFFORTS. THE BILL SHOULD BE RESTUDIED BY THE COMMITTEE. WE CANNOT SUPPORT IT IN ITS PRESENT FORM. WITH RECOMMENDED CHANGES TO S. 338 OR ENACTMENT OF H.R. 2545, EITHER WOULD BE MORE BENEFICIAL FOR THE TAXPAYERS AND CITIZENS OF OUR COUNTRY. WE HAVE SHOWN COMMITMENT TO IMPROVE PROCUREMENT PRACTICES WHERE NECESSARY. THESE EFFORTS ARE SHOWING RESULTS. IF H.R. 5184 BECAME LAW, HOWEVER, MANY OF OUR PROCUREMENT RESOURCES WOULD NEED TO BE DIVERTED NOT JUST TO IMPLEMENT THE NEW LAW, BUT TO TRY TO EXPLAIN AND DEAL WITH ITS NOVEL CONCEPTS.

THIS CONCLUDES MY STATEMENT AND I WOULD BE PLEASED TO RESPOND TO YOUR QUESTIONS.



Mr. BROOKS. Thank you very much.

I would say that I thought we had another eulogy in the first 11 pages and that the Defense Department was dead because they are doing everything perfect in those 11 pages.

You have committees and efforts and the concept that you agree with, but the only thing is when you get into the last section, you have some differences with the legislation. You are never for those things that are going to change the Defense Department.

The object of legislation is to improve the Defense Department; 40 years of doing it wrong doesn't make it worth a toot. We want to change it; it needs to be changed.

On page 15, you say, "but to try to explain and deal," and it is going to be difficult to implement the new law and there is going to be difficulty in explaining and dealing with novel concepts.

I admit in the Defense Department, everybody believes competition is a very novel concept, except for the documentation that they provide. I would say that you all could probably write a better report on this competition bill than we can write because you have more people at your disposal. Those wordsmiths out there could write both sides of anything. They could write that they are for competition and are dedicated to it and are committed to do it. They have got that cute outfit in the Navy called BOSS. That is clever; isn't it—"Buy Our Spares Smart"? Isn't that cute? I think that is just darling. They waste as much money as anybody and could care less.

It is results that we are interested in, not those cute little slogans and all those words and all those committees. They aren't doing very much.

I say this not as a partisan effort. This went on under the Democrats, and goes on under the Republicans. I think the Defense Department is the most independent body in the Federal Government. They make Federal judges look humble. Think about that.

How do you account for the rising number, except in your own deep dedication and devotion to competition, of sole-source procurements made by the Department over the last 3 years?

And I will, without objection, submit for the record a chart we obtained from the Defense Department showing their procurement figures for 1981, 1982, and 1983. The figures reflect that about 67 percent—$201 billion of an expenditure of about $300—was sole source.

[The chart follows:]

DOD'S FISCAL YEARS 1981–83 PROCUREMENT SUMMARY

[Dollars in billions]

| Fiscal year | Totals | | Competitive | | Sole-source | | | Percent |
|---|---|---|---|---|---|---|---|---|
| | Actions | Amount | Actions | Amount | Actions | Percent | Amount | |
| 1981 | 33,678 | $84 | 13,324 | $28 | 20,354 | | $56 | |
| 1982 | 39,798 | 106 | 15,586 | 37 | 24,212 | | 69 | |
| 1983 | 43,875 | 110 | 17,180 | 34 | 26,695 | | 76 | |
| Total | 117,351 | 300 | 46,090 | 99 | 71,261 | 61 | 201 | 67 |

Note. These figures are for transactions above $250,000.

Ms. GILLEECE. Mr. Chairman, as I indicated to you before, the fiscal year 1983 figures do include the Trident submarine and do include nuclear aircraft carriers. I might add that most of our major programs are now in a follow-on mode so that much of the statistics—although I do not see that they have increased in an incredible amount in the noncompetitive area—do reflect the fact that our major systems are in a follow-on mode.

Mr. BROOKS. Once companies get in on a noncompetitive sole-source contract, the follow-on mode, translated into English, means DOD keeps giving them the contracts for all the add-ons, all the extras, all the changes, all the additionals. It just stays with that same company. It does make for a very tidy arrangement.

Ms. GILLEECE. Mr. Chairman, I think that is why we are focusing our attention on making sure that there is breakout from the prime contractor of spare parts and that is also why we have recently issued a regulation specifically dealing with breakout. Our attention is being focused in that area.

Mr. BROOKS. Breakout on spare parts?

Ms. GILLEECE. Breakout from the prime contractor in these follow-on contracts.

We believe we can improve our competition in the subsystem area.

Mr. BROOKS. I believe that wholeheartedly. I really believe you could.

And you say that they are going to do some of that?

Ms. GILLEECE. Yes, sir; and——

Mr. BROOKS. And they have done two or three already?

Ms. GILLEECE. Yes, sir.

Mr. BROOKS. That is wonderful. Two, or three, or four?

Ms. GILLEECE. There have been at least that, sir.

I would gladly provide you a list of some major systems that have been broken out, if you wish.

Mr. BROOKS. Sure; that would be helpful.

[The information follows:]





Program offices assess the practicality of component breakout as a regular part of their business strategy planning for new procurements. Some example component breakouts are provided below.

E-4: A spare engine was purchased from General Electric, the current subcontractor, for approximately $2.5M which was a savings of $2.0M over the cost of a new engine through Boeing the prime contractor.

B-1B: In FY 85 (Lot IV) the following items were broken out:

| ITEM | SUPPLIER |
|---|---|
| Wheel and Brakes | Goodyear |
| Radomes | Brunswick |
| Inertial Navigation | Singer |
| System Gyro | Sperry |
| Stabilization System and Vertical | Sperry |
| Situation Display | Sperry |
| Ejection Seats | To Be Determined |

A Component breakout of capacitors was made by requesting the Navy to buy the capacitors on a Navy contract which went competitive. The estimated costs avoided were over $300K, for the life of the production contract.

CVN-70 AIRCRAFT CARRIER: 52 percent of the dollar value of the material subcontracts were competed on this contract.

Additionally, the Highspeed Anti-Radiation Missile, Tomahawk Missile, and the Alternate Fighter Engine for the F-15 and F-16 aircraft were all programs with substantial subcontract competition.