Case 1:06-cv-00599-MBH Document 17-4 Filed 08/29/2006 Page 1 of 10



Mr. BROOKS. Over the last year, how many times did the Defense Department challenge a contractor's claim to proprietary rights in its procurement of spare parts?

Mr. GORDON. Mr. Brooks, I have been asked to answer that question.

We don't have any statistical data on that point. However, our regulations impose on the contractor the affirmative burden and responsibility to support his claim for proprietary rights.

There have been many instances in which we have litigated this matter. There have been many instances in which the contractors have voluntarily proferred to the Government data where they do have appropriate property claims to facilitate competition.

I don't know if we can compile an answer to you that is accurate, but we can certainly give you one that would give you an indication.

Mr. BROOKS. I am sure that it will just be an indication, but would you give us just an indication of what they have done on those proprietary rights?

Mr. GORDON. Yes, sir.

[The information follows:]



Most often, the Government first becomes aware of contractors assertions of limited rights during the provisioning conference period, when each potential spare and repair part is initially identified and described. The conference is a face-to-face meeting attended by contractor and government technical personnel. Our policy is to evaluate the legitimacy of asserted rights at that time and to challenge every assertion which is not clearly substantiated by the facts brought forth at the conference. A decision is made to either accept or reject the contractor's assertion, or to investigate in greater depth. These further investigations may resolve the question or result in further challenges. In sum, challenges to assertions of limited rights is routine as a matter of policy and these are most often resolved informally in a face-to-face contact between government and contractor personnel. More formal challenges only occur when initial resolution is not possible. Because of this policy it has not been considered necessary to track the instances of initial challenge nor those of a more formal nature. In most cases, resolution is achieved during the conference meeting. We have instructed our personnel to be more assertive and skeptical in their challenges. Contractors have within the last year turned back thousands of items with accompanying data where quantities were uneconomical or other sources could supply.

Case 1:06-cv-00599-MBH Document 17-4 Filed 08/29/2006 Page 2 of 10



Mr. BROOKS. I would point out that the Air Force Logistics Command, in 1981, procured $1 billion in engine spare parts with only about 10 percent being competitive.

You can check that out. We got it from your office. We verified it.

The truth of the matter is that contractors will routinely stamp their logo on spare parts and claim proprietary rights saying that it came from their company.

Spare parts are just a minor item or a little blip in the Defense Department's expenditures, when you consider their total expenditures. It is unfortunately, I am afraid, a sample of their general efficiency at saving the Government money. It is very discouraging.

Mr. GORDON. I don't disagree with you at all.

Mr. BROOKS. If you do, they will fire you tomorrow.

Mr. GORDON. No; but I would like to put the problem in a proper perspective.

In the case of the Air Force, in only 9 percent of the instances do we find that the lack of data rights is a constraint on effective competition; overall, only 3 percent of the time.

It is a much more pervasive management problem than it is just a data rights problem.

Mr. BROOKS. Without objection, I will put in the record at this time a letter to General Decker from Robert Gilroy, senior associate director of the logistics operations. In that, he said he wanted to commend General Decker for his positive response to the House Appropriations Subcommittee on Defense's request to compete the fiscal year 1981 procurement of 5-ton M-939 series trucks.

"It is our best estimate that the competition obtained will produce savings of at least $141 million or 23 percent on this $577 million, two-step, formally advertised, 5-year multiyear contract for 11,394 trucks."

[The letter follows:]





UNITED STATES GENERAL ACCOUNTING OFFICE
WASHINGTON, D.C. 20548

PROCUREMENT, LOGISTICS, AND READINESS DIVISION

JUN 15 1982

Major General Oscar C. Decker, Jr.
United States Army Tank -
Automative Command
Warren, Michigan 48090

Dear General Decker:

I would like to commend your positive response to the House Appropriations Committee, Subcommittee on Defense, request to compete the FY 1981 procurement of 5-ton M-939 series trucks. It is our best estimate that the competition obtained will produce savings of at least $141 million or 23 percent on this $577 million 2-step formally advertised 5-year multiyear contract for 11,394 trucks. This savings is based on our analysis of unnegotiated proposed prices for an earlier planned noncompetitive sole-source 3-year multiyear procurement of these trucks which was canceled. Further, the savings realized can increase depending upon the extent to which additional quantities are bought under the 100-percent option clause contained in the contract.

I believe the above action clearly demonstrates the savings to be achieved through competition and that the inducement provided by a potential 5-year multiyear contract for up to 22,788 trucks heightened the competitive environment.

A copy of this letter is being forwarded to the House Appropriations Committee, Subcommittee on Defense.

Sincerely yours,

Robert M. Gilroy
Robert M. Gilroy
Senior Associate Director

Mr. Brooks. This is just another example, I admit. It is not much. It is just several million dollars, but it all adds up; it really does make a difference.

I don't believe the country can continue to fund the Defense Department at $260 billion this year—a new record—and then something like they just came in for, $313 million. Maybe we will get to cut it a little bit, but DOD will still get $20 or $30 billion of new money to commit.

My problem is that you don't spend it very wisely. There are too many of these things that come up where every time we look carefully we find something that could be obviously improved and money could be saved.

I don't know why the people out there refuse to do it. It is not that difficult. If you just think about it, if you were buying those trucks, then you would advertise them. You would get some competition.

But the policy and the tendencies and the proclivities of the people in the Defense Department is to buy from whomever is there with a nice fat bid. I don't accuse you of fraud. I don't accuse you of trying to go to work for the company. Most of the people in the Defense Department don't do that. There are just a few of them who go on to be vice president of a company. Most of them just go on with their usual job. But they have the same mindset.

I don't think the Federal Government can continue to finance that kind of waste.

I don't see how they sleep at night when they let these contracts that do the Government in. However, it is not that difficult to figure out. The contractors who get those contracts that are so profitable and helpful to them make a lot of money out of it. I don't blame them for trying. Their job is to sell at the highest price they can get, whatever they are making—widgets, trucks, airplanes, tanks, whatever; whether they run or not is not their problem. If you buy them, you bought them; they are yours.

And that is what they do. I don't blame them, but I blame us and I blame the Defense Department for not driving better bargains for the American people. That is my problem. And, it is a problem.

This eulogy in the first 11 pages of your statement, Ms. Gilleece, is very sweet and nice, and you all mean well, and it just sounds beautiful; but it won't fly. That isn't what DOD does. They say they are going to do it. They work at it. They will appoint four task forces in every service to do everything good that Congress can think up, but they don't do any of it. I don't know why they are so hard set against improving what we are doing.

This bill won't hurt you any; you can live with it.

I hope we can pass it.

Do you support H.R. 5064, the spare parts legislation introduced by Congressman Nichols and currently before the House Armed Services Committee?

Ms. Gilleece. Mr. Gordon testified on that, Mr. Chairman.

Mr. Gordon. Yes, sir; we support the thrust of the bill because——

Mr. Brooks. You support the bill or the thrust or the concept?

Mr. Gordon. Yes.

Mr. Brooks. Which?



Mr. Gordon. We support the bill, in large measure, because it really enunciates and formulates in statutory form essentially all the initiatives we have already instituted and have ongoing, so it would be very difficult to argue.

What we are concerned about is that we don't necessarily feel assured that everything we are doing is, per se, correct and that everything we are doing is all that there is to be done, so we have some reservation about inhibiting our flexibilities.

But on balance, we are supportive of the legislation, and so is the Secretary of Defense. We are working with the committee in suggesting some technical revisions to the language.

Mr. Brooks. If I were Mr. Nichols, I would look at those technical revisions pretty closely. You don't have to change but a few words—"must" to "may" and "shall" to "consider" and "evaluate."

You know how to do that very well. I understand that game.

How would you respond to the assertion that the DOD has circumvented GAO's bid protest procedures to avoid awarding competitive contracts?

Ms. Gilleece. Mr. Chairman, in total, we do not believe that we are circumventing the bid protest procedure. In fact, we are supportive of that particular method of protest.

Mr. Brooks. Would the Secretary comment on the example of the Amdahl Corp., which protested the award of an Army contract to the IBM Corp., on the basis that, one, IBM was not the low bidder—that wouldn't worry you much—and, two, the equipment that IBM bid was out-of-date and not in current production? That was the allegation of the protesters.

The GAO decided in favor of Amdahl, apparently agreeing with those two premises that IBM was not the low bidder, and the equipment was out-of-date and not in current production, and directed the Army to open the bidding again.

The Army, however, immediately installed the IBM equipment. After 5 months of negotiations, the Army finally hassled the GAO, convinced the GAO that since the equipment was already installed, it was in the "best interest of the U.S. Government and the taxpayers to continue the contract."

Now, that is the kind of thing I want to submit for the record, and I think you ought to think about that. Those things do happen.

Why in the world when they were directed not to install equipment A because it was not the low bid and it was out-of-date would they then go ahead and install it? And then hardheadedly and arrogantly insist it is already installed and it is going to cost us a lot of money to come out of there?

This is the same thing they do on contracts, Ms. Gilleece. If they have a contract that is in being, and they don't like it, they'll give you all the costs of closing out that contract.

If they catch them stealing redhandedly at 12 noon, taking it out in trucks, they say, well, the contract is going on. It would cost too much money to take it away from A and readvertise it. It would slow down the effort and would not be in the best interest of the U.S. Government and the defense effort would be seriously curtailed if we took it away from A, and they promise not to steal anymore this week.

Now, that is what happens, and I will submit this for the record. I want you to take a look at it. You might enjoy it.

[See app. 2.]

Mr. BROOKS. Is it not true that much of the cost overruns experienced by DOD is the result of sole-source extensions or modifications of contracts with incumbent vendors?

Ms. GILLEECE. Mr. Chairman, the Department last week submitted to Congress the 64 selected acquisition reports which indicate if there are or are not cost overruns. I am happy to report that in only 3 of those 64 are there cost overruns. Substantially less than there have been in the recent past.

Additionally, I might add, that the cost estimating procedures have been part of the Carlucci initiative review.

Mr. BROOKS. And without objection, I will put in the record a statement of Senator William S. Cohen on this legislation.

[See app. 3.]

Mr. BROOKS. How do you respond to the assertion that even when the DOD awards are contracted competitively, it is often expanded beyond its original scope at great cost to the Government? They call that a buy-in in the trade.

Ms. GILLEECE. Mr. Chairman, buy-ins, by their nature, are not disallowed simply because a buy-in is supposed to be a situation where the contractor is proposing to the Government at a cost less than it would cost him. So, it would be wise for us to buy at a lesser amount of money; thus, we do not necessarily discourage them. However, we take a very close look to make sure that after award, the contractor does not recover the amount that he would have lost by claims, engineering change proposals, et cetera.

Mr. BROOKS. It sounds a little incestuous, doesn't it? I am going to give it to you for less than it cost me, and then later on we will work out an adjustment; let me recover my cost which I'll multiply, and my profit, and so forth, and we'll work that out later. I would be reluctant to make that kind of deal in the open market with people. There are not many businesses that do it. They've got more faith in their arrangements with the contracting officers than I do. I think those contracting officers often are more concerned with the profits of the corporations with which they deal than the efficiency with which they let Government contracts.

Doesn't it sound just a little unusual to you that they bid something less than it is worth and say we're going to lose $8 million on this, but we know we will get it back? Now, how do you justify that to your stockholders? Do they have a contract? They must have an understanding with somebody that they are going to get every nickel of that back, or they fire that vice president.

Ms. GILLEECE. Mr. Chairman, our regulations specifically do not allow change——

Mr. BROOKS. What is not allowed?

Ms. GILLEECE [continuing]. Our regulations do not allow a contractor to recover because of change orders if, in fact, there has been a buy-in.

Mr. BROOKS. Well, then how do they ever get back the money if they come in and say they are bidding for $8 million under their cost. Would you do that in your right mind? I mean, other than patriotism and dedication to our country?





Ms. GILLEECE. There are reasons that contractors presumably would bid less than it would cost them. For example, they may wish to keep a production line open. They may wish to gain experience in a particular market. That would be something that an individual contractor would have to answer at that time, but we are aware that there are reasons for them to do so.

Mr. BROOKS. Well, let me give you one reason. They sure earn a lot of money for that experience. The Army and Navy awarded a contract to a commercial time-sharing firm for a computerized recruiting system. After the contract was awarded, the agencies greatly expanded their requirements and paid dearly for it. The Army anticipated that it would pay $8.5 million. And that turned out to be $120 million. Well, I mean, they didn't recover the cost on that original $8 million, probably lost a little money on that, but who knows when they got that $120 million. Do you think they made a profit?

The Navy's expected cost under this beautiful contract was $524,000, and that turned out to be $13 million. So, when they escalate them like that, somebody either is not planning—they are not being honest when they lay out the specs in the prospectus. If you think something is going to cost half a million dollars, and that is what you anticipate the bids are, and they come in at $524,000, and you pay for it. And it escalates to $13 million, somebody made a serious error in evaluating what that kind of effort was going to cost the Government. And this is the kind of example that makes me very nervous because I am afraid you do that in the billions just like you do in a couple of million dollars.

From $8 million to $120 million. It's a pretty significant change in the amount of effort for this recruiting program. They have been recruiting since George Washington's time. It isn't anything new, but this system they just escalate it. All of a sudden it got to be worth $120 million instead of $8.5 million. Doesn't that ring a bell? Send up something? Doesn't that look strange? Wouldn't that want to make you take a look at how they do business out there?

Ms. GILLEECE. Mr. Chairman, I am not familiar with that specific example that you bring to our attention.

Mr. BROOKS. Well, yes, this is what—every time you really dig into them, you can find one every day. You can find a new project in the Defense Department that reflects this same kind of laxed attention to wise expenditures.

Mr. Horton.

Mr. HORTON. Thank you, Mr. Chairman.

In connection with the earlier part of your statement, were those commissions or committees or groups that have been set up to check on this matter of competition working prior to last year? And, if so, how long have they been working?

Ms. GILLEECE. Mr. Horton, Mr. Gordon is the Chairman of the High Level Working on Group Competition. I think he can give you an historic perspective of when they were set up.

Mr. HORTON. I don't want 11 more pages. I just want to know how long they have been in existence. Were they created last year as a result of these spare parts hearings, or had they been in existence in the Department of Defense for some period of time?

Case 1:06-cv-00599-MBH Document 17-4 Filed 08/29/2006 Page 5 of 10



Mr. GORDON. They were created by Mr. Thayer upon his arrival in the Pentagon. He felt that of the 32 Carlucci inititatives, some were in the category of harder to do and required special attention. They have been in existence 1 year. A little over 1 year.

Ms. GILLEECE. January 1983.

Mr. HORTON. Now on page 9 of your statement, you say, "Another area where we found a problem in pricing, particularly small value items, was in contractor cost accounting practices." And then you go on by saying, "A number of contractors utilize cost accounting methods for costing parts on an item basis rather than a value basis. Each item, regardless of its material and direct labor costs, is allocated the same cost for material handling, overhead, general and administrative expenses, et cetera." And then you point out, "A 50-cent part gets the same treatment as a $1,000 part."

What does all that mean?

Ms. GILLEECE. Mr. Horton, if you buy—presuming you are the Department of Defense for a moment—1,000 items from one contractor, what he would do is take the direct material and direct labor cost—prime cost—for those 1,000 items.

Mr. HORTON. Let's say some are worth 13 cents each.

Ms. GILLEECE. All right. Let's say they are 13 cents.

Mr. HORTON. They are worth 13 cents. You can buy them for 13 cents in the store.

Ms. GILLEECE. No, because 13 cents is not their prime value—cost—in the store. That has the overhead already allocated to it. Let's say they are 7 cents in the store and 5 cents in overhead, because there is an amount of money that is overhead. The contractor also has an amount of overhead. He takes that total amount of overhead that is allowable and allocable to those 1,000 items, and instead of having the 5 cents allocated to the 7-cent item, he simply divides the overhead by 1,000 so that there is a certain amount of overhead that is applied to every single one of the items regardless of the intrinsic value—prime costs—of the item. So, that the 7-cent part will have the same allocation.

Mr. HORTON. So, that's how you get——

Ms. GILLEECE. That is how very often you get these strange amounts of money.

Mr. HORTON. So that is how you get a $7 hammer costing $300 or $400?

Ms. GILLEECE. That can very well be the way, yes, sir.

Mr. HORTON. Well, how do you explain that to the American people?

Ms. GILLEECE. It is very difficult. What happens, I am afraid, is so often they report those particular examples that are priced far in excess of what the perception would be as their intrinsic value, but they do not report those where it would be a million dollar item with only the same amount of overhead allocated to it.

Mr. HORTON. Well, I have a little allen wrench on my suit jacket here. I am told that it costs about 13 cents and that the Department of Defense was paying $9,606 for each one of them. Is that because of that process?

Ms. GILLEECE. Mr. Horton, I can only tell you that, first of all, we didn't buy the allen wrenches. That is the price they were offered to us for. But, second, as far as any individual item, there are times





when the situation has incorrectly been managed as far as the price is concerned, but there are also other times when this particular allocation method that I specifically defined was used.

Mr. HORTON. I got a letter the other day from a friend of mine, who used to be the president of NAM [National Association of Manufacturers]—a very good friend—and he signed one of these little cards that came in about a constitutional amendment that we balance the budget. And he said, "I guess what you have to do is hit them over the head with a 2 by 4." I guess the American people are feeling that. This kind of information, as you say, is hard to explain, but the people are talking about trillions of dollars in the Department of Defense budget, and a $180 billion budget deficit. I just saw 2,500 people in my district on a 1-to-1 basis, and it took me 4 weeks to do it; 1 to 1 they come in, and most of them are complaining about the spare parts, complaining about the Department of Defense budget and how much it is costing. And the old people especially don't understand why they have their programs cut out so that we can put more money into the military. Now, you just can't sit there at that table and read this kind of—if I read that language to the people out in my district, they would throw me out of office just like that.

Now, what do we do? The 2 by 4 is H.R. 5184. That is a 2 by 4. Somebody in the Department of Defense better wake up and realize that this kind of thing can't go on. I don't care how they cost account it. Nobody ought to be allocating $500 or $600 for a $7 hammer, right?

Ms. GILLEECE. Mr. Horton, there was also indicated in the statement that we have directed that this cost accounting method no longer be used.

Mr. HORTON. Well, that's a method. I want to find out what we can do. Last year, we had the first congressional hearings on this spare parts matter. We had people that came in and testified that all you have to do is break out some of this stuff and buy it through competitive practices. This spare parts problem was first brought to my attention by a person in my district, who is in the tool and die business. He said, "The profit that I am getting on this as a subcontractor is obscene." He said, "I can make these and make a profit out of them and charge a lot less to the Department of Defense." And he said, "this is terrible. Something has got to be done about it." And that is when I came back and talked to Mr. Brooks and this committee got involved in spare parts.

Now here we are reading something like your statement about the utilized cost accounting methods for costing parts on an item basis rather than a value basis, and a 50-cent part gets the same treatment as $1,000, and so forth.

Well, I think that the Department of Defense, as far as I am concerned, ought to get rid of all those committees. Somebody at the top just needs to say, "we won't do it any more."

Ms. GILLEECE. That's exactly, Mr. Horton, what the next paragraph says.

Mr. HORTON. Where does it say that?

Ms. GILLEECE. It says:

Case 1:06-cv-00599-MBH Document 17-4 Filed 08/29/2006 Page 6 of 10



We have directed the military departments, the DLA, and the Defense Contract Audit Agency to use value-based cost allocation methods that comport with costing more in line with the intrinsic value of the part.

Mr. HORTON. Well, if you go to competitive bidding, won't that help some?

Ms. GILLEECE. Sir, that is why we are focusing on breakout of spare parts, as well as in the major systems area, but I would be glad to work with you and your staff to go over the specific management directives that the Secretary of Defense issued last July and August. We provided to the appropriations and authorization committees two reports on what we are doing and what each of the services and DLA is doing. We will also provide you this report. We agree with you that there are problems. That is why we are spending the time and the management attention to resolve the problems.

Mr. HORTON. Well, I go to the military bases. I've got a son in the Navy, a graduate of the Naval Academy, and I know the military people on board the ships. The operations are running pretty austere. I mean, the actual military operations are pretty austere. But when you look at this business of contracting and take a look at what we are spending—just as an example, on these spare parts—it seems to me that somebody in the Defense Department ought to get very much upset. I would like to see them say, "Look, we have saved $x$ number of dollars in the billions and, as a result, we're going to ask for that much less when we come in and ask the Congress for something." We don't do that, though.

And the people out there, I'm telling you, are very upset by this kind of thing. You've got the American people concerned about the Defense Department budget.

If you went out to those 2,500 people that I saw, or you did a poll of any congressional district, out of 1,000 people, I will bet 999 of them will tell you that the amount that we're putting into defense is too much. Every one of them will also agree that we need a strong national defense, but on the other hand, they look to us to make certain that things are done to reduce that military budget. This is the place where it can be done, and in your area, because you are the one testifying here today. In your area, you have the responsibility, as I see it.

So I don't think this bill is as bad as you folks think it is. And if we get it passed, I'm sure it would help. It might be a 2 by 4 approach, but on the other hand, it would certainly wake you up to the fact that something better be done about overspending on contracts.

I don't have any further questions.

Mr. BROOKS. Thank you. I recognize the distinguished member from Indiana, Mr. Burton.

Mr. BURTON. Thank you, Mr. Chairman.

I hope that I don't cause a coronary thrombosis to occur in our chairman, but I agree with him on this issue, and that's kind of rare, Mr. Chairman, I know, and I want you to know that I really appreciate the opportunity to agree with you almost wholeheartedly on this.

Mr. BROOKS. I wish you would do it a little more often.





Mr. BURTON. As the chairman, and the ranking member will tell, I am probably one of the strongest supporters of the Defense Department on this committee, and probably in the Congress.

Are you listening to me, or are you listening to him?

Ms. GILLEECE. Both, sir.

Mr. BURTON. If you can do that, you are better than my wife.

But, you know, I go out in my district and I see things happening with the defense appropriations that really bother me. I have Fort Harrison—Fort Benjamin Harrison, the Army Finance Center—right on the edge of my district. And just to give you an example of some of the things that have happened, they had to build some new bus stops, they said. And a contractor from my area came to me and said, "Do you know what they are doing out there?" I said, "No, what?" And he said, "Well, they've got some extra money evidently and they are building bus stops with copper roofs, made out of the finest bricks that you can get, with redwood roofing, redwood, and redwood benches in there."

And I said, "I can't hardly believe that." And I went out there, and they did. They built about seven, or eight, or nine bus stops that nobody uses that are made out of redwood and brick. They are the most beautiful things you've ever seen with copper ceilings and roofs on them. They are going to last for 150 years and nobody uses them. They just did that last year. And they did the same thing with the entrance pillars down there at Fort Benjamin Harrison. Great big entrance signs made out of copper and it really appalled me and a lot of my constituents who knew about that.

And then we hear about these hammers, and screws, and bolts, and everything that are excessively priced, and the Defense Department buys them. And you try to explain to people, like I do, how important Central America is and how important it is that we have an adequate defense budget and we try to get additional appropriations for the Defense Department. We're fighting and bleeding for that over in the House and the Senate and we go back to our districts and the people say, "You've got to cut defense spending. They are wasting all that money."

And the only message—I don't want to ask any questions, but the only message I want to get across to you and the entire Defense Department today is these buying practices are undermining the defense of this country. And they are undermining the defense of this country because the people out there aren't going to tolerate this waste, and they are going to put pressure on us to cut the Defense budget at a time that there is a window of vulnerability.

And you folks had better come up with some solution. This bill may not be the answer, but, by God, you better find an answer because if you don't, there's going to be severe cuts in the Defense budget that we shouldn't have. And I don't know what the answer is. You can tell me it is management; you can tell me anything you want to tell me today, and I have listened to all of this, but you better do something because the people of this country are demanding cuts in defense because of these wasteful practices that have been occurring.

Thank you, Mr. Chairman.

Mr. BROOKS. Thank you, Mr. Burton. I would give you a little more time if you want.

I want to thank you all very much for coming down this morning. You made your usual contribution for consideration and I hope that if you've got any genuine comments on the legislation, you would give us those thoughts on it before we write it up, mark it up.

Ms. GILLEECE. Thank you, Mr. Chairman.

Mr. BROOKS. Our next witness who has just come over from the U.S. Senate, the very distinguished Hon. Carl Levin, the Senator from Michigan. He is a strong proponent of procurement reform and a cosponsor of S. 338, the Senate version of the Competition in Contracting Act. Senator Levin is the ranking minority member of the Senate Governmental Affairs Subcommittee on Oversight of Government Management.

He is also the ranking minority member of the Senate Armed Services Preparedness Subcommittee and the Small Business Subcommittee on Government Procurement.

Senator, we appreciate your taking time out of your very busy schedule to come over here and share your views with us today. You can proceed, and we will take your statement for the record, and you say whatever you want. We are delighted to have you here.

## STATEMENT OF HON. CARL LEVIN, A SENATOR IN CONGRESS FROM THE STATE OF MICHIGAN

Mr. LEVIN. Thank you, Mr. Chairman, and thank you for the invitation. Both Senator Cohen, who was the chairman of that subcommittee and I are grateful for your work and this committee's work. We were delighted to be invited. Senator Cohen was not able to make it today, but I would like to submit his testimony for the record.

Mr. BROOKS. Without objection.

[See app. 3.]

Mr. LEVIN. First of all, Mr. Chairman, relative to Mr. Horton's questions of Ms. Gilleece, the very pertinent questions on a case that we all hear a lot about back in our districts and States, the question of the allen wrench. We've done some real investigation into that little allen wrench. Some of the figures are startling, not just what they were going to charge us for it, and while Ms. Gilleece is correct, we didn't pay it, there is some dispute as to why it was that it was caught in time, and I won't go into that now. But what is interesting is that the manufacturer, at least the purveyor of that wrench, thought that they could sell it to us for $9,600. That's the critical point. We had solicited a part. They had given us a group of parts on a list. We said, "Go ahead" on that basis. There was no formal contract. We hadn't formally bought it, but they reasonably believed that we were going to pay $9,607 for that allen wrench.

Mr. BROOKS. They must have thought we were congenital idiots.

Mr. LEVIN. They also must have some reason in our background of the way we procure things to believe that that's the way we do things. Obviously, that is the way we do things.

Now, to dig it down to the next layer, they were going to pay $5,200 for that allen wrench from their supplier, Westinghouse.





Westinghouse was going to pay 12½ cents for that part from their supplier. They buy them at $12.50 per 100. We have asked Westinghouse how is it that you could charge or think you could charge General Dynamics, who was the prime contractor for us, $5,200 for a part for which you pay 12½ cents. We have not gotten an answer from Westinghouse. They consider that to be confidential information.

But you have got to dig. What I am urging the committee to do is keep digging on that allen wrench because it not only symbolizes a lot of things, but it is an easy way to transmit a problem to our constituents. When you dig deeper, I believe it will demonstrate a lot of problems with the procurement process which boils down to the lack of competition, and not just the way we buy things, but the way our contractors buy things. We are going to have to stimulate competition among subcontractors if we are really going to get to the bottom of this issue.

This bill, Mr. Chairman, and I commend you and the other members of the committee—I know you have a number of cosponsors on the bill—is a very important step. As one of the members said this morning, it is not a cure all, it is going to take some comprehensive changes in the way we do things to cure the procurement practices. We are going to be introducing a bill on the Senate side, which is a comprehensive reform package, and I won't go into that this morning because that is not what is before you. We have, however, passed a bill, S. 338, which is very similar to the bill which is before you this morning. Senator Cohen and I introduced this bill, the Competition in Contracting Act of 1983. This bill has now passed the Senate. It has been combed and recombed and reviewed, and rereviewed. It has been looked at, relooked at, and the key parts of this bill are in the bill before the committee today, and I hope that you will move swiftly to adopt the bill before you in the House so that we can get to a conference committee; resolve the differences, and get these changes made.

In essence, this bill does two things, or at least two of the key things it does is to stimulate competition by eliminating some of the exemptions to competition. The present acts—we have two acts on the books, and in one case it has 17 exemptions and in the other case, it has 15 exemptions. There are simply too many exemptions to competition.

We also allow contractors to move from a competitive mode to a noncompetitive mode too easily. This bill would prevent that. And so, I commend you for having this section, which would reduce the number of exemptions which are allowed to competition, and will reduce the amount of sole-source contracting.

If that allen wrench were competed, it would have cost us, or we would have been charged a few dollars. It's that simple.

When you strip away everything else, how can they add overhead, on overhead, on overhead and get the $9,600? When you strip everything away, if we would have had two people supplying that part instead of one, that would have cost us a few bucks.

So, the question is: How do you stimulate competition? You approach that in the part of the bill by reducing the number of exemptions that we allow, and it is important that we do it.

Case 1:06-cv-00599-MBH Document 17-4 Filed 08/29/2006 Page 8 of 10



One other comment and then I am going to rest, and I would ask that my statement be made part of the record.

Mr. BROOKS. Without objection.

Mr. LEVIN. And that is the certification of cost and pricing data. What we did, mistakingly, a few years ago was that we raised the threshold for DOD contractor compliance with the requirements to certify cost and pricing data as required by the 1962 law called the Truth in Negotiations Act. Everybody else who does negotiated business with the Government has to certify at the $100,000 threshold level. If the price is above $100,000, the contractor must certify his cost and pricing data. In the absence of competition, the only way that we can negotiate how much we are going to pay these folks is if we have the cost and pricing data. Otherwise, our buyers don't know how much the labor costs are; how much the overhead costs are; how much all the other costs are. They just don't know unless they have the cost and pricing data in their hands.

Again, if we had competition, we wouldn't have to worry about it, but 63 percent of our contracts are noncompetitive. We are going to try to reduce that. Your bill will reduce it, but we are not going to get down to zero tomorrow. As long as we have sole-source contracting, we are going to have to negotiate a lot of prices. To negotiate prices, you've got to know what the costs are to that guy on the other side of the bargaining table. Otherwise he can say, well, my labor costs are X; my overhead costs are Y; my utility costs are Z; my administrative costs, and so forth. The only way you can compete on an even basis when you negotiate is if you have the same cost and pricing data that the other person has on the other side of the table. Otherwise, you are at such a disadvantage that we are going to end up paying $9,600 again for an allen wrench.

What we did when we lowered the threshold was say forget about this if you are bidding under $500,000 in the defense area. We kept $100,000 threshold for all other Government contracts. This bill returns the threshold for Defense to $100,000, the way it is in all other parts of Government procurement.

We have talked to buyers; we've been out in the field. They tell us it is essential they have this data, and that it be certified so that businesses are accountable if they misrepresent their costs.

Again, we have adopted this in the Senate. We've gone through this issue. We have deliberated on it. It has been in two Congresses now and the Senate. It is overdue that we get this into law. I am delighted that this committee is continuing its determination to reform the procurement process.

I commend you, Mr. Chairman, and the other members of the committee for taking the time to look into an area which is very technical, sometimes very unglamorous, but very essential if we are going to save the billions of dollars for two reasons. One, the deficit and the waste issue. The other reason is the reason, which I believe Mr. Burton mentioned, which is the public is not going to support a strong defense if they see a heck of a lot of waste. And I am not sure which of the members made that point, but it is an important point.

Mr. BROOKS. The distinguished member from Indiana.



Mr. LEVIN. It is a critical point. We are going to weaken our defense. Not just weaken our budget, but we are going to weaken our defense unless we can reform these procurement practices.

Mr. Chairman, again, I would ask that my entire statement be made part of the record.

[Mr. Levin's prepared statement follows:]

STATEMENT BY SENATOR CARL LEVIN

MR. CHAIRMAN

I am most pleased today to appear before your Committee to testify on S.338, the Competition in Contracting Act of 1983. I joined with Senator Cohen in offering this bill in February of 1983 and it is similar to a bill Senator Cohen and I cosponsored in the 97th Congress that was reported by the Governmental Affairs Committee but was unfortunately never enacted into law. Senator Cohen had other commitments this morning but has asked me to submit his statement for the record. Before I discuss that bill, however, I want to commend the Chairman on the initiative he has taken in this area. I understand your bill, H.R.5184, is very similar to this bill we have acted on in the Senate and I look forward to working with you in resolving any of the minor differences between the two bills.

Mr. Chairman, I am convinced that our efforts in this are will accomplish two very important things: they will save the Federal Government large sums of money through increased competition leading to lower procurement prices; and also, they will foster the growth and health of small business and industry so essential to our economy and national defense.

Need for Competition

The way the government spends its procurement dollars--both in the Department of Defense and in the rest of the federal government--has been one of my greatest interests and areas of endeavor since I came to the Senate. During these last five years I have been compelled to become an advocate for competition. I say compelled because I find the level of competition in government procurement to be appalling. Although it is commonly accepted knowledge that competition can reduce the cost of



procurement 25% or more, until very recently there was little proven commitment to increase the levels of competitive procurement.

Clarke Equipment Case

I would like to relate the results of one experience I had with respect to following through an effort to overturn a sole-source procurement and measuring the amount of savings.

In March of 1981, representatives of the Clarke Equipment Company of Benton Harbor, Michigan came to my office to register their complaints about a recent sole-source contract award by the Army for earth moving equipment - large tractors. Their complaint was that there was not reasonable basis for the decision that only one company could perform the contract.

I asked GAO to investigate their allegations and GAO concluded that several other suppliers could have furnished the equipment and that the Army had ample opportunities to solicit this procurement competitively. When we presented these findings to the Army they agreed to attempt to procure a portion of this buy competitively. Well Mr. Chairman, I was curious to see just what would happen as a result of that decision and decided to use this as a test to confirm my belief that competition does result in savings.

I asked GAO to follow the competitive procurement for these tractors. In a letter to me dated November 20, 1982, Donald Horn, the Director of the Procurement, Logistics and Readiness Division of the GAO reported that what was to cost $1,078,000 under the sole-source contract, was now, pursuant to an award to the low bidder, going to cost $609,923 or a savings of 43%.

This is a classic example Mr. Chairman of what we both believe about competition. It will save money and it must be used to every extent possible.

Case 1:06-cv-00599-MPH Document 17-4 Filed 08/29/2006 Page 10 of 10



The Amount of Dollars at Stake

Mr. Chairman, as you well know the size of the numbers at stake here and the possible savings involved is immense. In fiscal year 1982 total federal contract actions totaled $159 billion, of this amount actions within the Department of Defense accounted for $125 billion. Yet only 37% of these actions, and 35% of the DOD actions, were done competitively. In other words, 63% of the total $159 billion are spent with sole-source contracts.

S.338 represents not only my and Senator Cohen's efforts, but is the consensus product following lengthy consideration in the Senate. S.338 was carefully combed, filtered and refined by both the Senate Committee on Governmental Affairs and the Senate Armed Services Committee before its passage on the floor of the Senate. Furthermore, it represents the first major effort by Congress to overhaul the Government procurement statutes since the Armed Services Procurement Act of 1947 and the Federal Property and Administrative Services Act of 1949.

Exemptions to Competition

One of the reasons the government has been able to award so many contracts on a sole-source basis is because of the large number of statutory exemptions from requirements for sealed-bid procurement included in those two procurement laws that have been on the books relatively unchanged for 35 years.

The 1947 act and the 1949 act contain 17 and 15 exemptions to the sealed bid process, respectively. The agencies have been able to cite thes exemptions as the basis for using the process of negotiation instead of sealed bids, and then could shift from competitive negotiations to non-competitive negotiations without any further justification.





As my colleague, Senator Cohen ably explains in greater detail in his statment, S.338 replaces these numerous and loosely-worded exemptions with six tightly drafted exemptions to competition. Upon enactment of our bill, no exception would need to be cited to move from sealed bids to competitive negotiation; but moving from competition to sole-source procurement will prove much more difficult.

Certification of Cost and Pricing Data

Mr. Chairman, in addition to the tightened exemptions to competition, another item of particular interest to me is an amendment I offered to this bill in mark-up in the Governmental Affairs Committee. This language lowers the threshold for DOD contractor compliance with the requirements to certify cost and pricing data as required by the Truth in Negotiations Act of 1962 (P.L. 87-653) to the same $100,000 level that must be abided by for doing business with the other procuring branches of the federal government. This act simply required that any contractor awarded a contract in the absence of competition for more than $100,000 must certify that, "To the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete, and current...." Two years ago the conferees on the FY 1982 DOD Authorization Bill raised this threshold for certification form $100,000 to $500,000.

With the passage of that amendment the Department of Defense began to routinely fail to perform pre-award audits on contracts in this $100,000 to $500,000 range. Many of the spare parts horror stories and discussions of overpricing that have been so much in the forefront during the last year have resulted from spare parts and other purchases below $500,000 which escaped tight auditing attention. Thank goodness for the DOD Inspector General's Office, as they have been instrumental in catching many of these problems, but it is imperative that we provide the DOD auditors with the tools they need to demand fair and accurate prices.