Case 1:06-cv-00599-MBH Document 17-6 Filed 08/29/2006 Page 1 of 10



I would like just to briefly first state that both the public contract law section and the ABA have been active for a number of years in regard to needed reforms in Federal procurement.

Many of the section's members participated in the study of Federal procurement conducted by the Commission on Government Procurement. Over the past years, we have analyzed and testified with regard to a number of Senate and House bills to reform the existing statutory framework for Federal procurement. We provided input to OFPP's proposals for a uniform Federal procurement system, as well as the new Federal acquisition regulation.

ABA also has adopted a model procurement code for State and local governments; a model procurement ordnance for cities; a model procurement regulation to implement the model code and the ordnance; and we are continuing to work with the State and local governments in their programs to improve their procurement laws and ordnances.

By way of summary of our prepared statement, I will say that the ABA endorses the concept of a single, Governmentwide procurement statute contained in H.R. 5184, elimination of the terms "formal advertising" and "negotiation" as the authorized procurement methods and recognition of competitive proposals as a distinct and acceptable competitive procurement method when the use of the sealed bid method is not appropriate.

These changes in the basic statutory framework governing Federal procurement are important in creating a flexible, efficient, and economic Federal procurement system. However, as discussed in our prepared statement, we believe H.R. 5184 does not achieve these goals; that it overstructures the authorized procurement methods and mandates reviews and approvals which will unnecessarily impede effective competition.

In addition, it proliferates the statutory framework for procurement rather than consolidates it.

Why do we say this? Very briefly, one, the bill does not remove or correlate the differences between the Armed Services Procurement Act and the Federal Property and Administrative Services Act.

Two, it overrides some existing Presidential statutory authorities which we think should be preserved. For example, Public Law 85-804 and section 162 of the Atomic Energy Act.

Three, it appears to overrule other statutes and existing procurement policies that play a role in the procurement process one way or another.

It is not in our prepared statement, Mr. Chairman, but thinking about it this morning, I can interpret the bill as, in effect, overruling the Buy American Act and not permitting preference for domestic bidders.

Also, that it leaves in doubt the rules about directing contracts to labor surplus areas. It leaves in doubt procurement policies not in a statute now that are designed to protect the industrial immobilization base where you are getting competition, but you are restricting it to domestic sources.

Next, we think, in part, this all comes about by the new definitions in the bill and their impact on the sealed bid and competitive proposal methods of procurement. In addition, because of the limitations that are written into the act with regard to the use of what I will just say is the "less rigorous method," and with the reviews and approvals required for both the less rigorous and the noncompetitive award methods. These reviews and approvals, and certification and justification requirements, we believe, are overstructured and will adversely affect the procurement process.





In many ways, they give the impression that the many dedicated, really hard-working contracting officers are being told that they are no good and they haven't done a good job.

We think rather than starting to impose statutory mandates with respect to their performance, we should put our emphasis on training, providing career opportunities, and overview of their performance; and hold them responsible. They are indispensable people with a lot of responsibilities. They need flexibility, and so they need support from that standpoint. And the way to do it is take the positive tone and not try to put a lot of statutory rules on them.

Our prepared statement notes the bill does not cover or refer to multiyear contracts or multiple award contracts, and because of the changes that the bill otherwise makes we think these subjects should be covered in the bill.

As I said, ABA supports the concepts of the bill and as a positive recommendation or comment we would offer for the committee's consideration the substitution of title I of S. 338 for title II of H.R. 5184.

On the bid protest system, Mr. Chairman, the ABA supports in principle the creation of a statutory base for the GAO. We have not gone into the details of what is in that whole system, but we will be glad if that is desired to look at it some more and to work with the staff on providing comments about what is in that bill with regard to the GAO protest authority.

[Mr. Hiestand's prepared statement follows:]

STATEMENT OF

O. S. HIESTAND

on behalf of the

AMERICAN BAR ASSOCIATION

Mr. Chairman. My name is O. S. (Sparks) Hiestand, and I am a Past Chairman of the Public Contract Law Section of the American Bar Association (ABA). With me is C. Stanley Dees, a member of the Public Contract Law Section Council.

We appear today at the request of Wallace D. Riley, President, ABA, to express ABA's views with respect to those portions of H.R. 5184 on which the ABA has a position.

The Public Contract Law Section and the ABA have been active for a number of years in regard to needed reforms in Federal procurement. Many of the Section's members participated in the study of Federal procurement conducted by the Commission on Government Procurement. Over the past several years, we have analyzed and testified with regard to a number of Senate and House bills to reform the existing statutory framework for Federal Procurement; and provided input to OFPP's Proposal for a Uniform Federal Procurement System, as well as the new Federal Acquisition Regulation. Also, ABA has developed a Model Procurement Code for state and local governments, a Model Procurement Ordinance for cities, and Model Procurement Regulations to implement the Model Code and Model Ordinance; and we are continuing to work with state and local governments in



their programs to improve their procurement laws and ordinances.

We have included this background information only to indicate ABA's interest in how all public procurement is conducted, and its commitment to assist in improving laws and ordinances affecting public procurement.

SUMMARY

ABA endorses the concept of a single, government-wide procurement statute contained in H.R. 5184, elimination of the terms "formal advertising" and "negotiation" as the authorized procurement methods, and recognition of "competitive proposals" as a distinct and acceptable competitive procurement method when use of the "sealed bid" method is not appropriate. These changes in the basic statutory framework governing Federal procurement are important in creating a flexible, efficient, and economic Federal procurement system.

However, H.R. 5184, as discussed below, does not achieve these goals. It overstructures the authorized procurement methods, and mandates reviews and approvals which will unnecessarily impede effective competition. In addition, it proliferates the statutory framework for procurement rather than consolidates it.

DISCUSSION

Title II - Federal Procurement Competition Requirements

Section 201. This Section provides that procurement must be conducted in accordance with this Title (and

Case 1:06-cv-00599-MBH Document 17-6 Filed 08/29/2006 Page 3 of 10



conforming regulations) notwithstanding any other provision of law. Since H.R. 5184 does not repeal the Armed Services Procurement Act (ASPA) and the Federal Property and Administrative Services Act (FPASA), some provisions of both Acts will continue to apply to the executive agencies covered by those statutes. Thus, there will continue to be different requirements applicable to DOD/NASA and the civilian agencies, e.g., the oral and written discussion, competitive range, and cost and pricing data requirements of the ASPA.

In addition, Section 201 appears to override the authority of the President under various statutes which should be preserved, e.g., P.L. 85-804 and Section 162 of the Atomic Energy Act, as amended.

Section 202. This Section, which recognizes both the sealed bid and competitive proposal methods as "full and open competition," creates a new acquisition method between "full and open competition" and "noncompetitive" procurements as defined in subsection (j). The new method referred to as "less than rigorous full and open competition" (Section 202(b)(1)) is an example of statutory micromanagement of the procurement process that should be avoided.

ABA has long advocated that Congress should establish basic procurement policies and avoid detailed prescription of the ways and means to implement the statutory policies. In this instance, the apparent need for the "less vigorous" competitive method arises from the overstructuring of "full and open competition" as defined in Section 202(j)(1)(A), and recognition that there are situations where some excep-





tions would be appropriate even where competition is involved. Rather than creating by statute a separate category of competition, we suggest the situations contemplated by the "less vigorous" method are better handled by a simple policy statement in the bill providing that the Administrator of OFPP shall prescribe policies or regulations governing restrictions on bidders or proposers when competitive procurements are involved.

As drafted, the authority to award a contract using the "less vigorous" method is unclear. Section 202(b)(2) only requires review and approval by a "higher level official." However, Section 202(e) requires approval by the "senior procurement executive." In addition, Section 205(c)(3) mandates a review by the "advocate for competition." Apart from this uncertainty, the extent of review and approval has the potential to cause unnecessary delays, and prompt protests and litigation over the validity of contract awards.

With respect to "noncompetitive" procurements (Section 202(c)(1)), we again believe the controls are overstructured and will be detrimental to the procurement process. We suggest the criteria in S. 338 for noncompetitive procurement are more appropriate. We also note Section 202(c)(1) does not permit such awards in emergency situations affecting public health and safety or national defense. We assume this is an oversight, and it is not intended that contracting officers are to be prohibited from contracting for goods and services without competition when necessary to save lives, protect valuable property, or meet crucial

defense needs. Even so, the controls and approvals imposed on noncompetitive procurements will seriously hamper such officials in their efforts. Moreover, as with the "less rigorous" method review and approval procedures, it is not clear just what review and approval is required. Section 202(c)(2) requires review and approval by the "head of the procurement activity," except for contracts under $250,000 which may be delegated to another "senior" official within the office or unit responsible for the procurement activity. Apart from this uncertainty, moreover, Section 202(e) requires approval by the "senior procurement official," and Section 205(c)(3) mandates a review by the "advocate for competition."

Under both the "less rigorous" competitive and noncompetitive procurement methods, contracting officers must certify their decision, and in noncompetitive awards prepare a statutorily detailed justification statement. We believe this unnecessarily calls into question actions by the many conscientious, dedicated, and competent procurement officials we all must rely on to satisfy the executive agencies' needs for goods and services. We all want trained and competent contracting officers. But they have a demanding job in which integrity, responsibility, and flexibility are indispensable. We should seek these goals by assuring adequate training, opportunities for career development, and overview of performance -- not through statutory mandates for certifications and justification statements.

In regard to Section 202 as a whole, the definitions in 202(j) produce new and unwarranted meanings to well-





understood and accepted interpretations of procurement terminology. Thus, the definition of "full and open competition" applies to both the sealed bid and competitive proposal methods, but only if a "sufficient number of bids or competitive proposals are received" as will "ensure that the Government's requirements are filled at the lowest possible price..." (p. 10, lines 17-23). In sealed bid procurements, a bidder expects an award if it has the lowest price. This applies even if no one else bids, i.e., the bidder is automatically lowest. The proposed definition distorts this fundamental principle of sealed bid contracting by, in effect, prohibiting an award if only one bid is received.

Similarly, the "less rigorous" method definition applies to both the sealed bid and competitive proposal methods, and permits award only if bids or proposals are received from at least two sources whom the agency decides are in a "competitive range" or eligible for selection. Again, this combination changes the long-standing basic rule for sealed bid procurement. In addition, it is unclear why the "competitive range" test will be applied only to the "less rigorous" method and not to competitive proposals under the "full and open competition" method. Ironically, limiting the "competitive range" test to the "less rigorous" method could provide an incentive to stretch the use of the "less rigorous" criteria in order to have the "competitive range" test available.

The definition of "noncompetitive" is fundamentally contradictory to the sealed bid method of procurement since

Case 1:06-cv-00599-MBH Document 17-6 Filed 08/29/2006 Page 5 of 10



it states a procurement is noncompetitive if only one bid is received. The result is that an award cannot be made without meeting the conditions for noncompetitive awards and going through the elaborate review and approval procedure for noncompetitive awards. Apart from the inconsistency involved, we suggest this procedural conversion of a sealed bid procurement to a noncompetitive procurement will be very detrimental to a sound and efficient procurement process.

We note Section 202 does not contain any provision regarding multiple awards and multi-year procurements. The former, in particular, are currently "authorized" by the broad scope of negotiation authority under the ASPA and FPASA. Since this authority would no longer be available under H.R. 5184, Section 202 should expressly sanction the use of multiple awards. Likewise, since H.R. 5184 prescribes policies and procedures for all government contracts, it should include a government-wide policy concerning multi-year contracting. Otherwise, if enacted as drafted, questions would remain as to the existing authority for multi-year contracts.

While our comments on Section 201 and 202 have been largely critical, ABA supports their basic concepts, i.e., a single, government-wide procurement statute, use of both the sealed bid and competitive proposal methods of procurement, and appropriate restrictions on noncompetitive awards. By way of positive comment, we respectfully urge the Committee to consider the substantive provisions of Title I of S.338 as a substitute for Title II of H.R. 5148, and repeal of Section 303 of the FPASA and Chapter 137 of the ASPA.





Procurement Protest System

Section 204. This Section establishes a statutory base for, and strengthens, GAO's authority with respect to award protests. The ABA supports this provision in principle. At this time, we have only two suggestions for improvements. Section 204(b)(3) provides that GAO will recommend a course of action if it finds there has been a violation of law or regulation. We suggest it would be appropriate to include language requiring the agency whose contract is involved to notify the appropriate committees of the Congress if it does not accept or follow the GAO recommendations, and to make its report available to the interested parties. Requiring a report by the agency when it fails to comply with GAO recommendations would focus management attention on the issue involved and how it should be handled.

Section 204(c)(4)(A) authorizes GAO to award costs and attorney fees when a solicitation or award does not comply with law or regulations. Subsection (4)(B) requires the agency involved to pay such awards. We suggest it would be appropriate to authorize GAO to make the payment directly and charge the executive agency, as GAO is authorized to do on awards under the Contract Disputes Act.

## CONCLUSION

Mr. Chairman, many of us in ABA have been directly and intimately involved with Federal procurement for a long time as government employees, company counsel, and as private practitioners. We understand this procurement process involves complex and frustrating events and situations. Moreover, there have been significant changes in what the executive agencies buy, as well as the market places, and how they

respond. Procurement is a dynamic process and continues to change. Some of today's problems in Federal procurement can be traced to the rigidity and structuring of the statutory framework to counter perceived problems and actions that existed or were concerns in the years following World War II. We respectfully suggest the committee not repeat some of those past mistakes. For the first time in our history, we have an OFPP headed by an Administrator, appointed by the President with the advice and consent of the Senate, with authority to issue government-wide policies and regulations consistent with the basic statutory framework. Now is an appropriate time for the Congress to structure a statutory framework that contains the fundamental policies (including restrictions) with regard to Federal procurement methods, and relies on the OFPP Administrator to provide or ensure regulations, procedures, and guidelines to carry out the Congressional policies. This may be the last chance to capitalize on an opportunity to formulate a comprehensive statutory approach to modernizing the procurement process in a way that achieves the common goal of a flexible, efficient and economical Federal procurement system.

Mr. Chairman, since the time to study H.R. 5184 prior to presenting this statement was fairly short, I would like to ask permission to file a supplemental statement for the record if additional study warrants.

This concludes ABA's prepared statement, Mr. Chairman. We would be glad to answer any questions you or members of the Subcommittee may have.



Mr. Brooks. We appreciate your coming down, the careful evaluation by you and Mr. Dees of this matter, and your contribution to this hearing.

Mr. Horton.

Mr. Horton. Thank you, Mr. Chairman.

Sparks, it is good to have you before the committee. We appreciate your testimony, and we probably will call on you to help us with the drafting changes to the legislation.

Mr. Hiestand. We will be glad to assist.

Mr. Horton. Thank you very much.

Mr. Brooks. Mr. Clinger.

Mr. Clinger. Thank you, Mr. Chairman. I would just like to thank you for your testimony and for both you and Mr. Dees being here today.

Mr. Brooks. I want to thank you, gentlemen.

This concludes the subcommittee's hearing on H.R. 5184. The subcommittee is adjourned.

Thank you.

[Whereupon, at 12:35 p.m., the subcommittee adjourned, to reconvene subject to the call of the Chair.]

# APPENDIXES

## APPENDIX 1.—ASSOCIATED GENERAL CONTRACTORS' BOOKLET

# THE COST AND IMPACT OF SMALL BUSINESS SET-ASIDE PROGRAMS IN THE CONSTRUCTION INDUSTRY

**The Associated General Contractors of America**
**1957 E St. NW, Washington, DC 20006**
**(202) 393-2040**

Case 1:06-cv-00599-MBH Document 17-6 Filed 08/29/2006 Page 8 of 10



TABLE OF CONTENTS

Executive Summary .......... 1

Background .......... 6

Small Business Set-Asides .......... 7
Size Standards .......... 8
Impact on Competition .......... 10
Cost of the Set-Aside Program .......... 11
Are Small Business Set-Asides Needed in Construction? .......... 12

Small Business 8(a) Program .......... 14
Incompatibility with Construction .......... 15
Costs of the 8(a) Program .......... 17
Impact on Non-8(a) Construction Firms .......... 18

A Constructive Role Government Can Play .......... 19

Conclusions and Recommendations .......... 19





EXECUTIVE SUMMARY

The construction industry can quite properly be referred to as one of the true bastions of the free enterprise system and consequently the haven of small business.

Two characteristics of the construction industry need particular emphasis.

First, the subcontracting system offers small business firms a training ground in which to develop the skills necessary to become a successful contractor.

Open competitive bidding is the second major characteristic which adds to the ease of entry into the industry. Virtually all public works construction, whether it be on the federal, state or local level, is procured through open competitive bidding. *All* competitors submit a sealed bid by a stated deadline. *All* bidders bid on the same specifications and *all* are expected to meet the same standards of quality. Open competitive bidding ensures that the construction purchaser will receive the highest quality product for the lowest possible price. It also ensures that the *only* factor which will be considered in selecting between qualified contractors is the price offered.

The award of Federal construction contracts through open unrestricted competition to the lowest responsible bidder has always been and continues to be the most effective way to obtain economical bids and afford maximum safeguards in the expenditures of public funds. However, it now appears that open unrestricted competition on Federal construction is rapidly becoming a thing of the past because the Small Business set-aside program and the Small Business 8(a) program have acted to undermine the open competitive bid system by limiting those who are permitted to compete.

## Small Business Set-Aside Program in Construction—Unworkable

Section 15 of the Small Business Act has resulted in the use of the small business set aside program in which federal agencies remove contracts from the open competitive market and restrict bidding and award of these contracts to only those firms defined to be small businesses by the Small Business Administration.

Section 15 has been interpreted by federal contract awarding agencies to mean that fully 100 percent of federal construction contracts should be removed from open competition and awarded on a restricted set-aside basis to small businesses. The Defense Acquisition Regulations (DAR), for example, require that *all* construction contracts up to $2 million in value be automatically set aside for restricted bidding and award. It also requires that *all* other construction contracts should be set aside if the Contracting Officer expects that two responsible small businesses will bid on a contract and also expects that the award will be made at a "reasonable price." Given the broad language of the regulation and despite the fierce competition in the construction market, a contracting officer can literally decide that *all* construction

contracts must be set-aside for restricted bidding and award to small businesses.

Overzealous and non-selective implementation of the small business set-aside program by the Small Business Administration and Federal Contracting Awarding Agencies has resulted in extremely large quantities of construction contracts being routinely set aside for restricted bidding and award. Statistics issued by the Federal Procurement Data System reveal that a shocking 60 percent of all federal construction contract actions in FY '81 and FY '82 were unavailable for open, unrestricted competition due to SBA's Set Aside and 8(a) Programs.

Within the Department of Defense 63 percent of all construction contracts were unavailable and within the Naval Facilities Engineering Command, a staggering 77 percent of its construction contracts in FY '81 and 75 percent in FY '82 were unavailable for open competition because of these programs.

The overzealous and non-selective use of the set-aside program has also resulted in extremely large construction contracts, many requiring specialized skills and equipment, being set-aside for restricted bidding and award and thus unavailable for open free competition. Examples of $10 million projects being set aside are commonplace and some projects in the $15–$20 million range are set aside.

The set-aside program has a dramatic impact on "medium sized" contractors whose volume puts them over the eligibility standard for "small business" classification. The set aside program, because of its exclusionary practices, restricts "medium sized" firms from bidding on many contracts that are of a size to meet their business strategy objectives.

The program also adversely impacts firms that are eligible for set aside contracts by forcing them to alter their business strategy to comply with the program. As a contracting firm approaches the size standard limit, it is faced with the dilemma of making the choice of 1) limiting the company's growth in order to continue to qualify to bid on the overwhelming majority of federal construction contracts in its geographic area or 2) exceeding the size standard and thus eliminating itself from the opportunity to secure federal construction contracts.

Another dramatic adverse effect of the set-aside program is its cost to the government and the taxpaying public. There is no question but that when competition is restricted it results in increasing costs, and the set-aside program is no exception. A 1976 Report of Consultants to the Army Corps of Engineers on small business set-asides (dredging) found the following: ". . . the low bids received under unrestricted advertisements were 9 percent lower than those received under set asides . . ." When projected to the total value of construction contracts set aside government-wide in FY 1982, $3.0 billion, the "penalty cost" for restricted bidding and award under the construction set-aside program was over $270 million.

The cost and impact of small business set-asides in the construction industry is particularly wasteful since small business set asides are simply not needed in construction.





In 1963 the Administrator of the Small Business Administration directed that a study be instituted to look at the construction industry to detail its characteristics. The findings of that study are as valid today as they were in 1963:

- There can be no question but that the application of any measures of competitiveness to the building and construction industry would result in the conclusion that it should be ranked among the least concentrated or most competitive. It is not dominated by a few large firms.
- The above features of the construction industry suggest that the construction industry is already relatively highly competitive among sectors, and that the need for using the influence of federal contracts to increase competitiveness deserves a low priority in construction.

The above facts lead inescapably to the conclusion that the characteristics of the construction industry already assure ample opportunity for qualified contracting firms of all sizes to obtain a share of federal construction outlays.

## SBA 8(a) Program—A Dismal Failure

Another Small Business Administration program which is contributing to the demise of the open competitive bid system and inflating costs is the SBA 8(a) program. Under the 8(a) program, the SBA and a federal contract awarding agency agree to remove a contract from the open unrestricted competitive bid system and sole-source negotiate the contract with a "socially and economically disadvantaged small business firm" as defined by the Small Business Administration.

Between 1968 and 1983, the SBA has utilized the 8(a) contracting program to channel some $10.2 billion in federal procurement contracts to 4,977 participating "socially and economically disadvantaged" firms.

The SBA 8(a) program, designed around a "protected market" for selected disadvantaged firms, has proven to be a dismal failure. According to data contained in a 1981 GAO Report (CED-81-55), only a miniscule 4 percent or 166 of the 4,598 MBE firms participating in the 8(a) program between 1968 and 1980 graduated. An earlier GAO Report on firms that did graduate found that only 33 showed a positive net worth.

The failure of this program in the construction industry is assured and justified for three primary reasons: first, the 8(a) program does not achieve its stated purpose in construction because it is not compatible with the very nature of the industry; second, the extremely high cost it engenders to the government and the taxpaying public; and third, because it impacts harshly on non-8(a) construction firms.

Survival in the construction industry requires that one must learn to be competitive: one must learn to submit the lowest responsible bid. Yet, the 8(a) program, the stated purpose of which is to "promote the competitive viability of socially and economically disadvantaged firms," never requires the firms to be competitive, never requires the firms to bid. One has to wonder how a firm can learn to be competitive, without ever having to compete. Giving a contract to a firm in the 8(a)

Case 1:06-cv-00539-MBH Document 17-6 Filed 08/29/2006 Page 10 of 10



program and negotiating the price for the work, does not help that firm become a competitive business. In fact, it removes the 8(a) contractor from that portion of the process in which competitive skills are developed.

Once a competitive contract is won, a contractor must use his technical skills. These skills cannot develop through the 8(a) program because SBA allows an 8(a) construction firm to subcontract up to 85 percent of the work. Retaining only 15 percent of the construction contract would generally result in the 8(a) firm serving only as a conduit to pass along payments to the subcontractor or subcontractors.

Whenever competition is limited, or eliminated as in the case of the 8(a) program, higher costs usually result. This is generally difficult to document, however, because once a federal construction project has been removed from the open unrestricted competitive market for delivery to the 8(a) program, there is no opportunity for open competitive bids for comparison purposes. Several examples are available, however, wherein 8(a) contracts were initially negotiated but subsequently released to open competition, thus allowing valid cost comparisons.

| | | Savings Through Open Competitive Bidding |
|---|---|---|
| Highway relocation, Elephant Butte, Idaho (Federal Highway Admin.) | The 8(a) negotiated price was $3,024,000: the low competitive bid was $2,355,000 | $669,000 or 22% |
| Environmental test facility, Yuma, Arizona (Army Corps of Engineers) | The 8(a) price was $1,839,872: the low bid was $1,558,884. | $280,988 or 15% |
| Flood wall project, Delta, Louisiana. (Army Corps of Engineers) | The 8(a) price was $416,000: the low bid was $188,950. | $227,050 or 55% |
| Water Supply project, Riverton, Wyoming (Bureau of Reclamation) | The 8(a) price was $580,000: the low bid was $353,812. | $226,133 or 39% |

These examples are indicative of the cost of the 8(a) program in construction. The waste of money to the taxpaying public is staggering.

## Ways to Eliminate Waste of Tax Dollars

Open, unrestricted competition in federal construction procurement has served the nation's taxpayers well. Taxpayers have the right to be assured that their tax monies are being spent in the most





efficient and economic manner possible. Open unrestricted competition in federal construction procurement has always given that assurance.

The SBA set-aside and SBA 8(a) programs are changing all that. Through over-zealous advocacy and misguided implementation, these programs have for too long eliminated open unrestricted competition in federal construction procurement.

In order to restore open unrestricted competition to federal construction procurement and reduce federal construction costs to the government and the taxpaying public, the small business set-aside program and the small business 8(a) program must:

- Be legislatively eliminated from application in the construction industry.

At a minimum, the problems engendered by these special preference programs can be reduced by the following actions:

*SMALL BUSINESS SET-ASIDE PROGRAM*

- Revision of Federal Contract Awarding Agency regulation requirements for small business set-asides.
- An overall reduction in all agency's "goals" for utilization of the small business set-aside program.
- Placing a maximum limit of no more than $2 million on the size of a construction contract which can be set-aside.

*SMALL BUSINESS 8(a) PROGRAM*

- Limiting the number of 8(a) contracts in construction.
- Placing a maximum limit of no more than $2 million on the size of a construction contract which can be used in the 8(a) program.