## BACKGROUND

Small Businesses are the backbone of the American economic system. Historically, small business has provided much of the growth in jobs and innovation, as well as being the primary supplier of services and deliveries of goods to virtually every community, large and small, in the country.

Nowhere is this more true than in the construction industry. The industry is typified by family-owned businesses that work close to home, jealously guarding their integrity and reputation in the community, in an extremely competitive and open industry. Construction is not dominated by a few firms, rather it is dominated by the open competitive bid system. That is, competition in terms of price and ability to complete the task determines which companies win contracts. Depending on the nature of the construction project, the general contractor may complete the work entirely with his own forces, or may subcontract the speciality work as may be required for a complete job.

The industry is also one of but a few that permit an individual to make a start with little or no capital. An emerging construction firm generally uses credit to buy materials and arranges for short term loans to pay for equipment rental and labor costs. This ease of entry into the industry, while safeguarding and assuring competition in the industry, is also one of the chief reasons for the high rate of failure in the industry.

The entire system adds up to an industry that is remarkably open to entrepreneurs willing to parlay expertise, capital and hard work into a successful business.

Two characteristics of the construction industry need particular emphasis.

First, the subcontracting system offers entrepreneurs a training ground in which to develop the skills necessary to become a successful contractor. It also allows the general contractor to delve into new markets within the industry by subcontracting for those specialized aspects of a job for which the contractor may not have the needed in-house expertise.

Open competitive bidding is the second major characteristic which adds to the ease of entry into the industry. Virtually all public works construction, whether it be on the federal, state or local level, is procured through open competitive bidding. This is also true in the private sector where most construction contracts are awarded to the lowest bidder. In construction *all* competitors submit a sealed bid by a stated deadline. *All* bidders bid on the same specifications and all are expected to meet the same standards of quality. In this way, open competitive bidding ensures that the construction purchaser will receive the highest quality product for the lowest possible price. It also ensures that the *only* factor which will be considered in selecting between qualified contractors is the price offered. This is true not only for the general contractor but also for the subcontractors who are selected in the same manner.





The construction industry, consequently, can quite properly be referred to as one of the true bastions of the free enterprise system and therefore the haven of small business. The industry, however, has been under a concerted, non-stop attack for years which severely threatens the open competitive bid system. The Federal Government has long preferred the use of formal advertising and *open competition* in the award of public contracts. As far back in our history as 1809, Congress required that "all purchases and contracts for suppliers or services . . . shall be made either by open purchases or by previously advertising for proposals." (2 Stat 536). The award of Federal construction contracts through open unrestricted competition to the lowest responsible bidder has always been, and continues to be, the most effective way to obtain economical bids and afford maximum safeguards in the expenditures of public funds. However, it now appears that open unrestricted competition on Federal construction is rapidly becoming a thing of the past.

The attacks, oddly enough, have come from the primary beneficiaries of the industry's competitiveness—the Small Business Administration and Federal Contract Awarding Agencies—and have come in the form of competition restricting set-asides. Since 1958 when the Small Business Act became law, the federal government has been directed "to aid, counsel, assist and protect . . . the interests of small business concerns in order to preserve free business enterprise." The primary emphasis in the Act is that "The essence of the American economic system is free competition . . . the preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation."

The Small Business Administration and federal procuring agencies are charged with implementing programs to achieve this goal. Two of these programs—the Small Business set-aside program and the Small Business 8(a) program—have, however, acted to undermine the open, competitive bid system and "free business enterprise" rather than aid it by limiting those who are permitted to compete. This study looks at the way these programs are imposed and analyzes their adverse impacts and costs on the construction industry and the tax-paying public.

## SMALL BUSINESS SET ASIDES

Section 15 of the Small Business Act empowers the Small Business Administration and federal contract awarding agencies to take procurement actions determined "to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the government are placed with small business concerns." This language has resulted in the development and use of the small business set-aside program in which federal agencies remove contracts from the open competitive market and restrict bidding and award of these contracts to only those firms defined to be small businesses by the Small Business Administration.

## BACKGROUND

Small Businesses are the backbone of the American economic system. Historically, small business has provided much of the growth in jobs and innovation, as well as being the primary supplier of services and deliveries of goods to virtually every community, large and small, in the country.

Nowhere is this more true than in the construction industry. The industry is typified by family-owned businesses that work close to home, jealously guarding their integrity and reputation in the community, in an extremely competitive and open industry. Construction is not dominated by a few firms, rather it is dominated by the open competitive bid system. That is, competition in terms of price and ability to complete the task determines which companies win contracts. Depending on the nature of the construction project, the general contractor may complete the work entirely with his own forces, or may subcontract the speciality work as may be required for a complete job.

The industry is also one of but a few that permit an individual to make a start with little or no capital. An emerging construction firm generally uses credit to buy materials and arranges for short term loans to pay for equipment rental and labor costs. This ease of entry into the industry, while safeguarding and assuring competition in the industry, is also one of the chief reasons for the high rate of failure in the industry.

The entire system adds up to an industry that is remarkably open to entrepreneurs willing to parlay expertise, capital and hard work into a successful business.

Two characteristics of the construction industry need particular emphasis.

First, the subcontracting system offers entrepreneurs a training ground in which to develop the skills necessary to become a successful contractor. It also allows the general contractor to delve into new markets within the industry by subcontracting for those specialized aspects of a job for which the contractor may not have the needed in-house expertise.

Open competitive bidding is the second major characteristic which adds to the ease of entry into the industry. Virtually all public works construction, whether it be on the federal, state or local level, is procured through open competitive bidding. This is also true in the private sector where most construction contracts are awarded to the lowest bidder. In construction *all* competitors submit a sealed bid by a stated deadline. *All* bidders bid on the same specifications and all are expected to meet the same standards of quality. In this way, open competitive bidding ensures that the construction purchaser will receive the highest quality product for the lowest possible price. It also ensures that the *only* factor which will be considered in selecting between qualified contractors is the price offered. This is true not only for the general contractor but also for the subcontractors who are selected in the same manner.



The construction industry, consequently, can quite properly be referred to as one of the true bastions of the free enterprise system and therefore the haven of small business. The industry, however, has been under a concerted, non-stop attack for years which severely threatens the open competitive bid system. The Federal Government has long preferred the use of formal advertising and *open competition* in the award of public contracts. As far back in our history as 1809, Congress required that "all purchases and contracts for suppliers or services . . . shall be made either by open purchases or by previously advertising for proposals." (2 Stat 536). The award of Federal construction contracts through open unrestricted competition to the lowest responsible bidder has always been, and continues to be, the most effective way to obtain economical bids and afford maximum safeguards in the expenditures of public funds. However, it now appears that open unrestricted competition on Federal construction is rapidly becoming a thing of the past.

The attacks, oddly enough, have come from the primary beneficiaries of the industry's competitiveness—the Small Business Administration and Federal Contract Awarding Agencies—and have come in the form of competition restricting set-asides. Since 1958 when the Small Business Act became law, the federal government has been directed "to aid, counsel, assist and protect . . . the interests of small business concerns in order to preserve free business enterprise." The primary emphasis in the Act is that "The essence of the American economic system is free competition . . . the preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation."

The Small Business Administration and federal procuring agencies are charged with implementing programs to achieve this goal. Two of these programs—the Small Business set-aside program and the Small Business 8(a) program—have, however, acted to undermine the open, competitive bid system and "free business enterprise" rather than aid it by limiting those who are permitted to compete. This study looks at the way these programs are imposed and analyzes their adverse impacts and costs on the construction industry and the tax-paying public.

## SMALL BUSINESS SET ASIDES

Section 15 of the Small Business Act empowers the Small Business Administration and federal contract awarding agencies to take procurement actions determined "to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the government are placed with small business concerns." This language has resulted in the development and use of the small business set-aside program in which federal agencies remove contracts from the open competitive market and restrict bidding and award of these contracts to only those firms defined to be small businesses by the Small Business Administration.

One would assume that Section 15's use would be limited to actions necessary to assure that a fair proportion of contracts are awarded to small businesses. Such, however, is not the case. Instead, Section 15 has been interpreted by federal contract awarding agencies to mean that fully 100 percent of federal construction contracts should be removed from open competition and awarded on a restricted set-aside basis to small businesses.

The Defense Acquisition Regulations (DAR), for example, require that all construction contracts up to $2 million in value be automatically set-aside for restricted bidding and award. It also requires that *all* other construction contracts should be set-aside if the Contracting Officer expects that two responsible small businesses will bid on a contract and also expects that the award will be made at a "reasonable price." This broad language and subjective terminology leaves contracting officers with very little discretion in making the choice to restrict competition. There are no guidelines as to what represents a "reasonable price." There is also no requirement that the contracting officer look at the requirements of the project to see if it is even within the capabilities of a small business. He only need guess that any two small business firms may be willing to bid on the project.

In today's market, it is not unusual for 25 or more contractors to bid on available contracts, and not unusual for even the highest of the 25 bids to be below the government's estimate. Given the broad language of the regulation and despite the fierce competition in the construction market, a contracting officer can literally decide that *all* construction contracts must be set-aside for restricted bidding and award to small businesses.

Clearly, this exceeds the actions necessary to implement Section 15. Clearly, as well, this portends the demise of open competition for federal construction contracts.

## Small Business Size Standards

The Small Business Administration is responsible for determining which firms are eligible to participate for these restricted set-aside contracts by establishing size standards defining what is and what is not a small business. This determination is at best an arbitrary decision.

To get a clear picture of just how arbitrary the size standard process can be, one need only look at the various size proposals SBA has made over the past three years.

- Since 1975, to qualify as a small business general construction firm, a company's three year average annual volume must not have exceeded $12 million.
- In 1980, obviously because its arbitrary size standard was unfair and unworkable, SBA proposed a size standard based on the number of employees. The "corrective" proposal reflected a gross lack of understanding of the construction industry. The proposal would have permitted and encouraged "broker" operations by allowing large volume firms which subcontract an abnormal amount of work and do virtually no work with their own forces to qualify for the set-aside program, while genuine contractors



that were also genuinely small business firms would have been excluded by SBA's misguided efforts to help them.

- In 1982, SBA tried again and proposed raising the existing volume standard on an "emergency basis" from $12 million to $15 million. That proposal did not get by the scrutiny of the Office of Management and Budget.
- Two months later, presumably knowing that its arbitrary size standards were not working, SBA tried another approach which again reflected abominable ignorance of the industry it was regulating. SBA proposed a multitude of different size standards based on different construction categories. One of the many results of this inept proposal was that the same construction firm would have been eligible for SBA largesse while engaged in one type of construction, but ineligible in another type of construction despite the fact of being essentially a small business by any reasonable yardstick.
- Undeterred by the continued failure of its size standard proposals, the most recent SBA proposal seeks to raise the volume standard to $21.5 million. That proposal is again deficient because it fails to recognize that the only small business development program that is necessary in the construction industry is open, free, and unfettered competition.

Perhaps this indecision is better understood by reference to a 1978 GAO study entitled "What is A Small Business? The Small Business Administration Needs to Reexamine Its Answer." (CED-78-149). The GAO study quotes a former SBA Acting Assistant Administrator as

The Effect of Small Business Set-Aside and 8(a) Programs on Competition in Construction




*(contracts, change orders, amendments, additions)

Case 1:06-cv-00599-MBH Document 17-7 Filed 08/29/2006 Page 4 of 10



- 60% OF ALL FEDERAL CONSTRUCTION CONTRACT ACTIONS (CONTRACTS, CHANGE ORDERS, AMENDMENTS, ADDITIONS) WERE UNAVAILABLE FOR OPEN, UNRESTRICTED COMPETITION IN FY 1981 DUE TO SBA'S SET-ASIDE AND 8(a) PROGRAMS.
- 57% OF ALL FEDERAL CONSTRUCTION CONTRACT ACTIONS WERE UNAVAILABLE FOR OPEN, UNRESTRICTED COMPETITION IN FY 1982.
- 62% OF FEDERAL CONSTRUCTION CONTRACT ACTIONS WITHIN THE DEPARTMENT OF DEFENSE WERE UNAVAILABLE FOR OPEN, UNRESTRICTED COMPETITION IN FY 1981, AND 61% WERE UNAVAILABLE IN FY 1982.
- 77% OF FEDERAL CONSTRUCTION CONTRACT ACTIONS WITHIN THE NAVAL FACILITIES ENGINEERING COMMAND WERE UNAVAILABLE FOR OPEN, UNRESTRICTED COMPETITION IN FY 1981.
- 75% OF FEDERAL CONSTRUCTION CONTRACT ACTIONS WITHIN THE NAVAL FACILITIES ENGINEERING COMMAND WERE UNAVAILABLE FOR OPEN, UNRESTRICTED COMPETITION IN FY 1982.
- 43% OF FEDERAL CONSTRUCTION CONTRACT ACTIONS WITHIN THE ARMY CORPS OF ENGINEERS WERE UNAVAILABLE FOR OPEN, UNRESTRICTED COMPETITION IN BOTH FY 1981 AND FY 1982.

saying, "What is wrong with the present size standards? First of all, the economic basis upon which they were developed is hazy at best. Because the procedures used to establish them are unclear, their validity and accuracy in many cases is subject to question . . . the original standards that serve as the basis for the current ones are in many cases questionable in terms of their appropriateness and justification."

It is clear that SBA has no idea of what constitutes a small business in the construction industry, and yet the arbitrary decision which they reach in setting a size standard has a devastating impact on those firms which are excluded from competing for federal construction contracts.

## Impact on Competition

Overzealous and non-selective implementation of the small business set-aside program by the Small Business Administration and Federal Contracting Awarding Agencies has resulted in extremely large quantities of construction contracts being routinely set aside for restricted bidding and award. Statistics issued by the Federal Procurement Data System reveal that a shocking 60 percent of *all* federal construction contract actions in FY '81 and FY '82 were unavailable for open, unrestricted competition due to SBA's Set-Aside and 8(a) Programs. Within the Department of Defense 63 percent of all construction contracts were unavailable and within the Naval Facilities Engineering Command, a staggering 77 percent of its construction contracts in FY '81 and 75 percent in FY '82 were unavailable for open competition because of these programs.

As shocking as these national figures are, they do not portray what can and does happen on a regional basis. In many sections of the country the construction market is largely dominated by the presence of the federal government. For example, many areas along the Mississippi River and around the Great Lakes rely almost exclusively on federal government activity to generate construction markets. This is also true in areas where there are military installations and government owned research facilities. In these areas the federal government





is literally the only construction market and its actions have a significant impact on local contractors.

In some of these regions the use of the set aside program has resulted in 90 percent or more of federal construction contracts being unavailable for open unrestricted competition.

The overzealous and non-selective use of the set-aside program has also resulted in extremely large construction contracts, many requiring specialized skills and equipment, being set-aside for restricted bidding and award and thus unavailable for open free competition. Examples of $10 million projects being set aside is commonplace and some projects in the $15–$20 million range are set aside.

For example, in November 1983 the General Services Administration set aside for restricted bidding and award to small businesses the Denver Mint renovation and expansion project which had an estimated value range of $10 to $20 million. Additionally, the specifications for this project required strong experience on projects of a similar nature and a strong financial position.

The set-aside program also has a dramatic impact on "medium sized" contractors whose volume puts them over the eligibility standard for "small business" classification. In selecting projects to bid, contractors must select those that are within their capabilities at the time, consistent with obligations on other on-going work. This means that the size and type of project to be bid will change according to many different variables. The set-aside program, however, because of its exclusionary practices, restricts "medium sized" firms from bidding on many contracts that are of a size to meet their business strategy objectives.

The program also adversely impacts firms that are eligible for set-aside contracts by forcing them to alter their business strategy to comply with the program. As a contracting firm approaches the size standard limit, it is faced with the dilemma of making the choice of: 1) limiting the company's growth in order to continue to qualify to bid on the overwhelming majority of federal construction contracts in its geographic area or 2) exceeding the size standard and thus eliminating itself from the opportunity to secure federal construction contracts.

Clearly, under these circumstances, the set-aside program is self-defeating in that it prevents the growth of small business firms and free enterprise opportunities.

## Cost of the Set-Aside Program

The most dramatic adverse effect of the set-aside program is its cost to the government and the taxpaying public. There is no question but that when competition is restricted it results in increased costs, and the set-aside program is no exception. A 1976 Report of Consultants to the Army Corps of Engineers on small business set-asides (dredging) found the following ". . . the low bids received under unrestricted advertisements were 9 percent lower than those received under set-asides. . . ."

When projected to the total value of construction contracts set-aside government-wide in FY 1982, $3.0 billion, the "penalty cost" for

**ARBITRARY SIZE STANDARDS**

To get a clear picture of just how arbitrary the size standard process can be, one need only look at the various size proposals SBA has made over the past three years.

- Since 1975, to qualify as a small business general construction firm, a company's three year average annual volume must not have exceeded $12 million.
- In 1980, SBA proposed a size standard based on the number of employees.
- In 1982, SBA proposed raising the existing volume standard on an "emergency basis" from $12 million to $15 million.
- Soon after, SBA proposed a multitude of different size standards based on different construction categories.
- A current proposal now seeks to raise the volume standard to $21.5 million.

restricted bidding and award under the construction set-aside program was over $270 million.

The incurring of such "penalty costs" raises serious questions as to the violation of the SBA's and Federal Contracting Awarding Agencies' fiduciary responsibility to assure that public monies are spent in the most efficient and economical manner possible.

Not only is there a direct cost impact from restricted competition, the administrative costs are equally significant. A recent Congressional Budget Office estimate on legislation establishing a new Research and Development set-aside program places the administrative costs for 4 years at $193 million. Considering that this new program is only a fraction of the size of the construction set-aside program, there is little doubt that the set aside program in construction will cost the government and the taxpaying public many times more than $193 million.

## Are Small Business Set-Asides Needed in Construction?

Simply put, the answer is no.

In 1963 the Administrator of the Small Business Administration directed that a study be instituted to look at the construction industry to detail its characteristics. The study looked at the economic factors that influence the industry to determine if the then emerging SBA programs were applicable to construction. The findings of that study are as follows, and are as valid today as they were in 1963:

- "There can be no question but that the application of any measures of competitiveness to the building and construction industry would result in the conclusion that it should be ranked among the least concentrated or most competitive. It is not dominated by a few large firms.
- The industry is comprised of a very large number of enterprises.
- The industry is comprised of small enterprises by conventional standards.
- There is a very high rate of business births in construction. None of the major industry categories had an entrance rate as high as construction.



- There is also a high rate of business failures in the industry.
- The financial costs of entry to the industry are relatively low in many branches. Equipment may be rented. Workmen typically furnish their own tools. In many cases owners and clients may advance part of capital.
- The scale of operations in the construction industry reaches efficient levels at relatively small size. The technology of the industry does not require large scale operations and large capital costs, compared to industry generally, in order to achieve efficient operations.
- Construction enterprises have few fixed costs and move readily from locality to locality and even region to region, increasing materially the degree of competition in a single locality. Work opportunities attract bidders from far and wide.
- The bidding or pricing system of the industry in effect on most federal government work is highly competitive. Operations do not continue for a long time on prices initially established by a seller, as in many manufacturing industries. The contractor must in the ordinary case face new competition on each new contract he gets.
- The bidding takes place on a specifically defined project. All bidders are furnished the same specifications and plans, and in the typical case, the competitors are bidding on a precisely defined and identical product.
- The subcontracting system, characteristic of construction projects, enhances the competitive nature of the industry. Each successful bidder may consider whether to perform the work or subcontract a portion of it in turn.
- Contractors face keen competition from prospective clients who prefer to perform work themselves. Industrial enterprises, householders, and local, state and federal government agencies affect competition conditions in construction by performing an appreciable amount of construction work themselves.
- The above features of the construction industry suggest that the construction industry is already relatively highly competitive among sectors, and that the need for using the influence of federal contracts to increase competitiveness deserves a low priority in construction. The use of set-asides in construction needs to be placed in this perspective."

The above facts lead inescapably to the conclusion that the characteristics of the construction industry assure ample opportunity for qualified contracting firms of all sizes to obtain a share of federal construction outlays.

Large firms, for example, place themselves at a competitive disadvantage if they compete for a project that is too small for them since they have to assign key management or supervisory personnel to such projects or have to acquire such personnel. At the same time, such larger firms have to commit some of their bonding capacity for these smaller projects with the result that when they contemplate bidding on projects in their own construction marketplace level they are at a disadvantage with their real competitors because they may have dissipated their management and supervisory skills, their bonding capacity and their financial resources on projects that are outside the scope of their natural market area.

Further evidence that set-asides are not needed in construction is provided by the Federal Procurement Data Center's statistics on federal construction contract actions. These statistics indicate that in both FY '81 and FY '82, *75 percent* of federal construction contract actions were awarded to small business. Over one third of these awards were made through the open unrestricted competitive bid system and not by way of the set-aside program, clearly indicating that small businesses are capable of winning construction contracts in the open unrestricted market without the government's assistance. What makes this figure particularly significant is that, presumably, these contract actions were not set-aside for restricted bidding and award for small business because a contracting officer deemed that they were not within the capabilities of a small business. If small businesses can compete so successfully for contracts "not within their capabilities," there is little doubt that they will be equally successful in open unrestricted competition for all contracts.

The subcontracting system in the construction industry also negates any need for small business set-asides in construction.

Depending on the type of construction, as much as 50 percent of prime contracts may be subcontracted to various specialty contractors who are typically small businesses. In reporting the results of contract actions awarded, the Federal Procurement Data Center's statistics do not report the percentage subcontracted to small businesses. If such figures were available, it is anticipated they would reveal that the overwhelming majority of federal construction contracts are accomplished by small businesses.

## SMALL BUSINESS 8(a) PROGRAM

Another Small Business Administration program which is contributing to the demise of the open competitive bid system is the SBA 8(a) program. This program was created by section 8(a) of the Small Business Act of 1958, although it did not become operable until 1968. Under the 8(a) program, the SBA and a federal contract awarding agency agree to remove a contract from the open unrestricted competitive bid system and sole-source negotiate the contract with a "socially and economically disadvantaged small business firm" as defined by the Small Business Administration.

Between 1968 and 1983, the SBA has utilized the 8(a) contracting program to channel some $10.2 billion in federal procurement contracts to 4,977 participating "socially and economically disadvantaged" firms. The theory underlying the program is that a disadvantaged firm, once awarded one or more sole-source negotiated contracts by various federal agencies in cooperation with the SBA, and having taken advantage of SBA management and technical assistance, would eventually be able to stand alone, compete successfully, and survive in the free enterprise system.

Just the opposite has occurred. The SBA 8(a) program, designed around a "protected market" for selected disadvantaged firms, has proven to be a dismal failure. According to data contained in a 1981





GAO Report (CED-81-55), only 4 percent or 166 of the 4,598 MBE firms participating in the 8(a) program between 1968 and 1980 graduated. An earlier GAO Report on firms that did graduate found that only 33 showed a positive net worth. There has been little, if any, improvement in the 8(a) success rate since this data was compiled.

Nationally syndicated columnist Donald Lambro may have summed it up best when he said "The idea was to temporarily give small approved 8(a) businesses non-competitive federal contracts and other aid to help them eventually become self-sufficient. In fact, the program has become an unending contract pipeline upon which most 8(a) firms are almost totally dependent for survival."

The failure of this program in the construction industry is justified for three primary reasons: first, the 8(a) program does not achieve its stated purpose in construction because it is not compatible with the very nature of the industry; second, the extremely high cost it engenders to the government and the taxpaying public; and third, because it impacts harshly on non-8(a) construction firms.

History of 8(a) Program




## Incompatibility with Construction

Construction is not dominated by a few firms, rather it is dominated by the open competitive bidding system with award to the lowest responsible bidder. Owners, both private and public, benefit from this competitive bid system by receiving top quality work for the lowest possible price. Contractors benefit by the assurance that an equitable opportunity to participate and bid on any work is open to all. Competition assures that the industry will remain open. To survive in the construction industry one must learn to be competitive; one must learn to submit the lowest responsible bid. Yet, the 8(a) program, the stated purpose of which is to "promote the competitive viability of socially and economically disadvantaged firms," never requires the firms to be competitive, never requires the firms to bid. The 8(a) program in construction is a sole source negotiation program—not even competitive negotiation—but sole source.

One has to wonder how a firm can learn to be competitive, without ever having to compete. Giving a contract to a firm in the 8(a) program and negotiating the price for the work, does not help that firm become a competitive business. In fact, it removes the 8(a) contractor from that portion of the process in which competitive skills are developed. Surveying the market of available work, deciding which projects are within the firm's capabilities, estimating the project, obtaining bonding, soliciting competitive subcontract bids and supply quotes, and finally preparing a competitive bid are the skills which are needed to become competitive in construction. The 8(a) program undermines the development of these skills.

Once a competitive contract is won, a contractor must use his technical skills to schedule the progress of the work, coordinate delivery of materials, manage the performance of the construction by his employees, and ensure that subcontractors are performing their tasks and keeping the entire progress of the project on schedule. These skills also are not developed by the 8(a) program because SBA allows an 8(a) construction firm to subcontract up to 85 percent of the work. Subcontracting is, of course, a part of construction. Depending on the nature of the construction project, the general contractor may complete the work entirely with his own forces, or may subcontract segments of the work as he deems appropriate. However, 85 percent of a project is an extremely high subcontract percentage, and, in fact, would not be allowed on most federal construction contracts which require that the contractor perform between 50 percent and 80 percent of the work with his own forces. Retaining only 15 percent of the construction contract would generally result in the 8(a) firm serving only as a conduit to pass along payment to the subcontractor or subcontractors. An 8(a) firm, ironically, is not required to subcontract that 85 percent of the work to another disadvantaged business, or even another small business.

Despite the fact that the 8(a) program is not relevant to participation in the construction industry, construction has been relied on heavily by agencies and the SBA to achieve 8(a) usage. The 1981 GAO report (CED-81-55) included a breakdown of the firms which are included in the 8(a) portfolio.

Comparison of 8(a) Program Participants by Business Class
As of September 30, 1980






The business category with the largest number of participating firms was construction, at 34 percent, but the impact is even greater than this number implies. Construction is the only category that only includes one industry. The other categories, for example "professional services" or "nonprofessional services" are broad groupings which can cover a variety of industries. No other single industry is impacted as significantly as construction.

In attempts to achieve disadvantaged business utilization goals, larger and larger construction contracts have been given to the 8(a) program. In 1983 the Army Corp of Engineers sole-source negotiated a $14 million construction contract under the 8(a) program. One must wonder how firms large enough and sophisticated enough to handle a $14 million construction contract can be considered small disadvantaged businesses. The 85 percent subcontracting allowance undoubtedly provides the answer by allowing the 8(a) firm to merely serve as a payment conduit for other firms who actually perform the work. It seems apparent that projects of this size are being awarded 8(a) merely because their volume quickly adds up and helps an agency achieve its disadvantaged business utilization goal.

## Costs of the 8(a) Program

Whenever competition is limited, or eliminated as in the case of the 8(a) program, higher costs usually result. This is generally difficult to document, however, because once a federal construction project has been removed from the open unrestricted competitive market for delivery to the 8(a) program, there is no opportunity for open competitive bids for comparison purposes. Several examples are available, however, wherein 8(a) contracts were initially negotiated but subsequently released to open competition, thus allowing valid cost comparisons:

### Example I

A highway relocation project in Idaho was removed from the competitive market by the Federal Highway Administration (FHWA) and given to the SBA for the 8(a) program. SBA provided an 8(a) contractor for the project who submitted a proposal of $3.9 million for the work. This price was $911,000 over the government's estimate and FHWA was reluctant to pay the price. The negotiations continued and FHWA eventually agreed to remove a portion of the work from the contract. In addition, SBA agreed to give the 8(a) contractor $350,000 in "business development expense funds" for the purchase of equipment. With these changes the 8(a) firm was able to offer a price of $3.025 million. It should be noted that this 8(a) contractor's past construction experience had been in the $200,000 or less range with limited highway construction experience and that a non-8(a) construction firm was to be a major subcontractor and would in fact be in charge of the project.

FHWA decided not to award the contract to the 8(a) firm but to competitively bid the entire work, including the previously removed portion. Three months later 19 firms bid for the work. When the bids were opened the low bid price was $2.355 million. The government

Case 1:06-cv-00599-MBH Document 17-7 Filed 08/29/2006 Page 8 of 10



and the taxpayers saved over $1 million when compared to the overall original negotiated price, and $669,000 when compared to the last negotiated price. When added to the additional $350,000 in business development expense funds that would not be paid out, the competitive price represents a 40 percent savings, or $1.019 million.

## Example II

A flood wall project was given by the Corps of Engineers to the SBA for the sole-source negotiated 8(a) program. A price of $416,000 was negotiated for the work with an 8(a) firm. The project, however, was eventually put out for open competitive bid. Fourteen months after the contract could have been offered for competition, bids were finally opened. The low bidder was awarded the contract at a price of $188,950. This represents a 55 percent savings to the taxpayer. As in the previous example, there were 19 bidders on this project from six different states.

If these examples, and those which follow, are indicative of the cost of the 8(a) program in construction, the waste of money to the taxpaying public is staggering.

| | | *Savings Through Open Competitive Bidding* |
|---|---|---|
| Highway relocation, Elephant Butte, Idaho (Federal Highway Admin.) | The 8(a) negotiated price was $3,024,000; the low competitive bid was $2,355,000. | $669,000 or 22% |
| Environmental test facility, Yuma, Arizona, (Army Corps of Engineers) | The 8(a) price was $1,839,872; the low bid was $1,558,884. | $280,988 or 15% |
| Flood wall project, Delta, Louisiana, (Army Corps of Engineers) | The 8(a) price was $416,000; the low bid was $188,950. | $227,050 or 55% |
| Water supply project, Riverton, Wyoming (Bureau of Reclamation) | The 8(a) price was $580,000; the low bid was $353,812. | $226,188 or 39% |

## Impact on Non-8(a) Construction Firms

Nineteen bidders on construction projects is becoming commonplace throughout the industry and is indicative of the state of the construction market. These conditions naturally impact all construction contractors. When added to the increased use of the 8(a) program which takes further work out of the open market, the non-8(a) small business construction contractor is facing a bleak future. The impact is compounded by the way in which contract awarding agencies administer their participation in the 8(a) program.

The Army policy, for example, for implementing the 8(a) program requires the Corps of Engineers to "reserve" for the SBA, which means to take out of the open competitive market, any projects which they deem are "susceptible" to performance by a small disadvantaged firm. This has resulted in the "reserving" of undue quantities of contracts for the SBA. In turn, SBA takes many months to place the project with an 8(a) firm. For example, the Vicksburg District of the Corps of





Engineers in 1981 reserved its entire procurement list for a major part of the construction season for the 8(a) program. The total estimate for these projects was $28 million and was "reserved" in an attempt to meet a $6 million disadvantaged business utilization goal. Also in 1981, the Corps of Engineers Lower Mississippi Valley Division "reserved" 81 projects valued at S87 million and the four Ohio River Districts "reserved" 89 contracts valued at S78 million.

While much of this work was not awarded to 8(a) firms but was eventually returned to the open competitive market since the SBA was unable to supply 8(a) contractors for all of this work, the impact was still devastating. It is impossible for a contractor to do any future planning and to decide which projects he will bid if he cannot be sure what work will be available. Even if all of these contracts were eventually turned back for open competitive bid, "reserving" them en masse for an indefinite time period plays havoc with a contractor's projection of workforce needs and equipment requirements. This particularly impacts the small contractor who is not able to provide contingencies to cover these uncertainties by making use of his workforce and equipment on other jobs. Reducing the market this significantly, even for a short period of time, leads to the demise of many small contractors who have provided the government top quality work at the lowest price for years.

## A CONSTRUCTIVE ROLE GOVERNMENT CAN PLAY

Small business firms could be greatly assisted by the elimination of public construction agency competition via public force account construction. Small construction projects have proved to be the ideal training grounds for emerging small business enterprises. Yet, we are presented with an extraordinary contradiction: as a social policy the nation has attempted to encourage the growth and development of small business firms; but many cities, counties and other public agencies refuse to put small construction projects out for bid to the private sector, instead keeping them to be performed by taxpayer financed construction operations. This system, commonly referred to as public force account construction, removes from the marketplace hundreds of thousands of construction opportunities that are within the scope of small business qualifications and bonding capacities, and denies firms an enormous market for projects which are within their current capacities.

## CONCLUSION AND RECOMMENDATIONS

The construction industry is a highly competitive and open industry dominated by small family-owned businesses that work close to home in a fairly well defined geographic area. Construction is not dominated by a few firms, but by vigorous competitive bidding among many. That is, federal construction contracts generally must be awarded through competitive bidding procedures to the lowest responsible

Case 1:06-cv-00599-MBH Document 17-7 Filed 03/29/2006 Page 9 of 10



bidder. This procedure assures intense competition within the industry, and assures that the project will be completed at the most economical cost to taxpayers. These factors make the construction industry one of the last true bastions of the free enterprise system.

This bastion, however, has been under a concerted, non-stop attack for some time from government imposed special preference procurement programs. These special preference procurement programs are contributing to the demise of the open competitive bid system in construction. Specifically, the small business set-aside program, and the small business 8(a) program are eliminating open competition, and increasing costs to the taxpayers.

Statistics provided by the Federal Procurement Data System on Federal construction contracts reveal that 60% of all Federal construction contract actions were unavailable for open, unrestricted competition in FY 1981 due to the Small Business set-aside and 8(a) program.

These set-asides are artificial props which do little but limit competition and increase the cost of public work construction. The characteristics of the construction industry are such that qualified contracting companies of all sizes are assured ample opportunity to obtain their "fair share" of federal outlays. Under open, unrestricted competition the smaller contractor secures more of the smaller contracts because of proximity to work, specialized requirements or many other circumstances, when it is more economical for a medium size or large size contractor to perform a contract and it would, therefore, likely be the low bidder. In denying these firms the opportunity to bid on set-aside contracts, the government is interfering with the free market system and increasing the cost of construction to the public.

Open, unrestricted competition in federal construction procurement has served the nation's taxpayers well. Taxpayers have the right to be assured that their tax monies are being spent in the most efficient and economic manner possible. Open unrestricted competition in federal construction procurement has always given that assurance.

The SBA set-aside and SBA 8(a) programs are changing all that. Through over-zealous advocacy and misguided implementation, these programs have for too long eliminated open unrestricted competition in federal construction procurement.

In order to restore open unrestricted competition to federal construction procurement and reduce federal construction costs to the government and the taxpaying public, the small business set-aside program and the small business 8(a) program must:

- Be legislatively eliminated from application in the construction industry.

At a minimum, the problems engendered by these special preference programs can be reduced by the following actions:

SMALL BUSINESS SET-ASIDE PROGRAM

- Revision of Federal Contract Awarding Agency regulation requirements for small business set-asides.
- An overall reduction in all agency's "goals" for utilization of the small business set-aside program.





- Placing a maximum limit of no more than $2 million on the size of a construction contract which can be set-aside.

SMALL BUSINESS 8(a) PROGRAM

- Limiting the number of 8(a) contracts in construction.
- Placing a maximum limit of no more than $2 million on the size of a construction contract which can be used in the 8(a) program.

Case 1:06-cv-00599-MBH Document 17-7 Filed 08/29/2006 Page 10 of 10

## APPENDIX 2.—LETTER AND MEMORANDUM REGARDING AMDAHL PROTEST OF ARMY AWARD TO IBM

amdahl AMDAHL CORPORATION
4801 MASSACHUSETTS AVE. N.W
SUITE 600
WASHINGTON, D.C. 20016
(202) 362-7772

22 September 1983

The Honorable Jack Brooks
Chairman, Committee on Government Operations
U.S. House of Representatives
2449 Rayburn House Office Building
Washington, D.C. 20515

Dear Mr. Chairman:

As you know, I share your concern with procurement practices of various federal agencies which discourage bona-fide competition, result in uneconomical purchases or leasing of expensive computer systems, and which do not encourage the very best in terms of contractor performance.

As a result of our recent experience with a Department of the Army procurement, I am now asking your assistance, and the assistance of your able staff members Jim Lewin and Jim Rife, in a situation which not only discourages competition, but represents a serious affront to the authority of the General Services Administration, the General Accounting Office, and the Congress, itself.

Specifically, earlier this year the Army solicited bids for a Joint Military Service/Selective Service computer (MEPCOM RFP No. DAHC26-83-R-0007). The computer was to be installed at a site near Great Lakes, Illinois commanded by Air Force Brigadier General W. Vaught. The requirement as stated in the MEPCOM solicitation was for a large scale computer system which had to be "commercially available," "in current production," and "state-of-the-art," all key terms which are used by vendors to determine which of their products are responsive to the RFP requirements.

Following the submission of bids and the evaluation process, we were informed in writing that although we were the low bidder, the Army was making the contract award to another bidder. The Army attempted to rationalize this action by stating that in order to have made a contract award to us they would have had to seek clarification (after best and final) of certain information connected with our bid -- and they had decided not to seek such a clarification.

However, much to our surprise -- and the surprise of another unsuccessful bidder, the Army sought a clarification of certain information from an other than low bidder -- to whom it made the contract award -- despite abundant evidence that the more costly equipment which it selected was not truly "commercially available" nor "in current production". In short, the Army decided to award the contract to a non-responsive bidder.

We protested this matter to the General Accounting Office (GAO). In the course of its inquiry, GAO obtained the opinion of the General Services Administration (GSA). GSA disavowed the Army's actions in making the contract award -- stating that if it knew that the Army was going to make a contract award for equipment which was inconsistent with the solicitation





specifications, (i.e. was neither "commercially available" nor "in current production"), it would have suspended the Delegation of Procurement Authority (DPA) it had previously granted to the Army.

Following its inquiry, the GAO agreed that the procurement was seriously flawed -- reaching this conclusion on different grounds than those on which we based our protest and on grounds that also differed from the concerns expressed by GSA. GAO directed the Army to obtain new best and final offers from the bidders and to evaluate the offers -- for the express purpose of making a decision and contract award which would be in the best interests of the Government.

Notwithstanding the substance of the GAO decision, the serious criticism of its action by GSA, and the fact that the bid protest was conducted on an expedited procedure by GAO the Army installed the computer after they learned of the GAO decision mandating a new round of best and final offers.

The Army clearly knew that by proceeding to install the computer, the likelihood of any protesting party being able to compete price-wise at a later time would be eroded substantially since the contractor receiving payments could thereafter reduce its price quotation by the amount the Army had already disbursed under the contract. In short, this conduct not only discourages competition at the outset -- it also discourages a firm from protesting those procurement irregularities which discourage competition.

At this point I offer no particular suggestion as to what corrective action might be taken. We have asked Jim Lewin to think about what might be done under these circumstances, and I am certain that his thoughts will be most helpful to you in this matter. I do hope that you would raise an appropriate inquiry with the Department of Defense officials who exercise oversight of these matters.

I look forward to seeing you again soon -- and, of course, should you need any additional information concerning this matter, please let me know.

Thanks for your help,

Murray S. Scureman
Vice President
Federal Operations

isy