General Services Administration
Office of Information Resources Management
Washington, DC 20405

ate: JUN 23 1983
ply to
in of: KA

ject: Amdahl Protest B-212018 (Army/MEPCOM RFP No. DAHC26-83-R-0007)

: Dinah Stevens, Attorney Advisor - LK

The Amdahl Corp. has protested the Army's award to the IBM Corporation in the subject case. Amdahl indicates:

> "The Army clearly sought to acquire equipment in "current production" as opposed to out-of-date, discontinued products. Contract No. DAHC26-83-R-0007 acquires an IBM 3081D which does not meet the solicitation requirement that all equipment must be in current production at the time proposals are submitted. In March 1983, six months after a major public announcement, IBM notified GSA that the 3081D was no longer in new production as of October 1, 1982. There has been no official document to reverse that decision. Amdahl challenges the IBM letter of 5/27/83 as not meeting either the spirit or the specific language of the RFP."

The Army specifications required current production, state-of-the-art technology and commercially available off-the-shelf equipment. The solicitation further specifies that "out-of-date, discontinued equipment is not acceptable." IBM proposed a 3081D to meet this requirement. On September 3, 1982, IBM announced that the availability status of the 3081D was changed from "currently in new production" to "not currently in new production" (emphasis added). On May 27, 1983, IBM indicated that it considers the 3081D to be in current production for sale to a very limited market. According to IBM, this equipment is currently being produced for availability only to the government and education sector customers. These two actions by IBM negate the claim that the equipment is commercially available and that it is current technology as contrasted to out-of-date discontinued equipment.

"Current production" and "commercially available" are important terms in Federal procurement. The traditional definition of these terms defines equipment which is regularly produced and has a commercial (general nongovernment) market. This is presumed to be accompanied by a long term, broad array of product support from the vendors. With respect to commerciality, "commercially available" is a term that is particularly important to the General Services Administration in the development of government-wide procurement policies.





Commerciality in government-wide procurement actions is used as an indicator of price reasonableness for products which compete in the commercial marketplace. When a product is not commercially available, as in the case of the 3081D, the Government has no assurance of price reasonableness or of the duration of anticipated support.

IBM maintains that the Federal Government, state and local governments, and the educational sector comprise a commercial sector. We disagree. This is a new definitional attempt by IBM and is contrary to the traditional meaning (has a broad commercial market) of "commercially available" in Federal procurement. Further, according to IBM, the Federal government is only 6% of IBM's total market; and, state and local government and education comprise only another 6% of IBM's total market. These facts speak for themselves. An offer made to only 12% of IBM's market (of which the government is only one half) is not an offer which can be classified as commercially available.

Similarly, with regard to the requirement for "current production" equipment, IBM has, in effect, redefined a term in a way which is contrary to the accepted and traditional definition (regularly produced for the general market). Current production equipment is specified by the government to ensure that we obtain state-of-the-art technology which will be maintained and supported over a long period of time. The objective is to avoid acquiring equipment which is being phased out by a manufacturer because of competitive market forces and technological advances. The objective is to avoid being left high and dry with equipment upon which the marketplace has turned its back. In essence, in this case the government will not get the benefit of a product which is broadly distributed and, there is no way that IBM can demonstrate long term commitment to equipment that is sold to only 12% of its total market and has already been replaced with a newer offering to the other 88% of its market. We question why IBM feels it can continue to market the 3081D to the government as current production when it is unable or unwilling to compete in the broader marketplace with this device.

IBM has maintained that the 3081D is current because it is upgradable. This is a diversion from the central issue in this protest. Upgradability was another Army requirement but it is not an issue in this protest. The issue at hand is simple. Does the 3081D meet the Army's requirement for current production, state-of-the-art, and commercially available, off-the-shelf equipment? We maintain that the 3081D does not meet the requirements as outlined in the Army's solicitation.

As you know, the Army was operating under GSA's delegated procurement authority in this case. In GSA, we have grave concern about this case. If the circumstances regarding commercial availability and the production status of the 3081D had been known prior to contract award, we would have suspended the procurement, verified the Army's minimum requirements, and ensured they were clarified to the full vendor community.

In addition to the concerns regarding this procurement, GSA has serious concerns about the potential long-range impact of this problem on Government automatic data processing equipment (ADPE) procurements. IBM has developed a novel marketing strategy, ostensibly driven by the differences between those customers who benefit from the advantages of the investment tax credit (ITC) and those who do not. This marketing strategy raises serious concerns in GSA for the integrity of the Government ADPE procurement process. Thus, GSA's position in this protest is also novel. GSA is urging the General Accounting Office (GAO), in its role as a guardian of the Government procurement process to look at the forest as well as the trees in its decision in this procurment. GSA believes that there are potential long-term implications to this kind of marketing strategy which may have a severe detrimental effect on governmental ADP procurement.

The Government's procurement process is unusual, often cumbersome and complex, and the resources, human and otherwise, necessary to administer the process are limited. One of the ways the Government has sought to assure it receives value for the dollars spent in an economic and efficient manner is that acquisitions are made in the same marketplace in which other major enterprises are acquiring similar products. In the area of ADP hardware, and other high technology equipment, this marketplace assurance is additionally important to insure that the Government is buying the latest state-of-the-art equipment for which there will be a long-term vendor commitment to maintenance and replacement parts.

In the absence of the foregoing protection, the Government would be placed in the impossible position of scrutinizing each specific product to determine currency. Neither GSA, nor any other Government agency, is in a position to review the practices of each vendor who may seek to isolate certain of its customers for one reason or another.

It is the very segregation of the Government as a user from the largest and most active part of the customer community which is the hazard with which GSA is concerned. We note also, that GAO has, in recent reports, expressed its concerns about some of the issues GSA is raising in this case.





For these reasons, it is felt that the IBM proposal in this case is not in the best interests of the government; and, we feel that the Amdahl protest has merit.

Francis A. McDonough

FRANCIS A. McDONOUGH
Deputy Assistant Administrator
for Federal Information
Resources Management

Case 1:06-cv-00599-MBH Document 17-8 Filed 08/29/2006 Page 3 of 10



# APPENDIX 3.—STATEMENT SUBMITTED FOR THE RECORD

STATEMENT OF

WILLIAM S. COHEN

before the

HOUSE GOVERNMENT OPERATIONS COMMITTEE

hearing on

COMPETITION IN CONTRACTING LEGISLATION

March 29, 1984

Mr. Chairman, I am pleased that you have scheduled these hearings to consider H.R. 5184, the Competition in Contracting Act of 1984. You and Representative Horton are to be commended for introducing this legislation and for your overall efforts to improve the Federal procurement process.

I certainly share your concern over the lack of competition in Federal contracting, and have worked with Senators Levin, Roth, and others to remedy this problem. Last November, the Senate passed S. 338, the Competition in Contracting Act of 1983, which I introduced to increase the use of competition and to impose more stringent restrictions on noncompetitive -- sole-source -- contracting.

Since H.R. 5184, if passed by the House, would presumably serve as a companion bill to S. 338 in conference, I have focused my statement on the Senate legislation.

S. 338 represents over two years of work, beginning in the 97th Congress with S. 2127, the Competition in Contracting



Act of 1982. S. 338 has been subject to extensive hearings before the Governmental Affairs and Armed Services Committees, which both reported the bill unanimously, and countless comments from a broad range of procurement experts. Considering the bipartisan support for S. 338 in the Senate and widespread support throughout the procurement community, I strongly believe that S. 338 represents the best opportunity for procurement reform this year.

S. 338 builds on the two primary procurement statutes -- the Armed Services Procurement Act and the Federal Property and Administrative Services Act -- to establish a uniform framework which distinguishes between competitive and noncompetitive procedures. S. 338 recognizes that competitive contracting, whether formally advertised or competitively negotiated, is beneficial to the Government. Together, they constitute competitive procedures, with limited exceptions provided in the bill for noncompetitive procedures.

This approach, while not intended to solve all the problems inherent in the Federal procurement process, was based on the Administration's February 1982 proposal for a Uniform Federal Procurement System. The Administration's proposal, in turn, was based on recommendations from the Commission on Government Procurement's 1972 report to Congress, which set forth nearly 150 recommendations to improve the efficiency of the Federal procurement process. Despite

this consensus over the past decade that procurement reform is needed, and despite the fact that the dollar value of Government contracts has almost tripled -- from $57.5 billion in 1972 to $159.8 billion in 1982 -- the laws which have governed contracting since 1947 remain intact.

Under these current laws, Government agencies are required to promote the use of full and free competition in the procurement of property and services. In Government contracting, competition is a marketplace condition which results when several contractors, acting independently of each other and of the Government, submit bids or proposals in an attempt to secure the Government's business.

Formal advertising is currently the preferred procurement procedure, with negotiation authorized by proscribed exceptions. Despite this preference for competition through formal advertising, however, negotiated contracts account for the vast majority of Federal procurement dollars. Negotiated contracts can be competitive -- and S. 338 recognizes and encourages competitive negotiation when it is the appropriate contracting method -- but more than half of all negotiated contracts are sole-sourced.

While not all Government contracts can be awarded competitively, too often agencies contract on a sole-source basis. A July 1981 General Accounting Office (GAO) report, entitled "DoD Loses Many Competitive Procurement Opportu-



nities," estimated that the Defense Department failed to obtain competition in awarding $289 million in new fiscal 1979 contract awards surveyed. Moreover, an April 1982 GAO report, entitled "Less Sole-Source, More Competition Needed in Federal Civil Agencies' Contracting," found that this problem was not confined to the DoD. According to this report, the six civil agencies reviewed, which awarded new sole-source contracts totaling $538.1 million, failed to obtain competition on an estimated 40 per cent of their contract awards.

The significance of these lost opportunities for competition is the benefits that could have been gained. First, competition in contracting saves money. Studies have indicated that between 15 and 50 per cent of the contract price can be saved through increased competition. In 1977, the Defense Science Board (DSB) examined more than a dozen examples of competed contracts for weapons and found significant evidence of cost savings, with an average savings of nearly 15 per cent. The DSB concluded that "competition is a powerful motivator for cost control." More recently, the GAO reported, at Senator Levin's request, the results of the competitive procurement for the T-3 tractor -- a contract which initially was to have been awarded noncompetitively. The GAO found that the lowest bid in a competitive procurement for the T-3 tractor was 43 per cent less than the cost of the contract had it been awarded on a sole-source basis.

The recent Air Force jet engine competition is a good example of how competition may cost more in the initial years but save substantially in the out-years. While the Air Force paid a five per cent premium by having two companies compete rather than awarding a sole-source contract, the expected savings over the next ten years may exceed $3 billion because the engines will be more dependable and efficient. By dual-sourcing, moreover, the Air Force hopes to continue pressure on the companies to hold down prices and provide service and spares at lower costs.

In March 1983, the Congressional Budget Office (CBO) estimated that "significant" savings could be achieved through the effective implementation of S. 338. The CBO estimates that each one per cent saved on new contract actions reduces costs by about $200 million per year. Since studies on the use of competitive contracting have concluded that potential savings range from 15 to 50 per cent, a conservative estimate of savings resulting from this legislation would be well over $2 billion.

In addition to potential cost savings, competition curbs cost growth. The Analytic Sciences Corporation (TASC) completed a study in April 1982 which compared cost growth between competitive and noncompetitive programs. The TASC study found that cost growth in programs during full-scale development varied from 2.0 per cent for competitive programs to 40.2 per cent for noncompetitive programs, while



cost growth during production ranged from 9.65 to 12.7 per cent.

The last, and possibly the most important, benefit of competition is its inherent appeal of "fair play." Competition maintains the integrity in the expenditure of public funds by ensuring that government contracts are awarded on the basis of merit rather than favoritism.

These benefits are often lost because of what I believe are two primary shortcomings in the present procurement statutes: first, they do not recognize negotiation as a legitimate competitive procurement procedure; and second, they do not adequately restrict the use of noncompetitive negotiation. Effective implementation of S. 338 would rectify both problems.

The formal advertising requirement in present law is intended to keep the system honest and to secure the most advantageous contract for the Government. The emphasis on formal advertising, however, results in excessive justification requirements for the use of negotiation, which is more appropriate for complex procurements. If contracting officers need to consider factors other than price in making awards, or wish to have any discussions with prospective contractors, they must satisfy one of the statutory exceptions that permit negotiation. For all practical purposes,

therefore, competitive negotiation lacks recognition as a bona fide competitive technique.

Our legislation removes the restriction from -- and the written justification required for -- competitive negotiation and places it on par with formal advertising. The objective is to establish an absolute preference for competition and to provide more flexibility in contracting. William Long, former Deputy Under Secretary for DoD Acquisition Management, testified at a 1982 Governmental Affairs hearing that this new approach to competitive procurement best represents the real procurement world.

Under S. 338, agencies are not only required to obtain competition, but to increase its effectiveness. Agencies would be required to obtain "effective competition" through advance procurement planning, market research, and the development of specifications which are not restrictive of competition. We recognize that this extensive an effort may not be cost effective for small purchases. Therefore, this legislation provides a basis in statute for regulations to establish separate small purchase procedures for procurements under $25,000, which would allow agencies to scale down their efforts as long as they obtained reasonable competition.

As for the second shortcoming, the procurement statutes authorize negotiated procurement but restrict its use to 17



conditions for defense contracts and 15 conditions for civilian contracts. While agencies are required to award negotiated contracts competitively to the maximum extent practicable, negotiation can be -- and frequently is -- noncompetitive. Beyond the justification for negotiated procurement, however, present law does not require further justification for noncompetitive award.

Due to this lack of direct restriction on noncompetitive contracting, the exceptions to formal advertising in present law are often used inappropriately to justify sole-source procurement, rather than negotiation. The justification most frequently invoked by the procuring agencies is the "competition is impracticable" exception -- an enormous loophole. The use of such broad exceptions to formal advertising as a means to sole-source contract often conceals the true reason for awarding a contract noncompetitively.

S. 338 provides six exceptions to competitive procedures which permit agencies to use noncompetitive procedures in awarding a contract when competition is not possible. In doing so, the bill shifts the emphasis from having to justify negotiation, as is presently required, to having to justify noncompetitive procurements. The intent is to place greater restrictions on the use of noncompetitive procurements without precluding its use when necessary. Awarding a contract on a sole-source basis would for the

first time constitute a clear violation of statute unless permitted by one of the following six exceptions:

(1) the property or service is available from only a single source and no competitive alternatives are available;

(2) the agency's need is of such unusual and compelling urgency that the Government would be seriously injured by the delay involved in using competitive procedures;

(3) the Government needs to award the contract to a particular source in order to create or maintain an essential industrial capability or for purposes of industrial mobilization;

(4) the terms of an international agreement have the effect of requiring the use of noncompetitive procedures;

(5) a statute requires that the procurement may be obtained through a specified source; or

(6) disclosure to more than one source of the property or service to be obtained would jeopardize the national security.



These six exceptions parallel the conditions under which the Comptroller General has historically permitted agencies to award on a sole-source basis. Even in these situations, however, I feel there should be a "double-check" for potential competition before the sole-source award is made. This legislation would generally require agencies to publish a notice of their prospective contracts over $25,000 in the Commerce Business Daily. The objective is to alert contractors, who may be capable of meeting the agency's needs but would have otherwise not known of the contract, to submit offers.

In closing, Mr. Chairman, while I recognize your preference for a single statute, the dual conforming amendments to the defense and civilian procurement statutes contained in S. 338 are a significant step in that direction and certainly facilitate any future consolidation efforts.

I look forward to working with you and Representative Horton toward our common goal of increasing competition in contracting.

## COMMITTEE ON GOVERNMENT OPERATIONS

JACK BROOKS, Texas, *Chairman*

| | |
|---|---|
| DON FUQUA, Florida | FRANK HORTON, New York |
| JOHN CONYERS, Jr., Michigan | JOHN N. ERLENBORN, Illinois |
| CARDISS COLLINS, Illinois | THOMAS N. KINDNESS, Ohio |
| GLENN ENGLISH, Oklahoma | ROBERT S. WALKER, Pennsylvania |
| ELLIOTT H. LEVITAS, Georgia | LYLE WILLIAMS, Ohio |
| HENRY A. WAXMAN, California | WILLIAM F. CLINGER, Jr., Pennsylvania |
| TED WEISS, New York | RAYMOND J. McGRATH, New York |
| MIKE SYNAR, Oklahoma | JUDD GREGG, New Hampshire |
| STEPHEN L. NEAL, North Carolina | DAN BURTON, Indiana |
| DOUG BARNARD, Jr., Georgia | JOHN R. McKERNAN, Jr., Maine |
| BARNEY FRANK, Massachusetts | TOM LEWIS, Florida |
| TOM LANTOS, California | ALFRED A. (AL) McCANDLESS, California |
| RONALD D. COLEMAN, Texas | LARRY E. CRAIG, Idaho |
| ROBERT E. WISE, Jr., West Virginia | DAN SCHAEFER, Colorado |
| BARBARA BOXER, California | |
| SANDER M. LEVIN, Michigan | |
| BUDDY MacKAY, Florida | |
| MEL LEVINE, California | |
| MAJOR R. OWENS, New York | |
| EDOLPHUS TOWNS, New York | |
| JOHN M. SPRATT, Jr., South Carolina | |
| JOE KOLTER, Pennsylvania | |
| BEN ERDREICH, Alabama | |

William M. Jones, *General Counsel*
John E. Moore, *Staff Administrator*
James E. Lewin, *Chief Investigator*
John M. Duncan, *Minority Staff Director*

## Legislation and National Security Subcommittee

JACK BROOKS, Texas, *Chairman*

| | |
|---|---|
| DON FUQUA, Florida | FRANK HORTON, New York |
| ELLIOTT H. LEVITAS, Georgia | JOHN N. ERLENBORN, Illinois |
| HENRY A. WAXMAN, California | WILLIAM F. CLINGER, Jr., Pennsylvania |
| STEPHEN L. NEAL, North Carolina | DAN BURTON, Indiana |
| TOM LANTOS, California | |

Richard C. Barnes, *Staff Director*
Cynthia Meadow, *Professional Staff Member*





# CONTENTS


Page

Hearing held on—
- March 27, 1984 ..... 1
- March 29, 1984 ..... 91

Text of H.R. 5184 ..... 3

Statement of—
- Biddle, A.G.W., president, Computer and Communications Industry Association, accompanied by David Cohen, Cohen & White ..... 56
- Bowsher, Charles A., Comptroller General, U.S. General Accounting Office, accompanied by Milton J. Socolar, Special Assistant to the Comptroller General, and Robert M. Gilroy, Senior Associate Director, National Security and International Affairs Division ..... 32
- Brooks, Hon. Jack, a Representative in Congress from the State of Texas, and chairman, Legislation and National Security Subcommittee: Opening statement ..... 1
- Chiles, Hon. Lawton M., Jr., a Senator in Congress from the State of Florida ..... 162
- Gilleece, Mary Ann, Deputy Under Secretary of Defense for Research and Engineering (Acquisition Management), accompanied by Dennis Trosch, Assistant General Counsel (Logistics), and Harvey J. Gordon, Assistant Deputy Under Secretary (Acquisitions) ..... 95
- Henriques, Vico E., president, Computer & Business Equipment Manufacturers Association ..... 72
- Hiestand, O.S., former chairman, public contract law section, American Bar Association, accompanied by C. Stanley Dees, member, Public Contract Law Section Council ..... 177
- Hutchinson, Philip A., Jr., legal counsel, Committee on Federal Procurement of Architectural/Engineering Services, accompanied by William J. Birkhofer, managing director, governmental and international services, American Consulting Engineers Council ..... 85
- Levin, Hon. Carl, a Senator in Congress from the State of Michigan ..... 150
- Sowle, Donald E., Administrator, Office of Federal Procurement Policy, accompanied by Patricia Szervo, Associate Administrator for Procurement Law and Legislation, and Leroy Haugh, Associate Administrator for Policy Development ..... 165
- Suchanek, Leonard J., Chairman, Board of Contract Appeals, General Services Administration, accompanied by Jim Regan, Chief Counsel, and John Burkholder, Deputy Chief Counsel ..... 92
- Supica, James W., vice chairman, highway division, Associated General Contractors of America, accompanied by John Sroka, executive director, occupational division, and Brian Deery, assistant director, municipal utilities division ..... 63

Letters, statements, et cetera, submitted for the record by—
- Bowsher, Charles A., Comptroller General, U.S. General Accounting Office:
  - Additional suggestions relating to H.R. 5184 ..... 37–39
  - Submissions to additional questions of Mr. Horton ..... 48–55
- Brooks, Hon. Jack, a Representative in Congress from the State of Texas, and chairman, Legislation and National Security Subcommittee:
  - DOD's fiscal years 1981–83 procurement summary (chart) ..... 135
  - June 15, 1982, letter to Maj. Gen. Oscar C. Decker, Jr., from Robert M. Gilroy, Senior Associate Director, GAO, re 5-ton, M-939 series trucks ..... 141

| | Page |
|---|---|
| Letters, statements, et cetera, submitted for the record by——Continued | |
| Gilleece, Mary Ann, Deputy Under Secretary of Defense for Research and Engineering (Acquisition Management): | |
| List of component breakouts | 137 |
| Prepared statement | 120–134 |
| Series of memorandums, dated March 12, 1984, from Deputy Secretary of Defense to DOD components | 98–114 |
| Gordon, Harvey J., Assistant Deputy Under Secretary of Defense (Acquisitions): Information re Defense Department's challenge of a contractor's claim to proprietary rights in its procurement of spare parts | 139 |
| Henriques, Vico E., president, Computer & Business Equipment Manufacturers Association: Prepared statement | 78–85 |
| Hiestand, O.S. former chairman, public contract law section, American Bar Association: Prepared statement | 180–188 |
| Levin, Hon. Carl, a Senator in Congress from the State of Michigan: Prepared statement | 154–159 |
| Sowle, Donald E., Administrator, Office of Federal Procurement Policy: Prepared statement | 169–176 |
| Supica, James W., vice chairman, highway division, Associated General Contractors of America: Prime contract awards for construction, fiscal years 1981–83 | 67–69 |

APPENDIXES

| | |
|---|---|
| Appendix 1.—Associated General Contractors' booklet | 191 |
| Appendix 2.—Letter and memorandum regarding Amdahl protest of Army award to IBM | 214 |
| Appendix 3.—Statement submitted for the record | 220 |

A59

# COMPETITION IN CONTRACTING ACT OF 1984

---

TUESDAY, MARCH 27, 1984

HOUSE OF REPRESENTATIVES,
LEGISLATION AND NATIONAL SECURITY SUBCOMMITTEE
OF THE COMMITTEE ON GOVERNMENT OPERATIONS,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in room 2154, Rayburn House Office Building, Hon. Jack Brooks (chairman of the subcommittee) presiding.

Present: Representatives Jack Brooks, Frank Horton, and William F. Clinger, Jr.

Subcommittee staff present: Richard C. Barnes, staff director; Cynthia Meadow, professional staff member; Mary Alice Oliver, secretary; full committee staff: William M. Jones, general counsel; John E. Moore, staff administrator; James E. Lewin, chief investigator; James E. Rife and Robert S. Richard, professional staff members; Ralph Doty and Judge Williams, staff members; John M. Duncan, minority staff director; and Stephen M. Daniels, minority professional staff, Committee on Government Operations.

Also present: Charles Wheeler, GAO detailee.

## OPENING STATEMENT OF CHAIRMAN BROOKS

Mr. BROOKS. The subcommittee will come to order. This hearing is called to consider H.R. 5184, the Competition in Contracting Act of 1984, introduced by Congressman Horton and myself.

H.R. 5184 would require agencies to use full and open competition except under very limited circumstances. Specifically, the bill: (1) prohibits agencies from excluding any qualified vendor from their procurements; (2) severely limits noncompetitive procurements unless fully justified and approved by high-level officials; and, (3) creates the position of advocate for competition within each agency who will be responsible for eliminating noncompetitive procurement practices.

Another major and distinctive provision of the bill establishes a system which allows vendors to appeal to the General Accounting Office when they have been wrongly excluded from competing in procurements. In this regard, H.R. 5184 recognizes, for the first time in statute, the General Accounting Office bid protest function and provides specific guidelines for handling vendor complaints in a timely and equitable manner.

Agency officials no doubt will assert that we should leave things the way they are now. Current regulations do require agencies to award contracts on a competitive basis. Recalcitrant procurement officials within the agencies, however, have found numerous and

devious ways to severely limit competition or to circumvent these requirements altogether. Statistics show that sole-source procurements are on the rise. Moreover, a large percentage of these sole-source contracts could have been awarded competitively. This is happening in civilian agencies as well as in the Department of Defense which, of course, is only going to spend this year something like $260 billion with possible increases of another $53 billion. This is a great bonanza that we ought to keep an eye on. DOD will waste a large amount of this money—which means a real windfall for an innovative entrepreneur with good connections in the Defense Department—if we don't catch them. As a result, this sole-source problem is getting worse and there may come a time in the very near future when competitive procurements become as rare and as hard to find as a balanced Federal budget.

Horror stories abound of gross overpayments for items purchased noncompetitively. The best way to throw away money is not tell anybody—just get a buddy and pay him whatever you can think up. This is a simple way to dispose of large amounts of Federal tax dollars.

The Federal Government just recently bought a 60 cent light for which it paid $500. The Government paid $435 for an ordinary claw hammer. These are but a few of the sweetheart deals that occur daily—daily throughout the Federal Government. And it is time to put a stop to them. H.R. 5184 is intended to accomplish this objective.

[The bill, H.R. 5184, follows:]





I

98TH CONGRESS
2D SESSION

# H. R. 5184

To revise the procedures for soliciting and evaluating bids and proposals for Government contracts and awarding such contracts using full and open competition, and for other purposes.

---

IN THE HOUSE OF REPRESENTATIVES

MARCH 20, 1984

Mr. BROOKS (for himself and Mr. HORTON) introduced the following bill; which was referred to the Committee on Government Operations

---

# A BILL

To revise the procedures for soliciting and evaluating bids and proposals for Government contracts and awarding such contracts using full and open competition, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Competition in Contracting Act of 1984".

SEC. 2. (a) The Office of Federal Procurement Policy Act is amended by adding at the end thereof the following new title: