(8) by striking out the first section 15 (relating to repeals and amendments); and

(9) by redesignating the remaining sections 2 through 17 as sections 101 through 116, respectively.

SEC. 3. Section 115 of the Office of Federal Procurement Policy Act (as redesignated by section 2(8) of this Act) is amended—

(1) by inserting "(a)" after "SEC. 115.";

(2) by striking out "effective competition" in clause (1) and inserting in lieu thereof "full and open competition"; and

(3) by adding at the end thereof the following new subsections:

"(b)(1) There is established in each executive agency an advocate for competition.

"(2) Each head of an executive agency shall—

"(A) designate for each executive agency one senior officer or employee (other than the senior procurement executive designated pursuant to subsection (a)(3)) serving in a position authorized for such executive agency on the date of enactment of this Act to serve as the advocate for competition;

"(B) relieve such officer or employee of all duties and responsibilities that are inconsistent with the duties and responsibilities of the advocate for competition; and





"(C) provide such officer or employee with such staff or assistance as may be necessary to carry out the duties and responsibilities of the advocate for competition.

"(c) The advocate for competition designated under subsection (b)(2)(A) shall be responsible for removing barriers to and promoting full and open competition in the procurement of property and services and shall—

"(1) review the purchasing and contracting activities of the executive agency;

"(2) identify and report to the head of the executive agency—

"(A) opportunities and actions taken to achieve full and open competition on the basis of price and other significant factors in the purchases and contracts of the executive agency;

"(B) solicitations and proposed solicitations that include unnecessarily detailed specifications or unnecessarily restrictive statements of need that may reduce competition in the procurement activities of the executive agency; and

"(C) any other condition or action that has the effect of unnecessarily restricting competition in the procurement actions of the executive agency;

"(3) review all proposals which have been submitted to the senior executive for approval under section 202(e) and provide such executive a written determination on the validity of the proposal;

"(4) prepare and transmit to the head of the executive agency an annual report describing—

"(A) such advocate's activities under this section;

"(B) new initiatives required to increase competition; and

"(C) barriers to full and open competition that the advocate was unable to remove;

"(5) set goals and develop plans for increasing competition on a fiscal year basis;

"(6) develop a system of personal and organizational accountability for competition, which may include the use of recognition and awards to motivate program managers, contracting officers, and others in authority to promote competition in procurement programs (which will be implemented by the agency's senior procurement executive); and

"(7) emphasize competition in programs for procurement training and research.

"(d)(1) Each head of an executive agency shall establish and maintain for a period of five years a computerized file by





fiscal year containing records of all procurements other than small purchases in such fiscal year. Each record shall include—

"(A) the date of the contract award;

"(B) information identifying the source to whom the contract was awarded;

"(C) the property or services obtained by the Government under the procurement; and

"(D) the total cost of the procurement.

"(2) With respect to any procurement in which practices were used which were less rigorous than full and open competition or which were noncompetitive, the procurement record shall include, in addition to the information required by paragraph (1)—

"(A) information identifying the procurement practices used and the reason for the use of such practice; and

"(B) the name and position of the officers or employees of the agency who, as required by this Act, approved the procurement practices used, and the date of such approval.

"(3) The information included in the record established and maintained under this subsection shall be transmitted to, and included in, the Federal Procurement Data System referred to in section 105(d)(4) of this Act.

"(e)(1) Not later than October 31 of each of 1985, 1986, and 1987, each head of an executive agency shall transmit to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives an annual report including the information specified in paragraph (2).

"(2) Each annual report transmitted under paragraph (1) shall include—

"(A) a summary of the activities and accomplishments of the advocate for competition of the executive agency during the preceding fiscal year; and

"(B) a specific description of all actions that the agency intends to take during the current fiscal year to—

"(i) increase competition for contracts with the executive agency on the basis of price and other significant factors; and

"(ii) reduce the number and dollar value of noncompetitive contracts.".

SEC. 3. (a) This Act and the amendments made by this Act shall take effect on October 1, 1984.

(b) Notwithstanding subsection (a), any authority to promulgate regulations or procedures (or modifications thereof) shall be effective upon enactment of this Act.





Mr. BROOKS. Today, we will hear from the General Accounting Office and representatives of vendors who do business with the Government. During a second day of hearings, scheduled for Thursday, March 29, we will hear from the Office of Federal Procurement Policy, the Department of Defense, and others interested in this bill.

I would like to yield now to my distinguished associate, Mr. Frank Horton of New York.

Mr. HORTON. Mr. Chairman, thank you for giving me this opportunity to comment on the bill. We are here this morning to discuss once again how the Congress can help move that mountain called the Federal procurement system to make it more efficient, effective, and economical. We tackle few subjects that are so intractable, but we address none that have such important consequences for the American taxpayers.

Last November, the U.S. Senate passed a bill, S. 338, which bears the title, "Competition in Contracting Act."

The chairman and I recently introduced a bill with the same title, but one that takes a substantially different approach.

I look forward to hearing from our witnesses today and Thursday on how they view these two measures. Specifically, I look forward to answers to the following questions:

Would enactment of either or both of these bills promote efficiency and economy in Federal procurement?

Are the innovative mechanisms that H.R. 5184 establishes to enforce the principles of the legislation likely to be keystones for achieving greater economy?

Would subjecting every procurement not under full and open competition to elaborate justifications and multiple layers of review result in more economical purchases?

Would authorizing and expanding the General Accounting Office's bid protest system make agencies adhere more fully to principles of good procurement?

Would establishing a parallel bid protest system within the GSA's Board of Contract Appeals for reviewing challenges to computer procurements be an admirable prototype for resolving bid protests within the executive branch?

Would appointing a competition advocate within each agency create a force for more effective procurement?

I want to commend the chairman for bringing a major procurement reform bill before our committee. As a sponsor of H.R. 5184——

Mr. BROOKS. I'll give you another 2 minutes.

Mr. HORTON. Thank you. I am committed to bringing out of this committee a bill which will promote efficiency, effectiveness, and economy in Federal procurement. I think this bill is an innovative approach to improving our procurement system. I am asking all of the witnesses today and Thursday to help us mold the best bill possible.

I commit myself to that goal as well. And I do feel it is an important goal. The chairman mentioned some abuses in current contracting practices. I am familiar with them, as a result of some of the hearings that we've had. It seems to me that the business of competition in contracting is a very important thing to highlight.

Case 1:06-cv-00599-MBH Document 17-10 Filed 08/29/2006 Page 4 of 10



And I feel that as a result of the legislation in the Senate, and then the legislation that the chairman and I have introduced, we are at least putting the spotlight of attention on this problem.

A notice came across my desk the other day that the OMB has just recently issued directives that more competition should be pursued, and I think as a result of all of this, we will have a better procurement system. Perhaps we can then avoid some of these abuses that are occurring. I might tell you as a result of talking to people in my district, they are very much upset by the fact these abuses occur, especially at a time when we are talking about a $180–$200 billion deficit.

So, I think that H.R. 5184 is a very important piece of legislation, and I hope that we can, as I have indicated, mold a statute that is going to be effective in halting this type of abuse that has been going on.

Thank you, Mr. Chairman.

Mr. BROOKS. Thank you, Mr. Horton.

Our first witness this morning is Charles A. Bowsher, the Comptroller General of the U.S. General Accounting Office, and distinguished Government executive.

He is accompanied by Milton J. Socolar, Special Assistant to the Comptroller General, who earlier served as Acting Comptroller General. It is a miracle that anybody serves as Acting Comptroller General and survives the job. Mr. Socolar is one of those long-lived versatile, genial, and competent men. We are very proud of him. There are not many in your category, Milton, that survive. But, having done that, you might as well eat raw meat for breakfast every morning.



General Bowsher is also accompanied by Robert M. Gilroy, the Senior Associate Director of the National Security and International Affairs Division.

General, you may proceed.

**STATEMENT OF CHARLES A. BOWSHER, COMPTROLLER GENERAL, U.S. GENERAL ACCOUNTING OFFICE, ACCOMPANIED BY MILTON J. SOCOLAR, SPECIAL ASSISTANT TO THE COMPTROLLER GENERAL, AND ROBERT M. GILROY, SENIOR ASSOCIATE DIRECTOR, NATIONAL SECURITY AND INTERNATIONAL AFFAIRS DIVISION**

Mr. BOWSHER. Thank you, Mr. Chairman, Congressman Horton, we are pleased to be here today to comment on H.R. 5184, the Competition in Contracting Act of 1984.

We generally support this legislation as containing many positive provisions for improving Federal procurement, including GAO's bid protest function. There are a few areas in the bill, however, where we believe refinements would be useful. We would be glad to work with the committee on these matters.

Federal contract awards totaled $168 billion in fiscal year 1983. Awards exceeding the small purchase ceiling totaled $152 billion, and, of this amount, only about a third, $54.7 billion, was categorized as competitive.

Most of the dollars that Federal agencies obligated were for actions under existing contracts. New contract decisions are, therefore, especially significant because they tend to limit the Government to use of the same contractor when contract modifications or additions are necessary.



Our Office has examined statistical samples of new, sole-source contracts above the small purchase ceiling awarded by the Department of Defense and six major civil agencies, the National Aeronautics and Space Administration; the Veterans' Administration; and the Departments of Energy, Interior, Transportation, and Health and Human Services.

The reviews showed that the Department of Defense and these major civil agencies frequently did not base their contract awards on competition to the maximum extent practical, as required. We found that the Department of Defense should have competed 25 of 109 new, sole-source contracts we reviewed.

We estimated that DOD lost opportunities to obtain available competition on about $289 million in new fiscal year 1979 contract awards. The six civil agencies lost opportunities to obtain available competition on an estimated $148 million in new contract awards. The dollar amounts for both defense and civil agencies represent initial contract obligations, which in some cases may be substantially increased through later contract modifications.

Now, why did agency officials fail to obtain competition on awards that could have been competitive? The major factors we identified included: one, ineffective procurement planning or the failure of contracting officers to perform market research adequate to ensure that sole-source procurement was appropriate.

And, two, inappropriate reliance by procurement officials on the unsupported statements of agency program, technical, or higher-level officials.

In addition, a general lack of commitment to competition on the part of key agency personnel was a major factor. There were also instances of overly restrictive specifications and failure to use available data packages.

H.R. 5184 proposes several important changes to address these and other problems and also provides a comprehensive statutory prescription for GAO as a bid protest forum.

To improve Federal procurement, first, the bill would authorize noncompetitive procurements only under special and strictly limited circumstances. Based on our work, we have specifically recommended this type of requirement.

Second, the bill would require agencies to use advance procurement planning and market research. As previously mentioned, our reviews of defense and civil agency sole-source contracts identified ineffective procurement planning and inadequate market research as deficiencies needing correction.

Third, the bill would require the use of full and open competition, allowing all qualified sources to submit offers, but would permit the use of competitive practices that are "less rigorous than full and open competition" in several specific circumstances. This recognition of degrees of competition should increase its use and reduce the tendency toward sole-source awards in certain circumstances.

Fourth, the bill specifies the minimum information that must be included in written justifications for noncompetitive procurements.

This includes the facts supporting use of the noncompetitive exception and, when appropriate, a description of the market survey conducted to locate competitive sources, or the reasons why one was not conducted, as well as the reasons for excluding any potential sources that expressed an interest in competing.

In reviewing noncompetitive contract awards, we found that frequently the justifications did not include such information and reviewing officials did not have the information needed to establish the appropriateness of decisions to make awards on a sole-source basis. Competition was in fact available in a number of these instances.

Regarding GAO's bid protest function, although there are significant additions, the bill, to a great extent, reflects GAO's current bid procedures.

The bill would preclude an agency from either awarding a contract or continuing with contract performance when a protest is pending before GAO, unless the agency head or the agency's senior procurement executive determines that the vital interests of the United States will not permit awaiting GAO's decision.

At present there is no requirement that contract performance be discontinued pending a protest. Although agency procurement regulations limit the authority of the contracting officer to make an award while a protest is pending, the contracting officer is authorized to make an award in the face of a protest where he determines that the award would be advantageous to the Government.

We think that limiting continuation of the Government's business except where the vital interests of the United States are at stake may be too rigid a standard to apply realistically. We recognize the bill's purpose, but are concerned that an unrealistic standard may ultimately result in necessary dilution of the standard through interpretive decisions. We would prefer a less rigid standard applied, perhaps, at the agency head level to assure proper consideration.

Second, the bill would require agencies to submit their report within 25 working days—and in some cases within 10 days—after receiving a notice of protest. It would further provide that if an agency report is not timely filed, GAO may consider the agency's failure to do so as an admission of the protester's contentions. GAO's current procedures state that agency reports should be submitted as expeditiously as possible within a set goal of 25 working days. A late report has no effect on the merits of the protest.

We would suggest it be made clear that the Comptroller General may grant extensions in situations where there are legitimate reasons making these time periods unreasonable.

Third, the bill would require agencies to provide protesting parties with all nonprivileged relevant documents. Existing procedures call for this information to be furnished.

In addition, the bill would provide that GAO may declare the entitlement of a successful protester to the costs of perusing its protest as well as its bid and proposal preparation costs. Under existing law, GAO may award bid and proposal preparation costs only.

Now, these proposed changes to the existing protest system would clearly enhance GAO's ability to provide protesters with meaningful relief. Thus, the bill would help assure that procure-



ments are awarded in accordance with the requirements of law. In keeping with the bill's enhancement of GAO as a protest forum, we would want to expedite our processing of protest cases. After enactment we may find that we need to augment our staff to meet increased demands placed upon us in meeting the bill's underlying objectives.

We should point out that the bill's tightened competition requirements together with stricter protest requirements could cause delay in the Government procurement programs and an attendant increase in costs. Whether contracting agencies should be required to accept the resulting delays in their procurement programs and any increased costs is a matter we leave for the Congress to consider.

There are several other provisions in the bill which we think should be refined or changed. The bill would provide that interested parties may file protests with the General Services Administration, Board of Contract Appeals concerning procurements made under section 111 of the Federal Property and Administrative Services Act of 1949. This would be in addition to a right to protest to our Office. Procurements made under section 111 of the act for automatic data processing equipment are, like all other procurements, subject to the provisions of this bill.

Establishing additional protest jurisdiction in the Board could therefore result in inconsistent rulings from the Board and from GAO. While ADP procurements are also subject to section 111 of the Federal Property and Administrative Services Act, they do not necessarily concern the technical aspects of the ADPE being purchased. Most often they concern the same procurement-related issues that affect all acquisitions. We see no reason to treat ADPE protests differently and recommend this provision be deleted.

In addition, circumstances authorizing the use of noncompetitive practices need to be better defined. Under the bill agencies would likely justify the need for noncompetitive follow-on contracts under section 202(c)(1)(A) on the ground that the property or services required are available from only one source. The bill should specify the conditions under which such follow-on awards are appropriate.

Our specific suggestion relating to follow-on procurements as well as several additional suggestions intended to define and limit the important exception to the use of competition provided by section 202(c)(1)(A) are set forth in the attachment to this statement.

Section 202(c)(4) of the bill provides that "In no case shall an executive agency be authorized to engage in noncompetitive procurement on the basis of the lack of advance planning or concerns related to the amount of funds available to the agency for procurement functions."

Although we have found that agencies generally need to improve their advance procurement planning efforts, we believe that for at least some procurements this provision would be too costly and burdensome to the Government. Therefore, we suggest the provision be revised to require instead a report to the committee in each case where the lack of advance planning caused a noncompetitive procurement. The report should include the steps taken to avoid such problems in the future.

Also, the bill should provide that failure to obligate funds by reason of a pending protest shall not cause such funds to lapse if the protest is ultimately resolved in favor of the agency position.

Subsection (a) of section 204 of the bill states in part that protests concerning violations of this title shall be given priority consideration by GAO. We recommend that this provision be modified to give GAO some discretion to determine how best to handle its case load.

Technical concerns we have regarding specific provisions of the bill are shown in the attachment. This concludes my prepared statement. We'd be happy to address any questions you or Congressman Horton might have.

Mr. BROOKS. Without objection, we will include the attachment of the additional suggestions from your organization, General.

Mr. BOWSHER. Thank you, Mr. Chairman.

[The information follows:]



ADDITIONAL SUGGESTIONS RELATING TO H.R. 5184

The Committee report should make clear that the use of noncompetitive practices under section 202(c)(1)(A) for follow-on contracts covers the avoidance of (1) unacceptable delays in accomplishing the agency's mission objectives or (2) substantial duplication of costs to the government for the property or service being procured, which cannot be expected to be recovered through competition.

The Committee report accompanying the bill should also include an explanation along the following lines to define several other important bases for single-source availability determinations under 202(c)(1)(A):

--The agency head determines that it is in the public interest to procure technical equipment or parts which require standardization and interchangeability where only one source can provide such standardization and interchangeability and it is neither practical nor economical to establish more than one source. Determinations under this paragraph shall not be made for the initial procurement of equipment and spare parts which ultimately will be standardized or for the purpose of arbitrarily selecting the equipment of certain suppliers.

--Data, such as drawings or other specifications, needed for competition are not available and there is no alternative way of obtaining competition, such as through redescribing requirements in terms of function or performance required. However, agencies are responsible for avoiding such noncompetitive situations by obtaining adequate data wherever feasible.

--There is existing equipment and only one source can satisfy the government's legitimate need for an item compatible with it. If other sources can modify or adjust their products to produce acceptable items, they must be given the opportunity to compete.

We also have some concerns about the wording of section 202(c)(5) relating to spare parts. We suggest that the words "in the parts or their manufacture" be deleted because a firm's proprietary interest would relate to the data needed by the government for competition rather than the parts themselves.

Section 202(j)(1)(D) provides that full and open competition means "the contract is entered into only after the executive agency has received, from qualified sources, a sufficient number of sealed bids or competitive proposals to ensure that the government's requirements are filled at the lowest possible price given the nature of the product or service being





acquired." This is a very strict standard and could necessitate repeated resolicitations to achieve full and open competition as defined. We suggest that the words "a fair and reasonable" be substituted for "the lowest possible" price.

In addition, as part of this same definition, subsection (j)(1)(A)(iii) states that each bid or proposal must be "fully evaluated" in the selection of a contract recipient. We are uncertain whether this term would needlessly add to agency administrative burdens and we suggest that the term "fairly evaluated" be used instead.

Section 203 of the bill does not exempt agencies from publishing a preaward notice in The Commerce Business Daily inviting bids or proposals under certain circumstances that we believe should be exempted. This includes section 202(c)(1)(C) and (D) under which noncompetitive practices would be authorized based on international agreements, procurements directed by foreign governments reimbursing the agency for their cost, and statutes requiring procurement from specified sources. Current law does not require publishing notices inviting competitive offers in these situations when noncompetitive awards are determined to be necessary (see Public Law 98-72).

This type of notice is primarily intended as a final check on the marketplace to identify potential competitors that have not yet been solicited either (1) in competitive situations or (2) when agency officials claim that a noncompetitive procurement is necessary because the property or service required are available from only one source (section 202(c)(1)(A)). Publishing such notices in all other noncompetitive situations is burdensome and most likely not worthwhile. The Committee may also wish to consider exempting procurements made by an order placed under an existing contract, including orders for perishable subsistence supplies, as currently provided by Public Law 98-72.

Mr. BROOKS. What is your assessment of the recent directive on competition issued by the Office of Federal Procurement Policy?

Mr. BOWSHER. Well, we commented on that directive in writing to OFPP. I believe that the directive is a good faith effort, but it failed to define the term "competition," thus, it was leaving it up to the agency to determine what is and what isn't a competitive procurement.

And, second, while the directive contains seven exceptions to competition, it also allows the agencies to establish any additional exemptions that they believe are necessary.

Mr. BROOKS. It sounds like a waste of time. I could drive trucks through that kind of an exemption. I never saw so many people dedicated to doing wrong.

In your view, does the pending Federal acquisition regulation properly reflect our national policy of using full and open competition?

Mr. BOWSHER. Well, first, there is no direct reference to full and open competition as being the national policy in the FAR.

Second, the regulation does not have a section highlighting the specific requirements and rules for using competition. And, further, there is language contained in the body of the regulation which conflicts with the principle of full and open competition. In this regard the regulation states, "Bids shall be solicited from all qualified sources deemed necessary by the contracting officer."

Mr. BROOKS. All right. They are going to raise the dollar limit on April 1 from $10,000 to $25,000 for small purchase thresholds.

Do you feel that the three categories of procurement established by H.R. 5184 will result in the increased use of competition?

Mr. BOWSHER. We believe it will, Mr. Chairman. We feel this spells it out a little more effectively and, hopefully, people will not move to the sole-source category quite as directly by having the three categories rather than the two.

Mr. BROOKS. What is your estimate, General, of the potential savings that are available if agencies increase their use of competition in their procurements?

Mr. BOWSHER. It is difficult to come up with an overall figure. We've found many instances, and we have cited them in some of our reports, such as spare parts in computer procurements, where you could achieve significant savings. And I think over time we have seen quite a few of these individual situations. What the overall percent or amount would be, that is just very difficult to determine.

Mr. BROOKS. According to the OFPP statistics, $87 billion in Federal contracts were awarded in 1983 without competition. Assuming even a 20-percent savings, almost $17½ billion could be saved in 1 year. And it is not a whole lot of money when you have a "small" budget deficit of several hundred billion dollars, but it adds up. It adds up even in this administration.

How have agency actions significantly delayed or hindered GAO's bid protest decisions?

Mr. BOWSHER. Well, our current procedures require agencies to respond to protests within 25 working days, but the agencies frequently take considerably more time, and this often significantly delays our decisions. We sometimes feel that these protests work





their way toward the bottom of the pile because of the agencies' priorities on other issues, and sometimes that is understandable, but it all adds up to delay in the protest system.

Mr. BROOKS. General, over the last 3 years, how many times did the agencies implement GAO's decision to cancel or terminate a contract when GAO examined the facts in each situation?

Mr. BOWSHER. Yes. Where GAO actually recommended straight out cancellation or termination, the number is 34 over the last 3 years and the agencies did carry that out to the best of my knowledge.

Mr. BROOKS. That is 7 percent to the best of your knowledge?

Mr. BOWSHER. Yes, that is right.

Mr. BROOKS. That is, 7.3 percent of the protests decided were in favor of the protester. Based on the committee's experience and exposure to these agencies, how can anyone think they were right 93 percent of the time, particularly when you look at the numbers that we have?

Mr. SOCOLAR. May I comment on that, Mr. Chairman?

The raw sustained figure is not really the appropriate measure in terms of the actions taken with regard to protests filed in our office. The fact is that about 600 protests that are initially filed are withdrawn by the protester himself, and in at least half of those cases, we have a very good basis for understanding that those were withdrawn because the agency itself took proper action upon notification that a protest had been filed.

Mr. BROOKS. I looked at the numbers—so, that's true. In 1983, for example, you received 2,639 protests. Well, you took some out and the agencies withdrew some and knuckled under in others. For one reason or other, the only protests that GAO decides are about half of those received—less than half of those.

Mr. SOCOLAR. That's correct, we received 2,425 protests in 1983. One thousand two hundred forty-one resulted in formal decisions.

Mr. BROOKS. 1,241. You know, that's a normal procedure. A lot of cases were filed and some of those you wash out. But in the ones that you sustain, 62, that's where I am getting my 7.3 and that is where you say 93 percent of the time the agencies are absolutely right. We're not tripping up a whole lot.

Mr. SOCOLAR. Well, out of the 1,241——

Mr. BROOKS. Yes, sir.

Mr. SOCOLAR [continuing]. Actually only 743 were fully developed protests. The difference between that figure and the 1,241——

Mr. BROOKS. What's this 700 number?

Mr. SOCOLAR. That is the number of protests——

Mr. BROOKS. Decided?

Mr. SOCOLAR [continuing]. That were fully developed and required agency reports.

Mr. BROOKS. What is a protest decided? That's the number they gave us.

Mr. SOCOLAR. Now, many of those——

Mr. BROOKS. Do you have another category? I mean, decided really, honestly, or just decided?

Mr. SOCOLAR. Many of those that are decided are decided on the basis of the incoming protest where it is clear.

Mr. BROOKS. Based on what?

Mr. SOCOLAR. Based on the incoming protest where it is clear——

Mr. BROOKS. The facts.

Mr. SOCOLAR [continuing]. That there is no basis for sustaining the protest.

Mr. BROOKS. You read those, though?

Mr. SOCOLAR. Oh, yes.

Mr. BROOKS. Now, here's another category that you read twice and you get the agency to give you a comment. That means decided seriously? That means really decided——

Mr. SOCOLAR. Where there are——

Mr. BROOKS. Adjudicated and decided?

Mr. SOCOLAR. Yes.

Mr. BROOKS. Ex cathedra?

Mr. SOCOLAR. Correct. Those are cases where it is clear that there is an issue in controversy that requires development, which are in fact fully developed by comments by all interested parties before we do reach our decision.

Mr. BROOKS. So there were 700 of those?

Mr. SOCOLAR. 743.

Mr. BROOKS. 743. The protest was sustained in 62 of them, is that correct?

Mr. BOWSHER. Sixty-two plus 47 or 109. There were 47 sustained in part, Mr. Chairman.

Mr. BROOKS. You've changed that number since you gave it to us?

Mr. SOCOLAR. What I would suggest is that we get with the staff and give you the right line up of numbers.

Mr. BROOKS. The point I am making is that either way you cut it——

Mr. SOCOLAR. That's right.

Mr. BROOKS [continuing]. About 90 percent of the time you say the agency is right?

Mr. BOWSHER. Eighty-five percent. That's right.

Mr. BROOKS. Whether you make a decision and decide the case on the basis of the facts you have, or whether you decide the case on the basis of facts that you dig up and then resolve it—you know, hustle it along for a little bit, promote it, cogitate over it, those kinds of decisions——

Mr. BOWSHER. Yes.

Mr. BROOKS. Either way, you find that the agencies win about 90 percent of the time?

Mr. SOCOLAR. That is correct, if you count cases which are discussed without being developed.

Mr. BROOKS. How many claw hammers do they have to buy before we find them wrong? You know, it is just unbelievable. Some of these examples are so bad that if they are indicative of agencies' policies—it is like an iceberg, only one-seventh is above the water. My goodness, what must be underneath the water. Think of the ones that we don't find, that we never hear about. Somebody washes out beautifully. They must be making billions of dollars and we never even catch them stealing. If we only catch the little ones, that is what worries me.

Well, should H.R. 5184 contain a provision which sets a specific timeframe in which the GAO must render its bid protest decision?





Mr. BOWSHER. We prefer not, Mr. Chairman. We prefer——

Mr. BROOKS. I'll bet.

Mr. BOWSHER [continuing]. To have flexibility.

Mr. BROOKS. I understand.

All right. Mr. Horton.

Mr. HORTON. Thank you, Mr. Chairman.

The Senate, as you know, passed S. 338, which deals with the subject of competition in Government procurement. The Senate bill establishes principles of competition by amending the two basic Government procurement statutes, the Federal Property and Administrative Services Act and the Armed Services Procurement Act. Our bill, on the other hand, establishes principles by creating a new statute which would take precedence over all existing laws.

Which approach do you prefer and why?

Mr. BOWSHER. Now, we basically would go with the uniform statute approach which is this bill. I think Bob here has worked in the area of procurement a long time and can probably give you the best descriptions and the advantages and disadvantages to each approach.

Mr. HORTON. Mr. Gilroy.

Mr. GILROY. Mr. Horton, both bills are directed at reducing noncompetitive procurement and we see an awful lot of similarity in those bills. One of the basic differences is that there is a stronger protest provision in H.R. 5184 versus S. 338. And, also, we have three categories of procurement in H.R. 5184 while there are two, the noncompetitive and effective procurement in S. 338. But we feel very strongly that both bills strike at the heart of the thing that we've been reporting on for many, many years and that is the reduction of noncompetitive procurement.

Mr. HORTON. The Senate bill requires that noncompetitive procurements be justified in writing. Our bill requires that both noncompetitive procurements and purchases made under practices which are less rigorous than full and open competition be fully justified in writing. It also mandates that justification be certified by the contracting officer as being accurate and complete, reviewed and approved in writing by a higher-level official, reviewed and analyzed in writing by the agency's competition advocate, and finally, approved or disapproved by either the agency's senior procurement executive or, if the procurement is under $500,000, someone to whom that executive has delegated approval authority.

Do you think that procurements which are to be conducted under procedures that are less rigorous than full and open competition need to be justified in writing?

Mr. BOWSHER. Yes, we do.

Mr. HORTON. Do you think that all the levels of review and approval mandated by H.R. 5184 are necessary for either less rigorous or noncompetitive procurement?

Mr. BOWSHER. Yes, we feel the same way on that point, too, sir.

Mr. HORTON. The major overall responsibility of OFPP, as specified in its enabling statute, is to promote economy, efficiency, and effectiveness in the procurement of property and services by the executive branch.

The general premise of H.R. 5184 is that competition is the single best way to this goal. Do you agree with that premise?

Case 1:06-cv-00599-MBH Document 17-10 Filed 08/29/2006 Page 10 of 10



Mr. BOWSHER. Well, we think that the thrust—as we've all been saying here—the thrust of competition is what all these efforts are about and we feel that this bill gives it that thrust. We don't feel that the general premise is that it is the only way to go, but that it is the best way to go, if at all possible. And so we support that.

Mr. HORTON. If H.R. 5184 does become law, do you think that the procurement system would be more economical, efficient, and effective? Are there ways in which it might not be so effective?

Mr. BOWSHER. Well, we certainly hope it would be. That is what we have felt for some time on the issue of competition. There is always the problem that in a competition you might get a contractor that can't perform, but I think that is part of carrying out a good competition, that is, looking for people that can perform and still having it on a competitive basis.

Mr. HORTON. Our bill establishes the GAO bid protest system by statute. Do you think it is necessary that we do this on a statutory basis?

Mr. BOWSHER. Well, it would give the system a greater force, you might say. We are hoping that some of the features here would make a more timely system. That has always been one of the problems. We think by adding some remedies in there that would he helpful. We are concerned about the one remedy, as I pointed out in my statement, that the filing of a protest would halt the procurement process. I think that is one provision that the committee should give quite a bit of thought to and maybe adopt some less rigid approach to trying to handle that issue.

Mr. HORTON. Overall, when you look at the situation that we have been faced with in the last year, the disclosures with regard to noncompetitive procurement and the OMB directive to go toward more competition, do you think that there is a need for this type of legislation—either the Senate bill or ours?

Mr. BOWSHER. We would support this type of legislation, yes.

Mr. HORTON. Is it really necessary to have a statute of this type?

Mr. BOWSHER. Well, we believe the statute would add emphasis here. You know, I think, as we said earlier on, some of the other efforts are also moving in the right direction. Unfortunately we have these situations, like the spare parts, that obviously indicate that competition is not being pursued. So this raises the question of whether a statute would help to enforce or make people more aware of the big desire to go out on a competitive basis if at all possible.

Mr. HORTON. On page 7 of your testimony, you have indicated that there might be, as a result of these stricter protest requirements, delays in the Government procurement programs and an increase in costs. And then you say whether or not the contracting agency should be required to accept the resulting delays and any increased costs is a matter we leave for the Congress to consider.

Well, that is all right, but let's have a little of your own view with regard to——

Mr. BOWSHER. That's the part that concerns us, Mr. Congressman. In other words, that's why we raised it there in the statement. We are just not sure if you bring the procurement process to a halt—in other words, say a person can file a letter of protest and get literally the injunction power practically on the process—





whether that might not cause quite a bit of additional costs, in effect, because on some of these procurements a lot of money goes out every day that the clock ticks, you might say. So, that is the part that we are somewhat concerned about in this bill.

Mr. HORTON. Well, I would be concerned about that, too. If that is going to be a substantial amount, then I would be concerned, too. Maybe we ought not to tighten it up; leave it like it is.

Would you prefer to have it like it is, or would you prefer what we have in the bill?

Mr. SOCOLAR. Mr. Horton, under current procedures the agencies have in their regulations a requirement to stop an award if a protest is filed before award is made. There is no similar provision with regard to stopping work if the protest is filed after the award is made. The bill, H.R. 5184, allows for work to proceed or award to be made on the basis of a determination that the vital interest of the United States is at stake. We feel that that may well be too rigid a standard. It may not accord with the full reality of what is required under the procurement process. We don't think it is bad to have to stop award actions or even the prosecution of work as long as there is a reasonable basis and a reasonable means for overcoming that where the interest of the United States would call for that.

Mr. BROOKS. Will the gentleman yield?

Mr. HORTON. I would be glad to yield.

Mr. BROOKS. I just want to observe that over the years the best way to run a real fandango through the Government is to set up an emergency. That's the way some agencies operate.

Any need that they have, they build into an emergency. They say it is critical and vital and essential, and they want it right now. They have no more time. They can't go out on a bid procedure. It takes too much time. They couldn't advertise specifications. They've got them kind of roughed out—the contractor developed the specs, of course. Who could compete with them? Nobody else has a copy of those specs—except the people that drew them up—so they could meet them. It fits neatly into their factory operations, their plant, and their subcontractor capabilities. That is the way they set them up with the big emergency. If the Congress questions the procedure for a specific contract, the agency says we can't go out for bid now. Everything will go to pot, we won't be able to operate. It has been going on for years. However, I am just not convinced. I think you must get them by the chain and jerk them good. Tell them to stop and not spend another dime until they justify it. It will hurt, but this country will save an awful lot of money.

When you leave the house in the morning—think about it—and your wife says, by the way, I need $20 to pick up your shirts. It is something you need, you understand, but it is $20 cash out of your pocket. You only have $22 in your pocket and she wants $20 to pick up the shirts. And she knows she can go write a check. She could go through the regular procedure, but she tells you just when you are leaving, "Hey, Frank, I need $20 to pick up your shirts and to get a new pair of shorts for the boy." That's all. "Well, don't you have any money, Nancy?" "No," she says, "I don't have any. I