Case 1:06-cv-00599-MBH Document 17-11 Filed 08/29/2006 Page 1 of 10



could write a check, Frank, but I didn't want to have to stop. I want to do it this morning."

It is the same old hustle. You give it to them because you are in a hurry and you don't have time to argue about why not pick up the shirts next week. Or why not wait until you go to the grocery store and cash a check. You don't go into that. It isn't worth it. It is too much trouble at home.

However, it isn't too much trouble when it is the Government spending billions of dollars and millions of dollars. I think we ought to just tell agencies, "Well, let's wait until tomorrow. Let's check. I think we would save a lot of money." It would add to the efficiency with which this Government runs.

And every time I get ready to pay my taxes, I just get sick at the thought of how agencies are spending it. That is what worries me.

It ought to worry you, too, General, you're getting a pretty good salary now.

Mr. BOWSHER. Mr. Chairman, we share your concern.

Mr. BROOKS. Steak tartare, they call it, for breakfast.

Mr. BOWSHER. Right. But our concern also is for the procurements that are being run right because this would allow a person to file a protest if they lose the procurement and bring the procurement to a halt.

Mr. BROOKS. But can't you throw it out if it is a specious protest?

Mr. BOWSHER. I don't think we could according to this law. That is what concerns us.

Mr. SOCOLAR. Well, there are——

Mr. HORTON. You mean, this law changes it?

Mr. SOCOLAR. No, there are some that could be thrown out on the basis of the protest filed.

Mr. BROOKS. That's right. That's correct.

Mr. HORTON. But, excuse me, I'm concerned now. You said—Chuck, you said that this law made a change so you couldn't throw it out?

Mr. SOCOLAR. No, you could under this bill.

Mr. HORTON. Oh, you could?

Mr. SOCOLAR. You could.

Mr. BOWSHER. You could on a very specious protest, but there could be some others where it isn't quite so clear.

Mr. HORTON. Oh.

Mr. BOWSHER. We might ultimately rule that the procurement was all right but it would have been brought to a halt.

Mr. HORTON. I understand what you say about these emergencies——

Mr. BOWSHER. Yes.

Mr. HORTON [continuing]. And following up on what the chairman was just saying, it reminds me——

Mr. BROOKS. Did Nancy get you this morning?

Mr. HORTON. No, no, no. I haven't been home since Thursday. I have been up in my congressional district. I just got in. She'll probably get me tonight, though.

But these emergencies remind me of when I used to try lawsuits. I would have an automobile accident case in which a fellow would say, "The car in front of me stopped suddenly." Well, they had been going along normally in normal traffic and the car in front,





as you find out later, made a normal stop. The car in front stops; so, the car in back would normally stop too. But the car in back that hit him instead of being aware of what was happening in front was watching on the side, maybe picking up a pretty girl, or something like that, and then all of a sudden he would look back, and, boom, the car in front would appear to stop. So, it stopped suddenly for him, because he was looking someplace else. That is what some of these emergencies remind me of. You know, they don't look where they are going. They are looking at something else, and then all of a sudden we have got a big emergency and so we have got to go through with these things.

And I think——

Mr. BOWSHER. And that is why I think having the three categories is good. I think it is good that we add the additional remedies like making it more costly to an agency that loses on the protest system. In other words, you are now going to say to them that they have got to give back more than the bid and proposal preparation cost. And so I think it is good to put the additional remedies in there. But this one feature, we are just trying to alert to you that it is a very important feature and it could be one that turns out with some effect greater than maybe you intended to handle those emergencies.

Mr. HORTON. OK. I have another series of questions and I would just like to submit those to you and ask you to give me the answers in writing so that we could put them in the record.

Mr. BOWSHER. We would be pleased to do that.

Mr. HORTON. I would like to have your answers to those other questions, and I think you have a copy of them, or we will see that you get a copy so that you can prepare the answers for the record.

Thank you.

[Mr. Bowsher's submissions to additional questions of Mr. Horton follow:]

ADDITIONAL QUESTIONS OF MR. HORTON
FOR COMPTROLLER GENERAL BOWSHER

QUESTION: The Senate Bill, S. 338, establishes two levels of competition in procurement. H.R. 5184 establishes three. Which of these approaches do you prefer? Why?

GAO ANSWER: We believe it is preferable for the legislation to spell out all three because this would be more explicit.

QUESTION: All in all, which bill do you prefer, S. 338 or H.R. 5184?

GAO ANSWER: We believe both bills have merit. However, because its bid protest provisions would enhance our ability to provide protesters with meaningful relief, we prefer H.R. 5184.

QUESTION: H.R. 5184 contains a number of exceptions which agencies may invoke to depart from the general rule that all procurements be by full and open competition. If we decide to drop the middle category of competition, should all the exceptions be made applicable to noncompetitive procurements?

GAO ANSWER: Under those circumstances we would support making two of the exceptions applicable to noncompetitive procurements: (1) the urgency situation, when the government would be seriously injured by the delay associated with soliciting bids or proposals from more than one qualified source, and (2) the situation where disclosure of the agency's need to more than one source would compromise the national security.



QUESTION: H.R. 5184 establishes the GAO bid protest system by statute. Are there any deficiencies in the present system which could be cured by statutory authority?

GAO ANSWER: Yes, H.R. 5184 should speed up the bid protest process and result in more prompt decisions.

QUESTION: H.R. 5184 would make violations of the newly-established competition principles subject to bid protests. By giving these protests priority consideration, the bill practically pleads with protesters to base their complaints, at least in part, on violations of the principles. Do you believe that the principles are sufficiently reasonable, and drafted with enough precision, that the bill would not generate vast numbers of new, more theoretical, protests which would be difficult for GAO to resolve?

GAO ANSWER: We think that, as with any new legislation, there will at first be a number of parties who will file protests in order to receive interpretations of the new terms and provisions. We have no reason to believe that there will be a "vast" number of new protests or that these protests will be any more difficult to resolve than current protests. As far as the theoretical nature of the protests under the bill are concerned, we note that current law contains such broad concepts as "free and full competition," and "maximum number of qualified sources."

Case 1:06-cv-00599-MBH Document 17-11 Filed 08/29/2006 Page 3 of 10



We have been able to handle protests involving these concepts. Thus, while we recommend that the provision stating that protests concerning violations of the bill be given priority consideration be modified to give us discretion to manage our case load, we see no reason why we would not be able to handle protests under the bill.

QUESTION: The bill would permit failure of a party to produce documents on time to be taken as an admission of the contentions made by an opposing party. Is this a fair penalty to impose on someone who is a day or two late in producing documents?

GAO ANSWER: It could be unfair in some cases. This is why we suggested in our statement that the Comptroller General be given authority to grant extensions in situations where there are legitimate reasons making the bill's time periods unreasonable.



QUESTION: The bill would permit the Comptroller General to grant to an appropriate party, from an executive agency's procurement funds, the cost of filing and pursuing the protest. Should contesting parties be reimbursed for these expenses?

GAO ANSWER: Yes, we believe they should be reimbursed. But, of course, a protester would have to win its case to collect.



QUESTION: The GSA Board of Contract Appeals is empowered to review determinations made by agency contracting officers before reaching final decisions. Do you think that contract appeals boards should be authorized to examine preliminary determinations made by agency employees?

GAO ANSWER: We do not think that the GSA Board should be empowered to review bid protests at all.

QUESTION: Do you think that any judge of a bid protest should be authorized to review these determinations?

GAO ANSWER: Currently, protesters may complain to GAO about a proposed award selection. If in fact the agency does intend to make award to the protested party it will defend against the protest on that basis. If a final decision has not yet been made the agency will so inform us and we will dismiss the matter as premature. Thus, we have no problem permitting protesters to raise such matters.

QUESTION: The bill requires the Board to provide for discovery of relevant information. What are the practical consequences of this provision in terms of legal presentation, time, and complexity of the cases?

GAO ANSWER: We feel that the procedure set forth in the portion of the bill regarding GAO's bid protest function is more desirable. The more formal type proceedings before the Board could delay the processing of protests and most likely increase the costs both for protesters and agencies. Because of the complexities of such procedures it would be difficult for a protester to pursue a case without hiring a lawyer.

QUESTION: On page 20, lines 15 through 21 of the bill, the Board is required, after holding a hearing, to suspend an agency's authority to acquire any goods or services under a contract whih are previously delivered and accepted, unless the agency establishes that certain circumstances will not permit awaiting the decision of the Board. On page 21, lines 16 through 22, however, the bill provides that "If the Board revokes or suspends a delegation of procurement authority after contract award, the affected contract shall not be considered void ab initio (from the beginning) but shall be presumed valid as to all goods or services delivered and accepted thereunder prior to the suspension." These two provisions seem to mandate contradictory results. Which makes more sense to you?

GAO ANSWER: It makes more sense to us to presume the delegation of procurement authority to be valid as to all goods or services delivered and accepted prior to its suspension, revocation, or revision.





QUESTION: Would the procedures mandated by this bill require the Board to use a different administrative process from the one it uses for other cases? If so, how should the bill be revised so as to avoid making the workings of the Board more complex or confusing?

GAO ANSWER: We are not sufficiently familiar with the GSA Board's processes to comment on whether its current process would have to be changed to meet the requirements of the bill.

QUESTION: Do you have any estimates of how much the bid protest system authorized in this bill might cost the GAO, GSA, procurement activities of the executive agencies, and private contractors who wish to do business with the government?

GAO ANSWER: While we think that the bid protest systems authorized by the bill will be more costly than the current system, we have no basis upon which to base an accurate estimate of the increased costs.

QUESTION: The bill requires the head of each executive agency to designate one senior employee to serve full-time as an advocate for competition. The competition advocate is given several responsibilities which could have a significant impact on the way in which the agency conducts its procurements. Only last

December, we amended the Office of Federal Procurement Policy Act to require the head of each agency to "establish clear lines of authority, accountability, and responsibility for procurement decisionmaking within the . . . agency," and "designate a senior procurement executive who shall be responsible for management direction of the procurement system of the . . . agency." Is establishment of a new procurement official with duties which impinge on the operations of the senior executive consistent with the December amendments? What effect would it have on the administrative structure?

GAO ANSWER: We don't see that the duties of the competition advocate are inconsistent with the December 1983 amendments. Indeed, each of the military services (1) has named a full-time competition advocate, and (2) either has nominated or plans to nominate a separate senior procurement executive.

QUESTION: The bill requires each agency to transmit certain procurement information to the Congress in an annual report to be submitted 1 month after the end of each fiscal year. Is the information mandated to be included in these reports easily compiled?

GAO ANSWER: We believe these requirements are reasonable.





QUESTION: Lines 19 through 22 on page 10 of the bill state that the term "full and open competition" includes procurement of architectural or engineering services conducted in accordance with title IX of the Federal Property and Administrative Services Act. That title makes very clear that all procurements of those services are to be by negotiated contracts. I realize that this definition is in the bill so that agencies will not have to go through the time-consuming and expensive process of writing justifications and approvals for excepting every A/E procurement from "full and open competition." I note, though, that we do require that process for other non-competitive procurements, even when a statute requires that the procurement be made from a specified source. Why should purchases of architectural and engineering servies be treated differently?

GAO ANSWER: The Congress has determined that procurements of architectural or engineering services are to be treated separately under current law. The bill merely continues that policy.

Mr. BROOKS. And I would suggest that you take a quick look at page 17 of the bill, lines 19, 20, and 21, which says, "Three, the Comptroller General is authorized to dismiss any protest determined to be frivolous or which on its face does not state a valid basis for protest." So, it gives you a real opportunity if the protesters are just whistling dixie to throw them out. If they have a valid case, you've got a timeframe to promptly get an idea of what is going to be done about it. Plus, the people that got the bid probably won't start work right away. It takes a little time to get shaped up. Even if they had the whole thing wired, it takes a little time to really put everything in place. They have options on those subs, and so forth. It takes a little time.

Well, I thank the three of you for a very splendid presentation.

Mr. BOWSHER. Thank you.

Mr. BROOKS. We will take a look at your comments and be back in touch with you.

Mr. BOWSHER. Thank you.

Mr. BROOKS. Now, our next witness is A.G.W. "Jack" Biddle, president of the Computer and Communications Industry Association, which he founded in 1971.

Mr. Biddle is accompanied today by David Cohen, the senior partner with Cohen & White.

We are delighted to see you again, Jack, David, and we welcome you to the committee.

**STATEMENT OF A.G.W. BIDDLE, PRESIDENT, COMPUTER AND COMMUNICATIONS INDUSTRY ASSOCIATION, ACCOMPANIED BY DAVID COHEN, COHEN & WHITE**

Mr. BIDDLE. Chairman Brooks, Mr. Horton, I am happy to have this opportunity to appear before you on this important piece of legislation.

Before I go into my remarks, I would like to make an observation on the dialog that just occurred. In our experience typically an agency is involved in the planning, internal debating, and approval for a major procurement over a period of two or more years. It seems to us that a 60- to 90-day delay imposed upon them for trying to warp the rules is not an excessive delay. Perhaps if they spent time during the planning process to ensure that it was an open and competitive procurement; then, they would not have the delay and we would all be a lot better off.

Mr. BROOKS. You mean they don't think them up one day and let them the next?

Mr. BIDDLE. No. They generally do not.

Mr. BROOKS. They've been around some time?

Mr. BIDDLE. I think that is generally the case. I think another area of concern is that because of the present way the bid protest system works, they try to delay the process on the bid protest while they actually install the equipment and now can claim that the cost of disinstalling it and replacing it with the equipment of the competitor who really should have won, is excessive to the Government.

Mr. BROOKS. Already in?

Mr. BIDDLE. Yes.





Mr. BROOKS. Yes, I understand about that.

Mr. BIDDLE. We think H.R. 5184 is probably one of the most important pieces of legislation that this committee has considered in many, many years. The ability to compete for Government contracts is seriously threatened by a massive wave of noncompetitive procurements.

The Office of Federal Procurement Policy has reported that agencies made at least $87 billion in noncompetitive procurements during fiscal year 1983. And, of importance, $56 billion of this was for initial, not follow-on contracts.

In recent years, some procuring activities have awarded as much as 70 to 90 percent of their contracts on a noncompetitive basis.

In fiscal year 1974, GAO found that 56.4 percent of DOD's procurements were noncompetitive. In fiscal year 1981, 63.4 percent of DOD's procurements were performed without open competition.

We don't think there can be any dispute that noncompetitive procurements significantly increase the Government's cost and in turn the Federal deficit.

Despite clear benefits for the Government, there is no indication that agencies will reduce the volume of noncompetitive procurements without action by the Congress. H.R. 5184 supplies the key statutory provisions which will force an increase in competition. H.R. 5184's requirements to use full and open competition and its establishment of a more effective bid protest system aims squarely at some of the key causes of today's noncompetitive procurement.

H.R. 5184's requirement for full and open competition plugs a vast loophole that permits considerable abuse. The bill would prevent agencies from describing procurements as fully competitive simply because two bids or proposals were submitted. Such procurements are often smoke screens which conceal the fact that restricted specifications have precluded numerous sources from bidding at all.

We suggest that the subcommittee tighten the bill even further by making clear that full and open competition requires agencies not only to receive, but also to include in the competitive range a sufficient number of bids or proposals to ensure that the Government attains the best product at the lowest possible price. We are also encouraged by the provisions of H.R. 5184 which remove many of the present restrictions that prevent agencies from using the competitive negotiation process.

Competitive negotiation is the only rational method of procuring high-technology products. We believe that H.R. 5184 should remove all statutory preferences favoring sealed bids over competitive negotiation. It does not matter if an agency uses sealed bids or competitive negotiations so long as the procurement is truly open and competitive.

Section 204 of the bill will strengthen the procurement system even further. Our association believes that this is the single, most important section of H.R. 5184, and the one most essential to the attainment of the bill's objectives.

If this section is deleted or weakened, we will probably never see significant increases in competitive procurements within the Federal Government.

Case 1:06-cv-00599-MBH Document 17-11 Filed 08/29/2006 Page 7 of 10



The generally cited causes for noncompetitive procurement, lack of advance planning, lack of market research, and the rush to spend fiscal year-end money, have considerable validity. But a more significant cause for lack of competition is that there is no effective remedy to prevent or correct noncompetitive procurements. There is no penalty when an agency improperly procures sole source. Indeed, the agency officials who participate in such a procurement may in fact receive "brownie points" within their agency for getting the boss what he wants.

Unless and until agency officials learn that noncompetitive procurement means contract cancellation, personal embarrassment, and the necessity to reprocure correctly, there will be little incentive to take the extra steps to compete a procurement and save the taxpayers' dollars.

You do not have to look very far to find an effective police force to stop noncompetitive procurement. The companies who compete in the Federal marketplace have a vital interest in preventing their competitors from obtaining sole-source awards. These companies are invariably "on the scene" when an agency attempts to slip a contract to a preferred vendor.

If the companies who compete for Federal business could obtain effective relief, they could force agencies to use competitive procedures. Competition would become a fact, not a piously mouthed goal.

At the present time there is no effective remedy against lack of competition in Federal procurements. Almost by default, the GAO's bid protest procedure has become the major hope for companies who have unfairly lost Government contracts. However, the GAO is hampered by severe institutional limitations which preclude it from acting as an aggressive enforcer of competitive policies.

This subcommittee should understand from the outset that the lawyers who decide protests operate in a much different manner than the GAO auditors who perform investigations at the request of you and the other Members of Congress.

GAO lawyers act like judges, not investigators. In fact, GAO does not conduct investigations to establish the validity of a bid protester's claim. Thus, without any independent factfinding, GAO's protest decisions must rely on the facts which the agency chooses to disclose. Not surprisingly, agency protest reports are often highly selective. The protester's inability to force disclosure of relevant facts is compounded by procedural obstacles imposed by GAO. For example, GAO has ruled consistently that the protester has the burden of proof.

If the record consists of conflicting statements of the protester and the contracting agency, GAO will rule that the protester has failed to carry its burden of proof.

Think about that for a minute. Except for the Freedom of Information Act, the protester has no way to get the facts which will counter an agency assertion that the protest is wrong. GAO procedures do not provide for independent documents or independent investigation, compulsory production of documents, or the examination of witnesses under oath, or any of the other established procedures which have long been recognized as fundamental prerequisites of objective factfinding.





Under GAO procedures, an agency need only deny that a protester's statement of facts is correct. In 9 cases out of 10, the agency's denial will carry the day.

To make matters worse, a protester is required not only to counter agency assertions of fact, but to overcome them with overwhelming evidence. For example, a protester who challenges the agency's statement of its requirements must somehow come up with "clear evidence" that the agency's specifications were arbitrary or otherwise unreasonable.

A protester who argues that the agency should maximize competition by splitting its requirement, must provide a clear showing that the agency's contrary determination lacks a reasonable basis. A protester who claims that the agency failed to maximize competition by conducting sufficient negotiations must present a clear showing that the agency's actions were without reasonable basis even though the agency's conduct produced a sole source.

This high burden of proof and the fact that agencies can win protests with barely supported denials of the protester's statements, make the protest remedy virtually worthless. In fiscal year 1983, GAO decided 1,377 protests. Only 62 protests were sustained. In other words, the protester won about 4 percent of the decided cases.

In fiscal year 1982, the GAO decided 1,091 cases, and sustained 83, so protesters won about 7 percent of the decided cases.

But the most frustrating fact is not that protesters win so few cases. The basic problem is that protests rarely produce corrective action even when the protester overcomes the enormous burdens imposed by GAO.

Consider the case of Amdahl and ViON, which successfully protested an award to IBM. The GAO sustained the protest, and ruled that the procuring agency should issue a new round of best and finals, and terminate the IBM contract if a more advantageous offer was received.

This apparent victory for competitive procurement dissolved after the parties moved for reconsideration. Although the initial protest had been decided in less than 30 days, GAO took over 5 months to decide the request for reconsideration.

The Army completed installation of the procured computer immediately after the GAO issued its first decision. The GAO later ruled that the cost of terminating the contract was too high, and withdrew its recommendation for effective action.

These cases highlight a hideous problem with GAO protests. They rarely accomplish anything. GAO recommended contract cancellation or termination in only 14 cases during fiscal year 1983. In other words, the protester obtained meaningful relief in only 1 percent of all decided cases. And I might say that means the taxpayer received meaningful relief in only 1 percent of the decided cases.

These examples—and there are countless others—point out a cardinal failing of the bid protest process. GAO has no power to stop a contract award or contract performance while a protest is pending.

As a result, agencies usually proceed with their contracts knowing that they will preclude any possibility of relief simply by delaying the protest process. Moreover, long delays at GAO are not uncommon. One of our members has had a protest pending at GAO for over a year. The reconsideration process in the PhilCon and Amdahl cases took over 5 months each. GAO's own statistics show that the average time required to decide a protest was 132 days in fiscal year 1983. This statistic can be deceiving because an agency intent on delay can block the process for a longer period by delaying preparation of a protest report. The delay alone will ensure a meaningless decision from GAO.

As it now functions, the protest process is not a remedy. It is a joke designed to place a thin veneer of fairness on waste, abuse and noncompetitive awards. H.R. 5184 contains several significant provisions which will add some muscle to a process that now only corrects the most egregious, isolated abuses.

The bill will make it more difficult for an agency to award or perform a contract pending a protest. The bill will also prevent agencies from stalling the protest process by refusing to provide a protest report on a timely basis.

The bill will strengthen the Comptroller General's authority to recommend relief. These provisions will significantly improve the current bid protest procedures. However, we have serious questions as to whether GAO should be the sole forum for deciding protests.

Even after H.R. 5184 is passed, GAO will still not have sufficient tools to obtain the facts or enforce its decisions. Our concern is especially acute in regard to automated data processing procurements under Public Law 89-306. ADP procurements present numerous unique and highly technical problems. Experience has shown that in order to discharge its statutory responsibilities under the Brooks Act, GSA needs a vehicle which will allow it to identify abuses of competitive procedures and expeditiously obtain the facts.

Now, under present procedures, GSA will provide a delegation of procurement authority to the agency, but really doesn't have the means at its disposal to take away what it has given when the terms of that agreement were breached.

Because of GSA's unique responsibilities, we strongly support the provision of H.R. 5184 which would give the GSA Board of Contract Appeals authority to decide bid protests involving procurements under the Brooks Act. The Board is capable of providing effective relief under GSA's existing powers to delegate procurement authority. The Board's streamlined procedures should allow decision of protests in less than 60 days. The Board has the power, which GAO lacks, to stop procurements, and thereby preserve the right to obtain meaningful relief. The GSA Board is also able to hold hearings and force production of evidence so that protesters will not have to discharge impossible burdens of proof.

By establishing the GSA Board role as an alternative—and I note, "alternative"—forum for protests involving Brooks Act procurements, H.R. 5184 still allows GAO to hear numerous protests involving ADP acquisitions. For example, many ADP procurements have been excluded from the Brooks Act under the Warner Amendment. GAO will still have significant protest work in those procurements alone. There is no provision in H.R. 5184 which pre-





cludes any protester from bringing his case to GAO instead of the GSA Board.

The establishment of a limited bid protest remedy in the GSA Board of Contract Appeals provides benefits for the entire procurement process. It will give us working experience with an alternate forum for deciding bid protest cases. If the GAO is unable, even as strengthened, to provide effective relief, we will have a working alternative which can be expanded as necessary to enforce requirements for competition in Federal procurements.

We believe that H.R. 5184 goes a long way toward establishing the first workable set of remedies which will prevent noncompetitive procurements. As agencies gradually learn that there are sanctions for improper, noncompetitive procurements, they will comply with the law and increase competition in their purchases.

For this reason alone, H.R. 5184 is the most significant procurement legislation in recent years. It deserves wide support, quick approval, and I assure you that it has the support of our member companies.

Mr. Brooks. Thank you, Mr. Biddle.

Can you give some specific examples of the excessive costs associated with noncompetitive procurements?

Mr. Biddle. Well, there certainly have been a number of them through the years. I think in recent history, the Army and the Navy awarded contracts to a commercial computer time-sharing firm for a new recruiting system. The Army expected to pay some $8.5 million. Instead, it turned out to be $120 million.

The Navy's expected cost was $524,000, yet it turned out to be $13 million. Now, these were not noncompetitive procurements. There was some competition, but at the same time the process was not sufficiently rigorous to ensure that the Government got what it expected for what it expected to pay.

The next case, certainly, is phase IV of the $5 billion Air Force procurement where the Air Force managed to spec it out to where they could only get two bids, both of which were incumbent vendors.

In another case, the Navy managed to only receive one bid on a $2 billion inventory system procurement. So, there are many ways by rigging the specs, by increasing the use of evaluation criteria that have nothing to do with the ability of the product to perform, the price of the product, but rather have to do with whether it is your cousin or your uncle. Those things are just rampant throughout the system.

Mr. Brooks. Do you believe that the current measures by the executive branch to improve competition are adequate?

Mr. Biddle. I read the recent OMB circular and it says all the right words. I think the administration is trying its best to get its hand around something, but we have a fundamental problem in the Government. There is no reward system. There is no incentive for a Federal employee to seek the best for the least.

In the private sector, a man gets promoted by making good decisions. And he gets pay raises and he gets bonuses. But the Federal employee doesn't, and consequently the safer bet is to do that which is least likely to be criticized. And often times that turns out to be the most expensive for the taxpayer.

The Carlucci initiatives to reform DOD procurement didn't even include competition as one of the objectives. It was included finally after pressure from you gentlemen and from other Members of Congress, but you can imagine the impression that gave to the bureaucrats within DOD. If the top man doesn't believe that competition is worthy of being a principal objective of the procurement process, why should they?

So, there is an attitude. And it is an attitude that we think H.R. 5184 addresses, provides a vehicle by which the agency no longer can say that competitive process is interesting, but it is just a game and we can circumvent it any time we want and get just the hardware from just the guy we wanted to buy it from.

Mr. BROOKS. Do you believe that using GSA's Board of Contract Appeals for deciding disputes involving ADP could possibly conflict with the GAO's bid protest function?

Mr. BIDDLE. We don't. We think actually it provides an alternative forum. The protester basically would look at the two forums and decide which one is most likely to achieve the needed result of ensuring that this competition is fair, that the contract is awarded to the appropriate supplier. You know, in a sense it sets up a little competition within the Government. If the GSA Board of Contract Appeals can do a better job and the vendor community goes to it instead of GAO, we learn something. We learn that GAO wasn't as effective as the GSA Board of Contract Appeals.

On the other hand, if they don't use the GSA Board of Contract Appeals, we have had an opportunity under the Brooks Act procurements to find out whether it will work or not, and if it does work, because again for the first time you have a protest process with a remedy. The ability to stop the procurement because it is wrong. Not find that it was wrong and watch the procurement continue to unfold because now we've already put both feet in the water and we're in deep.

Mr. BROOKS. Do you believe that the bid protest system established by H.R. 5184 would encourage vendors to file frivolous protests?

Mr. BIDDLE. I think a vendor looks very carefully before filing a bid protest. One, you know, there's a little black book in the agency that says who the good guys are and who the bad guys are. So, you don't want to get your name in there too often. You really have to feel pretty aggrieved. And as you know, Mr. Brooks, these lawyers in this town don't come cheap. You're looking at a pretty expensive bill when you undertake one of these protests. So, no, I don't think they embark upon them frivolously and I think the provisions in the bill which allow GAO to throw out the frivolous protester; that allow the GSA Board of Appeals to throw out the frivolous protester, and, in fact, levy cost against him will serve to keep everybody pretty honest.

What we have seen in the protest, in most cases that our members have been involved in, have been protesting legitimate breaches of the original procurement specs, or legitimate breaches of law.

Mr. BROOKS. In your view, does the bid protest function established by H.R. 5184 set an excessively high standard——

Mr. BIDDLE. No; we don't think so.





Mr. BROOKS [continuing]. For agencies to follow?

Mr. BIDDLE. We don't think so. We think the high standards are necessary to ensure that agencies do not continue to abuse the protest process by performing the contract while the protest is pending. Under H.R. 5184, the protest process will be expedited considerably. You have some tight deadlines in there for people to do their job. There is no reason why a bid protest should take more than 90 days. And, as I said, in my opening comment, in a procurement that has been in the planning process, in the intra-agency approval process, and all the rest for a period of 2 or more years, that 90 days is not the end of the national security and well-being of our country.

If they are doing a decent planning job, they can plan the 90 days in if they are really trying to rig the bid, or get around the system.

Mr. BROOKS. You can pick up the shirts next week?

Mr. BIDDLE. Yes.

Mr. BROOKS. Mr. Horton.

Mr. HORTON. Thank you, Mr. Chairman. I just have one question because Mr. Brooks has covered the subject pretty well, I think. I do want to commend you for the position you have taken in support of the bill.

The Comptroller General indicated that because of the bill's tightened competition requirements and the stricter protest requirements, the bill possibly could cause some delay in the procurement programs and also might result in increased cost. And he said, "The delays and increased cost would be a matter for the Congress to have to consider."

Do you feel that the bill's provisions with regard to tighter requirements for competition and stricter protest requirements would result in increased delays or costs which would make it probably not a good thing to proceed with the legislation?

Mr. BIDDLE. I commute in the morning down the GW Parkway and occasionally if I decide that I want to go 80 miles an hour and a policeman stops me, he delays me and he costs me, but I was the one who chose to do 80 miles an hour in a 50-mile zone. I am suggesting that if an agency a couple of times experiences the delay and the fine, they will watch the speed limit. And I think that we have to do a little bit of overcorrection to break some awfully bad habits.

Mr. HORTON. Yes, but the Congress is on the other side of it, and we are concerned about adding costs to the procurement system. And I wondered, in your expert view, whether you thought that this would or could possibly end up in prohibitive costs?

Mr. BIDDLE. I think there will be some nominal costs initially until people learn that they can no longer beat the system and that the protest process works at which point I think we will see more competition of that multi-billions of dollars which is now noncompetitive, and as the chairman mentioned in his opening remarks, there are big bucks to be saved by getting competition in the procurement process.

So, I think we will come out way ahead as compared to the present process where we have all the bureaucratic administration

in place to process protests to no avail and continue to have a noncompetitive procurement environment.

Mr. HORTON. Thank you very much.

Mr. BROOKS. Thank you, Mr. Horton. Mr. Clinger.

Mr. CLINGER. I have no questions, Mr. Chairman.

Mr. BROOKS. I want to thank Jack Biddle and Dave Cohen. Thank you all for coming down and we appreciate your contribution at this hearing and your evaluation, careful evaluation, of this legislation.

Our next witness is James W. Supica. Is that correct?

Mr. SUPICA. That's correct.

Mr. BROOKS. Mr. Supica is vice chairman of the highway division of the Associated General Contractors of America. He is president of the United Construction Co. in Lenexa. Is that correct?

Mr. SUPICA. That's correct, sir.

Mr. BROOKS. How about that, Lenexa, KS. He's been on numerous committees at the State and national levels of the AGC. He is accompanied by John W. Sroka, executive director of occupational divisions for the AGC, and Brian Deery, assistant director of the municipal utilities division.

It is a pleasure to have all you gentlemen here, and you can proceed.

**STATEMENT OF JAMES W. SUPICA, VICE CHAIRMAN, HIGHWAY DIVISION, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, ACCOMPANIED BY JOHN SROKA, EXECUTIVE DIRECTOR, OCCUPATIONAL DIVISION, AND BRIAN DEERY, ASSISTANT DIRECTOR, MUNICIPAL UTILITIES DIVISION**

Mr. SUPICA. Thank you, Mr. Chairman.

AGC wholeheartedly supports the intent of this legislation to require that the Federal agency use full and open competition in the procurement of goods and services. The award of construction contracts through open, unrestrictive competition to the lowest responsible bidder has always been and continues to be the most effective way to ensure that the purchaser is receiving the highest quality product for the lowest possible price.

H.R. 5184, unfortunately, falls short of the mark of guaranteeing full, open, unrestricted competition in the procurement of construction services by exempting from its provision 82 percent of the Department of Defense's construction procurement and 55 percent of civilian agency construction procurement.

Section 202(b)(1)(c) of the bill allows Federal agencies to conduct a procurement using practices that are less rigid than full and open competition when it is necessary to fulfill the goals of socially and economically disadvantaged or small business programs and all such businesses that are qualified or allowed to compete.

This exemption will allow Federal agencies to continue unencumbered to restrict competition on a massive scale through the use of the small business set-aside program and the small business 8(a) program.

For example, in fiscal year 1983, according to DOD's own figures, 77 percent of DOD's construction contract actions were set aside for exclusive small business bidding. When DOD's 8(a) program actions for that fiscal year are added to the total, a shocking 82 percent of DOD's construction procurements were unavailable for open unrestricted competition. I would like to submit for the record statistics from DOD and the Federal Procurement Data Center which show the adverse impact on full and open competition as a result of these small business programs.



[See charts on pp. 67–69.]

Mr. SUPICA. I would also like to submit for the record a booklet that AGC has prepared, "The Cost and Impact of Small Business Set-Aside Programs in the Construction Industry."

[See app. 1.]

Mr. SUPICA. There is little doubt that restricting competition to this degree costs the Government and taxpayers more. These costs are unnecessary because small businesses are able to obtain their share of the construction market without the assistance of these programs.

The reason DOD was compelled to reduce competition this significantly is due to the provision in the Defense acquisition regulation which has come to be known as the "rule of two." This rule of two provision is now being expanded to all Federal procurement as a result of the soon-to-be-implemented Federal acquisition regulation.

We note that Chairman Brooks has taken exception to the inclusion of this provision in the FAR in a letter earlier this month to the Office of Management and Budget, and we applaud this effort.

AGC is concerned, however, that the language contained in section 202(j)(2) could be interpreted by Federal procurement officials as legislative sanction of the use of the rule of two practice.

The Federal Government had traditionally preferred the use of the formal advertising and open competition in the award of public construction contracts. However, over the years, there have been a steady erosion of this principle as more and more the Federal construction procurement system has been used as a vehicle for implementing social and economic goals through a variety of special preference programs. We strongly urge this committee to strike section 202(b)(1)(c) from the bill and in doing so return construction procurement to that which it was intended to procure construction in a most cost-effective manner.

It must be noted that in striking such a blow for the cost-effective procurement, this committee's action would not be in conflict with the language or the intent of the Small Business Act. The act makes no mention of set-asides, nor restricted competition, nor a rule of two. It has been administrative fiat which has created the small business set-aside and 8(a) programs which shelter a massive portion of the Federal construction market from fair and open competition.

While striking section 202(b)(1)(c) from the bill would be the most cost-effective action this committee could take, we do appreciate that such action could incur the wrath of nonprocurement oriented social engineers.

As a result, AGC respectfully offers the following two interim actions: First, a 1-year moratorium on the use of the small business set-aside and 8(a) programs in construction procurement. It is AGC's belief that such a moratorium will result in little change in