the number of contract actions that are awarded to small business, thus setting the stage for the complete elimination of these programs from construction procurement.

Second, section 202(j)(2) should be revised to set strict guidelines for when construction may be procured using less than full and open competition. AGC suggests that a project volume limit, not greater than $2 million, be placed on the the size of construction projects that may be set aside. This would limit restricted competition set-asides and permit full and open competition on the remainder, to the benefit of the taxpaying public and in the interest of preserving free competition.

AGC also strongly endorses section 205 of the bill which establishes in each executive agency an advocate for competition. There is no question but that such an office is necessary. The procurement process has moved so away from its true purpose that establishing a watchdog to steer the agencies back to making sound, full and open competition procurement decisions is clearly needed. AGC applauds the efforts of this bill to return full and open competition to the Federal procurement process.

Thank you, Mr. Chairman.

[Charts showing fiscal years 1981–83 construction contract actions set-aside for small business follow:]



1981 Prime Contract Awards for Construction
(Dollars in Thousands)

| | Total | | Total Small Business Awards | | Small Business Percent of Total | | Set Asides | | Set Asides Percent of Total | | 8(a) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Act | Dol | Act | Dol | Act | Dol | Act | Dol | Act | Dol | Act | Dol |
| Army | 8,571 | 1,741,795 | 7,576 | 1,358,423 | 88.4 | 65.4 | 5,728 | 801,579 | 66.8 | 46 | 546 | 54,465 |
| Navy | 6,460 | 1,191,212 | 5,932 | 886,257 | 91.8 | 74.4 | 5,093 | 715,071 | 78.8 | 60 | 669 | 99,491 |
| Air Force | 4,720 | 509,132 | 4,495 | 461,368 | 95.2 | 90.6 | 4,163 | 421,652 | 88.2 | 82.8 | 189 | 10,936 |
| Defense Logistics Agency | 81 | 4,320 | 80 | 4,348 | 98.8 | 100 | 61 | 3,835 | 75.3 | 88.8 | 5 | 202 |
| Corps of Engineers | 3,660 | 1,498,202 | 2,656 | 633,113 | 72.6 | 42.3 | 1,476 | 299,288 | 40 | 20 | 141 | 18,277 |
| DOD Total | 23,492 | 4,944,661 | 20,739 | 3,123,509 | 88.3 | 63.2 | 16,521 | 2,241,425 | 70 | 45 | 1,750 | 201,211 |
| Civilian Agencies Total | 14,607 | 2,052,297 | 12,725 | 1,298,799 | 87.1 | 63.3 | 5,971 | 522,198 | 40.8 | 25.4 | 1,581 | 175,554 |

Sources: DOD statistics from DOD Office of Small and Disadvantaged Business Utilization February 7, 1984 letter to Representative Melvin Price, Chairman, House Armed Services Committee

Civilian Agency statistics from the Federal Procurement Data Center

1982 Prime Contract Awards for Construction
(Dollars in Thousands)

| | Total Action | Total Dollars | Total Small Bus. Awards Action | Total Small Bus. Awards Dollars | Small Bus. % of Total Action | Small Bus. % of Total Dollars | Set-Asides Action | Set-Asides Dollars | Set-Aside % of Total Action | Set-Aside % of Total Dollars | 8(a) Action | 8(a) Dollars |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Army | 10,669 | 2,025,777 | 9,515 | 1,373,134 | 89.2 | 67.8 | 7,854 | 1,095,424 | 73.6 | 54.0 | 482 | 87,915 |
| Navy | 6,637 | 1,137,061 | 6,146 | 972,847 | 92.6 | 85.6 | 5,373 | 770,292 | 80.9 | 67.7 | 190 | 30,972 |
| Air Force | 6,001 | 668,822 | 5,732 | 578,368 | 95.5 | 86.5 | 5,254 | 538,386 | 87.5 | 80.5 | 226 | 26,860 |
| Defense Logistics Agency | 121 | 5,713 | 116 | 5,428 | 95.9 | 95.0 | 87 | 3,785 | 71.9 | 66.2 | 7 | 661 |
| Corps of Engineers | 3,519 | 1,485,309 | 2,502 | 586,530 | 71.1 | 39.5 | 1,597 | 335,297 | 45.4 | 22.6 | 310 | 78,590 |
| DOD Total | 26,947 | 5,322,682 | 24,011 | 3,516,307 | 89.1 | 66.1 | 20,165 | 2,743,184 | 74.8 | 51.5 | 1,215 | 224,998 |
| Civilian Agencies Total | 14,607 | 2,052,297 | 12,725 | 1,298,799 | 87.1 | 63.2 | 5,971 | 522,198 | 40.8 | 25.4 | 1,581 | 175,554 |

Sources: DOD statistics from DOD Office of Small and Disadvantaged Business Utilization February 7, 1984 Letter to Representative Melvin Price, Chairman, House Armed Services Committee

Civilian Agency statistics from the Federal Procurement Data Center



1983 Prime Contract Awards for Construction
(Dollars in Thousands)

| | Total Act | Total Dol | Total Small Business Awards Act | Total Small Business Awards Dol | Small Business Percent of Total Act | Small Business Percent of Total Dol | Set Asides Act | Set Asides Dol | Set Asides Percent of Total Act | Set Asides Percent of Total Dol | 8(a) Act | 8(a) Dol |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Army | 7,309 | 2,223,989 | 6,487 | 1,591,185 | 88.8 | 71.5 | 5,594 | 1,277,174 | 76.5 | 57.4 | 410 | 146,069 |
| Navy | 5,971 | 1,615,974 | 5,512 | 1,270,183 | 92.3 | 78.6 | 4,946 | 1,069,384 | 82.8 | 66.2 | 172 | 52,592 |
| Air Force | 3,824 | 850,772 | 3,644 | 680,723 | 95.3 | 80.0 | 3,338 | 627,749 | 87.3 | 73.8 | 212 | 42,155 |
| Defense Logistics Agency | 80 | 6,833 | 75 | 6,438 | 93.8 | 94.2 | 55 | 4,108 | 68.8 | 60.1 | 16 | 2,111 |
| Corps of Engineers | 2,600 | 1,408,567 | 1,896 | 615,034 | 72.9 | 43.7 | 1,348 | 391,405 | 52.0 | 27.8 | 207 | 54,484 |
| DOD Total | 19,784 | 6,106,135 | 17,614 | 4,163,563 | 89.0 | 68.2 | 15,281 | 3,369,820 | 77.2 | 55.2 | 1,017 | 297,411 |
| Civilian Agencies Total | 18,848 | 2,142,695 | 16,975 | 1,291,078 | 90.0 | 60.0 | 8,674 | 525,283 | 46.0 | 24.5 | 1,701 | 176,665 |

Sources: DOD statistics from DOD Office of Small and Disadvantaged Business Utilization February 7, 1984 Letter to Representative Melvin Price, Chairman, House Armed Services Committee

Civilian Agency statistics from the Federal Procurement Data Center

Mr. BROOKS. Thank you, sir.

How would you respond to the assertion that set-asides for small businesses would increase competition?

Mr. SUPICA. Contractors bid not only the material and cost of construction, but they also bid their competition. As a contractor, I can state that honestly. When I am bidding on a project that is open for the full market to compete against me on, I look at the project much more competitively than I do when I bid on work that is set aside. It has been my personal experience that on the market that I bid on, there is normally twice as many bidders competing against me on an open free market than there is on these special set-aside programs.

My company is still identified as a small business on Government projects.

Mr. BROOKS. You might want to contact some of the Members of Congress before they vote on this upcoming legislation called H.R. 2133.

Mr. SUPICA. We certainly will.

Mr. BROOKS. It is pretty difficult to campaign against small business, because I am a small businessman, too, like yourself. But when you are going to emasculate the Federal procurement process in the name of small business, you wonder whether it is worth it. That has been my position. I have been working on this, but we are going to need a lot of help from people who understand that situation. Everybody is for small business. Who is against small business?



The only other better named activity I can think of is "revenue sharing." The name is wonderful. You think the Federal Government has lots of money and we're going to split it among local jurisdictions. Well, the truth is there has been a deficit ever since revenue sharing was developed for political purposes, but you've got to admit it is a beautiful name. It's a good hustle.

Mr. SUPICA. We agree with you, Mr. Chairman. Over 85 percent of our association members are small business. However, we do have a strong feeling that the free enterprise system of open competition is vital to our construction industry.

Mr. BROOKS. Sharing that interest, I would suggest that you share that view with those Members of Congress who represent those 85 percent.

Mr. SUPICA. We certainly will, sir.

Mr. BROOKS. Soon. What is your opinion of the claim that full and open competition is too expensive and time consuming, particularly for small business?

Mr. SUPICA. Say again, please, sir?

Mr. BROOKS. What is your opinion of the claim that if you have full and open competition, it is too expensive—it takes too much time if you extend that to small business?

Mr. SUPICA. I certainly see where open competition is the least expensive way of getting a project awarded. It certainly doesn't add expense when you open it up to the full industry.

Mr. BROOKS. In your view, what efforts do you think the Government ought to take to help small business compete in the Federal marketplace?



Mr. SUPICA. I think perhaps from the financing end of it, and perhaps some other administrative guidelines and suggestions would be helpful. But as far as setting aside certain projects for the exclusive bidding of a selected group, whether it small business, or otherwise, it certainly restricts the competition; increases the cost of Government contracts.

Mr. BROOKS. Mr. Clinger, the distinguished Member from Pennsylvania.

Mr. CLINGER. Thank you, Mr. Chairman.

I really just have one question. I understand that the bill does provide for very full competition within the small business sector. And I take it that you don't feel that that's sufficient to get the kind of economies that you are suggesting that we should be trying to achieve. In other words, within the bill itself it does provide for full and open competition within the set-aside for small business.

Mr. SUPICA. Mr. Clinger, the set-aside itself restricts many of the people who I compete against in the open market. The majority of my competition in the Kansas City area on the contracts that I bid on are larger contractors than myself and they are in the larger than the set-aside limits. Those are the people who need also to compete on the small business projects in order to make myself, as a small business contractor, more competitive. I compete against these contractors in the majority of my work where the bids are on the open competitive system.

On the set-aside, that group of contractors are excluded from competing against me. And it certainly doesn't result in the lowest, best price to the agency that we submit prices on when we exclude a segment of the industry from bidding on those projects.

Mr. CLINGER. Well, I certainly applaud your position on that, and I would just second the chairman's motion that that position be conveyed to some of our colleagues.

Thank you, Mr. Chairman.

Mr. BROOKS. Thank you, gentlemen, for making a significant contribution to this hearing. We appreciate you gentlemen for coming here, and studying and evaluating this legislation.

Mr. SUPICA. Thank you, Mr. Chairman. If there is any additional information you need, Mr. Sroka and Mr. Deery would be glad to provide that.

Mr. BROOKS. How are they on telegrams and phone calls?

Mr. SUPICA. They do a good job at that, too, sir.

Mr. BROOKS. Well, you tell them they've got a lot of work to do.

Mr. SUPICA. Yes, sir. They will assist us on contacting the other Congressmen, I can assure you that.

Thank you, sir.

Mr. BROOKS. Our next witness is Vico Henriques, president of the Computer and Business Equipment Manufacturers Association. Before going on to higher rewards in 1970, he was associated with Arthur Young and Company. Prior to that, he worked for the public in Federal and State jobs where he did an outstanding job.

He graduated from the University of Utah and has broad experience in the academic community as a lecturer and as an adjunct professor.

And we are delighted to have you back with us, and we will include your statement for the record.

You haven't got it with you?

Mr. HENRIQUES. We will have it by the end of the week.

Mr. BROOKS. That will be fine. We will include it in the record. It will be open until then, and if you would just proceed, we are delighted to have you here.

## STATEMENT OF VICO E. HENRIQUES, PRESIDENT, COMPUTER AND BUSINESS EQUIPMENT MANUFACTURERS ASSOCIATION

Mr. HENRIQUES. Thank you, Mr. Chairman, it is a pleasure to be here and to share our views with each other. We were, I guess, somewhat surprised by the rapidity of the introduction in the hearings on H.R. 5184 because it seems to leave little time for debate, development and refinement of the legislation. We were also taken a little back by the committee's expedited schedule in light of its nature dealing with basic procurement policy.

The process does not seem to be in line with your normal responsible development of significant procurement legislation, and it concerns us that the full and open hearings that we would like to see may not have a chance to take place.

We are also concerned that the bill may in fact be a step backward in the information, technology and ADP area. And the passage of the Brooks Act indicates that it is a—that since the time of the passage of the Brooks Act, there is an indication that it is a sound statute, but its implementation has resulted in policies and practices which are detrimental to the best interest of the Government. And by this, I mean that implementation has focused almost strictly on the procurement of hardware and with the passage of time, we have ended up with the important task of the overall management and utilization of ADP being driven through the procurement system.

You have recognized this in recent years, and we compliment you for having addressed this problem by the development and passage of the Paperwork Reduction Act which created the Office of Information Resource Management in OMB.

To begin with, some of the basic policy of H.R. 5184 appears to be countered to the basic policy in Public Law 89-306; that is, the award based on the lowest price in 5184 as opposed to the selection of automatic data processing equipment capable of efficient and effective use by Federal agencies.

It has been proven, and is widely accepted throughout the ADP procurement community, both private and Federal, that decisions and selection based on the lowest total overall cost are the only reasonable way to ensure efficient technology management of the Government's total resource and investment. I have already commented on my concern about the lowest price philosophy and I am also concerned about the apparent characteristic of H.R. 5184 focusing on ADP procurement and driving that process through the protest, and, in fact, through a duplicative protest process. I guess you might say that we are a little confused about the basic objective of 5184. We supported your first rechartering of OFPP because of your mandate to them to develop a new uniform Federal procurement system. And the expectation was that would lead to one basic statute for all Federal Government procurement.



We read H.R. 5184 as being a single procurement statute in the provisions it explicitly covers, but actually it is a third basic procurement statute as a result of the Federal Property and Administrative Services Act and the Armed Services Procurement Act continuing to exist for all other aspects of procurement.

If, in fact, the goal is to make H.R. 5184, the single procurement statute, then we believe its development must take place in an openly cooperative fashion involving all interested parties with adequate time to explore the ramifications of such comprehensive legislation.

While OFPP's uniform Federal procurement system proposal ultimately did not propose the single procurement statute, the reason the rigorous development of that proposal did produce some recommendations which we applauded and hoped that the Congress would endorse.

Some, but not all of these, were adopted by S. 338, which has been mentioned several times here today. And while we do have some reservations about that bill, we still support those very basic procurement policies. Some of those key policies which are contained either in the UFPS or in S. 338, and which are in conflict with the provisions of H.R. 5184 are the removal of the current statutory preference for sealed bids over competitive negotiated procurement.

Recognition that the basic concern should be differentiation between competitive and noncompetitive procurement and recognition of the high desirability of the Government's acquisition and utilization of commercial products to the maximum possible extent. And recognition of the inherent competitive nature of such commercial products developed in the free enterprise system in the private sector market.

In this regard, we are concerned that the category of practices that are less rigorous than full and open competition will apply negative stigma to currently utilized procurement methodologies that result in significant benefits to both Government and industry. An example of one of these would be GSA's ADP multiple award schedule program. On numerous occasions since the passage of the Brooks Act, GSA has received warm endorsement of its testimony before this committee as to the very significant cost avoidance savings which the Government has realized as a result of the conduct of this program under the auspices of the Brooks Act.

I would like to note in passing that there are those in the Federal Government who feel that if H.R. 5184 passes, the multiple award schedule program will no longer be legal.

S. 338 and the uniform Federal procurement system have taken advantage of the experience and thinking of many procurement experts, and have adopted the proven concepts of effective competition and maximum practical competition. In no way do I want to give the impression that we, and the companies I represent, are opposed to free and open competition. I do feel it is necessary to express some concerns about the definition of full and open competition contained in H.R. 5184.

History has proven that a philosophy which results in competition for competition's sake can have detrimental effects to all parties and is not in the best interest of the Government.

In our view, two of the provisions in H.R. 5184's definition of "full and open competition" could result in serious confusion in the Government's procurement process, and numerous protests or lawsuits from the industry.

These two points are, first, that requirements that all qualified sources are allowed and encouraged to submit sealed bids or competitive proposals on the procurement. We believe that the "are encouraged philosophy" could expose the Government to major second-guessing and numerous protests.

Second, we believe that a similar negative could result from the terminology "sufficient number of sealed bids or competitive proposals to ensure that the Government's requirements are filled at the lowest possible price."

CBEMA has not completed an exhaustive analysis of H.R. 5184 and we have not completed our written statement. We will strive to submit the statement by the end of the week, and because of the press of time, it is likely that we will not be able to encompass all of the concerns and comments that we have, but I would like to make some specific comments having read the bill.

First, there's a provision that would exclude a source of supply from competition simply because he is doing well in the business sense with a particular agency or in a particular segment of the Government's business. This provision is not tied to reasons of defense or national security, and it would seem that a contractor who has competed successfully could be excluded from further business to his detriment and that of the Government, in fact, by reducing competition rather than increasing it.

Another point is that we should consider alternative sources to not be available for the production or assembly of spare parts if another party has a legitimate proprietary interest in the parts that are manufactured. The current wording would allow the Government to participate in a willful violation of such legitimate rights should the violator offer to indemnify the Government from legal liability. And we would suggest some rewording and will provide that to you.

We are concerned that certain sections would eliminate protection provided under the Freedom of Information Act for proprietary business data, trade secrets, and so forth, and we have spoken to that point on several occasions before.

The bill contains, what we believe, is an incorrect definition of "noncompetitive." A noncompetitive situation should be defined as a procurement practice that results in the award of a contract when the agency solicits bids or proposals from only one party rather than the current wording of "award after receiving only one bid or proposal."

Again, the definition of a "small purchase" as any purchase or contract that does not exceed $25,000 without further qualification as to what constitutes a small purchase procedure could cause major disruptions to the low dollar value and portion of GSA multiple award schedule program.

Not requiring publication of a proposed noncompetitive procurement resulting from acceptance of an unsolicited proposal that demonstrates unique or innovative concepts should not be limited solely to research proposals. This provision should cover any unso-





licited proposal that demonstrates a unique or innovative solution to a valid Government problem when publication of a notice cannot avoid the disclosure of the originality of thought or innovativeness in the disclosure of proprietary data.

Now, turning to the protest system, we are concerned that the section, as currently written, will encourage even further abuse of the protest system than exists today. Companies not willing to make the investment of time and resources to compete responsibly on a Government procurement may adopt a marketing strategy of protesting to stop award or to stop contract performance after award in an effort to gain some advantage through such unwarranted disruption.

H.R. 5184 authorizes the Comptroller General to dismiss frivolous protests, history is replete with past GAO protests which prove that it is not always possible to tell from the face of the protest that it is frivolous.

Absent the determinations described above, Government programs may be delayed while the Comptroller General is required to perform the same review as he would in a situation involving an apparently valid protest merely to determine that the protest in question is frivolous.

It would appear more reasonable to allow the executive agency to award contracts in the face of a protest with the Comptroller General authority to order a termination for convenience if his decision is made within 60 days of the award and he finds an egregious violation of law or regulation was made by the agency.

Further, in cases of frivolous protests, the protester—and all protesters should furnish a bond—will pay the cost of the agency and interested parties' preparation of the response to the protest. This equalizes the treatment of successful parties in protest situations.

The creation of the GSA Board of Contract Appeals as an agency to hear protests creates a new and duplicative avenue of protests. It creates another layer of bureaucracy in a fashion that will further encourage a marketing strategy of frivolous protest action.

Combined with the provisions just discussed, this would create an environment which we view as one in which the protest system would drive the procurement system, which would worsen and not improve an already heavily abused system.

And, finally, the creation of the position of an advocate for competition in each executive agency is of concern to us because we think this will add to the bureaucracy that exists in the Federal acquisition process, and we question what practical benefit would result.

The bill proposes to add the advocate for competition to the already over-complicated information technology acquisition infrastructure which currently includes agency information resource managers, senior ADP policy officials, the inspectors general, in-house audit organizations, in-house investigation units and so forth. We believe that the proper step is not to add another layer, but to simplify and streamline the existing structure and take steps to make it work.

The wide range—in conclusion, Mr. Chairman, the wide range of basic procurement policy issues that have been touched on by H.R. 5184, and some of which I mentioned today, suggests that we

should consider the bill in detail and we might suggest that the affected committees of the Congress would be interested in reviewing this bill, perhaps in sequential reference. This is the type of legislation in which haste and lack of full consideration can have major negative impacts on both Government and the private sector, and I hope that you will proceed in the judicious fashion that you have often demonstrated in the past to bring a good piece of legislation out of the committee.

Mr. BROOKS. It has been a long time since you worked for the Government.

Mr. HENRIQUES. Sir?

Mr. BROOKS. I said it has been a long time since you worked for the Federal Government, hasn't it? But I must say that I thought—I realize you didn't have time to have a prepared statement—your impromptu remarks, off the top of your head were outstandingly delivered. Do you want to rewrite that and—you are going to write your own statement?

Mr. HENRIQUES. We will clean up this version and give you specific references, paragraph-by-paragraph through the bill, sir.

Mr. BROOKS. All right. We will have that Thursday?

Mr. HENRIQUES. Yes, sir.

Mr. BROOKS. Fine.

And if you want to submit some additional comments later, well, you can. We will be glad to hear from you. This is a pretty open hearing. You can say anything you want to say.

Now, would you like to say anything personally about this legislation? Just from your own personal standpoint, do you feel that this legislation is as disastrous as you described it in that nine-page document?

Mr. HENRIQUES. I think it confuses the issue, Mr. Chairman, because there are already two statutes on the books, the Administrative Property and Services Act and the Armed Services Procurement Act and these would seem to be the appropriate vehicles for modification if modification is needed in fact.

Mr. BROOKS. It probably doesn't need much really?

Mr. HENRIQUES. No; I guess my basic concern is going back—resetting the clock back to perhaps 15, 20 years ago when lowest price was the only consideration on the procurement, and over the last 15 years, I thought we moved away from that to the overall—lowest total overall cost as a concept.

Mr. BROOKS. Let me explain something about that. You know, the reasons for competition, open competition is to find out what the lowest price and the best quality would be. If you don't have open and free competition, how do you know you have the low price?

Mr. HENRIQUES. We don't have any quarrel with having open competition.

Mr. BROOKS. But you don't like the way we are doing it? You are for the principle, but you are just not for the implementation? I think that is a difficult position, but I appreciate your viewpoint. Under the circumstances, we understand exactly. I thank you for being here. Mr. Clinger.

Mr. CLINGER. Thank you very much, Mr. Chairman. You indicated in your statement that the history of free and open competition,





as apparently defined in the bill, has been replete with problems, and I wonder if you could amplify that a little bit? What have the problems been with free and open competition?

Mr. HENRIQUES. Well, Mr. Clinger, the problems in the so-called free and open competition in the implementation of the regulations for that part of the industry, which I represent, is that the ultimate user is pretty much isolated from the seller, and as a result communication tends to break down. The concentration on the procurement process as opposed to the ultimate agency mission, it greatly dilutes the authority of the program manager. There is a tendency to force to the lowest common denominator rather than what the avowed purpose to find the best solution for the least overall cost to the Government. And I said this for some time that the concentration on cost avoidance at the time of procurement tends to ignore the total cost over the lifecycle of the system, and we think that the nature of the competition is what forces that kind of a difference the Federal Government compared to the commercial area, but I would not like to leave the impression that we do not favor competition. We do in fact favor competition and welcome all competitors.

Mr. CLINGER. Thank you.

Thank you, Mr. Chairman.

Mr. BROOKS. Thank you, Mr. Clinger. And thank you, again, Mr. Henriques, for being here. We appreciate your contribution.

Mr. HENRIQUES. Thank you.

[Mr. Henriques' prepared statement follows:]

42-906 O—85——6

STATEMENT OF
VICO E. HENRIQUES, PRESIDENT
COMPUTER AND BUSINESS EQUIPMENT MANUFACTURERS ASSOCIATION

Mr. Chairman and members of the subcommittee, I am Vico E. Henriques, President of the Computer and Business Equipment Manufacturers Association, (CBEMA). It is a privilege to appear before you to discuss CBEMA's views on HR 5184, the "Competition in Contracting Act of 1984." CBEMA is a trade association representing 42 member companies engaged in the manufacture or assembly of information processing, business and communications products and related services and supplies. In 1983 CBEMA member companies had combined sales of more than $125 billion and employed more than one million people worldwide.

CBEMA has been a supporter of federal procurement reform for many years. Our members worked closely with OFPP on draft versions of the Uniform Federal Procurement System (UFPS) and our association was a leading proponent of a uniform procurement statute. We are on record as supporting S 338, the Senate version of HR 5184, because we believe that bill has many of the most urgently needed UFPS reforms:

- mandates competition, unless one of six exceptions is met,
- gives competitive proposals equal status with sealed bids,
- clearly spells out the definition of Competition vs Non-Competition,
- embraces an evaluation concept which allows awards based upon lowest total overall cost evaluations in the acquisition of commercial high technology products,
- introduces the advocate for competition as a management focus.

While OFPP's UFPS proposal ultimately did not propose the single procurement statute we anticipated, the reasoned and rigorous development of that proposal did produce some recommendations which we applauded and hoped that the Congress would endorse. Some but not all of these were adopted by S 338. And while we do have some reservations about that bill, we still support some of those very basic procurement policies. HR 5184 however, makes significant departures from these UFPS features we support and also introduces a new issue - the reform of the procurement protest system - that takes center stage in the bill.



We would like now to discuss each of these departures and, where possible, suggest how our concerns might be remedied.

1. HR 5184 introduces "lowest price" to replace lowest total overall cost as the basic decision criteria for source selection.

   Some of the basic policy of HR 5184 is counter to basic policy in PL 89-306, e.g., award based upon <u>lowest price</u> as opposed to selection of ADPE capable of efficient and effective use by federal agencies. It has been proven and is widely accepted throughout the ADP procurement community (private sector as well as federal) that decisions and selections based upon lowest total overall cost are the only reasonable way to ensure efficient and effective use. Such decisions are truly in the best interest of the government taking into account the government's total ADP investment - hardware, software, applications, personnel, training, facilities, etc.

2. The bill will again let the procurement of individual equipment/services drive the acquisition process.

   Experience since the passage of the Brooks Act indicates that it is a sound statute but that its implementation has resulted in policies and practices which are detrimental to the best interest of the government. By this I mean that implementation has focused almost strictly on the procurement of ADP hardware and that with the passage of time we have ended up with the important tasks of overall management and utilization of ADP being driven through the procurement system. You have recognized this in recent years and we compliment you for having addressed this problem by development and passage of the Paperwork Reduction Act which created the Office of Information Resource Management in OMB to carry out broad information technology management and policy functions. We were hoping that your next legislative initiative would be one to stimulate the effectiveness of the Paperwork Reduction Act by placing emphasis on planning, effective use of technology, and management of the government's total ADP resource and investment. I have already commented on my concern about the lowest price philosophy, but I am also concerned about the apparent characteristic of HR 5184 focusing on ADP procurement and driving that process through the protest process, and in fact through a duplicative protest process.

3. The ultimate UFPS objective was a one-statute procurement system. HR 5184 adds a third track to the existing two statutes governing procurement: Armed Services Procurement Act (ASPA) 1947, Federal Property and Administrative Services Act (FPASA) 1949.

CBEMA supported your first rechartering of OFPP because of your mandate to them to develop a new UFPS and the expectation that that would result in one basic statute for all federal government procurement. We read HR 5184 as being a single procurement statute in the provisions it explicitly covers, but actually it is a third basic procurement statute as a result of the Federal Property and Administrative Services Act and the Armed Services Procurement Act continuing to exist for all other aspects of procurement. If, in fact, the goal is to make HR 5184 the single procurement statute, then we believe its development must take place in a cooperative fashion involving all interested parties with adequate time to explore the ramifications of such comprehensive legislation.

4. HR 5184 does not recognize the competitive nature of commercial products that are procured through the GSA Multiple Award System.

HR 5184 lacks the UFPS's recognition of the high desirability of the government's acquisition and utilization of commercial products to the maximum possible extent and recognition of the inherent competitive nature of such commercial products developed in the free enterprise system of the private sector market.

Further, we are concerned that the category of "practices that are less rigorous than full and open competition" will apply negative stigma to currently utilized procurement methodologies that result in significant benefits to both the government and industry. An example of one of these would be GSA's ADP Multiple Award Schedule Program. On numerous occasions, since the passage of the Brooks Act, GSA has received warm endorsement of its testimonies before this committee as to the very significant cost avoidance savings which the government has realized as a result of the conduct of this program under the auspices of the Brooks Act.

The definition in Sec 202 (j)(5) of small purchase as "any purchase or contract that does not exceed $25,000" without exemption for GSA's ADP Multiple Award Schedule Program could cause major disruption to the low dollar value portion of that program as a result of the existing small business reservation.





5. HR 5184's definition of "full and open competition" will create confusion in implementation, and be subject to challenge/protest.

S 338 and the UFPS have taken advantage of the experience and thinking of many procurement experts and have adopted the proven concepts of effective competition and maximum practical competition. While in no way do I want to give the impression that CBEMA and the companies we represent are opposed to free and open competition, I do feel it necessary to express some concerns about the definition of "full and open competition" contained in HR 5184. History has proven that a philosophy which results in competition for competition's sake can have detrimental effects to all parties and is not in the best interest of the government. In our view, two of the provisions in HR 5184's definition of full and open competition could result in serious confusion in the government procurement process and numerous protests, and/or lawsuits from industry. These two points are, first, the requirement that all qualified sources are allowed and encouraged to submit sealed bids or competitive proposals on the procurement. We believe the "are encouraged" philosophy could expose the government to major second guessing and protests. Secondly, we believe that similar negative impact could result from the terminology "sufficient number of sealed bids or competitive proposals to insure that the government's requirements are filled at the lowest possible price." "Sufficient number" and "lowest possible price" would be subject to argumentative interpretations and many challenges.

In Sec. 202 (j)(3) a noncompetitive situation should be defined as a procurement practice that results in the award of a contract when the agency solicits bids or proposals from only one party, rather than the current wording of award "after receiving only one bid or proposal."

6. The bill appears to penalize a successful vendor.

In Sec. 202 (b)(1)(b), this provision would appear to allow an agency to exclude a source from competition simply because it is doing well business-wise in a particular agency or segment of the government's business. This provision is not tied to reasons of defense or national security. Rather, a source which has competed successfully, to the government's advantage, could be excluded from further business to its detriment and that of the government with, in fact, a reduction rather than an increase in competition.

7. The bill could encourage violation of legitimate rights in data and the

Case 1:06-cv-00599-MBH Document 17-12 Filed 08/29/2006 Page 9 of 10



use of the Freedom of Information Act for unethical marketing practices.

<u>Sec. 202 (c)(5)</u> should, without further qualification, consider alternative sources to <u>not</u> be available for the production or assembly of spare parts if another party has a legitimate proprietary interest in the parts or their manufacture. The current wording, without correction, would allow the government to participate in the willful violation of such legitimate rights should the violator offer to indemnify the government from legal liability. The text of (c)(5) should end after "unless another party has a legitimate proprietary interest in the parts or their manufacture".

<u>Sec. 202 (d)</u> would eliminate protection provided under the Freedom of Information Act for proprietary business data, trade secrets, etc.

<u>Sec. 202 (h)(2)</u> would appear to allow the government to reimburse a small business for patent infringement costs and/or trade secrets violation costs in a government encouraged development of alternate sources of supply such as the reverse engineering program mandated in HR 2133.

8. Unsolicited proposals that do not involve research would be open to compromise.

<u>Sec. 203 (c)(1)(b)</u> - not requiring publication notice of a proposed noncompetitive procurement resulting from acceptance of an unsolicited proposal that demonstrated a unique or innovative concept should not be limited soley to unsolicited <u>research</u> proposals. This provision should cover any unsolicited proposal that demonstrates a unique or innovative solution to a valid government problem when publication of a notice cannot avoid the disclosure of the originality of thought or innovativeness or disclosure of proprietary data.

9. The bill undermines the soundness of the "advocate for competition" concept by setting forth more detailed requirements as to how this function will operate.



<u>Sec. 205 (b) and (c)</u> - create the position of "advocate for competition" in each Executive Agency and prescribe the duties of that office. We are concerned that such action will create further unneeded bureaucracy in the federal acquisition process, and question as to what practical benefit would result. We view with alarm this action as further erosion of the authority of the agency contracting office and program manager. The bill proposes to add the "advocate to competition" to already overly complicated information technology acquisition intrastructure which currently includes agency information resource managers, senior ADP policy officials, Procurement Executives, Inspectors General, in-house audit organizations, in-house investigation units, etc., in addition to a normal internal agency management structure and numerous external policy oversights, and audit organizations. CBEMA believes that the proper step is not to add another layer to an already overburdensome bureaucracy, but to simplify and streamline that existing structure and take steps to make it work.

Finally we come to the issue of reforming the procurement protest process. S 338 and UFPS are silent in this regard. CBEMA makes no judgment on whether or not the protest process is in need of reform. Our concern here is the move for reform is premature and not sufficiently supported by past GAO and Congressional studies. We have identified several issues which we believe needs to be resolved before reform legislation is introduced.

We are concerned that Sec. 204, as currently written, will encourage even further abuse of the protest system than exists today. Companies not willing to make the investment of time and resources to compete responsibly on a government procurement may adopt a marketing strategy of protesting to stop award or to stop contract performance after award in an effort to gain some advantage through such unwarranted disruption. Though HR 5184 authorizes the Comptroller General to dismiss frivolous protests, history is replete with past GAO protests which prove that it is not always possible to tell from the face of a protest that it is frivolous. Absent the determination described above, government programs may be delayed while the Comptroller General is required to

perform the same review as he would in a situation involving an apparently valid protest merely to determine that the protest in question is frivolous. It would appear more reasonable to allow the Executive Agency to award contracts in the face of a protest with Comptroller General authority to order a termination for convenience if his decision is made within 60 days of award, and he finds that an egregious violation of law or regulation was made by the agency unless compelling or exigent circumstances affecting vital U.S. interests will not permit the loss of time associated with a termination and new procurement.

Further, in cases of frivolous protests, the protestor (all protestors should furnish a bond) will pay the costs of the agency and interested party(ies) preparation of response to the protest. This equalizes the treatment of successful parties in protest situations.

Section 204(c)(4)(a)&(b) require that the agency pay costs of pursuing the protest and bid and proposal expense to the successful protestor out of funds available for the purpose of the procurement concerned. This has the unfortunate overreaching effect of causing an agency which may have awarded a contract in violation of law, but which still has a valid need for the supply or service involved, to have lost its ability to obtain the item because of a requirement that its funds be used to pay the successful protestor as a penalty. The agency user group may thus be penalized as a result of the error of a contracting officer or other official. The costs covered by (4)(a) should be paid from the same source that any costs paid for by the U.S. government as a result of successful litigation against it are paid.

Sec. 204(f)(1) - This subsection (f) grants significant new powers to the GSA Board of Contract Appeals and creates an entirely new and duplicative avenue of protest. It creates another layer of bureaucracy in a fashion that will further encourage a marketing strategy of frivolous protest actions. Combined with the provisions of 204 (b)&(c), just discussed, this would create an environment which we view as one in which the protest system would drive the procurement system. It would worsen, not improve, an already heavily abused protest system!





Mr. Chairman, I would like to point out that CBEMA has not had ample time to do an exhaustive analysis of HR 5184's implications or to develop a complete set of suggested amendments. However, the wide range of basic procurement policy issues that I have touched on today does suggest that HR 5184 should be considered in detail by all affected committees of the Congress with adequate time for all parties, including executive agencies to be effected, to present their points and counterpoints and have them fully considered. This is the type of legislation in which haste and lack of full consideration in its development can have major negative impact on both the government and the private sector. I urge you to proceed in the judicious fashion that you have so often demonstrated in the past. In this regard CBEMA would be pleased to work with your staff in an effort to develop effective procurement reform legislation.

Mr. BROOKS. Our final witness this morning is William A. Rose, Jr., chairman of the Committee on Federal Procurement of Architectural/Engineering Services.

Mr. Rose is a graduate of Harvard and Columbia Universities. He is a partner in the New York architectural firm of Rose, Beaton, and Rose.

Accompaning Mr. Rose are Phil Hutchinson, legal counsel for the Committee on Federal Procurement of Architectural/Engineering Services—well known to this committee—and William J. Birkhofer, managing director of governmental and international services of the American Consulting Engineeers Council.

We are delighted to have you all here.

## STATEMENT OF PHILIP A. HUTCHINSON, JR., LEGAL COUNSEL, COMMITTEE ON FEDERAL PROCUREMENT OF ARCHITECTURAL/ENGINEERING SERVICES, ACCOMPANIED BY WILLIAM J. BIRKHOFER, MANAGING DIRECTOR, GOVERNMENTAL AND INTERNATIONAL SERVICES, AMERICAN CONSULTING ENGINEERS COUNCIL

Mr. HUTCHINSON. Thank you, Mr. Chairman. My name is Phil Hutchinson. I am the legal counsel to the Committee on Federal Procurement of A/E Services. Bill Rose, our chairman, was unable to make his travel connections, and has asked me to express his apologies to you for not being here.

With your permission, I would like to present our statement with the capable assistance of Mr. Birkhofer from the American Consulting Engineers Council.

Mr. BROOKS. You may proceed.

Mr. HUTCHINSON. Thank you, sir.

The Committee on Federal Procurement of Architectural/Engineering Services represents the views of the American Congress on Surveying and Mapping; the American Consulting Engineers Council; the American Institute of Architects; the American Society of Civil Engineers; the Planning and Design Division of the American Road and Transportation Builders Association, and the National Society of Professional Engineers.