Case 1:06-cv-00599-MBH Document 17-13 Filed 08/29/2006 Page 1 of 10



These societies, in turn, represent the vast majority of America's practicing architects, engineers and surveyors.

Our purpose in appearing before you today is to present our position on H.R. 5184, the Competition in Contracting Act.

We support this legislation and commend you, Mr. Chairman, and Congressman Horton, the cosponsor, for your commitment to full and open competion in the Federal marketplace.

We are especially pleased that the term "full and open competition" as used in section 202 of the bill, is defined to include the procedures now followed by all Federal agencies in procuring architect/engineer services. The A/E procurement procedures required by Public Law 92-582, the Brooks Act, and Public Law 97-214, the Military Construction Codification Act, are highly competitive and strongly supported by the practitioners we represent.

Mr. Chairman, as the principal draftsman of the Federal A/E procurement law, it must be a source of satisfaction to know that many, many millions of dollars worth of Federal projects have been designed by architects and engineers who competed and were selected in accordance with the Brooks Act. I should add that the vast majority of our members are small business. As such, they are especially appreciative of opportunties that they have had to compete for Federal work since the Brooks Act was enacted.

We are concerned, however, that application of the Brooks Act has been misconstrued by some agencies, but Congress has recently helped to clarify this matter and the Senate, during consideration of its version of the Competition in Contracting Act, provided some much needed clarification. We urge this committee to provide similar clarification during its deliberations of H.R. 5184.

We also support in the bill the procurement protest system. These procedures should assure that the Comptroller General handles protests expeditiously; that contracting agencies do not press on with an award in the face of a protest unless there are compelling circumstances, and that the costs of pursuing a successful protest are reimbursed.

We do have some concerns which, in our view, would promote competition in A/E contracting. These concerns may be beyond the scope of the bill before you, but they are related to the issue of competition and, therefore, I shall mention them briefly.

Small business set-asides. Since most of our members are small business, we see little merit in a set-aside program for our profession. Our basic position is that the best A/E should be selected for the job at hand using Brooks Act procedures. Typically a very small job can best be handled by a small firm, while larger firms are more often qualified to handle bigger projects.

We recognize and support the Government's desire to assist small firms, but we believe programs designed for the overall benefit of small business may not be applicable to every segment of small business. In fact, Congress has recognized that it is inappropriate to set aside all DOD A/E contracts for small businesses and has directed that contracts over $85,000 should be open to competition among all A/E firms.

Our general procurement laws and regulations should recognize that there may be situations where competition would not be promoted, nor would it be in the overall public interest to impose a





broad rule to a particular group or a profession. For example, if the rule of two was applied to all A/E contracts, every contract would go to a small business A/E contractor. Yet, in all likelihood, truly small A/E firms would not be helped at all, and some highly qualified A/E firms would be totally excluded from the opportunity to compete for Government business.

Mr. Chairman, we are encouraged that you have called the rule of two inequity to the attention of OMB Director Stockman. Hopefully, the FAR will be modified to exclude the rule of two before it goes into effect.

The Federal acquisition regulation. We know that a great deal of effort has been put forth to simplify Federal procurement regulations. The goal is a worthy one. Cut down the volume and conflict between Federal procurement regulations by providing one simplified body of procurement rules, applicable Governmentwide.

We regret to say we think the effort is going awry. The Federal acquisition regulation is scheduled to go into effect April 1. But in addition to the FAR, each agency is planning to issue supplemental regulations. We suspect when the whole effort is evaluated, the FAR plus supplements will be equal to or greater than the body of regulations that were to be simplified.

We can only report that our members do not think there has been a simplification based upon what we have seen so far.

The Office of Federal Procurement Policy. We have been a strong supporter of OFPP since its inception. Sometimes we have had disagreements with OFPP, but we have always had a fair hearing and an open door. This has been particularly true under the leadership of the current Administrator, Don Sowle.

We believe OFPP should be more aggressive to assure that inconsistencies are not permitted to creep into the procurement process. In our area of expertise, we see inconsistencies from time to time. We report these to OFPP, but we sense a reticence on the part of the office to exercise its policy role.

Perhaps this is due to other priorities and a limited staff. Nevertheless, we believe that when there is a conflict between agency practices, OFPP must step in and reestablish the course otherwise the authority and purpose of the office will be quickly eroded. It would be helpful if this committee would encourage OFPP to exert its policy authority when inconsistencies are brought to its attention.

Mr. Chairman, on behalf of America's practicing architects, engineers, and surveyors, we thank you for your consideration and the opportunity to present these views.

Mr. BROOKS. Thank you, Mr. Hutchinson, for a very splendid statement that you handled beautifully. You would think that you had written every word of it. I appreciate very much your contribution to this hearing——

Mr. HUTCHINSON. Thank you, Mr. Chairman.

Mr. BROOKS [continuing]. With the able assistance of Bill Birkhofer.

Would you just respond to one question, both of you, either of you, to the assertion that architectural and engineering procurements under Public Law 92-582 are not competitive?

Mr. HUTCHINSON. Well, Mr. Chairman, I think what needs to be done is look at the situation before the Brooks Act was enacted and look at it after the Brooks Act. Before the Brooks Act was enacted, there was no public announcement of A/E contracts. The smaller firms, in particular, really didn't know where the opportunities were. You had to have a Washington office to really be able to ferret out these opportunities. After the Brooks Act, every single prospective Federal A/E procurement was announced and there was an opportunity for all firms, large and small alike, to know that these opportunties existed and to compete for them.

Before the Brooks Act was enacted, I would say there was something of a closed shop in that the Government tended to go to the same firms over and over again just because the opportunities weren't out there and available for everybody to know about.

Today, since the Brooks Act has been enacted, we find that many, many new firms are entering the Federal marketplace. Based upon some estimates that I've heard from the General Services Administration and the Defense Department, we would say between 20 and 25 percent of the awards are going to firms that have never had a Government contract. So, there is a whole new cadre of people who are competing for A/E contracts.

I would also say that the whole process for awarding A/E contracts and negotiating fees has been vastly improved. Before the Brooks Act, a Government negotiator would simply pick a fee off of a curve. It was a very mechanical process. But because of the procedures that are set forth in the Brooks Act, there is now a detailed negotiation on each and every one of these projects. The project is analyzed. The agency has to sit down and it is forced to determine what it really wants. It has to go through the same process that the A/E has to go through to arrive at a fee.

And, finally, I would say that there is one similarity before and after the Brooks Act. Before the Brooks Act there was a fee limitation that established that for the design of Federal projects, the fees can't be beyond 6 percent of estimated construction cost. After the Brooks Act, that same rule is in effect and so, therefore, you have really a double limitation here. You have the fee limitation, and you have the imposition on the agency that they really have to sit down and understand their projects while they are negotiating with the A/E's. That is perhaps a long, drawn out answer, but I would have to tell you that the A/E community is very grateful for your leadership and for the vast improvement that this particular law has brought about in the A/E procurement system.

Mr. BROOKS. Thank you very much. Mr. Clinger.

Mr. CLINGER. I have no questions, Mr. Chairman.

Mr. BROOKS. We want to thank both of you for coming down and we are grateful for your continued interest in this legislation.

This will conclude our hearing today on the Competition and Contracting Act of 1984, and I appreciate the testimony of all the witnesses. Their suggestions and recommendations will be helpful to us as we continue to consider this legislation.

The hearings will continue on Thursday when we will hear testimony from representatives of the Department of Defense, the Office of Federal Procurement Policy, General Services Administration, and the private sector. The subcommittee is adjourned.





[Whereupon, at 12:07 p.m., the subcommittee adjourned to reconvene at 10 a.m., Thursday, March 29, 1984.]

# COMPETITION IN CONTRACTING ACT OF 1984

THURSDAY, MARCH 29, 1984

HOUSE OF REPRESENTATIVES,
LEGISLATION AND NATIONAL SECURITY SUBCOMMITTEE
OF THE COMMITTEE ON GOVERNMENT OPERATIONS,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:10 a.m., in room 2154, Rayburn House Office Building, Hon. Jack Brooks (chairman of the subcommittee) presiding.

Present: Representatives Jack Brooks, Frank Horton, William F. Clinger, Jr., and Dan Burton.

Subcommittee staff present: Richard C. Barnes, staff director; Cynthia Meadow, professional staff member; Mary V. Heuer, staff member; full committee staff: William M. Jones, general counsel; John E. Moore, staff administrator; James E. Lewin, chief investigator; James E. Rife and Robert S. Richard, professional staff members; Ralph Doty, staff member; John M. Duncan, minority staff director; Stephen M. Daniels and Douglas D. Mitchell, minority professional staff, Committee on Government Operations.

Also present: Charles Wheeler, GAO detailee.

Mr. BROOKS. The committee will come to order.

Today, the subcommittee will continue its consideration of H.R. 5184, the Competition in Contracting Act of 1984. This legislation is a result of public and congressional concerns that the Government is discouraging the use of competition in procurement. These concerns have been heightened in recent months by revelations of costly abuses in the purchase of military spare parts, and a growing pattern of noncompetitive procurements in major civilian agencies. There is no question that the lack of competition in the Federal Government's purchase of goods and services is costing U.S. taxpayers billions of dollars—every year.

In Tuesday's hearing, the General Accounting Office testified that the majority of the Government's procurement is being done on a noncompetitive basis. For example, in 1983, $152 billion was spent for procurement. Sole-source or noncompetitive acquisitions accounted for almost $100 billion of that amount—almost two-thirds of all procurements.

According to the Comptroller General, this situation exists because of a general lack of commitment to competition on the part of key agency personnel. Apparently, these officials do not consider full and open competition worth the trouble.

The GAO found that the Energy Department could have used competition in 77 percent of its sole-source contracts. At the Department of Transportation, the figure is 49 percent and at Interi-

or, it is 33 percent. The situation is even worse at the Department of Defense where sole-source awards to favored vendors have become a way of life. This subcommittee held oversight hearings last year on the huge overpayments for spare parts that resulted from lack of competition—and these abuses are just the tip of the iceberg.

Unfortunately, virtually everybody at DOD, including a few Defense contractors, like the current system as it is. We must all recognize, however, that the system they are trying to defend is plagued with waste and abuse of outrageous proportions that can no longer be tolerated. With its requirements for full and open competition, H.R. 5184 will put a stop to these practices and restore integrity to the Government's procurement process.

Our first witness was to have been Senator Lawton Chiles, senior Senator from Florida. He will be here later. Senator Carl Levin, the distinguished Senator from Michigan also will be here later.

So, we will move on to the Honorable Leonard J. Suchanek. He is Chairman of the Board of Contract Appeals, General Services Administration.

He is accompanied by Jim Regan, Chief Counsel for the Board, and John Burkholder, Deputy Chief Counsel for the Board.

Judge, we are delighted to have you. Please proceed.

## STATEMENT OF LEONARD J. SUCHANEK, CHAIRMAN, BOARD OF CONTRACT APPEALS, GENERAL SERVICES ADMINISTRATION, ACCOMPANIED BY JIM REGAN, CHIEF COUNSEL, AND JOHN BURKHOLDER, DEPUTY CHIEF COUNSEL

Mr. SUCHANEK. Mr. Chairman, as you know, I am blind, and I will necessarily be using Braille notes.

I also want to call to your attention that I have a partial hearing loss, so I hope that you will bear with me.

I wish to thank you for asking me to testify this morning before the committee on H.R. 5184, which may have a significant impact on the GSA Board of Contract Appeals, of which I serve as Chairman.

Let me first say that, although I am not prepared, nor do I think it entirely appropriate for me to go into detail regarding the purpose and the overall effect of the legislation, I am wholeheartedly in favor, as anyone would be, of the committee's intent as manifested in the bill, to provide for full and open competition in the Federal procurement process.

I believe that I have been requested to testify today on the proposed new section 204 to be added by the bill as an amendment to the Office of Federal Procurement Policy Act.

As you stated in your letter to me, Mr. Chairman, requesting that I testify, the bill would give the Board of Contract Appeals significant new responsibilities. Section 204 would create a Procurement Protest System with parallel forums at the GSA Board and the GAO for the resolution of so-called bid protests arising out of automatic data processing procurements.

Although GSA is opposed to the enactment of H.R. 5184 in its present form, I am confident that the Board would be equipped to hear and decide any protests generated under a new system, such





as the one envisioned by this bill. We have a fine complement of administrative judges with excellent administrative and legal support, and I have no doubt that our team would be able to deal with any increase in workload resulting from this legislation, at least on an interim basis.

While I have already stated that GSA does not favor H.R. 5184 as currently drafted, I would nevertheless like to point out some of our concerns for your consideration.

These concerns have to do with the powers of the Board to adjudicate protest actions. First, there should be statutory timeframes for the resolution of protests by the Board. There has been testimony by industry representatives to the effect that a decision on an ADP procurement protest should be resolved within 50 days after the protest is filed.

I feel that, in fact, the Board is capable of deciding most cases like these in 40 days, including a hearing on whether the delegated procurement authority should be suspended while the protest is pending. The availability of an expeditious and impartial forum for ADP protests is crucial if complex and sophisticated ADP systems are to be procured in an economical and efficient manner.

There has been some concern expressed at these hearings that the protest system proposed in the bill might allow disappointed bidders, or otherwise frustrated contractors, to hold up procurement for no good reasons. We at the Board share this concern, and for that reason would like to see some language regarding the dismissal of frivolous or facially invalid appeals in section 204(f), as it is already contained in section 204(c)(3).

If Congress wishes to create a parallel forum at the GSA Board for ADP protests, it may wish to consider parallel remedies to those available at GAO, such as the authority to grant costs, including attorneys' fees, and bid and proposal preparation costs.

Whether our recommendations are accepted in whole or in part, we at the Board of Contract Appeals are ready to assume the role envisioned for the Board in H.R. 5184.

Thank you for your patience. If you have any questions you would like to ask about the Board's operations or our recommendations regarding the bill, I shall try my best to answer them.

Mr. BROOKS. Judge, I want to thank you for a splendid statement. It didn't take any patience whatsoever. It is much more expeditious than most of the statements. You know the rule—people revise and extend their remarks. They speak extemporaneously for an hour and a half on a 10-minute statement. They would be better off if they would read it word by word kind of slowly and try and get the words right because they often didn't write them.

But we are delighted to have you here today. I appreciate your candid evaluation of this legislation and your obvious agreement and understanding that you could and would perform under this bill the kind of adjudicatory services that the contractors need. I am grateful for that.

I have a few questions for you, if you don't mind.

In your personal opinion—having been down there for a good many years—do you believe that H.R. 5184 will greatly reduce the waste and abuse currently plaguing the Government's procurement system?

Case 1:06-cv-00599-MBH Document 17-13 Filed 08/29/2006 Page 5 of 10



Mr. SUCHANEK. Mr. Chairman, I think anyone would be of the opinion that any bill such as this or any scheme of regulations that fosters open competition, that fosters appropriate recordation of contract actions would certainly have that effect.

Mr. BROOKS. Judge, could you give us a brief rundown on the Board's activities and maybe a description of the jurisdiction that you have?

Mr. SUCHANEK. Mr. Chairman, currently we have 9 administrative judges and 2 vacancies, so that means there is a total of 11 spaces for judges.

We have four attorney hearing examiners. We have a fine administrative and legal support staff for the Board. We have a current caseload of 667 cases.

Mr. BROOKS. Would the Board be able to work within the specific deadlines established by H.R. 5184?

Mr. SUCHANEK. Well, as I said in my statement, Mr. Chairman, I believe the Board would. In fact, in my statement, I pointed out that we believe that tight timeframes ought to be placed in the statute. Currently there is not any provision for such timeframes in the legislation.

Mr. BROOKS. Do you see any problems, Judge, with having both the GAO and the Board deciding bid protests—the parallel jurisdiction, so to speak?

Mr. SUCHANEK. No. I don't. This is common in American jurisprudence. It is common throughout the country. It is common in the Federal procurement area. It presently exists under the Contract Disputes Act. It existed prior to the Contract Disputes Act.

I see no problem at all.

Mr. BROOKS. Judge, is the standard which the agencies must meet to avoid temporary suspension of their delegated procurement authority too strict?

Mr. SUCHANEK. In terms of the scheme of the legislation, Mr. Chairman, no.

Mr. BROOKS. Well, I want to thank you very much for knowing a whole lot more about contract litigation than I ever wanted to know.

I recognize the distinguished ranking minority member of this committee, Congressman Horton.

Mr. HORTON. Thank you, Mr. Chairman.

Under the bill, as you were just commenting to the chairman, there is this dual protest procedure for challenges to computer procurement. Protests may be lodged with both the GAO and the GSA. If the two agencies ruled in contradictory ways, how should the contracting agency behave?

Mr. SUCHANEK. First of all, as I read the legislation, I believe the decisions, so-called, issued by the General Accounting Office are recommendations. That is not the case with regard to the Board, as I read this legislation.

Mr. HORTON. Would you recommend that we revise the bill to remove this possibility?

Mr. SUCHANEK. I don't think it is a problem.

Mr. HORTON. I, too, want to join with the chairman in commending you on your knowledge and expertise in this particular area. I know from my work on the Procurement Commission and my





many years here on the Government Operations Committee that it is a highly technical area in which you work, and we do appreciate your being here with us today and your willingness to undertake the compliance with the provisions of this bill if it is enacted.

Thank you very much.

Mr. BROOKS. Judge, we want to thank you very much, and we look forward to seeing you again and also Mr. Regan and Mr. Burkholder.

Our next witness is Ms. Mary Ann Gilleece who will be testifying for the Department of Defense. She is Deputy Under Secretary of Defense for Research and Engineering, Acquisition Management. Prior to that, she was a staff member of the House Armed Services Committee.

She is accompanied by Dennis Trosch, Assistant General Counsel (Logistics) for the Department of Defense and Harvey J. Gordon, Assistant Deputy Under Secretary of Defense for Acquisitions. He is also chairman of the high level working group on competition within the Department of Defense.

So, they are for it?

Ms. GILLEECE. Sir, unequivocally, the Department of Defense supports competition.

Mr. BROOKS. I love that language, but you know "By their deeds ye shall know them."

We will be delighted to have your statement, and you may proceed in any way you see fit.

**STATEMENT OF MARY ANN GILLEECE, DEPUTY UNDER SECRETARY OF DEFENSE FOR RESEARCH AND ENGINEERING (ACQUISITION MANAGEMENT), ACCOMPANIED BY DENNIS TROSCH, ASSISTANT GENERAL COUNSEL (LOGISTICS), AND HARVEY J. GORDON, ASSISTANT DEPUTY UNDER SECRETARY (ACQUISITIONS)**

Ms. GILLEECE. Thank you, Mr. Chairman, if I might I would request that my statement in total be put in the record, and I will read parts of it rather than summarize.

Mr. BROOKS. Without objection, your entire written statement will be inserted into the record.

Ms. GILLEECE. Thank you.

Mr. Chairman, as you know—and you are very aware—the mission of the Department of Defense has grown more complex in the last quarter century. Due to a quantum leap in technology in general and military development in such specific areas as aerospace, communications, electronics, computers, and high energy weapons, unprecedented procurement management skills are required today to maintain an adequate defense.

Statistically, in fiscal year 1983, the Department of Defense processed almost 15 million contract actions equaling $140 billion. There are 50,000 men and women committed to the procurement process in the Department of Defense, and, I might add, committed to doing the very best job that anyone can.

At the beginning of the administration, as you are aware, Mr. Carlucci, then Deputy Secretary of Defense, directed 32 initiatives

which became the acquisition improvement program but was popularly known as the 32 Carlucci initiatives.

One of those initiatives was specifically defined as competition, even though in fact competition was woven throughout each of those initiatives. Some of the initiatives have been accomplished; others have not; others need more focus in the near term as well as the long term.

Thus, the Deputy Secretary has combined into six management initiatives those techniques that we believe will require this near-term and long-term focus. One of those—and one very important one—is encouraging competition. As I indicated, we are, and continue to be, fully supportive of improving competition in the Department of Defense. Competition has been the preferred means for acquiring supplies and services in the Government for generations.

As you know, Mr. Chairman, we have had a great deal of difficulty often because some people only equate formal advertising with competition. However, as you also know, there are competitive negotiated contracts awarded. By the way, regarding the statistics which you so aptly quoted, follow-on contracts equate to about 25.3 percent of our procurement dollars. Follow-on efforts may come down to being sole source, but there is nothing that involves more competition than many of those follow-on contracts since they were competed in the first place.

The prime contractor and subcontractors also assure that for betterment of their prices they involve themselves in competition. We have a great deal of difficulty getting competition at times because, for example, only one shipyard makes nuclear aircraft carriers. Also included in our statistics for noncompetition are systems which can be built only one place such as the Trident nuclear submarines. These amount to a great deal of that 33.7 percent which is noncompetitive.

Nevertheless, a number of actions are underway to improve our performance in competition. The services and DLA [Defense Logistics Agency] have designated advocates for competition within their respective organizations. Competition goals have been established by each of the services and DLA. We are working to make it easier to determine the costs and benefits of competition in the production phase and clarify potential application of leader/follower and other means of second sourcing for programs being planned, as well as those already in production.

The potential for savings in this area is high, and the benefit to the industrial base is unequivocal. As an indication of our commitment to improve competition, the Department has requested a legislative change to establish a negotiation exception for developing a second source. The action is now pending before Congress.

Some other actions we are taking to enhance competition are centered in the Interservice High Level Working Group on Competition, chaired by Mr. Gordon. This group has recommended techniques for identifying second-source opportunities, improving data acquisition policies, and increasing the extent of competition at the subcontractor level.

The Deputy Secretary of Defense has acted on each of these recommendations with a series of memorandums to DOD components





dated March 12, 1984. Mr. Chairman, I would request at this time that we be allowed to place these in the record.

Mr. BROOKS. Without objection, that series of memorandums will be inserted into the record at this point.

[The information follows:]

THE DEPUTY SECRETARY OF DEFENSE

WASHINGTON, D.C. 20301

12 MAR 1984

MEMORANDUM FOR SECRETARY OF THE ARMY
SECRETARY OF THE NAVY
SECRETARY OF THE AIR FORCE
DIRECTOR, DEFENSE LOGISTICS AGENCY

SUBJECT: Data Rights

One inhibitor to breakout or development of competitive sources for spare parts and subsystem components is the "limiting" of data by contractors asserting proprietary rights. Recent reports suggest that current weapon system components and parts have been coded as proprietary in part because DoD had allocated inadequate resources to the early planning and effective implementation of methods for dealing with this problem.

The High Level Working Group on Competition, composed of representatives from each Service and DLA, has examined DoD policies and practices for acquiring rights in technical data and computer software. It sought to recommend changes to policies and practices on acquiring rights in data to enhance breakout and competitive procurement of weapon system components and parts. Attached is its report with proposed recommendations.

It is often necessary or advantageous to incorporate proprietary items and software in a weapon system. We should, nevertheless, reduce the quantum of data encumbered by proprietary restrictions by implementing two initiatives. We should plan early in the acquisition process for later breakout and development of competitive sources for replenishment items including, if appropriate, incentives for contractors to achieve this goal. Second, we should exert more discipline over the procedures by which contractors introduce proprietary items into weapon design as well as more careful assessment of asserted proprietary rights.

The report emphasizes the need to develop a middle ground in acquiring and using data associated with proprietary items as an alternative to the current choice between limited and unlimited rights. An initiative along these lines could open up broad areas of procurement for enhanced competition.

I ask that you review the attached report and provide formal comments and suggested improvements by April 16, 1984. We are seeking to change our data rights policies and practices to





strike a better balance between the need to encourage innovation by rewarding inventive talent and capital and the need to achieve more effective competition and an enhanced defense industrial base.

A parallel study is underway in response to a Congressional tasking to consider the feasibility of acquiring all data rights for reprocurement purposes.

William H. Taft, IV

Enclosure
As stated

Case 1:06-cv-00599-MBH Document 17-13 Filed 08/29/2006 Page 8 of 10



SUBGROUP REPORT

ON

RIGHTS IN TECHNICAL DATA

AND COMPUTER SOFTWARE

1. Initiative: Clarify DOD policies on acquisition of rights in technical data and computer software used to manufacture weapon system replenishment items, components or parts (hereafter referred to as spare parts).

2. Purpose of Subgroup: To clarify or recommend changes to DOD data rights policies to reduce the amount of technical data and computer software that is encumbered by restrictions on the Government's right to use it for breakout or competitive reprocure-ment of spare parts.

3. Background: An inhibitor to the breakout or the development of competitive sources for spare parts is contractor claims of proprietary rights on technical data and computer software. The subgroup examined whether DAR Section IX and related management practices offer appropriate means for managing this problem. The Government's need to recognize proprietary rights to encourage innovation and its need to achieve competition and an enhanced industrial base was considered.

4. Research Conclusions: Our review of DAR and current data rights initiatives led to the following conclusions:





a. Basic concepts underlying existing DOD policy are generally sound.

b. However, improvements to DOD procedures are required.

1. Planning for the breakout or development of competitive sources for spare parts should be accomplished early and refined throughout all phases of an acquisition program. This planning should specifically address the merits of excluding or including in hardware design items, components, processes or computer software developed at private expense (hereafter referred to as proprietary items or software). If inclusion of proprietary items or software is desired, this planning should address whether and how proprietary spare parts should be competed in the future.

2. DOD should continue to acquire only such data rights as are essential to meet Government needs. DOD should obtain necessary data with sufficient rights in the data to achieve breakout or develop competitive sources for spare parts where it makes good business sense to do so.

3. DOD should improve its capabilities for assessing the validity of a contractor's claim that an item, component, process or computer software was developed at private expense and for ensuring the completeness, accuracy and adequacy of data delivered by the contractor.

4. Where more than limited or restricted rights to data associated with proprietary items or software are desired, DOD should continue to reward inventive talent and capital,

but do so in consideration of its related responsibilities to pay fair and reasonable prices and to achieve competition and an enhanced industrial base.

c. Detailed comments and specific recommendations are provided as attachments to this report.

5. Recommendation: The High Level Working Group should ask concerned DOD agencies to comment on this report. These comments should be forwarded to USDRE and include examples of contract clauses and other pertinent information that illustrate agency initiatives in the data policy area. In turn, USDRE should implement policy changes as appropriate.

Robert E. Hergenroeder
ROBERT E. HERGENROEDER, Major, USAF
Subgroup Chairman

E D Collins
EDWARD D. COLLINS, DLA
Member

Norman E. Brown
NORMAN E. BROWN, USN
Member

A. Carr
ALBERT CARR, USA
Member

2 Atchs
1. Planning for the Breakout or Competitive Acquisition of Spare Parts
2. Business Relationships in Acquiring Technical Data and Computer Software





ATTACHMENT 1

PLANNING FOR THE BREAKOUT OR
COMPETITIVE ACQUISITION OF SPARE PARTS

1. DOD is required to competitively acquire, operate and maintain weapon systems developed under research and development contracts. Contractors and their subcontractors prepare data as an integral part of the design, development and production effort. DOD relies on this data throughout the life cycle of the hardware to perform management, engineering, maintenance, modification, competitive procurement of spares, test equipment and other logistics functions. Therefore, program managers must plan from the outset of the acquisition process to guide contractors and subcontractors to make sure that complete and accurate data with appropriate data rights are delivered when needed at the minimum life cycle cost.

2. A key program decision is whether to incorporate proprietary items or software in a weapon's design. It may be possible in programs pursuing less complex and more mature technology to restrict engineering design to non-proprietary items or software. However, many of DOD's acquisition programs will find it advantageous to include such in hardware design. This approach provides greater liklihood for obtaining quality technology while avoiding schedule and cost risks associated with developing alternative design solutions.

Case 1:06-cv-00599-MBH Document 17-13 Filed 08/29/2006 Page 10 of 10



3. Where incorporation of proprietary items or software in hardware design is desired, the following actions should be taken during the full scale engineering development phase to enhance later achievement of breakout or development of competitive sources for spare parts:

a. The Government should use source selection criteria and other incentives such as award fees to incentivize contractor actions to enhance breakout or development of competitive sources for spare parts. These criteria and incentives should address the contractor's make-or-buy plan, engineering design in terms of utilizing commercially available components, non-proprietary items and software and competitively available vendor material; and management plan to facilitate early breakout, to establish qualified competitive sources for spare parts which drive a weapon system's cost and to provide such complete, accurate and adequate acquisition data packages and sufficient rights in this data to permit another competent manufacturer to fabricate the subject item without requiring substantial technical assistance from the original contractor.

b. Competition shall be used to the maximum practical extent to obtain needed rights in data at reasonable prices. A contractor's priced proposal should include as a distinct line item the cost of data, and as an option, the acquisition of rights in data associated with proprietary items or software. This approach may be further tailored by category of data rights (e.g., prime contractor, subcontractor A, etc.) and used in conjunction with deferred ordering techniques since in this manner the Government





is likely to pay only for that data which is ultimately desired and delivered.

4. Finally, DOD should reexamine its instructions, military standards and data item descriptions to assure that resultant contract requirements will yield data that is so complete, accurate and adequate that another competent manufacturer can fabricate the item with little or no need for technical assistance.