ATTACHMENT 2

BUSINESS RELATIONSHIPS IN ACQUIRING TECHNICAL DATA AND COMPUTER SOFTWARE

1. Greater attention should be given by DOD contract administration services to validating the already DAR mandated contractor's management system for determining whether an item, component, process or software is developed completely at private expense. Formal reviews should be conducted on a regular basis with resulting determinations forwarded to concerned procuring agencies (This is a refinement of policy found in DAR 9-202.3(c)).

2. DOD should pursue the following business relationships in acquisitions that have the potential for involving proprietary items or software:

a. The contractor must notify DOD of the intention to include proprietary items or software in hardware design. This notification should be given when responding to a solicitation and upon any subsequent determination to include proprietary items or processes in hardware design. Included in this notification must be clear and convincing evidence that the item or software was developed completely at private expense.

b. To be considered developed, an item or component must have been constructed, a process practiced, or computer software, used, and in each case must have been tested to the extent necessary to determine that it is capable of accomplishing its intended practical purpose. When an item, component,





process or software does not meet these criteria, separable portions thereof that do meet these criteria will be considered to have been developed.

c. Failure to notify DOD before inclusion of a proprietary item or software in hardware design (for example, prior to identifying and entering an item into the configuration management system) should result in forfeiture of the right to limit DOD to limited or restricted rights in the associated data. This arrangement is considered appropriate as otherwise DOD will not be afforded sufficient opportunity to pursue alternatives to use of proprietary items or software. At the Government's option, a procedure may be established to automatically authorize the contractor to include a proprietary item or software if formal contracting officer disapproval is not rendered within a specified time period. (This is a refinement of policy found in DAR 7-104.9(b)).

d. Upon submittal of the above described notice and evidence, DOD shall have the right to furnish same to a consultant firm for the express purpose of assessing the validity of a contractor's asserted claim. The consultant firm shall be prohibited from disclosing such data and shall not be a direct competitor of the originating contractor. DOD shall use information furnished by the consultant firm in assessing the contractor's claim. All disputes shall be subject to the disputes clause of the contract (This is a refinement of policy found in DAR 9-202.2(g)).

e. Should DOD accept a contractor's assertions regarding proprietary data, an option should be available to acquire a license or royalty-free use rights in that data. In the case of a license, the fee should be paid over a specified period of time or up to a specific event, after which the license reverts to a royalty-free use or an unlimited rights arrangement. Also, this arrangement may provide for a reduction, suspension or termination of fee during periods of extreme national emergency.
(This is a refinement of policy found in DAR 9-202.1(c) and 9-202.2(f)).

f. Upon furnishing contractually required data pertaining to a proprietary item or software, DOD should have the right to provide all such data to a consultant firm for the express purpose of determining the completeness, accuracy and adequacy of the data for its intended purpose. Further, the contractor should be required to warrant the completeness, accuracy and adequacy of the data for its intended purpose. Finally, at a later date should this data be used by the Government for the purpose of competitively reprocuring the applicable spare part, and should such data be found to be incomplete, inaccurate or inadequate; the original contractor should be required to promptly correct any deficiencies in data identified by the Government, to furnish such technical assistance as is necessary for the successful manufacture of the applicable spare part and to reimburse DOD for such additional





costs incurred as a result of using defective data. (This is a refinement of policy found in DAR 7-104.9(o)).

g. All data pertaining to items or software developed at private expense should be marked as required by DAR. Should such data be furnished and not be appropriately marked, the contractor may petition DOD to place such markings on the data provided this petition is presented within 90 days after furnishing the data. Furthermore, the contractor should furnish all correction pages, drawings, etc. and bear the administrative cost of inserting same in DOD data bases/files/ manuals. Failure to do this within the prescribed period shall relieve DOD of any liability with respect to such data. (The time period is a refinement of policy in DAR 9-202.3(d)).

THE DEPUTY SECRETARY OF DEFENSE

WASHINGTON, D.C. 20301

12 MAR 1984

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS

SUBJECT: Programming and Investing for Competition

A recent review of noncompetitive contract actions by the High Level Working Group on Competition found that relatively few actions account for most of the noncompetitive dollars. A major share of our noncompetitive dollars originates in follow-on awards after initial competition (customarily during the development phase of a major program). This clearly indicates that competing just a few additional high-dollar military contracts in production could provide substantial benefit to our overall competition efforts.

We do a good job competing the development phase of major programs. I am aware of your strong support of competition in the production phase as well. However, competition often stops with award of the first production contract or earlier. It is viewed as being too expensive in most cases to maintain two producers, given other budgetary pressures, even though up to 70 or 80 percent of total program costs are associated with production. We must surface and debate the merits of such investments if we are to continue to make progress and achieve potential downstream benefits at the prime or other component contract level where investment costs are lower. I am unable to assess personally the costs and benefits of competition in the production phase when these alternatives are cut out during the Service budget reviews.

To indicate clearly DoD's commitment to competition and sound business judgement, and in keeping with direction from both the President and the Secretary of Defense, I urge aggressive pursuit of production competition in those programs where the expected benefits exceed the expected costs. As a step in this direction, I would like you to review all major programs expected to enter full-scale development (FSD) within the next two years. Identify for me, by the end of April, programs in which the expected quantity and associated production rate are deemed sufficient to facilitate enhanced competition. In those cases where production competition, at either the prime or subcontract level, offers substantial benefits, but is not included in current acquisition strategy, I would like you also to identify any additional investment required to undertake a competitive program along with expected benefits.





We will support the best of these programs through the budget process up through Congress. These programs will then provide Congress with a clear record of the downstream costs to be avoided if the requested investment is authorized and appropriated.

William H. Taft, IV

THE DEPUTY SECRETARY OF DEFENSE

WASHINGTON, D.C. 20301

12 MAR 1984

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
DIRECTORS OF THE DEFENSE AGENCIES

SUBJECT: Increasing Subcontract Competition

The need for increased effective competition is a major initiative that has been stressed on numerous occasions in recent years. The term, effective competition, encompasses the intelligent use of competitive forces to enhance overall value to the government, considering the life cycle benefits (economic, technical, schedule, or supportability) to be derived from competition and the life-cycle costs of obtaining competition. We must improve the use of effective competition to obtain greater economic benefits in our procurement programs.

Major emphasis has been placed on competition at the prime contract level. A study by the Army Procurement Research Office covering 12 major Army, Navy, and Air Force systems revealed that there is significant potential for increased subcontract competition, particularly at the component level (APRO Report 82-11). We must encourage more effective subcontract competition whenever practicable, such as in the general sets of circumstances set forth at Enclosure 1.

Different methods for encouraging prime contractors to award subcontracts competitively may be employed. Five possible methods are outlined at Enclosure 2. Any method selected should be judiciously employed on a case-by-case basis after careful consideration of all relevant factors involved in a particular procurement and after it has been assured that its use would not adversely affect other aspects or provisions of the solicitation or the resulting contract. Although special subcontract competition reporting requirements may be required by individual contract incentive clauses, we do not encourage general reporting of such competition in consideration of our efforts to reduce the paperwork burden of our contractors.

Efficient subcontract management by the prime contractor with proper emphasis on competition is the optimum situation. However, action to increase effective subcontract competition should be vigorously pursued whenever it is practicable.

William H. Taft, IV

Enclosures





## FACTORS FOR CONSIDERATION IN DETERMINING THE NEED FOR INCREASED SUBCONTRACT COMPETITION

Increased effective subcontract competition may be appropriate, given sufficient time and net economic benefits, if one or more of the following situations exist:

a. Primary Factors:

o When there are high-priced components.

o When quantities being procured are sizeable.

o When the requirements for the item are expected to continue for a considerable period of time.

o When it has been assured that the existing subcontractor possesses standard manufacturing techniques required for production of the item and has no proprietary rights for the component being considered. (If the subcontractor possesses exclusive manufacturing techniques or has proprietary rights, downstream subcontract competition may still be pursued if economically feasible or in the interest of industrial mobilization.)

o When to do so would fulfill a need to enhance the industrial base or mobilization capabilities, or when future requirements are expected to exceed planned subcontractor capability.

b. Additional Factors:

o When there is a problem, or a potential problem in performance of the major end item that can be attributed to the subcontracted item. Use of another subcontractor with better manufacturing capability or technical expertise could resolve the problem.

o When delays in delivery of the major end item have been attributed to late receipt of the subcontract item, and delivery improvement is not otherwise expected.

POSSIBLE METHODS OF ENCOURAGING INCREASED SUBCONTRACT COMPETITION

Five possible methods of increasing subcontract competition are as follows:

1. Directed Subcontract Second Sourcing - Experience indicates that the relatively low investment cost required to direct effective subcontract competition for selected key components can subsequently result in high payoffs. This is considered to be a primary method of obtaining the benefits of subcontract competition in production, especially where the producer is sole source. Contract provisions could be negotiated to require competitive purchase of specific subcontracted items. These items can be identified during pre-award review of the contractor's "Make or Buy" plan.

2. Use of Award Fee Provision - Award fee dollars should motivate prime contractors to increase effective competition at the subcontract level. Award fees could be tied to established subcontract competition goals based upon historical data, with additional fee (profit) provided for performance above the established goal.

3. More Detailed Analysis of Prime Contractor's Subcontractor Proposals - Provide, during negotiations, a process which requires the prime contractor to justify in detail the rationale for NOT competing subcontractor requirements. Subcontractors whose pricing trends are unsatisfactory should be challenged by the government. Consideration should be given to requiring formal government consent to awards involving problem subcontractors.

4. Increased Emphasis on Contractor Procurement System Reviews - Contract Administration Offices should review prime contractors' procurement systems with the intent of emphasizing needed improvement in subcontractor competition, as well as improved subcontractor negotiations. More periodic follow-up on procurement system reviews should be made.

5. Source Selection Criteria - For competitively negotiated contracts based primarily on nonprice considerations, the extent of competition in subcontracting can be made a part of the source selection criteria. This should be in instances when it is determined that effective subcontract competition is both feasible and desirable. Exercise of prudent judgment is required in making this a part of the selection criteria.





Ms. GILLEECE. The group has also developed a new directive on competition which is being coordinated with the Department of Defense components. This directive will firmly commit all elements of the Department to pursuing competition. It will accent early planning and market research to enhance competitive opportunities.

The services have also pursued independent actions to improve competition. For example, the Army has stressed the role of the program manager in planning early for competition in major systems, and the Navy has sponsored a 3-day training program on competition for over 300 Navy personnel with contracting, technical, and logistics disciplines involved. Topics included the legal basis for competition, techniques for enhancing competition, industry perceptions, and audit results. The Air Force is emphasizing planning at the major command level for competition. These plans will look at major noncompetitive problem areas and address planned remedial actions to assure future competition.

Through actions such as these, the entire procurement process is focusing on increasing competition where it makes sense. Perhaps the most vivid example of what can be done with earnest congressional support is the recent alternate fighter engine competition conducted by the Air Force. It was not only an effective program competition but one that will assure future competition in downstream spare parts requirements.

Mr. Chairman, as you know, the President of the United States is also very much devoted to making sure that we have as little noncompetitive procurement as possible and is encouraging competition throughout the Government.

Thus, on February 27, 1984, Don Sowle, the Administrator of the Office of Federal Procurement Policy, signed, at the request of the President, the memorandum on noncompetitive procurements.

Because of your interest, making sure that we improve our spare parts acquisition, I would like to digress for a moment on some of the initiatives that we have done since we were before you last time on spare parts.

As I am sure you are aware, the Secretary of Defense, on July 25, 1983, signed a memorandum defining a 10-point program on improvement of spare parts acquisition.

On August 29, 1983, he also signed a memorandum which was more specific requiring near-term, as well as long-term, initiatives in spare parts management.

Clearly, as you know, there are shortfalls in the resources which have contributed to the spare parts problem. But management attention has also been lacking. Expediencies and shortcuts were taken to meet an ever-increasing demand for support of equipment, with little change in the necessary resources. The Secretary of Defense has moved most aggressively to improve the policy governing the acquisition and management of spare parts. We are committed to making these improvements permanent and institutionalizing them to assure that the Department of Defense and American taxpayer receive full value for their tax dollar.

The military departments, as well as the Defense Logistics Agency, are responsible for implementing the improved procedures for the acquisition of spare parts and are taking necessary measures. For example, an Army task force has identified 67 initiatives

Case 1:06-cv-00599-MBH Document 17-14 Filed 08/29/2006 Page 6 of 7



in its spare parts program called Sprint. The Navy task force effort—which is Buy Our Spares Smart, called BOSS—recommended 102 initiatives. The Air Force has its AFMAG [Air Force Management Analysis Group] Program and has recommended 178 initiatives. The Defense Logistics Agency has also developed initiatives. Each is now in the process of implementing their initiatives.

We are challenging contractor claims of proprietary data, and contractors are being cooperative. A number have provided data packages and returned solicitations stating that the part can be procured from other sources. To benefit better from the data, we are obtaining automated systems that are designed to quickly retrieve and update data. At present our data packages are stored in large data repositories. To obtain information, we must manually retrieve the data package, reproduce it, and mail it out. With the computerized systems we are developing, the procedure will be done automatically. We will even be able to distribute engineering data and drawings over existing telecommunications networks. This is a large effort for our data management people to undertake.

Proprietary data rights to technical data are also of concern to the Secretary, as he indicated in his memorandum of August 29, 1983. In that memorandum he directed the Department's components to negotiate data provisions in contracts which, as appropriate, reduce contractors' proprietary right in data. For the 2.2 million items that have been screened for breakout, less than 3 percent are identified as being restricted because of proprietary claims.

While the incidence of proprietary claims appear small, the DOD components have been examining methods that would carry out the Secretary's direction.

Another effort which we believe has promise is to require that contracts for development incorporate the DOD Parts Control Program. This requirement promotes use of standard parts in the development and production of a weapon system. This allows us to make larger quantity buys, reducing parts' cost, and reducing the number of items in our inventory. It also supports competition because we typically have technical data available for these items. The Secretary, in his August 29 memorandum, mandated the application of this program in the development of new weapons systems.

To ensure reasonable pricing of parts at the time of contracting, the DOD components have all taken action to flag increases in prices that appear out of line with past prices. These items receive more intense analysis to assure that the price is reasonable.

Along these lines, we issued our implementation of section 1215 of the DOD Authorization Act of 1984, in Defense Acquisition Circular 76–48 this month. The regulation prohibits the purchase of spare parts when the price has increased by more than 25 percent within the most recent 12-month period unless the contracting officer certifies to the head of the contracting activity that the price is reasonable or that national security interests require the part to be purchased. Our regulation also emphasized that increases of less than 25 percent in no way relieves the contracting officer of the responsibility for obtaining a fair and reasonable price.





Another area where we have found a problem in pricing particularly small value items was in contractor cost accounting practices. A number of contractors utilize cost accounting methods for costing parts on an item basis, rather than a value basis. Each item, regardless of its material and direct labor costs, is allocated the same cost for material handling, overhead, general and administrative expense, et cetera.

A 50-cent part purchased by the prime contractor from a vendor and sold to the Government was burdened with the same cost as a $1,000 part purchased by the prime contractor from a vendor and sold to the Government. This gave the appearance of low value parts being overpriced and higher value parts being underpriced. The net total cost to the Government for all parts purchased was the same. We have directed the military departments, DLA, and DCAA [Defense Contract Audit Agency] to utilize value-based cost allocation methods that comport with costing more in line with the intrinsic value of the part. We have also directed the use of the most favored customer assurance clause for procurements of commercial-type items. This will assure that we pay no more than the contractor's most favored customer pays for the like items.

Mr. Chairman, I can assure you that there are additional focuses of attention in the spare parts arena. The Principal Deputy Under Secretary of Defense for Research and Engineering meets twice a month with the services to review and to make absolutely sure that they are focusing their attention, as necessary, on the management techniques which have been defined by the Secretary of Defense, as well as the individual services.

Mr. Chairman, you have asked us today to comment on the bill which you have introduced. You had asked us to focus on some of the things which I have mentioned this morning, so I thought we would be fully responsive.

The chairman has introduced a piece of legislation which we received late last week and have only had since beginning of this week to review.

I might mention that we, as you, are focusing our attention on how to improve competition in the Department of Defense. We have previously testified on S. 338. We have testified in support of the thrust of that legislation, albeit we have, and still do have, some very serious concerns and have recommended some changes to that legislation. We have also testified on H.R. 2545. We have testified in support of that. We have suggested one particular change to that legislation which deals with the procurement work force.

We suggest that H.R. 5184 is a comprehensive bill. I am afraid we are going to have some difficulty being thoroughly responsive to some of the questions which you might ask because it is comprehensive. We have developed, over the last 40 years, established case law and regulations under which the Department of Defense acts at this particular moment.

We have, however, been able to define some serious concerns that we have. We do not support the legislation. We believe that at best it is a disjointed approach to Government procurement reform.

Instead of modifying specific existing provisions of the law, it sets out a new piece of legislation. We are not exactly sure where the

current law leaves off and the new law begins. While it has been suggested in the past that there are lawyers relief acts introduced, this may also be one.

Section 201, for example, of title II, would require all Federal procurements to be conducted as it describes, notwithstanding the Armed Services Procurement Act of 1947 or the Federal Property and Administrative Services Act of 1949. It would also supersede Public Law 98-72, which requires publicizing procurements, just passed by Congress and signed into law only last August.

The approach of H.R. 5184 leaves in question exactly which portions of these earlier laws would still be effective as I previously mentioned.

Section 202 would institute a novel, three-tiered definition of competition. The three categories of full and open competition, less rigorous competition, and noncompetitive procurement would unnecessarily confuse and complicate procurement for the Government, as well as the private sector that provides the supplies and services.

Section 203 of title II would require publication of procurements in a manner different from Public Law 98-72, which has just recently, as I mentioned, become law.

Section 204 of title II is primarily addressed to the General Accounting Office and its role of adjudicating on a basis of nonexclusive jurisdiction, protests involving alleged violations of the bill's provisions.

We support the role the Comptroller General has assumed in rendering timely and impartial decisions on protests under present law and procedures. We find no need for further statutory underpinning for the Comptroller General of the United States to carry out this function.

Section 204 is a provision to require the General Services Administration Board of Contract Appeals review of protests on ADP procurement. We feel this would create an unnecessary backlog and extend procurement lead times without any benefit, since the Armed Services Board of Contract Appeals is perfectly capable of settling fairly disputes that may arise.

Section 205 of title II would require the Administrator of OFPP to modify and conform existing regulations to this title. This would appear to extend the Administrator's authority beyond that now contained in Public Law 98-191 and defined by law.

Section 3 of the bill would mandate an effective date of October 1, 1984. I assure you that we would have a great deal of difficulty, if it is at all possible, to meet that date.

I might add, Mr. Chairman, that over a 5-year timeframe, we have developed the Federal acquisition regulation. It is a uniform regulation that we have worked with the civilian agencies as well as NASA, and we have come up with, I believe, a very uniform regulation under which we will all exist. That regulation comes into effect on the first of April of this year. This legislation, if passed, would totally disrupt the uniformity of that regulation.

I am not quite sure I know exactly where we would end up, but I can guarantee you that it would disrupt the system that we so eagerly worked toward completing.

A117



In the final analysis, sir, I think that in representing the procurement community, as well as the Department of Defense, we would encourage the committee to take another serious look at this legislation. We support the competition that it strives for, but we do not believe that this legislation will achieve that end.

Thank you, sir.

[Ms. Gilleece's prepared statement follows:]