98TH CONGRESS
2d Session

HOUSE OF REPRESENTATIVES

REPORT
98-1157

# COMPETITION IN CONTRACTING ACT OF 1984

OCTOBER 10, 1984.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. BROOKS, from the Committee on Government Operations, submitted the following

## REPORT

together with

## SEPARATE AND DISSENTING VIEWS

[To accompany H.R. 5184]

[Including cost estimate of the Congressional Budget Office]

The Committee on Government Operations, to whom was referred the bill (H.R. 5184) to revise the procedures for soliciting and evaluating bids and proposals for Government contracts and awarding such contracts using full and open competition, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

That this Act may be cited as the "Competition in Contracting Act of 1984".

SEC. 2. (a) The Office of Federal Procurement Policy Act is amended by adding at the end thereof the following new title:

"TITLE II—FEDERAL PROCUREMENT COMPETITION REQUIREMENTS

"GENERAL PROHIBITION

"SEC. 201. Notwithstanding any other provision of law, no executive agency is authorized to engage in any procurement unless such procurement is conducted in accordance with this title and with the Government-wide regulations prescribed under section 105(b) as modified pursuant to section 205 of this title.

39-151 O

"COMPETITION REQUIREMENTS

"SEC. 202. (a) Except under the circumstances described in subsections (d)(1) (A), (D), and (E), each executive agency prior to entering into any contract for the procurement of property or services shall—

"(1) use advance procurement planning and market research before soliciting bids or proposals;

"(2) state requirements and prepare specifications in a manner designed to avoid unnecessary restrictions to the use of competition;

"(3) publish a notice with respect to such procurement pursuant to section 203(a)(1)(A);

"(4) allow and encourage the maximum number of responsible sources to submit sealed bids or competitive proposals; and

"(5) fully evaluate each such sealed bid or competitive proposal in the selection of a contract recipient.

"(b)(1) Except as provided in subsections (c), (d), and (g), each executive agency shall use full and open competition in making contracts for property or services.

"(2) For other than small purchases, an executive agency shall use either of the following competitive practices, or combinations thereof, that are best suited to the circumstances of the procurement:

"(A) solicit sealed bids when—

"(i) the award will be made on the basis of price and other price-related factors;

"(ii) it is not necessary to conduct discussions with the responding sources about their bids; and

"(iii) there is a reasonable expectation of receiving more than one sealed bid; and

"(B) request competitive proposals when sealed bids are not required under clause (A) of this paragraph.

"(c)(1) An executive agency is authorized to conduct a procurement using limited competition only when—

"(A) the executive agency's need for the property or services is of such unusual and compelling urgency that the Government would be seriously injured by soliciting bids or proposals from all responsible source;

"(B) exclusion of a current source from the competition for a particular requirement or set of requirements is temporarily necessary to establish or maintain alternative sources of supply;

"(C) it is necessary to fulfill the statutory requirements establishing programs for the benefit of small business concerns and socially and economically disadvantaged small business concerns, and all such businesses that are responsible are allowed to compete; or

"(D) the unrestricted disclosure of the executive agency's requirements would compromise the national security.

"(2) An executive agency may not award a contract using limited competition unless—

"(A) the use of such limited competition is justified in writing by the contracting officer and the contracting officer certifies that such justification is accurate and complete;

"(B) the contracting officer's justification and certification statements have been approved in writing by the head of the procurement activity if the procurement involves a total expenditure of more than $500,000; and

"(C) a notice has been published with respect to such contract pursuant to section 203(a)(1)(A) and all bids or proposals received from responsible sources in response to such notice have been fully considered by such executive agency.

"(d)(1) An executive agency is authorized to conduct a procurement using noncompetitive practices only when—

"(A) the executive agency's need for the property or service results from an emergency in which the public health or safety would be seriously injured by soliciting bids or proposals from more than one responsible source;

"(B) the property or services required by the Government are available from only one responsible source and no competitive alternative can be made available that will satisfy the requirements of the executive agency;

"(C) it is necessary (i) to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in the event of a national emergency, (ii) to achieve industrial mobilization in the event of such an emergency, or (iii) to maintain an essential research capability provided by an educational or other nonprofit institution or a federally funded research and development center;



"(D) the terms of any international agreement or treaty between the United States Government and a foreign government or international organization, or the written directions of any foreign government reimbursing the executive agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of practices that are noncompetitive; or

"(E) a statute requires that the procurement be made from a specified source.

"(2) An executive agency may not award a contract using noncompetitive practices unless—

"(A) the use of such practices is justified in writing by the contracting officer and the contracting officer certifies that such justification is accurate and complete;

"(B) the contracting officer's certification and justification statements have been reviewed and approved in writing (i) by the head of the procurement activity or another senior official within the office of the head of the procurement activity; and (ii) if the procurement involves a total expenditure of more than $500,000, by the agency's senior procurement executive (designated pursuant to section 115(a)(3)) after having reviewed the analysis prepared pursuant to section 115(c)(3);

"(C) a notice has been published with respect to such contract pursuant to section 203(a)(1)(A); all bids or proposals received in response to such notice have been fully considered by such executive agency; and the agency determines that only one responsible source is available; and

"(D) the justification statement prepared pursuant to clause (A) includes at a minimum the following:

"(i) an identification of the agency's requirements for which the agency proposes to use noncompetitive practices under paragraph (1) of this subsection;

"(ii) a determination that the anticipated cost is fair and reasonable;

"(iii) a demonstration, based on the proposed contractor's qualifications, that such contractor is the only responsible source able to meet the agency's requirement;

"(iv) a description of the market survey conducted, or the reasons a market survey could not be conducted, to locate other responsible sources;

"(v) a listing of all responsible sources who had expressed an interest in the procurement and the reason why they should be excluded; and

"(vi) a statement of the actions the agency plans to take to remove or overcome any barrier to competition prior to any subsequent procurement for such requirements.

"(3) In no case shall an executive agency be authorized to engage in noncompetitive procurement on the basis of the lack of advance planning or concerns related to the amount of funds available to the agency for procurement functions.

"(4) In the case of procurements permitted by paragraph (1)(A), the justification and approvals required by paragraph (2) may be made after the procurement has occurred.

"(5) For purposes of paragraph (1)(B) of this subsection, alternative sources shall be considered to be available for the production or assembly of spare parts if such sources have the capability to produce the parts in accordance with the Government's requirements and delivery schedule, unless another party has a legitimate proprietary interest in the parts or their manufacture.

"(e) Any justification, certification, or written approval under subsection (c) or (d), and any related account, document, or other record, shall be made available for inspection by the public consistent with the provisions of section 552 of title 5, United States Code.

"(f)(1) In any procurement conducted under subsection (b) or (c), an executive agency shall ensure that it receives a sufficient number of sealed bids or competitive proposals from responsible sources to assure that the Government's requirements, including performance and delivery schedules, are filled at the lowest possible cost given the nature of the product or service being acquired.

"(2) In any procurement conducted under subsection (b) or (c) in which the executive agency receives only one bid or proposal from a responsible source, the procurement shall be considered noncompetitive and the award shall not be made until the justifications, certifications, and approvals required under subsection (d)(2) have been completed.

"(g) Simplified practices and forms shall be used to facilitate making small purchases and to promote competition in such purchases to the maximum extent practicable.

"(h) No executive agency may procure goods or services from another executive agency unless such other executive agency complies fully with the requirements of this title in its procurement of those goods or services. The restriction contained in this subsection is in addition to, and not in lieu of, any other restriction provided by law.

"(i)(1) An executive agency may conduct its procurement pursuant to a 'qualified products' or similar list, but only if the administration of such list is consistent with the requirements of this title.

"(2) An executive agency may not refuse to include a product of a responsible source or group of responsible sources on a 'qualified products' or similar list without referring the matter for final disposition to the advocate for competition established pursuant to section 115(b) of this Act.

"(3) If a responsible small business would not otherwise have the resources to qualify a product of its manufacture for such list, then the procuring agency may reimburse the reasonable costs incurred by a small business in qualifying a product of its manufacture for such list.

"(j) During the planning for contracts for the procurement of the production or assembly of spare parts, the head of each executive agency shall take such steps as are necessary to develop its requirements so as—

"(1) to maximize competition for those components or services where competition is available, and

"(2) to insure that, to the maximum extent practicable, small and socially and economically disadvantaged businesses are not precluded from performing as prime contractors and subcontractors on such contracts.

"(k) As used in this section—

"(1)(A) The term 'full and open competition' means that all responsible sources are allowed and encouraged to submit sealed bids or competitive proposals on the procurement.

"(B) Such term includes procurement of architectural or engineering services conducted in accordance with title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.).

"(C) Such term includes the competitive selection of basic research proposals resulting from a general solicitation.

"(D) Such term includes orders and contracts made in accordance with the procedures established by the General Services Administration for its multiple awards schedule program if—

"(i) competition in the program has been open to all responsible sources; and

"(ii) such orders or contracts result in the lowest overall cost alternative to meet the minimum needs of the Government.

"(2) The term 'limited competition' means that a limited number of responsible sources are permitted to submit offers on the procurement.

"(3) The term 'noncompetitive' means any procurement that permits only one responsible source to submit an offer or that results in the submission of an offer from only one responsible source.

"(4) The term 'responsible source' means a prospective contractor who—

"(A) has adequate financial resources to perform the contract, or the ability to obtain such resources;

"(B) is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

"(C) has a satisfactory performance record;

"(D) has a satisfactory record of integrity and business ethics;

"(E) has the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain such organization, experience, controls, and skills;

"(F) has the necessary production, construction, and technical equipment and facilities, or the ability to obtain such equipment and facilities; and

"(G) is otherwise qualified and eligible to receive an award under applicable laws and regulations.

"(5) The term 'small purchase' means any purchase or contract that does not exceed $25,000. A proposed procurement shall not be divided into several procurements primarily for the purpose of using the small purchase practices.



"(6) The term 'basic research' means research directed toward increasing knowledge of a subject apart from any clear or necessary practical application of that knowledge.

"(7) The term 'general solicitation' means a public announcement of any agency's areas of research interest, its criteria for selecting proposals, including scientific merit, and its method of evaluating proposals.

"(8) The term 'competitive selection' means, in the case of basic research, a process which will include the issuance of a general solicitation and the peer review or scientific review (as appropriate) of resulting proposals.

"PROCUREMENT NOTICE

"SEC. 203. (a)(1) Except as provided in subsection (c)—

"(A) an executive agency intending to solicit bids or proposals for a contract for property or services at a price expected to exceed $10,000 shall furnish for publication by the Secretary of Commerce a notice described in subsection (b); and

"(B) an executive agency awarding a contract for property or services at a price exceeding $10,000 shall furnish for publication by the Secretary of Commerce a notice announcing such award if there is likely to be any subcontract under such contract.

"(2) The Secretary of Commerce shall publish promptly in the Commerce Business Daily each notice required by paragraph (1).

"(3) Whenever an executive agency is required by paragraph (1)(A) to furnish a notice of a solicitation to the Secretary of Commerce, such executive agency may not—

"(A) issue such solicitation earlier than 15 days after the date on which such notice is published by the Secretary of Commerce; or

"(B) establish a deadline for the submission of all bids or proposals in response to such solicitation that is earlier than 30 days after the date on which such solicitation is issued.

"(b) Each notice required by subsection (a)(1)(A) shall include—

"(1) an accurate description of the property or services to be contracted for, which description is not unnecessarily restrictive of competition;

"(2) the name, business address, and phone number of the contracting officer;

"(3) the name, business address and phone number, and title of the officer or employee of the executive agency who may be contacted for the purpose of obtaining a copy of the solicitation;

"(4) a statement that all responsible sources may submit a bid or proposal which shall be considered by the executive agency; and

"(5) in the case of a procurement which is commenced using noncompetitive practices, a justification for using noncompetitive practices and the identity of the intended source.

"(c)(1) A notice is not required under subsection (a)(1) if—

"(A) the notice would disclose the executive agency's requirements and the disclosure of such requirements would compromise the national security; or

"(B) the proposed noncompetitive procurement would result from acceptance of a research proposal that demonstrates a unique or innovative research concept and the publication of any notice of such research proposal cannot avoid the disclosure of the originality of thought or innovativeness of the proposed research or proprietary data associated with the proposal.

"(2) The requirements of subsection (a)(1)(A) do not apply to any procurement under conditions described in section 202(c)(1)(A) or in section 202(d)(1)(A).

"PROCUREMENT PROTEST SYSTEM

"SEC. 204. (a) Subject to subsection (f), protests concerning alleged violations of the procurement laws and regulations shall be decided by the Comptroller General if filed in accordance with this section. Any such protests which concern alleged violations of this title shall be given priority consideration over other bid protests by the Comptroller General. Nothing contained in this section shall be construed to give the Comptroller General exclusive jurisdiction over protests.

"(b)(1) In accordance with the procedures issued pursuant to subsection (d), the Comptroller General shall have authority to decide any protest submitted by an interested party or referred by any executive agency or any court of the United States.

"(2) The Comptroller General shall, except as provided in subsection (c)(1), issue a final protest decision within 90 working days from the date of protest unless the

Comptroller General determines that the specific and unique circumstances of the protest require a longer period.

"(3)(A) The Comptroller General shall notify the executive agency within one working day of the receipt of a protest and the executive agency shall submit a complete report (including all relevant documents) on the protested procurement to the Comptroller General within 25 working days from the agency's receipt of the notice of such protest unless the Comptroller General determines, upon a showing by such agency, that the specific and unique circumstances of the protest require a longer period. In any case determined by the Comptroller General to be suitable for the express option under subsection (c)(1), such report and documents shall be submitted within 10 working days from such receipt.

"(B) No contract shall be awarded on the basis of the protested procurement after the contracting officer has received notice of a protest to the Comptroller General and while the protest is pending.

"(C) If the contract has been awarded prior to the receipt of notice of protest, contract performance shall be ceased or the contract shall be suspended upon receipt of notice and while the protest is pending. This subparagraph shall not apply when the protest is filed more than 30 days after award of the contract.

"(D) An executive agency's senior procurement executive (designated pursuant to section 115(a)(3)) may authorize the award or performance of a contract notwithstanding a protest of which the agency has notice under subparagraph (B) or (C)—

"(i) upon a written finding that compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the Comptroller General; and

"(ii) after the Comptroller General is advised of such finding.

"(E) Prior to the award of the contract, no finding may be made under subparagraph (D)(i) unless the award of the contract is otherwise likely to occur within 30 days of notification of the protest.

"(4) With respect to any solicitation, proposed award, or award of a contract protested in accordance with this section, the Comptroller General is authorized to determine whether such solicitation, proposed award, or award complies with law and regulation. If the Comptroller General determines that the solicitation, proposed award, or award does not comply with law or regulation, or both, the Comptroller General shall recommend that the agency—

"(A) refrain from exercising any of its options under the contract;

"(B) recompete the contract immediately;

"(C) issue a new solicitation;

"(D) terminate the contract;

"(E) award a contract consistent with the requirements of such law and regulation; or

"(F) comply with any combination of recommendations under clauses (A), (B), (C), (D), and (E) and with such additional recommendations as the Comptroller General determines to be necessary in order to promote compliance with procurement law and regulation.

"(c)(1) To the maximum extent practicable, the Comptroller General shall provide for the inexpensive and expeditious resolution of protests under this section. The Comptroller General shall establish an express option for deciding those protests which the Comptroller General determines suitable for resolution within 45 days from the date of protest. Within such deadlines as the Comptroller General shall prescribe, each executive agency shall provide to any interested party—

"(A) any nonprivileged documents relevant to the protested procurement action (including the report required by subsection (b)(2)(A)) that would not give such party a competitive advantage, if the protest is submitted prior to the award of the contract; or

"(B) any nonprivileged documents relevant to the protested procurement action (including the report required by subsection (b)(2)(A)) if the protest is submitted after the award of the contract.

"(2) Each decision of the Comptroller General shall be signed by the Comptroller General, or a designee for such purpose. A copy of the decision shall be furnished to the interested parties and the senior procurement executive of the executive agency or agencies involved.

"(3) The agency's senior procurement executive shall report to the Comptroller General, within 60 days of receipt of the Comptroller General's recommendations, whether the agency has complied with such recommendations. Not later than January 31 of each year, the Comptroller General shall transmit to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations





of the House of Representatives an annual report describing each instance of an agency failure to comply with the Comptroller General's recommendations.

"(4) The Comptroller General is authorized to dismiss any protest determined to be frivolous or which, on its face, does not state a valid basis for protest.

"(5)(A) If the Comptroller General has determined that a solicitation, proposed award, or award of a contract does not comply with law or regulation, or both, the Comptroller General may further declare the entitlement of an appropriate party to the costs of—

"(i) filing and pursuing the protest, including reasonable attorney's fees; and

"(ii) bid and proposal preparation.

"(B) Declarations of entitlement to monetary awards shall be paid promptly by the executive agency concerned out of funds available for the purpose of the procurement concerned.

"(d)(1) The Comptroller General shall, within 90 days after the date of enactment of this title, establish such procedures, not inconsistent with this section, as may be necessary to the expeditious execution of the protest decision function, including procedures for accelerated resolution of the protest under the express option authorized by subsection (c)(1). Such procedures shall provide that the protest process shall not be delayed by the failure of any party to make any filing within the time provided therefore, and that such failure may be taken as an admission of the contentions made by an opposing party.

"(2) The Comptroller General may use any authority available under chapters 7 and 35 of title 31, United States Code, to verify contentions made by parties in protests under this section.

"(e) Any interested party adversely affected or aggrieved by the action, or the failure to act, of a Government agency with respect to a solicitation or award may obtain judicial review thereof to the extent provided by sections 702 through 706 of title 5, United States Code, including determinations necessary to resolve disputed material facts or when otherwise appropriate.

"(f)(1) Upon request of any interested party in connection with any procurement conducted under authority provided by section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759), including procurements conducted under blanket delegations of procurement authority, the board of contract appeals of the General Services Administration (hereafter in this subsection referred to as the 'board'), shall review any decision by a contracting officer alleged to violate law or regulation, or both, under the standard applicable to review of contracting officer final decisions by boards of contract appeals.

"(2) When a protest action under this section is filed before award of the challenged procurement, the board, at the request of any interested party and within 10 days of the filing of the protest action, shall hold a hearing to determine whether it should suspend the procurement authority of the Administrator or the Administrator's delegation of procurement authority for the challenged procurement on an interim basis until the board can decide the protest action. The delegation of procurement authority shall be suspended unless the agency establishes that—

"(A) absent action by the board, contract award is likely to occur within 30 days of the hearing; and

"(B) compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the board.

"(3) At the request of any interested party, when a protest action is filed within 30 days of publication of award by the Secretary of Commerce or receipt of written notice of award by the party challenging the award, whichever comes first, the board shall, within 10 days of the filing of the protest action, hold a hearing to determine whether it should suspend the procurement authority of the Administrator or the Administrator's delegation of procurement authority for the challenged procurement on an interim basis. The board shall suspend the agency's authority to acquire any goods or services under the contract which are not previously delivered and accepted unless the agency establishes that compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the board.

"(4) The board shall conduct such proceedings and allow such discovery as may be required for the expeditious, fair, and reasonable resolution of the protest action. The board shall give priority to protest actions filed under this section and shall issue its final decision within 45 working days from the date of protest unless the board's chairman determines that the specific and unique circumstances of the protest require a longer period. However, nothing contained in this subsection shall conflict with any deadlines imposed by section 9(a) of the Contract Disputes Act of 1978 (41 U.S.C. 608(a)). In making a decision on the merits of protest actions brought

under this section, the board shall accord due weight to the policies of this title, and the goals of economic and efficient procurement set forth in section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759). When the board determines that challenged agency action violates procurement law or regulation or the conditions of any delegation of procurement authority issued pursuant to such section, the board may suspend, revoke, or revise the delegation of procurement authority applicable to the challenged procurement. Whenever the board makes such a determination, it may, in accordance with section 1304 of title 31, United States Code, further declare the entitlement of an appropriate party to the costs of (A) filing and pursuing the protest, including reasonable attorney's fees; and (B) bid and proposal preparation. The final decision of the board may be appealed by the head of the agency involved and by any interested party, including interested parties who intervene in any protest action filed under this section, as set forth in the Contract Disputes Act of 1978 (41 U.S.C. 601 et seq.). If the board revokes or suspends the procurement authority of the Administrator or the Administrator's delegation of procurement authority after contract award, the affected contract shall be presumed valid as to all goods or services delivered and accepted thereunder prior to the suspension, revocation, or revision of the delegation of procurement authority. Nothing contained in this subsection shall affect the board's power to order any additional relief which it is authorized to provide under any statute or regulation. However, the procedures set forth in this subsection shall only apply to procurements conducted under the authority contained in section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759). In addition, nothing contained in this subsection shall affect the right of any person to file protests with the Comptroller General or contracting agency or to file actions in the district court or the United States Claims Court.

"(5) The board is authorized to dismiss any protest action determined to be frivolous or which, on its face, does not state a valid basis for protest.

"(6) The board shall, within 90 days after the date of enactment of this title, adopt and issue such rules and procedures, not inconsistent with this section, as may be necessary to the expeditious disposition of protest actions filed under authority of this section.

"(7) Except as otherwise provided by law, the filing of a protest with the Comptroller General shall not affect an interested party's rights to file and pursue protest actions involving Federal procurements in the courts, and before the board as authorized in this subsection.

"(g) For purposes of this section—

"(1) the term 'protest' means a challenge to a solicitation, or to the award or proposed award of any procurement contract; and

"(2) the term 'interested party' means a person whose direct economic interest would be affected as contractor or subcontractor by the award or nonaward of the contract.

"MODIFICATION OF FEDERAL ACQUISITION REGULATIONS

"SEC. 205. The Administrator shall promulgate, within 90 days after the date of enactment of this title, such modifications as may be necessary to the Government-wide regulations prescribed under section 105(b) to conform such regulations to the requirements of this title.

"LIMITATIONS

"SEC. 206. The provisions of this title do not supersede or affect the provisions of—

"(1) the Act of March 3, 1933 (41 U.S.C. 10a et seq.); or

"(2) section 8(a) of the Small Business Act (15 U.S.C. 637(a)).".

(b) The Office of Federal Procurement Policy Act is further amended—

(1) by inserting after the first section the following:

"TITLE I—GENERAL PROVISIONS FOR THE IMPROVEMENT OF FEDERAL PROCUREMENT";

(2) by striking out "this Act" each place it appears in sections 6 through 17 and inserting in lieu thereof "this title";

(3) by striking out "section 2" in section 6(f) and inserting in lieu thereof "section 101";

(4) by striking out "section 6(a)" in section 8(b) and inserting in lieu thereof "section 105(a)";

(5) by striking out "section 6" in section 9 and inserting in lieu thereof "section 105";



(6) by striking out the first section 15 (relating to repeals and amendments); and

(7) by striking out "section 2" in the second section 15 and inserting in lieu thereof "section 101"; and

(8) by redesignating the remaining sections 2 through 17 as sections 101 through 116, respectively.

SEC. 3. Section 115 of the Office of Federal Procurement Policy Act (as redesignated by section 2(8) of this Act) is amended—

(1) by inserting "(a)" after "SEC. 115.";

(2) by striking out "effective competition" in clause (1) and inserting in lieu thereof "full and open competition"; and

(3) by adding at the end thereof the following new subsections:

"(b)(1) There is established in each executive agency an advocate for competition.

"(2) Each head of an executive agency shall—

"(A) designate for each executive agency one senior officer or employee (other than the senior procurement executive designated pursuant to subsection (a)(3)) serving in a position authorized for such executive agency on the date of enactment of this subsection to serve as the advocate for competition;

"(B) relieve such officer or employee of all duties and responsibilities that are inconsistent with the duties and responsibilities of the advocate for competition; and

"(C) provide such officer or employee with such staff or assistance as may be necessary to carry out the duties and responsibilities of the advocate for competition.

"(c) The advocate for competition designated under subsection (b)(2)(A) shall be responsible for removing barriers to and promoting full and open competition in the procurement of property and services and shall—

"(1) review the purchasing and contracting activities of the executive agency;

"(2) identify and report to the head of the executive agency—

"(A) opportunities and actions taken to achieve full and open competition on the basis of cost and other significant factors in the purchases and contracts of the executive agency;

"(B) solicitations and proposed solicitations that include unnecessarily detailed specifications or unnecessarily restrictive statements of need that may reduce competition in the procurement activities of the executive agency; and

"(C) any other condition or action that has the effect of unnecessarily restricting competition in the procurement actions of the executive agency;

"(3) review all proposals which have been submitted to the senior executive for approval under section 202(d)(2)(B) and provide such executive a written analysis of the validity of the proposal prior to such approval;

"(4) prepare and transmit to the head of the executive agency an annual report describing—

"(A) such advocate's activities under this section;

"(B) new initiatives required to increase competition; and

"(C) barriers to full and open competition that the advocate was unable to remove;

"(5) set goals and develop plans for increasing competition on a fiscal year basis;

"(6) develop a system of personal and organizational accountability for competition, which may include the use of recognition and awards to motivate program managers, contracting officers, and others in authority to promote competition in procurement programs (which will be implemented by the agency's senior procurement executive); and

"(7) emphasize competition in programs for procurement training and research.

"(d)(1) Each head of an executive agency shall establish and maintain for a period of five years a computerized file by fiscal year containing records of all procurements other than small purchases in such fiscal year. Each record shall include—

"(A) the date of the contract award;

"(B) information identifying the source to whom the contract was awarded;

"(C) the property or services obtained by the Government under the procurement; and

"(D) the total cost of the procurement.

"(2) With respect to any procurement in which limited competition or in which noncompetitive practices were used, the procurement record shall include, in addition to the information required by paragraph (1)—

"(A) information identifying the procurement practices used and the reason for the use of such practices; and

"(B) the name and position of the officers or employees of the agency who, as required by this Act, approved the procurement practices used, and the date of such approval.

"(3) The information included in the record established and maintained under this subsection shall be transmitted to, and included in, the Federal Procurement Data System referred to in section 105(d)(4) of this Act.

"(e)(1) Not later than January 31 of each of 1986, 1987, and 1988, each head of an executive agency shall transmit to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives an annual report including the information specified in paragraph (2).

"(2) Each annual report transmitted under paragraph (1) shall include—

"(A) a summary of the activities and accomplishments of the advocate for competition of the executive agency during the preceding fiscal year; and

"(B) a specific description of all actions that the agency intends to take during the current fiscal year to—

"(i) increase competition for contracts with the executive agency on the basis of cost and other significant factors; and

"(ii) reduce the number and dollar value of noncompetitive contracts.".

SEC. 3. (a) This Act and the amendments made by this Act shall take effect on January 1, 1985.

(b) Notwithstanding subsection (a), any authority to promulgate regulations or procedures (or modifications thereof) shall be effective upon enactment of this Act. Such regulations and procedures shall not take effect until January 1, 1985.

The Committee on Government Operations, to whom was referred the bill (H.R. 5184), the Competition in Contracting Act of 1984, to revise the procedures for soliciting and evaluating bids and proposals for government contracts and awarding such contracts using full and open competition, and for other purposes, having considered the same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill, as amended, do pass.

The amendment strikes out all after the enacting clause of the bill and inserts a new text which appears in italic type in the reported bill.

## COMMITTEE ACTION AND VOTE

H.R. 5184 was introduced by Chairman Jack Brooks and Congressman Frank Horton, the Ranking Minority Member of the Committee. The Committee on Govenment Operations ordered the bill reported with an amendment in the nature of a substitute on May 9, 1984, by a voice vote with a quorum present.

## HEARINGS

Hearings on H.R. 5184 were held by the Legislation and National Security Subcommittee on March 27, 1984, and March 29, 1984. Testimony was received from Senators Lawton M. Chiles, Jr. (D-Fla.), William S. Cohen (R-Me.), and Carl Levin (D-Mich.), and representatives of the U.S. General Accounting Office, the General Services Administration, the Department of Defense, the Office of Federal Procurement Policy, the Computer and Communications Industry Association, the Associated General Contractors of America, the Computer and Business Equipment Manufacturers Association, the Committee on Federal Procurement of Architectural and Engineering Services, and the American Bar Association.





## EXPLANATION OF AMENDMENT

Inasmuch as all after the enacting clause of H.R. 5184 was stricken and all language incorporated into one amendment, this report constitutes an explanation of the amendment.

## DISCUSSION

*Introduction*

The Committee has long held the belief that any effort to reform government procurement practices must start with a firm commitment to increase the use of competition in the Federal marketplace. Competition not only provides substantially reduced costs, but also ensures that new and innovative products are made available to the government on a timely basis and that all interested offerers have an opportunity to sell to the Federal Government.

Despite the benefits that can be achieved, Federal agencies have successfully resisted using competition in the majority of their procurements. Statistics for recent years show that approximately two-thirds of all acquisitions are made on a non-competitive basis. While agency officials invariably claim that limiting competition is justified on the basis of program needs, the Committee has found that the deciding factor is frequently one or more of the following:

Reluctance to invest time and effort to ensure that competing sources of supply are maintained.

Lack of personnel with skill and expertise required to conduct a competitive procurement.

Dependence (psychological or actual) on the incumbent contractor's product or service.

Unwillingness to change current procurement practices.

Rewarding performance based on factors other than reducing cost.

Exaggerating the value of short-term expediencies at the sacrifice of overall cost and performance.

Institutional bias toward "in-house" solutions which severely limit full involvement of industry.

Unwillingness to commit sufficient time and resources to advanced planning.

Inability to clearly and concisely define mission requirements or needs to the industry.

These factors have combined to undermine the competitive principles by which the Federal procurement process historically has been governed. Left unchallenged, they will subject the process to untold waste and abuse, and eventually harm the viability of critical agency programs. Rather than address these problems, agency procurement officials continue to complain that seeking full and open competition is too complicated and time consuming. They assert that it is less risky and considerably more manageable to do business with a few seleceted vendors instead of encouraging all qualified companies to enter the Federal marketplace.

It is clear from this attitude that Federal agencies will not reduce the unacceptably high volume of non-competitive procurements without forceful action by the Congress.

*Agency Failure to Use Competition*

The Federal Government spends almost one-fifth of its total annual budget in the direct purchase of products and services from the private sector. In fiscal year 1983, Federal contract awards totaled $168 billion. Awards exceeding the small purchase ceiling ($25,000) totaled $152 billion, and, of this amount, only about one-third, $54 billion, was categorized as competitive.

The following chart, compiled from Federal Procurement Data Center (FPDC) statistics, summarizes Federal procurement actions exceeding $25,000 for the past three fiscal years. As indicated, 16,574 more sole-source actions were conducted in fiscal year 1983 than in fiscal year 1981. Also $19 billion more was spent on sole-source contracts in fiscal year 1983 than in fiscal year 1981, an increase of almost 25 percent over the three-year period.

TOTAL FEDERAL CONTRACT ACTIONS, FISCAL YEARS 1981–83

[Dollar amounts in billions]

| Fiscal year | Total | | Competitive | | Sole-source | | Percent sole-source |
|---|---|---|---|---|---|---|---|
| | Actions | Amount | Actions | Amount | Actions | Amount | |
| 1981 | 271,495 | $125 | 131,570 | $46 | 139,925 | $79 | 63 |
| 1982 | 293,927 | 148 | 144,223 | 57 | 149,704 | 91 | 61 |
| 1983 | 313,096 | 152 | 156,597 | 54 | 156,499 | 98 | 65 |
| Total | 878,518 | 425 | 432,390 | 157 | 446,128 | 268 | 63 |

A review of the procurement statistics for fiscal year 1983 showed that just five agencies accounted for 94 percent of all Federal procurement dollars spent. Further, these agencies were responsible for 98 percent of all sole-source dollars spent during the year. The procurement activities of these agencies are represented below:

FISCAL YEAR 1983 CONTRACT ACTIONS

[Dollar amounts in billions]

| Agency | Total | | Competitive | | Sole-source | | Percent sole-source |
|---|---|---|---|---|---|---|---|
| | Actions | Amount | Actions | Amount | Actions | Amount | |
| DOD | 235,592 | $123.1 | 109,242 | $40.4 | 126,350 | $82.7 | 67 |
| Energy | 5,114 | 12.0 | 1,488 | 3.0 | 3,626 | 9.0 | 75 |
| NASA | 23,878 | 6.1 | 14,796 | 3.8 | 9,082 | 2.3 | 38 |
| VA | 8,827 | 1.4 | 3,800 | .9 | 5,027 | .5 | 36 |
| DOT | 3,004 | .8 | 1,896 | .5 | 1,108 | .3 | 38 |
| Total | 276,415 | 143.43 | 131,222 | 48.6 | 145,193 | 94.8 | 66 |

As bad as this situation is, the actual non-competitive activity is much higher than even these statistics indicate, since contracts negotiated with only one vendor are generally reported as competitive as long as the procurement was initially advertised as competitive. For example, the Navy recently awarded a contract for replacement of computer hardware for its Inventory Control Points system. In this case, the Navy negotiated prices with only one vendor, although it had spent almost eight years in preparing for a



so-called competitive procurement. In the end, the vendor was awarded a contract without the government receiving the benefit of either price competition or technical competition on a system whose total life-cycle cost is estimated to be almost $2 billion.

Sole-source modifications or add-on's to existing contracts which go beyond the scope of the original contract are also often not reported or are included in the procurement data as competitive. In the case of Army and Navy contracts for computerized recruiting services, the work performed by the contractor greatly exceeded the original scope of the contracts. The result was that competing contractors only had a chance to bid on the original work estimated by the two agencies as worth $9 million. However, the Army ended up paying 14 times what it originally expected to pay—$120 million vs. $8.5 million—and the Navy was paying 25 times what it originally expected to pay—$13 milion vs. $524,000. In both cases, the original contracts were awarded competitively. In effect, the competing contractors were excluded from bidding for the additional $124 million worth of work. Notwithstanding, under the current reporting system, these two contracts were reported as being competitive.

The Committee recognizes there are legitimate circumstances under which contracts cannot be awarded competitively. It is apparent, however, that agencies often award contracts on a sole-source basis when competition is, in fact, available. The General Accounting Office (GAO) examined statistical samples of new contracts awarded on a sole-source basis by the Department of Defense (DOD) and six major civil agencies—the National Aeronautics and Space Administration (NASA), the Veterans Administration, and the Department of Energy, Interior, Transportation, and Health and Human Services (HHS). GAO's reviews showed that these agencies frequently did not base their new contract awards on competition as required by current statutes and Federal regulations.[1]

In DOD's case, GAO found that 23 percent (25 of 109) of the new contracts sampled had been inappropriately awarded on a non-competitive basis. From this sample, they estimated that opportunities to obtain available competition were lost on about $289 million in new contract awards. Similarly, the six civil agencies lost opportunities to obtain available competition on an estimated $148 million in new contract awards. The GAO found that the percentage of civil agency sole-source contract awards on which competition was found to be feasible varied from 20 percent at HHS, 21 percent at NASA, and 49 percent at the Department of Transportation, to 73 percent at the Department of Energy. As noted by Comptroller General Bowsher during testimony before the Legislation and National Security Subcommittee: "Most of the dollars that Federal agencies obligated were for actions under existing contacts. New contract decisions are, therefore, especially significant because they tend to limit the government to use of the same contractor when contract modifications or additions are necessary."

[1] Referenced General Accounting Office reports on sole-sourcing included: "DOD Loses Many Competitive Procurement Opportunities" (PLRD-81-45), dated July 29, 1981; and "Less Sole-Source, More Competition Needed in Federal Civil Agencies' Contracting" (PLRD-82-40), dated April 7, 1982.

The Comptroller General testified that GAO found not only ineffective procurement practices and other specific weaknesses, but also a general lack of commitment to competition on the part of key agency personnel.[2] Over the years, the Committee has found that dependence on large incumbent contractors plays a significant role in a given agency's resistance to using competition. Agency officials find it much easier to continue to award sole-source contracts to the incumbent vendor than to go through the process of seeking additional qualified firms which can offer the same goods or services at a cheaper price. These agency officials invariably assert that "follow-on contracts" to incumbent vendors are not really sole-sources, but are competitive.

This means that once a vendor lands a contract, ostensibly under some form of price-related or technical competition, the agency may continue to sole-source its acquisitions indefinitely into the future. If this practice is widely accepted, it will eliminate any chance of ever achieving an acceptable level of competition in Federal procurements. The end result will be that the government's ability to acquire innovative, cost-effective products will be drastically reduced. This is particularly true in the rapidly changing high technology areas where an incumbent product line may be technically generations behind other companies' latest offerings in the industry.

Further, despite the efforts of Congress to the contrary, a few dominant firms have gained an increasing share of government contracts, thus seriously affecting the government's ability to efficiently and economically acquire its goods and services. For example, only 25 large contractors hold about 50 percent of the value of all Department of Defense contracts, and only eight firms conduct 45 percent of all research for DOD. Clearly many of the most innovative, albeit smaller, firms are being locked out of the government marketplace and no longer do business with the government. In the 1970's, more than 2,000 aerospace industry subcontractors simply disappeared. It is clear that a pattern of favoring a few large contractors is undermining the government's ability to use competition in its procurements.

On a government-wide basis, the potential savings from greater use of competition promises to be substantial. The Congressional Budget Office (CBO) found that each one percent reduction in the prices of all new contracts could reduce the government's total procurement costs by about $200 million a year. Since the government has historically received price discounts on competitive procurements ranging from 15 percent to as high as 70 percent, these statistics indicate that billions could be saved annually. This estimate does not include sole-source add-on's or modifications to current contracts, which involve tens of billions of dollars of expenditures every year. If these contracts were also competed, the total savings could be much higher than the CBO calculations.

*Failure of Executive Branch Reform Efforts*

Over the years, Federal agencies have often asserted that they are capable of reforming their procurement activities without being

[2] Hearings transcript, page 10, March 27, 1984.



directed to do so by Congress. These agencies often use this rationale as their main argument in seeking broad exemptions from government-wide legislation aimed at eliminating waste and abuse in government procurements. However, these agencies have little to show for their efforts in this area and have proved themselves incapable of significantly reforming the Federal procurement system, including substantially increasing competition in the award of agency contracts.

An example of an agency "reform" effort is the so-called Carlucci Initiatives, were announced by DOD with much fanfare in 1981 and were billed as the most significant procurement reform effort ever attempted by the Department. DOD asserted that these initiatives would save the government billions of dollars. Incidentally, as initially proposed, the Carlucci Initiatives did not mention competition or competitive procurement, but after some concern voiced by this Committee, that flaw was corrected with the addition of a 32nd initiative devoted to encouraging competition. Nevertheless, the GAO has reported that progress on many of these initiatives has been slow, and the cost savings projected by DOD from practices such as multi-year procurements have not materialized. The Council of Economic Priorities provided an assessment last year of DOD's reform efforts based on the Carlucci Initiatives. The Council stated:

> The Carlucci initiatives fail to correct the most persistent causes of cost growth: *lack of competition in contract awards* (emphasis added); contracting practices that reward cost maximization; simultaneous design and manufacture of "concurrency"; disorganized program management and decisionmaking; weak supervision and auditing of weapons contracts; and the establishment of extravagant weapons performance goals, otherwise known as "gold plating".
>
> Furthermore, the initiatives may accelerate rather than reduce future cost growth.[3]

Over the period that the Carlucci initiatives have been in effect, the number of non-competitive procurements have increased in terms of dollars, volume, and percentage of total dollars awarded. For example, from 1981 to 1983, the dollar values of sole-source procurements in DOD went from $62 billion in 1981 to $83 billion in 1983, an increase of $21 billion. The percentage of dollars spent non-competitively increased from 65 percent in 1981 to 67 percent in 1983. During this same period, the GAO and the Inspector General uncovered the blatant and costly abuses occurring in the spare parts procurement program, including the lack of competition in the procurement of these parts. Apparently, the Carlucci procurement reform program did not correct this serious problem.

Another more recent attempt by the executive branch to increase the use of competition is the issuance, in August 1983, of Executive Order 12352, Federal Procurement Reforms. The Executive Order highlighted enhancing competition and limiting non-com-

[3] Gordon Adams, "Controlling Weapons Costs: Can the Pentagon Reform Its Work?", Council of Economic Priorities, dated 1983.

petitive procurement actions as key elements of procurement reform. The President also directed the heads of executive departments and agencies to use competition in agency buying programs. In addition, he directed the Administrator of OFPP to issue a formal policy directive establishing government-wide restrictions on the use of non-competitive procurement.

In response to the President's direction, OFPP prepared and issued a policy letter establishing restrictions on non-competitive procurement. The language contained in the directive consolidates for the first time on a government-wide basis the procedures that must be followed in using competition. While the language contained in the directive was a positive step, it also has some serious deficiencies. First, it fails to define the term competition, thus leaving it up to the agencies to determine what a competitive procurement is. Given the lack of commitment on the part of Federal agencies to use competition in contracting, the failure of OFPP even to define the term raises serious questions regarding OFPP's ability to promote procurement reform in this area. A second serious flaw in the policy directive is that while it contains seven specific exceptions to competition, it also lists numerous general exceptions, including the right of agencies to establish any additional exemptions they believe are necessary. Given these deficiencies, the policy directive does little more than legitimize current practices and may, in fact, result in loosening the requirements for competition.

Unfortunately, many of the deficiencies contained in the OFPP policy directive are reflected in the Federal Acquisition Regulation (FAR) which became effective April 1, 1984. As required by P.L. 98-191, the Office of Federal Procurement Policy Act Amendments of 1983, the separate procurement regulations of GSA, NASA, and DOD were consolidated into a single regulation which governs the acquisition of all products and services by the government. Like the OFPP directive, this regulation fails to define competition. In fact, the regulations do not even refer to the term "full and open competition" even though OFPP's authorization legislation establishes this as a national policy.

The FAR states that sufficient competition is achieved as long as offers are received from at least two independent sources that are capable of satisfying the requirements of the agencies. Thus, the standard for competition is not whether an agency has opened up a procurement to all qualified sources, but whether it received at least two bids. In the Committere's view, an acquisition is hardly competitive when it is limited to just two independent sources, since additional bidders are often available to meet a government requirement. Using the traditional view, an agency may select two of its favorite vendors and then assert that a "reasonable degree of competition" had been achieved. The Committee believes that full and open competition exists only when all qualified vendors are allowed to compete in an agency acquisition.

The Carlucci Initiatives and the OFPP policy directive are two clear examples of how the executive branch has been unable to promote effectively government-wide procurement reform, particularly in forcing agencies to use competition in their procurements. Despite the overwhelming need for increasing the use of competi-





tion, Federal agencies have, over the years, steadfastly resisted any efforts to use this method of procurement. As a result, the government is paying significantly more than it should for its goods and services.

A clear example of excessive costs resulting from a lack of competition is in the military's procurement of its spare parts. In hearings held over a year ago, the Legislation and National Security Subcommittee found that in the case of the Air Force Logistics Centers, almost 90 percent of spare engine parts were procured on a non-competitive basis. In one case, the Air Force purchased a seal used in an aircraft engine from the prime contractor under a sole-source action of $2,020. With the introduction of competition, the item was later bought for $476. In another case, a part called a support, which is also used in an aircraft engine, was initially bought from the prime contractor on a sole-source basis for about $15,000. Again, using competition, it was later purchased for about $6,360. Perhaps the most well publicized example was that the Air Force was at one time considering buying an allen wrench from a large defense contractor for about $9,000, although its original cost from the actual manufacturer was eight cents. Clearly, such procurement practices can no longer be tolerated.

## H.R. 5184

In the Committee's view, H.R. 5184 provides the necessary strong measures that are needed to require that the government obtains its goods and services at competitive prices. Given the failure of the Executive Branch to reform its procurement activities, strong reform measures are needed to ensure that government procurements are conducted in an effective and economical manner. H.R. 5184 contains several provisions which the Committee believes are necessary to accomplish this goal. Primary among these is the requirement that executive agencies, except under limited and well defined circumstances, use full and open competition in making contracts to acquire property or services. Full and open competition is accomplished only when (1) all qualified vendors are allowed and encouraged to submit offers on Federal procurements, and (2) a sufficient number of offers is received to ensure that the government's requirements are filled at the lowest possible cost.

The Committee recognizes that there are valid circumstances under which Federal procurements cannot be conducted using full and open competition. To accommodate these special situations, H.R. 5184 authorizes two additional categories of procurement—limited competition and non-competitive. To invoke either of these categories, however, an agency contracting officer must fully justify in writing the use of one of the specific exceptions associated with that category. Reasons for procuring under limited competition include national security, urgency, the need to maintain alternative sources of supply or fulfillment of the statutory requirements of small business set-aside programs. A non-competitive procurement, on the other hand, can only be conducted when: an emergency situation exists; only one source is available; it is necessary to maintain an essential supplier; it is required by an international agreement or treaty; or it is required by current law.

The Committee is aware that many agency procurement officials resist opening up agency procurements to all qualified sources. These officials often use restrictive specifications or state their requirements in such a way as to limit the number of vendors that can compete. This tactic undermines the Federal procurement system and results in excessive costs to the taxpayer. There is, unfortunately, a general attitude pervasive throughout the government that expanding the competitive base for government procurement is too costly, burdensome, and disruptive to agency activities. While the use of competition may not be considered worthwhile by some officials, it is the only way for the government to obtain the best products for the best prices. The Committee is also aware that under current practices there may be greater incentives to pay an incumbent contractor $436 for an ordinary claw hammer than to try to find out where it can be bought for $7. Clearly, economy and efficiency must be the cornerstone of the Federal procurement system and H.R. 5184 provides the means to accomplish this goal.

*Competition Requirements*

To ensure governmentwide compliance, the bill requires that all procurements be conducted in accordance with this title and in accordance with the regulations issued from the title. Except under specific, well-defined circumstances, the bill requires the use of full and open competition as the primary method of procurement. To ensure the integrity of the competitive process, the bill prescribes certain minimum requirements which must be met prior to conducting a procurement. These requirements include: the use of advance planning and market research; the preparation of unrestrictive specifications; the publication of a notice in the Commerce Business Daily; allowing and encouraging all responsible sources to compete; and the full evaluation of each sealed bid or competitive proposal received. If properly implemented, this bill will ensure that all qualified sources are given the opportunity to compete for government business.

H.R. 5184 also, for the first time, puts negotiated proposals on an equal footing with sealed bids. Under current law, a sealed bid is the primary procurement method that is to be used, and negotiated proposals are to be considered only in exceptional circumstances. However, due to the increased complexity of the government's procurements, negotiated proposals, in practice, have become more the rule than the exception. Current procurement law also concentrates on whether a procurement has been advertised or not. Today, however, all procurements are advertised whether they are sealed bids or negotiated proposals. The bill recognizes these changes that have occurred in procurement practices over the years and establishes negotiated proposals as a primary procurement method. Further, the bill puts the emphasis on whether all qualified firms have been allowed to compete, not on whether the procurement has been advertised, even though advertisement is a significant, corollary requirement of H.R. 5184.

*Limited Competition Requirements*

In these unusual situations in which it may not be possible to conduct procurements using full and open competition, the Committee sees no reason why agencies should be allowed to exclude all qualified vendors but one. The bill identifies specific circumstances whereby an agency is authorized to restrict the number of responsible sources, while still achieving limited competition. These circumstances include national security considerations, urgency, the need to maintain alternative sources of supply, and the fulfillment of the statutory requirements of small business set-aside programs.





As noted above, limited competition is allowed in urgent situations where an agency determines that its mission would be seriously affected if needed goods or services were not obtained in a certain period of time. Since agencies may take as long as three years to conduct medium to large procurements, urgent requirements in the past have almost always resulted in some type of sole-source contract award. To accomplish this, agencies typically follow one of two approaches—a sole-source justification, or the issuance of a "competitive solicitation" that is so restrictive that only a few favored vendors can respond. In the first approach, the government loses the benefits of competition altogether and, in the second, time and money are needlessly wasted by both the government and the vendors in making the procurement appear to be competitive when it is not. H.R. 5184 remedies the situation by authorizing agencies to limit competition, where justified, to more than one vendor but less than all responsible sources.

H.R. 5184 supports the long-standing policy of the Congress to provide assistance through the federal procurement process to small businesses. The bill authorizes the use of limited competition to fulfill the requirements of the Small Business Act pertaining to small business set-aside programs. These provisions require agencies to allow and encourage all responsible small businesses to participate in procurements classified as set-asides, while excluding other qualified sources. In addition, procurements conducted under Section 8(a) of the Small Business Act are exempt from the competition requirements of the bill, including all review and approval procedures. The Committee also recognizes the need to use limited competition in cases where the procurement would disclose national security requirements or if there is a need to temporarily establish or maintain alternative sources of supply.

Under the provisions of H.R. 5184, the review and approval for using limited competition is to be done by the responsible contracting officer unless (1) the procurement exceeds $500,000, or (2) the agency has determined that only one vendor is available to meet the government's requirements. Above $500,000, written approval must also be obtained from the head of the local procuring activity before a contract can be awarded. Under current practice, the head of the local procuring activity is currently required to review such procurements, as well as all procurements conducted under the small business set-aside program. The Committee believes that those procurements above $500,000 warrant higher level approval to ensure that they, in fact, are justified in using limited competition. Furthermore, in those cases where the agency determines that only one vendor is available, the procurement must be classified as sole-source and justified under the non-competitive provisions of H.R. 5184.