*Non-Competitive Procurements*

Besides providing for limited competition, the bill also allows the use of non-competitive procurements when they are fully justified. For instance, when the public health or safety is threatened during an emergency situation, there would not be enough time to conduct a competitive procurement. Similarly, during or preceding a national emergency, it would be necessary to act quickly for purposes of mobilization or to ensure a continued supply of needed goods or services. Further, there are legitimate circumstances where it is necessary to maintain an essential research capability provided by an educational or other non-profit institution or a federally funded research and development center. The Committee regards the National Academy of Sciences as such an essential research capability. The bill also allows non-competitive procedures to be used if required by international agreement or by statutes such as the Wagner-O'Day Act (41 U.S.C. § 46 et seq.). It is not the intent of this Committee that the provisions of H.R. 5184 have an adverse impact on programs for the handicapped established by the Wagner-O'Day Act.

Additionally, use of non-competitive procurements is authorized when only one responsible source is available. Currently, procuring agencies often narrowly define their requirements in order to severely limit the number of qualified firms that can compete. Recent well publicized examples of this practice have been exposed in the military's procurement of its spare parts. For instance, common parts which could be bought from the original manufacturer, or even from a hardware store, have been sole-sourced from the prime contractor at exorbitant prices. While the bill recognizes the fact that there are legitimate cases where there is only one vendor available, it does tighten up the requirements for this procedure by (1) defining what a responsible vendor is, and (2) ensuring that all responsible vendors are considered, inlcuding those vendors that can provide competitive alternatives.

*Justification and Approval Procedures*

Given that two-thirds of all government procurement is currently conducted on a non-competitive basis, the bill contains stringent review and approval requirements to ensure that agencies adequately assess the justification for a non-competitive procurement. Under the bill, an agency cannot use this method of procurement unless fully justified in writing; and the justification, in turn, must be certified by the contracting officer as being accurate and complete. The justification statement required shall contain at a minimum the items listed in this provision, such as the identification of the agency requirement and a determination that the anticipated costs are fair and reasonable. In addition, the certification and justification statement must be reviewed and approved in writing by the head of the procurement activity or another senior official within that particular office. If the procurement exceeds $500,000, it must also be reviewed and approved by the senior procurement executive. In the event of an emergency, such review and approval may be made after the procurement has occurred.



The bill contains a specific provision that prohibits an agency from using non-competitive procurements simply on the basis of concerns regarding the future availability of funding. This provision is designed to prevent the year-end spending abuses that often occur when agencies are faced with large amounts of unexpended appropriations at the end of a fiscal year. Under this situation, agencies typically rush to sign a contract with a vendor on a sole-source basis to avoid having to turn money back to the Treasury. In addition, the bill prohibits the use of the lack of advance planning as a justification for using non-competitive practices. The Committee does not believe that poor management or planning is an excuse for avoiding the use of competition. Agencies must also make the required justifications and certifications and other pertinent documentation available to interested vendors and the public. While these disclosures should be made consistent with the provisions of the Freedom of Information Act (5 U.S.C. § 552), the Committee intends that the Act's exemption for internal memoranda not be used to shield these documents from public disclosure. The exemption is intended to ensure that national security, law enforcement, confidential business data and other sensitive information is not publicly disclosed.

*Other Restrictions and Requirements*

Under the bill, when an agency receives only one bid or negotiates with only one offeror, the procurement is to be considered a non-competitive acquisition. This requirement recognizes that while the agency may use competitive procedures, the result may nonetheless be that only one company submits a bid; and it is, therefore, a sole-source procurement. Further, it has been the Committee's experience that many of these so-called competitive procurements are actually designed for one specific bidder and should meet the requirements for a sole-source justification. Even when an agency made a good faith effort to have competition, the outcome directs that the procurement still should be reviewed as a sole-source procurement to determine if excessive costs are involved or if the government is getting quality products or services.

Besides defining the three levels of competition that are authorized, the bill also addresses other specific procurement matters. For instance, the competition requirements of this bill do not apply to the small purchase procedures contained in existing law which are designed to facilitate the procurement of goods and services that cost less than $25,000. The bill does, however, require that such procurements use competition to the maximum extent possible within the constraints of existing law.

H.R. 5184 also addresses situations where an agency procures its goods and services under another agency's contract and, in so doing, may bypass procurement law or regulations. The Committee has found that, in many instances, a non-competitive contract awarded by one agency is modified or expanded to allow another agency to sole-source from that contract. To prevent this, the provisions of the bill prohibit an agency from acquiring goods and services under another agency's sole-source contract without itself justifying a non-competitive procurement.

In addition, H.R. 5184 contains a provision that will limit the use of "qualified products lists" which are often used as a basis to exclude many qualified vendors, particularly small businesses. Under the bill, an agency may not refuse to include a product of a qualified source from such lists without referring the matter to the advocate for competition who is mandated by this bill to increase competition in agency procurements. Further, if a small business does not have the adequate resources to qualify its products for a qualified products or similar list, then the procuring agency may reimburse the reasonable costs incurred by a small business in qualifying its products for such a list.

Finally, the abuses, that have been uncovered by this Committee and others, in the procurement of spare parts will be greatly alleviated by the general requirements for using competition contained in this bill. H.R. 5184 also contains a specific provision on spare parts which requires the head of each agency to maximize competition for these items. It also requires the agency head to ensure that small and socially and economically disadvantaged small businesses are not locked out of these procurements. The Committee believes that it is essential for the government to allow all qualified firms to compete for the procurement of spare parts, particularly small businesses, which are often the most innovative firms.

*Procurement Notices*

In order to ensure fairness in the Federal procurement system and reduce the intolerable level of non-competitive awards to favored and incumbent vendors, each procurement transaction should be publicly advertised. Only in this way will all qualified firms be made aware of the government's need for goods and services. By encouraging the maximum number of qualified firms to participate, the govenment will be able to obtain the best products and services at the best prices. Far too often, however, agencies attempt to restrict the number of firms that could compete by not making its procurement transactions known or by not providing enough time for qualified firms to respond to a procurement—except those few favored vendors with advance knowledge of the procurement.

H.R. 5184 provides a remedy to this situation by requiring an agency to publish in the Commerce Business Daily (CBD) its intent to solicit bids or proposals or to award a contract involving follow-on subcontracts if the price for the goods or services exceeds $10,000. To provide adequate time in which all qualified firms can respond, the bill prohibits agencies from issuing a solicitation earlier than fifteen days after the CBD notice is published. Further, agencies must allow at least 30 days after the issuance of the solicitation for qualified firms to respond. In recognition of legitimate circumstances whereby a procurement should not be publicized, the bill does not require a CBD notice if such a notice would result in the compromise of national security or the disclosure of the originality of thought or innovativeness of the proposed research or proprietary data associated with a research proposal. This includes those procurements conducted in accordance with the Small Business Innovative Research (SBIR) program. A notice is also not required in the case of a bona fide emergency situation whereby government activities would be seriously injured if the government could not immediately acquire its goods and services.





*Bid Protests*

The General Accounting Office (GAO) has been deciding executive branch contract award protests for about 60 years based on its authority to determine the legality of public expenditures. Although the courts also decide contractual disputes, GAO has become the principal forum for resolving such procurement protests. Its decisions are relied upon for guidance by the Congress, the courts, and the procurement community, including executive branch contracting agencies. GAO's bid protest role has long been recognized in regulations promulgated by the executive branch.

Nevertheless, over the years numerous questions have been raised concerning the effectiveness of GAO's bid protest process. In this regard, assertions have been made that the bid protest function involves the exercise of either executive or judicial authority and that the head of GAO, the Comptroller General (CG), as an officer of the legislative branch, cannot exercise these authorities without violating the separation of powers doctrine. These long-standing assertions, coupled with the lack of a statutory base for the bid protest function, have resulted in a weakened bid protest process which is principally advisory in nature and depends on voluntary compliance by the agencies. Further, GAO makes every effort to give agencies discretion in how and in what timeframe they respond to a protest, and has been hesitant to challenge any but the most blantant agency actions. As a consequence, the current bid protest process does not provide an adequate remedy to those wrongly excluded from procurements.

The following chart shows the total GAO bid protest activity for fiscal years 1981–1983. It shows that during these years only 7.3 percent of the protests decided were sustained in favor of the protester. In addition, during that three-year period only 34 recommendations were made to cancel an awarded contract.

| Fiscal year | Protests received | Protests decided | Protests sustained | Recommended cancellation |
|---|---|---|---|---|
| 1981 | 1,899 | 896 | 90 | 10 |
| 1982 | 2,462 | 1,091 | 83 | 10 |
| 1983 | 2,639 | 1,241 | 62 | 14 |
| Total | 7,000 | 3,228 | [1] 235 | 34 |

[1] 7.3 percent.

During testimony before the Subcommittee, A.G.W. Biddle, President of the Computer and Communications Industry Association (CCIA), explained why so few protests are sustained by GAO. He stated that:

> The GAO is hampered by severe institutional limitations which preclude it from acting as an aggressive enforcer of competitive policies. * * * GAO lawyers act like judges—not investigators. In fact, GAO does not conduct investigations to establish the validity of a bid protester's claims. * * * Thus, without any independent fact-finding,

GAO's protest decisions must rely on the facts which the agency chooses to disclose. * * * Under GAO procedures, an agency need only deny that a protester's statement of facts is correct. In nine cases out of ten, the agency's denial will carry the day.

Another major concern about the current bid protest process is that protests often do not produce corrective actions even when the protester overcomes the enormous burdens imposed by the system. Frequently, agencies ignore GAO's recommendations in order to avoid recompeting contracts. This problem was also illustrated during CCIA's testimony before the Subcommittee. In one case, Amdahl Corporation protested the award of an Army contract to the IBM Corporation on the grounds that (1) IBM was not the low bidder, and (2) the equipment being offered was out of date and not in current production. GAO decided in favor of Amdahl and directed the Army to reopen bidding. The Army, however, immediately installed the IBM equipment. After five months of negotiations, the Army finally convinced GAO that since the equipment was already installed, it was in the "best interests" of the government to continue the contract. Mr. Biddle suggested that cases like this:

> * * * point out a cardinal failing of this bid protest process. GAO has no power to stop a contract award or contract performance while a protest is pending. As a result, agencies usually proceed with their contracts, knowing that they will preclude any possibility of relief simply by delaying the protest process.

The Committee is also concerned about the amount of time consumed in deciding bid protests. The time delays in the process are due in part to the fact that agencies drag out the process for their own purposes, as occurred in the above described Amdahl case. The following are current statistics on average working days spent on GAO's fully developed bid protest decisions over the last three fiscal years.[4] On average, it took more than six months to render these decisions, with about one-third of that time consumed by the agencies. In some cases, however, decisions were pending for more than a year.

AVERAGE DECISION TIMES (WORKING DAYS)

| | Total days | Agency days |
|---|---|---|
| Fiscal year: | | |
| 1981 | 134.6 | 46.4 |
| 1982 | 128.5 | 42.0 |
| 1983 | 132.0 | 44.3 |
| | 131.7 | 44.2 |

H.R. 5184 strengthens GAO's current bid protest process by putting it in statute for the first time. In addition, it contains several

[4] Fully developed bid protest decisions are cases requiring comments from all interested parties, incuding a report from the agency. The three-year average for all classes of decisions rendered by GAO was 90.2 working days.





new requirements to enhance the effectiveness and timeliness of the process. First, it establishes an enforcement mechanism which prohibits the award or performance of a contract while a protest is pending unless the agency's Senior Procurement Executive justifies in writing that compelling circumstances require otherwise. Second, it allows the Comptroller General to declare the entitlement of bid protest costs to the successful protester. Third, H.R. 5184 establishes specific time frames for deciding protests (90 working days) and for submitting agency protest responses to GAO (25 working days), unless the Comptroller General determines that specific and unique circumstances require longer periods. In order to avoid unnecessary delays in agency procurements, the Committee expects such determinations to be rare. The bill also requires specific remedial actions which must be recommended when the Comptroller General determines that the agency did not comply with law or regulations in conducting the procurement.

With regard to the constitutionality of the bid protest function, the Committee does not believe that the provisions of H.R. 5184 violate the separation of powers doctrine.[5] H.R. 5184 does not authorize GAO to suspend the award of performance of a government contract while a protest is pending or to determine the form of relief that must be provided by agencies once a protest is decided. However, the bill establishes a statutory requirement that the award or performance of a contract must be suspended pending a GAO decision. Agencies would be authorized to override this general requirement:

> (1) upon a written finding that compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the Comptroller General; and
>
> (2) after the Comptroller General is advised of such finding.

The Committee would like to make clear that H.R. 5184 will neither increase nor decrease the Comptroller General's current authority in regard to programmatic matters which, under existing law, are to be determined by other agencies. For example, the bill does not affect the Small Business Administration's authority under the Small Business Act to establish industry-size standards, to determine whether a firm is a small business when measured against the applicable standard, or it issue Certificates of Competency to small businesses, including resolution of contract responsibility issues concerning such certificates.

In addition to strenthening GAO's bid protest function, H.R. 5184 establishes another forum for resolving vendors' complaints concerning procurements conducted under section 111 of the Federal Property and Administrative Services Act of 1949 (the Brooks Act, P.L. 89-306). Under this Act, the Administrator of the General Services Administration (GSA) is responsible for ensuring the economic and efficient purchase, lease, and maintenance of automatic data processing (ADP) capabilities by Federal agencies.[6] Since the

[5] See Appendix I for the analysis of the question of the constitutionality of GAO's bid protest function provided by the General Counsel to the Clerk of the House of Representatives.

[6] The Department of Defense Authorization Act of 1982 provided an exemption for DOD from the Federal Property Act if the procurement of certain ADP equipment and services is primarily for functions involving intelligence, cryptology, command and control, or weapons systems.

Administrator has the sole procurement authority for ADP, GSA can either (1) conduct a procurement for an agency, or (2) delegate to the agency the authority to conduct its own ADP procurements after carefully reviewing the appropriate justifications. Currently, the authority to delegate has been assigned to GSA's Assistant Administrator of the Office of Information Resources Management subject to policy and fiscal control of OMB.

The Act has worked well and has saved the taxpayers over $6 billion since its enactment in 1965 primarily by requiring the use of competition in ADP procurements. However, due to the increasing number of computer procurements conducted every year, coupled with the complexity of the technology, the current informal process of resolving conflicts between the buying agency and the suppliers has become cumbersome and prolonged. Further, charges have been made by both the agencies and the contractors that GSA's current process does not provide an objective forum for dispute resolution. The Committee believes that a new forum is needed to provide a fair, equitable and timely remedy in this area.

To accomplish this, H.R. 5184 gives the GSA Board of Contract Appeals authority to decide bid protests involving ADP procurements conducted in accordance with the Brooks Act. The bill requires that the Board issue its decision within 45 working days from the date of protest unless its chairman determines that specific and unique circumstances require a longer period. In addition to its current authorities to settle such disputes, the bill provides specific additional authorities which the Committee believes will ensure the establishment of a meaningful protest remedy system. First, based on the results of a hearing to be conducted within 10 days of the filing of a protest, the Board will have the direct authority to suspend the Administrator's procurement authority or delegation of procurement authority while the protest is pending. Second, using current procedures, the Board will have the authority to hold judicial proceedings in order to obtain evidence from all involved parties concerning the protest. Third, the Board will have authority to suspend or cancel any solicitation or contract that violates law or regulation.

The GSA Board of Contract Appeals has a reputation of being fair and impartial while providing its opinions in a timely fashion. Although the Board members are appointed by and accountable to the Administrator, the operation of the Board is outside the scope of GSA's normal everyday operations. As such, the Board is looked upon by the agencies and the vendor community as an objective forum in which to resolve contractual disputes. The Committee believes the Board is well equipped to provide meaningful relief in this area and should be given a chance to prove it is capable of doing so. The Administrator of GSA should ensure that the Board has adequate resources to fulfill the important new responsibilities given it by this legislation.

Certain questions have been raised concerning the interrelationship between the new protest forum, GAO's new bid protest process, and OMB's resolution of conflicts under P.L. 89-306. With regard to GAO, it has been suggested that inventive protesters will be able to file both at GAO and the Board in an attempt to obtain at least one favorable decision. It is the Committee's intent that if





this situation occurs, the organization receiving the initial filing will be responsible for deciding the protest and any subsequent filings concerning the procurement in question should be referred to that organization. Another question concerns whether the bill would have the effect of precluding GAO from deciding ADP protests. In this regard, the 1982 DOD Authorization Act—the so-called Warner Amendment—exempted many of DOD's ADP acquisitions from the requirements of P.L. 89-306. The GAO will remain the source of resolution, outside the courts, for these exempted procurements. In other cases, it will be the option of the protestor as to where to file ADP-related protests. With regard to OMB's authorities under the Brooks Act, the bill does not alter the current procedures for resolving conflicts between procuring agencies and GSA's procurement office under the Assistant Administrator for Information Resources Management. However, the resolution of disputes (outside the courts) between procuring agencies and suppliers or potential suppliers shall be decided solely by the Board or the GAO under the procedures established by this bill. Further, a final decision of the Board may be appealed in accordance with the Contracts Disputes Act of 1978 (41 U.S.C. 601 et seq.).

*Reporting Requirements*

To assess progress made in using full and open competition, H.R. 5184 requires the heads of executive agencies to prepare and transmit to the appropriate committees of Congress an annual report containing a summary of the agency's efforts to increase the use of competition in its procurements. To assist in the preparation of this report, the agency is required to establish and maintain a record for each procurement, other than small purchases. In addition to the basic information pertaining to the procurement, such as a description and cost of the property or services obtained and the name of the supplier, the record will also contain, where applicable, the appropriate justifications for the use of limited competition or non-competitive procurement procedures. The procurement record will be maintained on a computerized file for a period of five years and transmitted periodically to the Federal Procurement Data Center. The advocate for competition in each agency is also required under the bill to report to the head of the agency on his activities in identifying new initiatives to increase competition and in eliminating those barriers that inhibit the use of competition.

The Committee believes these reporting requirements will provide the necessary basic information for Congress to assess the progress that agencies are making in achieving full and open competition in their procurements. It will also assist the advocate for competition and the agency head in their efforts to achieve the goals established by each agency to increase the use of competition.

*Architectural and Engineering Services*

Under current law, the Federal Government selects the architectural and engineering firm best qualified to perform the particular service required. The selection is made on the basis of an evaluation of the design proposals and the qualifications of all offerors, not price competition. However, the law does require that a price that is fair and reasonable to the government be negotiated with

the most qualified offeror. If the agency is unable to negotiate a contract at a fair and reasonable price, it is required to negotiate a contract with the next most qualified firm. In any event, such price is limited to no more than six percent of the estimated cost of the overall construction project.

The principle behind this procedure is that the quality of the up-front design work done by the architects and engineers has a major impact on the total long-term cost of the project. The design quality also can have a significant effect upon our health and safety. It is, therefore, unwise to save a few dollars on the design phase of a contract and risk increasing by many multiples the overall life-cycle costs of the project, not to mention losing lives and property. Architects and engineers do not provide standard, off-the-shelf, routine services. The benefits of their expertise and experience are reflected in the overall efficiency of the ultimate product. In order to maintain quality and efficiency in the government's construction projects. H.R. 5184 specifies that architectural and engineering procurements conducted in accordance with Title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.) meet the competition requirements contained in the bill.

Further, the Committee recognizes that there are other professional services required by executive agencies in which the agency may justify the need to award to the best proposal among qualified firms. In these cases, price would not be the determining factor in the selection; however, agencies should ensure that fair and reasonable prices are obtained. The Committee believes the OFPP should initiate a study to determine the conditions under which this procedure should be used and promulgate a policy directive based in its results. OFPP's study should consider such services as soil engineering, real estate appraising, and other professional services which do not fit within the traditional concept of competitive procurement.

*Basic Research*

The Committee also recognizes that Federal procurements directed toward increasing knowledge of a subject apart from any clear or necessary practical application of that knowledge are special situations. These basic research procurements are unique in that the agency's solicitations are general in nature, identifying only areas of research interest, criteria for selecting proposals, including scientific merit, and method of evaluating proposals. Proposals received are then competitively evaluated through a peer review process before contracts are awarded. H.R. 5184 accommodates this area by specifying that the competitive selection of basic research proposals resulting from a general solicitation meets the mandated competition requirements of this bill.

Further, the Committee recognizes that many unique or innovative ideas, insights, and capabilities are submitted to agencies through unsolicited research proposals. It is not the Committee's intent that all such proposals automatically result in publication of competitive request-for-proposals. This is particularly true when the offeror is the only source available for the proposed research and a competitive procurement would result in the disclosure of the originality of thought or innovativeness of the proposed re-



search. When this occurs, the Committee believes it to be appropriate to award a non-competitive contract for the proposed research using the exception provided by Section 202(d)(1)(B).

*Multiple Award Schedule Programs*

H.R. 5184 also contains a provision that preserves the multiple awards schedule programs administered by the General Services Administration. Currently, multiple awards schedule contracts are used by GSA's Offices of Federal Supply and Services and Information Resources Management. Over the years, these programs have come under criticism as being anti-competitive and often leading to unreasonable prices for items ordered off the schedules. The Committee, however, believes that schedule contracts are worthwhile in areas where quantity discounts can be achieved by ordering products on a government-wide basis as in the case of the Federal Supply Service schedules. The ADP schedules serve to reduce the administrative burden and cost associated with minimum quantity, low dollar volume purchases. The availability of ADP contracts should not preclude the requirement to seek lower prices if there are responsible alternative sources available and willing to compete for the agency's business.

The objective of H.R. 5184 is to ensure that any responsible vendor wishing to compete for this business is, in fact, allowed and encouraged to compete. As long as the schedule contracts managed by GSA maintain these principles, they are operating within the intent of the bill and should be supported. In recognition of the benefits that can be achieved under these programs, H.R. 5184 authorizes the use of these schedules under the provisions of full and open competition as long as (1) competition in the multiple awards program has been open to all responsible sources, and (2) such orders or contracts result in the lowest overall cost alternative to meet the minimum needs of the government.

*Advocate for Competition*

Given the high level of non-competitive procurements conducted by Federal agencies and the inability of the executive branch to improve the use of competition, it is clear that no meaningful reform will be accomplished until key Federal officials at all levels are made aware of the benefits of competition and become firmly committed to its use. This will not be an easy task and it will not be accomplished overnight. However, the government cannot afford to do otherwise.

To achieve this objective, H.R. 5184 establishes an advocate for competition within each executive agency who will be responsible for removing the barriers to and promoting full and open competition in each procurement. The individual named to this position must be someone other than the agency's senior procurement executive. The advocate for competition is required to review the purchasing activities of the agency to identify and report to the head of the agency (1) initiatives undertaken to achieve full and open competition, and (2) overly restrictive solicitations or other conditions that would reduce competition. The advocate for competition will also be responsible for upgrading the procurement workforce within the agency by developing a system of personal and organiza-

tional accountability, including the use of recognition and awards to motivate procurement officials.

The Committee believes that the advocates for competition will be an increasingly important force within the executive branch to counter the stubborn resistance to competition that currently exists in the agencies. Besides identifying where substantial savings can be achieved, the advocates for competition will be able to explicitly identify those factors that have undermined the use of competition. Increased visibility and accountability within our procurement system are essential ingredients if Congress is to achieve true procurement reform. The advocate for competition should provide these ingredients.

## Effects on Existing Law

Two basic statutes provide the foundation upon which Federal procurement is governed. The Armed Services Procurement Act (ASPA) of 1947 applies to the procurement activities of the Department of Defense, the National Aeronautics and Space Administration, and the Coast Guard. Titles II and III of the Federal Property and Administrative Services Act (FPASA) of 1949, as amended, generally govern the purchasing activities of civil agencies. Additionally, the Office of Federal Procurement Policy (OFPP) Act establishes government-wide procurement policies and procedures which apply to all executive agencies. This Act requires the use of full and open competition as a government-wide standard for agencies to follow. Similarly, the ASPA (10 U.S.C. 2305) and the FPASA (41 U.S.C. 253) use the term full and free competition. However, these terms are not defined and there are no specific procedures established by these statutes to ensure that this requirement is implemented. As a result, neither the agency implementing regulations nor the recently issued government-wide Federal Acquisition Regulation specifically address the use of competition in Federal procurements. Instead, the statutes and regulations emphasize the use of "formal advertising" as the preferred method for acquiring the government's goods and services.

Under this procedure, an agency publicly advertises its requirement and receives sealed bids which are publicy opened; and the subsequent award is made to the lowest bidder. If contracting officers need to consider factors other than price in making awards or must have discussions with prospective contractors, the statutes require that they justify the use of negotiations. Currently, the principal authorities to negotiate contracts are listed as exceptions to the advertising requirements of the ASPA (10 U.S.C. 2304) and the FPASA (41 U.S.C. 252). The former statute provides 17 exceptions to the advertising requirement, and the latter act contains essentially all but two of those exceptions.

Over time, the impression has grown that formally advertised sealed bid procedures are the only true form of competition available and that a negotiated procurement is a non-competitive procurement. In reality, both procedures can be competitive. Approximately 88 percent of all Federal procurements are currently conducted on a negotiated bases. Although most of the negotiated procurements are sole-sourced, about one-third are fully competitive.



Further, under P.L. 98–72, all procurements must be formally advertised in the Commerce Business Daily. As such, using the term "formal advertising" as a way to differentiate a competitive procurement from a non-competitive procurement is both confusing and impractical.

H.R. 5184 requires that executive agencies use full and open competition—whether by soliciting sealed bids and making award without discussions or by requesting competitive proposals and making award with discussions—when entering into a contract for property or services. In effect, it removes the restriction from—and the written justification required for—competitive proposal procedures and places them on par with sealed bid procedures. H.R. 5184 maintains minimum criteria for sealed bid procedures to ensure the use of those procedures when appropriate. The purpose served by substituting the new terms "sealed bid" and "competitive proposal" procedures for "formal advertising" and "negotiation" is to eliminate the competitive and non-competitive connotations associated, respectively, with past terminology.

H.R. 5184 also establishes three levels of procurement: full and open competition, limited competition, and non-competitive. Under the bill, agencies may not limit competition or procure on a non-competitive basis except under specified conditions. Further, various review and approval procedures are established for these types of procurements to ensure that they are justified. Since the basic procurement statutes do not contain these types of requirements, the bill represents a substantial change in current law by adding specificity to the current general requirement for competition.

A question was raised during the hearings on what effect H.R. 5184 would have on other existing statutes, particulary since the bill would be implemented "notwithstanding any other provision of law." Besides the two basic statutes, there are over 4,000 separate provisions of law affecting procurement. However, relatively few of these provisions deal directly with the issue of competition and even fewer provide specific authorization for or require the use of non-competitive procedures. As a result, the requirement for the use of full and open competition and the other associated requirements contained in the bill would affect relatively few provisions of current law. In the case where non-competitive procurements are required by existing statute, H.R. 5184 would authorize such procurements under the exception contained in Section 202(d)(1)(E). For example, the Wagner-O'day Act (41 U.S.C. 46 et seq.) requires Federal agencies to procure products and services from the handicapped. In the case of procurements conducted under Section 8(a) of the Small Business Act, a specific exception was given to these types of procurements to ensure that they would not be negatively impacted by the competition requirements contained in the bill. Other existing procurement provisions are antiquated and out-of-date, having been enacted in the late 1940's and the early 1950's.

One of the principal benefits of H.R. 5184 is that it establishes uniform and consistent government-wide procedures on the use of competition. Further, it establishes specific conditions in which agencies are authorized to limit competition and conduct sole-source procurements. In the absence of a clear need to provide additional exemptions beyond those provided in the bill, the Commit-

tee believes it is unwise to maintain any current provision of law which may be used as a loophole by agencies to undermine the requirements for full and open competition contained in this legislation.

## Conclusion

Clearly, competition is the single most effective way in which the government can obtain its goods and services at the best prices. Despite the efforts of Congress to promote the use of competition in Federal agencies, procurement practices have built up over the years that have allowed competition to be avoided by procurement officials. As a result, the government currently uses this procurement method in only about one-third of its acquisitions. The cost to the government and the taxpayers is substantial. The 20 percent savings from competition estimated by the Office of Federal Procurement Policy would result in approximately $20 billion saved each year if applied to the current $100 billion spent on non-competitive acquisitions alone. This represents a significant reduction in the current budget deficits.

Notwithstanding the benefits of competition, efforts by the executive branch to reform its procurement activitis have been largely unsuccessful. It is clear to this Committee that the only way to increase the use of competition in agency procurements is through a major legislative reform initiative. H.R. 5184 contains the necessary measures to reform current procurement practices to ensure that economy and efficiency are once again the major objectives of the Federal procurement system. By requiring agencies to use competition, except in very limited circumstances, the government will be better able to acquire quality goods and services at the lowest cost. Further, all qualified firms will be allowed to compete for government business, ensuring that the government receives the most innovative products and services. Finally, the bill strengthens the current bid protest procecures to ensure an equitable forum in the event of contractual disputes. The Committee is well aware that for some procurement officials wedded to practices that have been tolerated in the past, the tendency may be to resist rather than aid in the implementation of a significant procurement reform measure such as this. Inview of the unacceptable costs from unnecessary sole-sourcing, however, such recalcitrance must not be tolerated. The government can no longer afford such a system and H.R. 5184 will correct the problem.

## Section-by-Section Analysis

### *Section 1. Short Title*

Section 1 titles the Act as the "Competition in Contracting Act of 1984."

### *Section 2. Requirements and Prohibitions*

Section 2(a) of the bill amends the Office of Federal Procurement Policy Act by adding a new title, "Title II—Federal Procurement Competition Requirements."



Section 201 requires executive agencies to conduct their procurements in accordance with this title and the government-wide regulations prescribed in the Office of federal Procurement Policy Act as modified by this title.

Subsection 202(a) requires executive agencies to conduct their procurements in an appropriate manner to avoid placing unnecessary restrictions on the use of competition. This includes the use of advance procurement planning, adequate market research, unrestrictive requirements and specifications, and publication of procurement notices in the Commerce Business Daily. Further, each agency should encourage all qualified firms to compete in the procurement and fully evaluate each sealed bid or competitive proposal submitted. Exempt from this provision are non-competitive procurements involving emergency situations, or as required by international treaty or by statute.

Subsection 202(b) requires agencies, except as provided in subsections (c) (limited competition), (d) (non-competitive procurements), and (g) (small purchases), to use full and open competition in their procurements, either through the use of sealed bids, competitive negotiations, or a combination of both. Agencies will not be allowed to prohibit or restrict any qualified vendor from competing. Depending on the curcumstances of the procurement, agencies should solicit sealed bids when (1) the award is to be made on the basis of price and other price-related factors, (2) it is not necessary to conduct discussions with the responding sources about their bids, and (3) there is a reasonable expectation of receiving more than one bid. Competitive proposals should be used when sealed bids are not required.

Section 202(c) authorizes executive agencies to use limited competition in well-defined circumstances provided the use of limited competition is (1) justified in writing and certified as accurate and complete by the contracting officer, (2) approved in writing by the head of the procurement activity if the procurement is over $500,000, and (3) a procurement notice is published in accordance with section 203(a)(1)(A) and all bids and proposals received as a result of the notice are fully considered by the executive agency. Limited competition is authorized in the following circumstances: national security, urgency, the need to maintain alternate sources of supply, or to fulfill the statutory requirements of small business set-aside programs.

Subsection 202(d) limits the use of non-competitive procurements to: emergency situations, when only one source is available, when it is necessary to maintain an essential supplier, or if required by international treaty or by statute. The use of non-competitive practices must be justified in writing and certified that such justification is accurate and complete by the contracting officer. In addition, the certification and justification must be reviewed and approved in writing by the head of the procurement activity or another senior official within that office, and by the senior procurement executive if the procurement exceeds $500,000.

In the case of a bona-fide emergency situation, the required justifications and approvals for non-competitive procurements may be made after the procurement has occurred. In no case, however, will such a procurement method be used on the basis of lack of advance

planning or concerns related to the unavailability of funds for the procurement. In determining whether alternative sources are available, the government must consider all such sources that have the production capability to meet its requirements and delivery schedules unless another party has a legitimate proprietary interest in the products or their manufacture. This subsection also specifically identifies those items which, at a minimum, must be included in the justification statement required for conducting a non-competitive procurement.

Subsection 202(e) requires that any justification, certification, or written approval needed to conduct limited competition or non-competitive procurements and other related documents must be made available to the public consistent with the provisions of the Freedom of Information Act (Section 552 of Title 5, U.S.C.). This provision does not authorize agencies to withhold documentation related to procurements from vendors on the basis that it is internal memoranda.

Subsection 202(f) requires executive agencies to ensure that a sufficient number of sealed bids or competitive proposals are received on full and open and limited competition procurements to assure that the lowest possible cost is achieved in the procurements. Further, when only one bid or proposal is received, the procurement shall be considered as non-competitive and no award shall be made until the justifications, certifications, and approvals are completed, as required when conducting non-competitive procurements.

Subsection 202(g) allows agencies to use simplified practices and forms when making small purchases, and requires that the maximum practicable competition be achieved in making such purchases.

Subsection 202(h) prohibits an executive agency from procuring goods and services from another agency unless the other agency has complied fully with the requirements of this title.

Subsection 202(i) prohibits an executive agency from excluding a product of a qualified business from a qualified products list without referring the matter to the advocate for competition who is required by this bill to increase competition in agency procurements. Further, if a small business does not have adequate resources to qualify its products for such a list, then the procuring agency may reimburse the reasonable costs incurred by a small business in qualifying its products for such a list.

Subsection 202(j) requires executive agencies to take the necessary steps in the procurement of spare parts to maximize competition for these items and to ensure that small and socially and economically disadvantaged businesses are not precluded as prime contractors or subcontractors in such procurements.

Subsection 202(k) contains the definitions of the terms used in this section. It also provides that the following types of procurements satisfy the requirements for using full and open competition as long as all responsible vendors are allowed and encouraged to compete: (1) under current law for architectural and engineering services, (2) in accordance with the multiple awards schedules established by the General Services Administration, and (3) to acquire basic research under a general solicitation.



Subsection 203(a) requires agencies, except as provided in subsection 203(c), to publish a notice in the Commerce Business Daily of their intent to solicit bids or proposals or to award a contract involving subcontracts if the price for the goods or services exceeds $10,000. It prohibits executive agencies from issuing a solicitation earlier than fifteen days after the CBD notice is published. Further, agencies must allow at least thirty days after the issuance of the solicitation for qualified firms to respond.

Subsection 203(b) describes the content of each procurement notice required to be published in the CBD.

Subsection 203(c) describes those legitimate circumstances whereby a procurement notice is not required. These are: (1) when national security would be compromised, (2) when the originality of thought or innovativeness of the proposed research or proprietary data association with a research proposal would be disclosed, and (3) during an emergency situation where a delay would harm the government.

Subsection 204(a) establishes a procurement protest system within the General Accounting Office and requires the Comptroller General to give priority consideration to protests concerning alleged violations of this title.

Subsection 204(b)(1) authorizes the Comptroller General to decide protests filed by contractors and subcontractors, or which are referred by an executive agency or court of the United States.

Subsection 204(b)(2) requires that protest decisions be issued within 90 working days of receipts unless the Comptroller General determines that specific and unique circumstances require additional time.

Subsection 204(b)(3) prohibits the agency from awarding or performing a contract which has been protested unless exceptional circumstances as defined in the bill exist and the Senior Procurement Executive notifies the Comptroller General. It also authorizes the Comptroller General to determine if the agency complied with law and regulations in conducting the protested procurement and, if noncompliance is found, requires the Comptroller General to recommend specific corrective actions. This subsection also establishes time frames within which agencies must provide protest reports to the Comptroller General.

Subsection 204(c)(1) requires to the Comptroller General to decide protests in an inexpensive and timely manner and to establish an expedited procedure for protests which can be decided with 45 days. This subsection also requires agencies to provide documentation relevant to the protest to interested parties within deadlines prescribed by the Comptroller General.

Subsection 204(c)(2) requires the Comptroller General or his designee to sign each protect decision and to furnish copies to interested parties and agencies.

Subsection 204(c)(3) requires agencies to report within 60 days on actions taken to comply with Comptroller General recommendations. It also requires the Comptroller General to report annually to the Congress on instances where agencies failed to comply with his recommendations.

Subsection 204(c)(4) authorizes the Comptroller General to dismiss frivolous protests.

Subsection 204(c)(5) authorizes the Comptroller General to declare entitlement of monetary awards covering protest costs and bid and proposal costs to successful protesters. It requires the agency to pay these costs promptly from funds available for the protested procurement.

Subsection 204(d)(1) requires the Comptroller General to establish procedures for handling protests within 90 days of enactment of this title. Further, the procedures must provide that the process can not be delayed by late report filings by any involved party.

Subsection 204(d)(2) authorizes the Comptroller General to use his audit authority in verifying information provided by any party to a protest.

Subsection 204(e) allows interested parties to file protests with the courts.

Subsection 204(f) authorizes the General Services Administration's Board of Contract Appeals to decide protests involving Automatic Data Processing (ADP) procurements conducted in accordance with section 111 of the Federal Property and Administrative Services Act of 1949. This subsection requires the Board to hold a hearing within 10 days of a protest action to determine if the General Services Administrator's procurement authority or his delegation of procurement authority (DPA) should be suspended on an interim basis. In the case of protests filed prior to award, the authority or DPA shall be suspended unless it would affect the vital interests of the United States and award is likely to occur within 30 days of the hearing. In the case of protests filed after award, the Board shall suspend the agency's authority to acquire goods and services not previously delivered unless such action would affect the vital interests of the United States.

This subsection requires the Board to issue its final decision within 45 working days unless specific and unique circumstances require a longer period. To accomplish this, the Board shall be priority to protest actions filed under this section and allow such discovery as may be necessary for an expeditious, fair and reasonable resolution of the protest. However, nothing contained in this subsection shall conflict with any deadlines imposed by section 9(a) of the Contracts Disputes Act of 1978 (41 U.S.C. 608(a)).

This subsection also requires the Board to duly consider the competition requirement contained in this title and economic and efficient goals establsihed in section 111 of the Federal Property and Administrative Service Act of 1949 (40 U.S.C. 759). In cases where the Board determines that law, regulation, or the conditions set forth in the DPA have been violated, it may suspend or cancel any solicitation or contract. The Board may, in accordance with section 1304 to Title 31 U.S.C., declare entitlement of an appropriate party to the costs of filing and pursuing the protest, including reasonable attorney's fees and bid and proposal preparation. The head of an agency or any interested party, incuding those who intervene in any protest action filed under this section (as set forth in the Contracts Dispute Act of 1978 (41 U.S.C. 601 et. seq.)) appeal the final decision of the Board.

All goods and services delivered and accepted prior to the protest and after contract award shall be considered valid in the event of a decision by the Board to suspend or revoke the DPA. Nothing con-



tained in this subsection shall affect the Board's power to order any additional relief which it is authorized to provide under any statute or regulation. Further, nothing contained in this subsection shall affect the right of any person to file protests with the Comptroller General or contracting agency or to file actions in the district court or the U.S. Claims Court. However, the Committee intends that the contractor cannot file the same protest action with both the Board and the Comptroller General, but must choose one or the other. The Board is also empowered to dismiss any frivolous protest action. It is required to issue within 90 days after enactment of this title such rules and procedures necessary to fulfill its responsibilities under this section.

Section 205 requires that the provisions of this title be incorporated in the Federal Acquisition Regulation within 90 days of enactment of this title.

Section 206 provides that provisions of this title do not supercede or affect the provisions of the Buy American Act and Section 8(a) of the Small Business Act.

Section 2(b) of the bill provides conforming amendments to the Office of Federal Procurement Policy Act.

*Section 3. Advocate for Competition and Reporting Requirements*

Section 3 amends section 115 of the Office of Federal Procurement Policy Act (as redesignated by Section 2(8) of this Act) and adds the following new subsections:

Subsection 115(b) requires each executive agency to establish the position of advocate for competition.

Subsection 115(c) outlines the specific responsibility of the advocate for competition.

Subsection 115(d) requires each executive agency to establish and maintain computerized records containing information on all procurements exceeding $25,000 and to transmit this information to GSA for inclusion in the Federal Procurement Data System.

Subsection 115(e) requires each executive agency to provide Congress with an annual report summarizing the activities and accomplishments of the advocate for competition.

Section 3(a) establishes January 1, 1985, as the effective date of this Act.

### Cost Estimate of the Congressional Budget Office

The cost estimate prepared by the Congressional Budget Office under Sections 308(a) and 403 of the Congressional Budget Act of 1974 is contained in the following letter from its Director:

U.S. Congress,
Congressional Budget Office,
*Washington, DC, June 5, 1984.*

Hon. Jack Brooks,
*Chairman, Committee on Government Operations,*
*House of Representatives, Washington, DC.*

Dear Mr. Chairman: The Congressional Budget Office has reviewed H.R. 5184, the Competition in Contracting Act of 1984, as ordered reported by the House Committee on Government Operations, May 9, 1984.

The bill revises procedures for awarding federal contracts for property and services, with the intent of increasing competition in government preocurement. Agencies would be required to use full and open competition in their procurement, either through the use of sealed bids or competitive negotiations. Limited competition could only be used under certain circumstances, including national security, urgency, the need to maintain sources of supply or to fulfill set-aside requirements for minority or small businesses. Noncompetitive procurements would be restricted to emergency situations, when only one supply source is available, when necessary to maintain an essential supplier, or as required by international treaty or statute. Additionally, procurements, conducted under section 8(a) of the Small Business Act would be exempt from requirements under this bill. Agencies that use limited competition or noncompetitive procurement would be required to justify those decisions. Notice of pending government procurement would be published in the Commerce Business Daily so all vendors would be notified of pending procurement contracts.

Studies by the General Accounting Office (GAO) and others have indicated that savings of 10 to 50 percent can sometimes be achieved through competitive contracting. Over the last three years, approximately $15–$20 billion worth of new contracts were awarded noncompetitively each year, primarily by the Department of Defense. While there is no reliable methodology available to estimate total savings from the bill, such savings could be significant, because each 1 percent saved on new contract actions could save up to $150–200 million per year, if applied to all new contract actions. However, the bill defines a number of circumstances where competition would not be required—and even in competitive situations, price is not always the sole consideration. As a result, the bill would not result in savings on all new contract actions, though there is no basis for determining the volume of actions that would be affected.

The bill also provides for establishment of a bid protest procedure to be carried out by the Comptroller General. This system would protect vendors against violations of procurement laws by federal agencies. Once a protest is filed, agencies could not award contracts until the protest is decided, unless the senior procurement official finds that circumstances compel the making of the award. Bid protest costs would be awarded by the Comptroller General to the successful protestor, with the funds coming from the procurement.

Contracts will not be awarded while a protest is pending and contracts will be suspended in cases where a contract was awarded prior to the pending protest. Based on information from the GAO it is estimated that while this provision may require some administrative costs, these are not expected to be significant.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

Eric Hanushek
(For Rudolph G. Penner, Director).





## Changes in Existing Law Made by the Bill, As Reported

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### Office of Federal Procurement Policy Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Office of Federal Procurement Policy Act".*

### *TITLE I—GENERAL PROVISIONS FOR THE IMPROVEMENT OF FEDERAL PROCUREMENT*

#### DECLARATION OF POLICY

Sec. [2.] *10.* It is the policy of the Congress to promote economy, efficiency and effectiveness in the procurement of property and services by the executive branch of the Federal Government by—

(1) by promoting full and open competition;

(2) establishing policies, procedures, and practices which will provide the Government with property and services of the requisite quality, within the time needed, at the lowest reasonable cost;

(3) promoting the development of simplified uniform procurement processes;

(4) promoting the participation of small business concerns;

(5) supporting the continuing development of a competent, professional work force;

(6) eliminating fraud and waste in the procurement process;

(7) eliminating redundant administrative requirements placed on contractor and Federal procurement officials;

(8) promoting fair dealings and equitable relationships with the private sector;

(9) ensuring that payment is made in a timely manner and only for value received;

(10) requiring, to the extent practicable, the use of commercial products to meet the Government's needs;

(11) requiring that personal services are obtained in accordance with applicable personnel procedures and not by contract;

(12) ensuring the development of procurement policies that will accommodate emergencies and wartime as well as peacetime requirements; and

(13) promoting, whenever feasible, the use of specifications which describe needs in terms of functions to be performed or the performance required.

#### FINDINGS AND PURPOSE

Sec. [3.] *102.* (a) The Congress finds that economy, efficiency, and effectiveness in the procurement of property and services by the executive agencies will be improved by establishing an office to