exercise responsibility for procurement policies, regulations, procedures, and forms.

(b) The purpose of this Act is to establish an Office of Federal Procurement Policy in the Office of Management and Budget to provide overall direction of procurement policies, regulations, procedures, and forms for executive agencies in accordance with applicable laws.

DEFINITIONS

SEC. [3.] *103.* As used in this Act—

(1) the term executive agency means—

(A) an executive department specified in section 101 of title 5, United States Code;

(B) a military department specified in section 102 of such title;

(C) an independent establishment as defined in section 104(1) of such title; and

(D) a wholly owned Government corporation fully subject to the provisions of chapter 91 of title 31, United States Code;

(2) the term "procurement" includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout;

(3) the term "procurement system" means the integration of the procurement process, the professional development of procurement personnel, and the management structure for carrying out the procurement function;

(4) the term "single system of Government-wide procurement regulations" means (A) a single Government-wide procurement regulation issued and maintained jointly by the General Services Administration, the Department of Defense, and the National Aeronautics and Space Administration, pursuant to their respective authorities, title III of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 251 et seq.), chapter 137 of title 10, United States Code, and the National Aeronautics and Space Act of 1958 (42 U.S.C. 2451 et seq.), and (B) agency acquisition regulations implementing and supplementing the Government-wide procurement regulation issued as provided in clause (A), which shall be limited to (i) regulations essential to implement Government-wide policies and procedures within the agency and (ii) additional policies and procedures required to satisfy the specific and unique needs of the agency; and

(5) the term "standards" means the criteria for determining the effectiveness of the procurement system by measuring the performance of the various elements of such system.

OFFICE OF FEDERAL PROCUREMENT POLICY

SEC. [5.] *104.* (a) There is established in the Office of Management and Budget an office to be known as the Office of Federal Procurement Policy (hereinafter referred to as the "Office").



(b) There shall be at the head of the Office an Administrator for Federal Procurement Policy (hereinafter referred to as the "Administrator"), who shall be appointed by the President, by and with the advice and consent of the Senate.

AUTHORITY AND FUNCTIONS OF THE ADMINISTRATOR

SEC. [6.] *105.* (a) The Administrator shall provide overall direction of procurement policy and leadership in the development of procurement systems of the executive agencies. To the extent that the Administrator considers appropriate, in carrying out the policies and functions set forth in this [Act,] *title,* and with due regard for applicable laws and the program activities of the executive agencies, the Administrator may prescribe Government-wide procurement policies which shall be implemented in the single system of Government-wide procurement regulations and shall be followed by executive agencies in the procurement of—

(1) property other than real property in being;

(2) services, including research and development; and

(3) construction, alteration, repair, or maintenance of real property.

(b) In any instance in which the Administration determines that the Department of Defense, the National Aeronautics and Space Administration, and the General Services Administration are unable to agree on or fail to issue Government-wide regulations, procedures and forms in a timely manner, the Administrator may, with due regard for applicable laws and the program activities of the executive agencies and consistent with the policies and functions set forth in this [Act] *title,* prescribe Government-wide regulations, procedures and forms which shall be followed by executive agencies in the procurement of—

(1) property other than real property in being;

(2) services, including research and development; and

(3) construction, alteration, repair, or maintenance of real property.

(c) The authority of the Administrator under the [Act] *title* shall not be construed to—

(1) impair or interfere with the determination by executive agencies of their need for, or their use of, specific property, services, or construction, including particular specifications therefor; or

(2) interfere with the determination by executive agencies of specific actions in the award or administration of procurement contracts.

(d) The functions of the Administrator shall include—

(1) providing leadership and ensuring action by the executive agencies in the establishment, development and maintenance of the single system of simplified Government-wide procurement regulations and resolving differences among the executive agencies in the development of simplified Government-wide procurement regulations, procedures and forms;

(2) coordinating the development of Government-wide procurement system standards that shall be implemented by the executive agencies in their procurement systems;

(3) providing leadership and coordination in the formulation of the executive branch position on legislation relation to procurement;

(4) providing for a computer-based Federal Procurement Data System which shall be located in the General Services Administration (acting as executive agent for the Administrator) and shall collect, develop, and disseminate procurement data;

(5) providing for a Federal Acquisition Institute which shall be located in the General Services Administration (acting as executive agent for the Administrator) and shall—

(A) foster and promote Government-wide career management programs for a professional procurement work force; and

(B) promote and coordinate Government-wide research and studies to improve the procurement process and the laws, policies, methods, regulations, procedures, and forms relating to procurement by the executive agencies;

(6) establishing criteria and procedures to ensure the effective and timely solicitation of the viewpoints of interested parties in the development of procurement policies, regulations, procedures, and forms;

(7) developing standard contract forms and contract language in order to reduce the Government's cost of procuring property and services and the private sector's cost of doing business with the Government; and

(8) completing action, as appropriate, on the recommendations of the Commission on Government Procurement.

(e) In carrying out the functions set forth in subsection (c), the administrator—

(1) shall consult with the affected executive agencies, including the Small Business Administration;

(2) may, with the concurrence of the heads of affected executive agencies, designate an executive agency or executive agencies to assist in the performance of such functions; and

(3) may establish advisory committees or other interagency groups to assist in providing for the establishment, development, and maintenance of a single system of simplified Government-wide procurement regulations and to assist in the performance of any of the other functions which the Administrator considers appropriate.

(f) The Director of the Office of Management and Budget may deny the promulgation of or rescind any Government-wide regulation or final rule or regulation of any executive agency relating to procurement if the Administrator determines that such rule or regulation is inconsistent with the policies set forth in section [2] *101* or any policies, regulations, or procedures issued pursuant to subsection (a).

(g) Except as otherwise provided by law, no duties, functions, or responsibilities, other than those expressly assigned by this [Act,] *title,* shall be assigned, delegated, or transferred to the Administrator.

(h) Nothing in this [Act] *title* shall be construed to—



(1) impair or affect the authorities or responsibilities conferred by the Federal Property and Administrative Services Act of 1949 with respect to the procurement of automatic data processing and telecommunications equipment and services or of real property; or

(2) limit the current authorities and responsibilities of the Director of the Office of Management and Budget.

(i)(1) With due regard to applicable laws and the program activities of the executive agencies administering Federal programs of grants or assistance, the Administrator may prescribe Government-wide policies, regulations, procedures, and forms which the Administrator considers appropriate and which shall be followed by such executive agencies in providing for the procurement, to the extent required under such programs, of property or services referred to in clauses (1), (2), and (3) of subsection (a) by recipients of Federal grants or assistance under such programs.

(2) Nothing in paragraph (1) shall be construed to—

(A) permit the Administrator to authorize procurement or supply support, either directly or indirectly, to recipients of Federal grants or assistance; or

(B) authorize any action by such recipients contrary to State and local laws, in the case of programs to provide Federal grants or assistance to States and political subdivisions.

ADMINISTRATIVE POWERS

SEC. [7.] *106.* Upon the request of the Administrator, each executive agency is directed to—

(1) make its services, personnel, and facilities available to the Office to the greatest practicable extent for the performance of functions under this [Act]; *title*; and

(2) except when prohibited by law, furnish to the Administrator and give him access to all information and records in its possession which the Administrator may determine to be necessary for the performance of the functions of the Office.

RESPONSIVENESS TO CONGRESS

SEC. [8.] *107.* The Administrator shall keep the Congress and its duly authorized committees fully and currently informed of the major activities of the Office of Federal Procurement Policy, and shall submit a report thereon to the House of Representatives and the Senate annually and at such other times as may be necessary for this purpose.

(b) At least 30 days prior to the effective date of any policy or regulation prescribed under section [6(a),] *105(a),* the Administrator shall transmit to the Congress a report on the proposed policy or regulation. Such report shall include—

(1) a full description of the policy or regulation;

(2) a summary of the reasons for the issuance of such policy or regulation; and

(3) the names and positions of employees of the Office who will be made available, prior to such effective date, for full consultation with such Committees regarding such policy or regulation.

(c) In the case of an emergency, the President may waive the notice requirement of subsection (b) by submitting in writing to the Congress his reasons therefor at the earliest practicable date on or before the effective date of any policy or regulation.

EFFECT ON EXISTING LAWS

SEC. ⟦9.⟧ *108.* The authority of an executive agency under any other law to prescribe policies, regulations, procedures, and forms for procurement is subject to the authority conferred in section ⟦6⟧ *105* of this ⟦Act.⟧ *title.*

EFFECT ON EXISTING REGULATIONS

SEC. ⟦10.⟧ *109.* Procurement policies, regulations, procedures, or forms in effect on the date of enactment of the Office of Federal Procurement Policy Act Amendments of 1983 shall continue in effect, as modified from time to time, until repealed, amended, or superseded by policies, regulations, procedures, or forms promulgated by the Administrator.

AUTHORIZATION OF APPROPRIATIONS

SEC. ⟦11.⟧ *110.* There are authorized to be appropriated to carry out the provisions of this ⟦Act,⟧ *title,* and for no other purpose, $4,500,000 for the fiscal year ending September 30, 1984, and for each of the three succeeding fiscal years.

DELEGATION

SEC. ⟦12.⟧ *111.* (a) The Administrator may delegate, and authorize successive redelegations of, any authority, function, or power of the Administrator under this ⟦Act⟧ *title* (other than the authority to provide overall direction of Federal procurement policy and to prescribe policies and regulations to carry out such policy), to any other executive agency with the consent of the head of such executive agency or at the direction of the President.

(b) The Administrator may make and authorize such delegations within the Office as he determines to be necessary to carry out the provisions of this ⟦Act.⟧ *title.*

ANNUAL PAY

SEC. ⟦13.⟧ *112.* Section 5315 of title 5, United States Code, is amended by adding at the end thereof the following:

"(100) Administrator for Federal Procurement Policy.".

ACCESS TO INFORMATION

SEC. ⟦14.⟧ *113.* (a) The Administrator and personnel in his Office shall furnish such information as the Comptroller General may require for the discharge of his responsibilities. For this purpose, the Comptroller General or his representatives shall have access to all books, documents, papers, and records of the Office.

(b) The Administrator shall, by regulation, require that formal meetings of the Office, as designated by him, for the purpose of developing procurement policies and regulations shall be open to the





public, and that public notice of each such meeting shall be given not less than ten days prior thereto.

⟦REPEALS AND AMENDMENTS

⟦SEC. 15. The Federal Properly and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.) is amended as follows:⟧

* * * * * * *

TESTS OF INNOVATIVE PROCUREMENT METHODS AND PROCEDURES

SEC. ⟦15.⟧ *114.* (a) The Administrator may develop innovative procurement methods and procedures to be tested by selected executive agencies. The innovative procurement methods and procedures tested under this subsection shall be consistent with the policies set forth in section ⟦2.⟧ *101.* In developing any program to test innovative procurement methods and procedures under this subsection, the Administrator shall consult with the heads of executive agencies to—

(1) ascertain the need for and specify the objectives of such program;

(2) develop the guidelines and procedures for carrying out such program and the criteria to be used in measuring the success of such program;

(3) evaluate the potential costs and benefits which may be derived from the innovative procurement methods and procedures tested under such program;

(4) select the appropriate executive agencies or components of executive agencies to carry out such program;

(5) specify the categories and types of products or services to be procured under such program; and

(6) develop the methods to be used to analyze the results of such program.

A program to test innovative procurement methods and procedures may not be carried out unless approved by the heads of the executive agencies selected to carry out such program.

(b) If the Administrator determines that it is necessary to waive the application of any provision of law in order to carry out a proposed program to test innovative procurement methods and procedures under subsection (a), the Administrator shall transmit notice of the proposed program to the Committee on Government Operations of the House of Representatives and the Committee on Governmental Affairs of the Senate and request that such committees take such action as may be necessary to provide that such provision of law does not apply with respect to the proposed program. The notification to Congress shall include a description of the proposed program (including the scope and purpose of the proposed program), the procedures to be followed in carrying out the proposed program, the provisions of law affected and any provision of law the application of which must be waived in order to carry out the proposed program, and the executive agencies involved in carrying out the proposed program.

EXECUTIVE AGENCY RESPONSIBILITIES

SEC. [16.] *115(a).* To further achieve effective, efficient, and economic administration of the Federal procurement system, the head of each executive agency shall, in accordance with applicable laws, Government-wide policies and regulations, and good business practices—

(1) increase the use of [effective] *full and open* competition in procurement by the executive agency;

(2) establish clear lines of authority, accountability, and responsibility for procurement decisionmaking within the executive agency, including placing the procurement function at a sufficiently high level in the executive agency to provide—

(A) direct access to the head of the major organizational element of the executive agency served; and

(B) comparative equality with organizational counterparts;

(3) designate a senior procurement executive who shall be responsible for management direction of the procurement system of the executive agency, including implementation of the unique procurement policies, regulations, and standards of the executive agency; and

(4) develop and maintain a procurement career management program in the executive agency to assure an adequate professional work force.

*(b)(1) There is established in each executive agency an advocate for competition.*

*(2) Each head of an executive agency shall—*

*(A) designate for each executive agency one senior officer or employee (other than the senior procurement executive designated pursuant to subsection (a)(3)) serving in a position authorized for such executive agency on the date of enactment of this subsection to serve as the advocate for competition;*

*(B) relieve such officer or employee of all duties and responsibilities that are inconsistent with the duties and responsibilities of the advocate for competition; and*

*(C) provide such officer or employee with such staff or assistance as may be necessary to carry out the duties and responsibilities of the advocate for competition.*

*(c) The advocate for competition designated under subsection (b)(2)(A) shall be responsible for removing barriers to and promoting full and open competition in the procurement of property and services and shall—*

*(1) review the purchasing and contracting activities of the executive agency;*

*(2) identify and report to the head of the executive agency—*

*(A) opportunities and actions taken to achieve full and open competition on the basis of cost and other significant factors in the purchases and contracts of the executive agency;*

*(B) solicitations and proposed solicitations that include unnecessarily detailed specifications or unnecessarily restrictive statements of need that may reduce competition in the procurement activities of the executive agency; and*



*(C) any other conditions or action that has the effect of unnecessarily restricting competition in the procurement actions of the executive agency;*

*(3) review all proposals which have been submitted to the senior executive for approval under section 202(d)(2)(B) and provide such executive a written annalysis of the validity of the proposal prior to such approval;*

*(4) prepare and transmit to the head of the executive agency and annual report describing—*

*(A) such advocate's activities under this section;*

*(B) new initiatives required to increase competition; and*

*(C) barriers to full and open competition that the advocate was unable to remove;*

*(5) set goals and develop plans for increasing competition on a fiscal year basis;*

*(6) develop a system of personal and organizational accountability for competition, which may inlcude the use of recognition and awards to motivate program managers, contracting officers, and others in authority to promote competition in procurement programs (which will be implemented by the agency's senior procurement executive); and*

*(7) emphasize competition in programs for procurement training and research.*

*(d)(1) Each head of an executive agency shall establish and maintain for a period of five years a computerized file by fiscal year containing records of all procurements other than small purcheses in such fiscal year. Each record shall include—*

*(A) the date of the contract award;*

*(B) information identifying the source to whom the contract was awarded;*

*(C) the property or services obtained by the Government under the procurement; and*

*(D) the total cost of the procurement.*

*(2) With respect to any procurement in which limited competition or in which noncompetitive practices were used, the procurement record shall include, in addition to the information required by paragraph (1)—*

*(A) information identifying the procurement practices used and the reason for the use of such practices; and*

*(B) the name and position of the officers or employees of the agency who, as required by this Act, approved the procurement practices used, and the date of such approval.*

*(3) The information included in the record established and maintained under this subsection shall be transmitted to, and included in, the Federal Procurement Data System referred to in section 105(d)(4) of this Act.*

*(e)(1) Not later than January 31 of each of 1986, 1987, and 1988, each head of an executive agency shall transmit to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives an annual report including the information specified in paragraph (2).*

*(2) Each annual report transmitted under paragraph (1) shall include—*

*(A) a summary of the activities and accomplishments of the advocate for competition of the executive agency during the preceding fiscal year; and*

*(B) a specific description of all actions that the agency intends to take during the current fiscal year to—*

*(i) increase competition for contracts with the executive agency on the basis of cost and other significant factors; and*

*(ii) reduce the number and dollar value of noncompetitive contracts.*

STUDIES AND REPORTS

SEC. [17.] *116.* (a) The Administrator shall conduct studies and issue a report on the extent of competition in the award of subcontracts by Federal prime contractors including an evaluation of the data available on subcontracts awarded in fiscal year 1982 with respect to (1) the source selection method used in awarding such subcontracts, (2) the type of subcontracts awarded, (3) the dollar value of such subcontracts, (4) the size of the subcontractors which were awarded the subcontract (by number of employees), and (5) the geographical location of such subcontractors. The report shall also include recommendations for improvements, if appropriate, in the extent of competition in the awarding of subcontracts and in the collection of data on such subcontract awards.

(b) The report required under subsection (a) of this section shall be completed by April 1, 1984, and shall be submitted to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives not later than April 15, 1984.

*TITLE II—FEDERAL PROCUREMENT COMPETITION REQUIREMENTS*

*GENERAL PROHIBITION*

*SEC. 201. Notwithstanding any other provision of law, no executive agency is authorized to engage in any procurement unless such procurement is conducted in accordance with this title and with the Government-wide regulations prescribed under section 105(b) as modified pursuant to section 205 of this title.*

*COMPETITION REQUIREMENTS*

*SEC. 202. (a) Except under the circumstances described in subsections (d)(1) (A), (D), and (E), each executive agency prior to entering into any contract for the procurement of property or services shall—*

*(1) use advance procurement planning and market research before soliciting bids or proposals;*

*(2) state requirements and prepare specifications in a manner designed to avoid unnecessary restrictions to the use of competition;*

*(3) publish a notice with respect to such procurement pursuant to section 203(a)(1)(A);*

*(4) allow and encourage the maximum number of responsible sources to submit sealed bids or competitive proposals; and*



*(5) fully evaluate each such sealed bid or competitive proposal in the selection of a contract recipient.*

*(b)(1) Except as provided in subsections (c), (d), and (g), each executive agency shall use full and open competition in making contracts for property or services.*

*(2) For other than small purchases, an executive agency shall use either of the following competitive practices, or combinations thereof, that are best suited to the circumstances of the procurement:*

*(A) solicit sealed bids when—*

*(i) the award will be made on the basis of price and other price-related factors;*

*(ii) it is not necessary to conduct discussions with the responding sources about their bids; and*

*(iii) there is a reasonable expectation of receiving more than one sealed bid; and*

*(B) request competitive proposals when sealed bids are not required under clause (A) of this paragraph.*

*(c)(1) An executive agency is authorized to conduct a procurement using limited competition only when—*

*(A) the executive agency's need for the property or services is of such unusual and compelling urgency that the Government would be seriously injured by soliciting bids or proposals from all responsible source;*

*(B) exclusion of a current source from the competition for a particular requirement or set of requirements is temporarily necessary to establish or maintain alternative sources of supply;*

*(C) it is necessary to fulfill the statutory requirements establishing programs for the benefit of small business concerns and socially and economically disadvantaged small business concerns, and all such businesses that are responsible are allowed to compete; or*

*(D) the unrestricted disclosure of the executive agency's requirements would compromise the national security.*

*(2) An executive agency may not award a contract using limited competition unless—*

*(A) the use of such limited competition is justified in writing by the contracting officer and the contracting officer certifies that such justification is accurate and complete;*

*(B) the contracting officer's justification and certification statements have been approved in writing by the head of the procurement activity if the procurement involves a total expenditure of more than $500,000; and*

*(C) a notice has been published with respect to such contract pursuant to section 203(a)(1)(A) and all bids or proposals received from responsible sources in response to such notice have been fully considered by such executive agency.*

*(d)(1) An executive agency is authorized to conduct a procurement using noncompetitive practices only when—*

*(A) the executive agency's need for the property or service results from an emergency in which the public health or safety would be seriously injured by soliciting bids or proposals from more than one responsible source;*

*(B) the property or services required by the Government are available from only one responsible source and no competitive*

*alternative can be made available that will satisfy the requirements of the executive agency;*

*(C) it is necessary (i) to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in the event of a national emergency, (ii) to achieve industrial mobilization in the event of such an emergency, or (iii) to maintain an essential research capability provided by an educational or other nonprofit institution or a federally funded research and development center;*

*(D) the terms of any international agreement or treaty between the United States Government and a foreign government or international organization, or the written directions of any foreign government reimbursing the executive agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of practices that are noncompetitive; or*

*(E) a statute requires that the procurement be made from a specified source.*

*(2) An executive agency may not award a contract using noncompetitive practices unless—*

*(A) the use of such practices is justified in writing by the contracting officer and the contracting officer certifies that such justification is accurate and complete;*

*(B) the contracting officer's certification and justification statements have been reviewed and approved in writing (i) by the head of the procurement activity or another senior official within the office of the head of the procurement activity; and (ii) if the procurement involves a total expenditure of more than $500,000, by the agency's senior procurement executive (designated pursuant to section 115(a)(3)) after having reviewed the analysis prepared pursuant to section 115(c)(3);*

*(C) a notice has been published with respect to such contract pursuant to section 203(a)(1)(A); all bids or proposals received in response to such notice have been fully considered by such executive agency; and the agency determines that only one responsible source is available; and*

*(D) the justification statement prepared pursuant to clause (A) includes at a minimum the following:*

*(i) an identification of the agency's requirements for which the agency proposes to use noncompetitive practices under paragraph (1) of this subsection;*

*(ii) a determination that the anticipated cost is fair and reasonable;*

*(iii) a demonstration, based on the proposed contractor's qualifications, that such contractor is the only responsible source able to meet the agency's requirement;*

*(iv) a description of the market survey conducted, or the reasons a market survey could not be conducted, to locate other responsible sources;*

*(v) a listing of all responsible sources who had expressed an interest in the procurement and the reason why they should be excluded; and*



*(vi) a statement of the actions the agency plans to take to remove or overcome any barrier to competition prior to any subsequent procurement for such requirements.*

*(3) In no case shall an executive agency be authorized to engage in noncompetitive procurement on the basis of the lack of advance planning or concerns related to the amount of funds available to the agency for procurement functions.*

*(4) In the case of procurements permitted by paragraph (1)(A), the justification and approvals required by paragraph (2) may be made after the procurement has occurred.*

*(5) For purposes of paragraph (1)(B) of this subsection, alternative sources shall be considered to be available for the production or assembly of spare parts if such sources have the capability to produce the parts in accordance with the Government's requirements and delivery schedule, unless another party has a legitimate proprietary interest in the parts or their manufacture.*

*(e) Any justification, certification, or written approval under subsection (c) or (d), and any related account, document, or other record, shall be made available for inspection by the public consistent with the provisions of section 552 of title 5, United States Code.*

*(f)(1) In any procurement conducted under subsection (b) or (c), an executive agency shall ensure that it receives a sufficient number of sealed bids or competitive proposals from responsible sources to assure that the Government's requirements, including performance and delivery schedules, are filled at the lowest possible cost given the nature of the product or service being acquired.*

*(2) In any procurement conducted under subsection (b) or (c) in which the executive agency receives only one bid or proposal from a responsible source, the procurement shall be considered noncompetitive and the award shall not be made until the justifications, certifications, and approvals required under subsection (d)(2) have been completed.*

*(g) Simplified practices and forms shall be used to facilitate making small purchases and to promote competition in such purchases to the maximum extent practicable.*

*(h) No executive agency may procure goods or services from another executive agency unless such other executive agency complies fully with the requirements of this title in its procurement of those goods or services. The restriction contained in this subsection is in addition to, and not in lieu of, any other restriction provided by law.*

*(i)(1) An executive agency may conduct its procurement pursuant to a "qualified products" or similar list, but only if the administration of such list is consistent with the requirements of this title.*

*(2) An executive agency may not refuse to include a product of a responsible source or group of responsible sources on "qualified products" or similar list without referring the matter for final disposition to the advocate for competition established pursuant to section 115(b) of this Act.*

*(3) If a responsible small business would not otherwise have the resources to qualify a product of its manufacture for such list, then the procuring agency may reimburse the reasonable costs incurred by a small business in qualifying a product of its manufacture for such list.*

*(j) During the planning for contracts for the procurement of the production or assembly of spare parts, the head of each executive agency shall take such steps as are necessary to develop its requirements so as—*

*(1) to maximize competition for those components or services where competition is available, and*

*(2) to insure that, to the maximum extent practicable, small and socially and economically disadvantaged businesses are not precluded from performing as prime contractors and subcontractors on such contracts.*

*(k) As used in this section—*

*(1)(A) The term "full and open competition" means that all responsible sources are allowed and encouraged to submit sealed bids or competitive proposals on the procurement.*

*(B) Such term includes procurement of architectural or engineering services conducted in accordance with title IX of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 541 et seq.).*

*(C) Such term includes the competitive selection of basic research proposals resulting from a general solicitation.*

*(D) Such term includes orders and contracts made in accordance with the procedures established by the General Services Administration for its multiple awards schedule program if—*

*(i) competition in the program has been open to all responsible sources; and*

*(ii) such orders or contracts result in the lowest overall cost alternative to meet the minimum needs of the Government.*

*(2) The term "limited competition" means that a limited number of responsible sources are permitted to submit offers on the procurement.*

*(3) The term "noncompetitive" means any procurement that permits only one responsible source to submit an offer or that results in the submission of an offer from only one responsible source.*

*(4) The term "responsible source" means a prospective contractor who—*

*(A) has adequate financial resources to perform the contract, or the ability to obtain such resources;*

*(B) is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;*

*(C) has a satisfactory performance record;*

*(D) has a satisfactory record of integrity and business ethics;*

*(E) has the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain such organization, experience, controls, and skills;*

*(F) has the necessary production, construction, and technical equipment and facilities, or the ability to obtain such equipment and facilities; and*

*(G) is otherwise qualified and eligible to receive an award under applicable laws and regulations.*



*(5) The term "small purchase" means any purchase or contract that does not exceed $25,000. A proposed procurement shall not be divided into several procurements primarily for the purpose of using the small purchase practices.*

*(6) The term "basic research" means research directed toward increasing knowledge of a subject apart from any clear or necessary practical application of that knowledge.*

*(7) The term "general solicitation" means a public announcement of any agency's areas of research interest, its criteria for selecting proposals, including scientific merit, and its method of evaluating proposals.*

*(8) The term "competitive selection" means, in the case of basic research, a process which will include the issuance of a general solicitation and the peer review or scientific review (as appropriate) of resulting proposals.*

### *PROCUREMENT NOTICE*

*SEC. 203. (a)(1) Except as provided in subsection (c)—*

*(A) an executive agency intending to solicit bids or proposals for a contract for property or services at a price expected to exceed $10,000 shall furnish for publication by the Secretary of Commerce a notice described in subsection (b); and*

*(B) an executive agency awarding a contract for property or services at a price exceeding $10,000 shall furnish for publication by the Secretary of Commerce a notice announcing such award if there is likely to be any subcontract under such contract.*

*(2) The Secretary of Commerce shall publish promptly in the Commerce Business Daily each notice required by paragraph (1).*

*(3) Whenever an executive agency is required by paragraph (1)(A) to furnish a notice of a solicitation to the Secretary of Commerce, such executive agency may not—*

*(A) issue such solicitation earlier than 15 days after the date on which such notice is published by the Secretary of Commerce; or*

*(B) establish a deadline for the submission of all bids or proposals in response to such solicitation that is earlier than 30 days after the date on which such solicitation is issued.*

*(b) Each notice required by subsection (a)(1)(A) shall include—*

*(1) an accurate description of the property or services to be contracted for, which description is not unnecessarily restrictive of competition;*

*(2) the name, business address, and phone number of the contracting officer;*

*(3) the name, business address and phone number, and title of the officer or employee of the executive agency who may be contacted for the purpose of obtaining a copy of the solicitation;*

*(4) a statement that all responsible sources may submit a bid or proposal which shall be considered by the executive agency; and*

*(5) in the case of a procurement which is commenced using noncompetitive practices, a justification for using noncompetitive practices and the identity of the intended source.*

*(c)(1) A notice is not required under subsection (a)(1) if—*

*(A) the notice would disclose the executive agency's requirements and the disclosure of such requirements would compromise the national security; or*

*(B) the proposed noncompetitive procurement would result from acceptance of a research proposal that demonstrates a unique or innovative research concept and the publication of any notice of such research proposal cannot avoid the disclosure of the originality of thought or innovativeness of the proposed research or proprietary data associated with the proposal.*

*(2) The requirements of subsection (a)(1)(A) do not apply to any procurement under conditions described in section 202(c)(1)(A) or in section 202(d)(1)(A).*

*PROCUREMENT PROTEST SYSTEM*

*SEC. 204. (a) Subject to subsection (f), protests concerning alleged violations of the procurement laws and regulations shall be decided by the Comptroller General if filed in accordance with this section. Any such protests which concern alleged violations of this title shall be given priority consideration over other bid protests by the Comptroller General. Nothing contained in this section shall be construed to give the Comptroller General exclusive jurisdiction over protests.*

*(b)(1) In accordance with the procedures issued pursuant to subsection (d), the Comptroller General shall have authority to decide any protest submitted by an interested party or referred by any executive agency or any court of the United States.*

*(2) The Comptroller General shall, except as provided in subsection (c)(1), issue a final protest decision within 90 working days from the date of protest unless the Comptroller General determines that the specific and unique circumstances of the protest require a longer period.*

*(3)(A) The Comptroller General shall notify the executive agency within one working day of the receipt of a protest and the executive agency shall submit a complete report (including all relevant documents) on the protested procurement to the Comptroller General within 25 working days from the agency's receipt of the notice of such protest unless the Comptroller General determines, upon a showing by such agency, that the specific and unique circumstances of the protest require a longer period. In any case determined by the Comptroller General to be suitable for the express option under subsection (c)(1), such report and documents shall be submitted within 10 working days from such receipt.*

*(B) No contract shall be awarded on the basis of the protested procurement after the contracting officer has received notice of a protest to the Comptroller General and while the protest is pending.*

*(C) If the contract has been awarded prior to the receipt of notice of protest, contract performance shall be ceased or the contract shall be suspended upon receipt of notice and while the protest is pending. This subparagraph shall not apply when the protest is filed more than 30 days after award of the contract.*

*(D) An executive agency's senior procurement executive (designated pursuant to section 115(a)(3)) may authorize the award or perform-*



*ance of a contract notwithstanding a protest of which the agency has notice under subparagraph (B) or (C)—*

*(i) upon a written finding that compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the Comptroller General; and*

*(ii) after the Comptroller General is advised of such finding.*

*(E) Prior to the award of the contract, no finding may be made under subparagraph (D)(i) unless the award of the contract is otherwise likely to occur within 30 days of notification of the protest.*

*(4) With respect to any solicitation, proposed award, or award of a contract protested in accordance with this section, the Comptroller General is authorized to determine whether such solicitation, proposed award, or award complies with law and regulation. If the Comptroller General determines that the solicitation, proposed award, or award does not comply with law or regulation, or both, the Comptroller General shall recommend that the agency—*

*(A) refrain from exercising any of its options under the contract;*

*(B) recompete the contract immediately;*

*(C) issue a new solicitation;*

*(D) terminate the contract;*

*(E) award a contract consistent with the requirements of such law and regulation; or*

*(F) comply with any combination of recommendations under clauses (A), (B), (C), (D), and (E) and with such additional recommendations as the Comptroller General determines to be necessary in order to promote compliance with procurement law and regulation.*

*(c)(1) To the maximum extent practicable, the Comptroller General shall provide for the inexpensive and expeditious resolution of protests under this section. The Comptroller General shall establish an express option for deciding those protests which the Comptroller General determines suitable for resolution within 45 days from the date of protest. Within such deadlines as the Comptroller General shall prescribe, each executive agency shall provide to any interested party—*

*(A) any nonprivileged documents relevant to the protested procurement action (including the report required by subsection (b)(2)(A)) that would not give such party a competitive advantage, if the protest is submitted prior to the award of the contract; or*

*(B) any nonprivileged documents relevant to the protested procurement action (including the report required by subsection (b)(2)(A)) if the protest is submitted after the award of the contract.*

*(2) Each decision of the Comptroller General shall be signed by the Comptroller General, or a designee for such purpose. A copy of the decision shall be furnished to the interested parties and the senior procurement executive of the executive agency or agencies involved.*

*(3) The agency's senior procurement executive shall report to the Comptroller General, within 60 days of receipt of the Comptroller General's recommendations, whether the agency has complied with*

*such recommendations. Not later than January 31 of each year, the Comptroller General shall transmit to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives an annual report describing each instance of an agency failure to comply with the Comptroller General's recommendations.*

*(4) The Comptroller General is authorized to dismiss any protest determined to be frivolous or which, on its face, does not state a valid basis for protest.*

*(5)(A) If the Comptroller General has determined that a solicitation, proposed award, or award of a contract does not comply with law or regulation, or both, the Comptroller General may further declare the entitlement of an appropriate party to the costs of—*

*(i) filing and pursuing the protest, including reasonable attorney's fees; and*

*(ii) bid and proposal preparation.*

*(B) Declarations of entitlement to monetary awards shall be paid promptly by the executive agency concerned out of funds available for the purpose of the procurement concerned.*

*(d)(1) The Comptroller General shall, within 90 days after the date of enactment of this title, establish such procedures, not inconsistent with this section, as may be necessary to the expeditious execution of the protest decision function, including procedures for accelerated resolution of the protest under the express option authorized by subsection (c)(1). Such procedures shall provide that the protest process shall not be delayed by the failure of any party to make any filing within the time provided therefore, and that such failure may be taken as an admission of the contentions made by an opposing party.*

*(2) The Comptroller General may use any authority available under chapters 7 and 35 of title 31, United States Code, to verify contentions made by parties in protests under this section.*

*(e) Any interested party adversely affected or aggrieved by the action, or the failure to act, of a Government agency with respect to a solicitation or award may obtain judicial review thereof to the extent provided by sections 702 through 706 of title 5, United States Code, including determinations necessary to resolve disputed material facts or when otherwise appropriate.*

*(f)(1) Upon request of any interested party in connection with any procurement conducted under authority provided by section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759), including procurements conducted under blanket delegations of procurement authority, the board of contract appeals of the General Services Administration (hereafter in this subsection referred to as the "board"), shall review any decision by a contracting officer alleged to violate law or regulation, or both, under the standard applicable to review of contracting officer final decisions by boards of contract appeals.*

*(2) When a protest action under this section is filed before award of the challenged procurement, the board, at the request of any interested party and within 10 days of the filing of the protest action, shall hold a hearing to determine whether it should suspend the procurement authority of the Administrator or the Administrator's delegation of procurement authority for the challenged procurement*



*on an interim basis until the board can decide the protest action. The delegation of procurement authority shall be suspended unless the agency establishes that—*

*(A) absent action by the board, contract award is likely to occur within 30 days of the hearing; and*

*(B) compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the board.*

*(3) At the request of any interested party, when a protest action is filed within 30 days of publication of award by the Secretary of Commerce or receipt of written notice of award by the party challenging the award, whichever comes first, the board shall, within 10 days of the filing of the protest action, hold a hearing to determine whether it should suspend the procurement authority of the Administrator or the Administrator's delegation of procurement authority for the challenged procurement on an interim basis. The board shall suspend the agency's authority to acquire any goods or services under the contract which are not previously delivered and accepted unless the agency establishes that compelling, exigent circumstances which significantly affect vital interests of the United States will not permit awaiting the decision of the board.*

*(4) The board shall conduct such proceedings and allow such discovery as may be required for the expeditious, fair, and reasonable resolution of the protest action. The board shall give priority to protest actions filed under this section and shall issue its final decision within 45 working days from the date of protest unless the board's chairman determines that the specific and unique circumstances of the protest require a longer period. However, nothing contained in this subsection shall conflict with any deadlines imposed by section 9(a) of the Contract Disputes Act of 1978 (41 U.S.C. 608(a)). In making a decision on the merits of protest actions brought under this section, the board shall accord due weight to the policies of this title, and the goals of economic and efficient procurement set forth in section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759). When the board determines that challenged agency action violates procurement law or regulation or the conditions of any delegation of procurement authority issued pursuant to such section, the board may suspend, revoke, or revise the delegation of procurement authority applicable to the challenged procurement. Whenever the board makes such a determination, it may, in accordance with section 1304 of title 31, United States Code, further declare the entitlement of an appropriate party to the costs of (A) filing and pursuing the protest, including reasonable attorney's fees; and (B) bid and proposal preparation. The final decision of the board may be appealed by the head of the agency involved and by any interested party, including interested parties who intervene in any protest action filed under this section, as set forth in the Contract Disputes Act of 1978 (41 U.S.C. 601 et seq.). If the board revokes or suspends the procurement authority of the Administrator or the Administrator's delegation of procurement authority after contract award, the affected contract shall be presumed valid as to all goods or services delivered and accepted thereunder prior to the suspension, revocation, or revision of the delegation of procurement authority. Nothing contained in this subsection shall affect the*

*board's power to order any additional relief which it is authorized to provide under any statute or regulation. However, the procedures set forth in this subsection shall only apply to procurements conducted under the authority contained in section 111 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759). In addition, nothing contained in this subsection shall affect the right of any person to file protests with the Comptroller General or contracting agency or to file actions in the district court or the United States Claims Court.*

*(5) The board is authorized to dismiss any protest action determined to be frivolous or which, on its face, does not state a valid basis for protest.*

*(6) The board shall, within 90 days after the date of enactment of this title, adopt and issue such rules and procedures, not inconsistent with this section, as may be necessary to the expeditious disposition of protest actions filed under authority of this section.*

*(7) Except as otherwise provided by law, the filing of a protest with the Comptroller General shall not affect an interested party's rights to file and pursue protest actions involving Federal procurements in the courts, and before the board as authorized in this subsection.*

*(g) For purposes of this section—*

*(1) the term "protest" means a challenge to a solicitation, or to the award or proposed award of any procurement contract; and*

*(2) the term "interested party" means a person whose direct economic interest would be affected as contractor or subcontractor by the award or nonaward of the contract.*

*MODIFICATION OF FEDERAL ACQUISITION REGULATIONS*

*SEC. 205. The Administrator shall promulgate, within 90 days after the date of enactment of this title, such modifications as may be necessary to the Government-wide regulations prescribed under section 105(b) to conform such regulations to the requirements of this title.*

*LIMITATIONS*

*SEC. 206. The provisions of this title do not supersede or affect the provisions of—*

*(1) the Act of March 3, 1933 (41 U.S.C. 10a et seq.); or*

*(2) section 8(a) of the Small Business Act (15 U.S.C. 637(a)).*

# APPENDIX

OFFICE OF THE CLERK,
HOUSE OF REPRESENTATIVES,
*Washington, DC, October 2, 1984.*

MEMORANDUM

To: The Honorable Jack Brooks, Chairman, Committee on Government Operations.
From: Steven R. Ross, General Counsel to the Clerk; Charles Tiefer, Assistant General Counsel to the Clerk.
Subject: Constitutionality of the Competition in Contracting Act.

We have been asked to address the constitutionality of the Competition in Contracting Act of 1984 ("the Act") (enacted as Title VII of the Deficit Reduction Act of 1984), and in particular the new 35 U.S.C. §§ 3551–3556 (enacted by section 2741 of the Act). On April 20, 1984, the Department of Justice presented its views on the predecessor bill of the Committee on Government Operations, H.R. 5184.[1] The Department's analysis focused on a key provision, section 204(b)(2), which provides for a stay of an agency's award of a contract upon notification of the agency that bid illegalities are being protested. As its conclusion, the Department stated that this provision is unconstitutional as violating the separation of powers. We disagree.

STATUTORY MECHANISM

A review of the statutory mechanism is appropriate, particularly since the Justice Department's analysis centers on its assertion that the statute is a means for the Comptroller General to put a permanent hold on contracting. The Competition in Contract Act of 1984 seeks to deal with endemic agency failures of competitive procurement by insuring proper proceedings for charges of illegalities. It works through an automatic stay and a recommendation by the Comptroller General.[2] Under the Act, an "interested party," meaning an "actual or prospective bidder or offeror,"[3] can file a protest concerning alleged violations of procurement statutes or regulations. The agency immediately receives notice of the protest, section 3553(b)(1), and the agency's receipt of notice automatically

[1] Letter to the Honorable Jack Brooks, Chairman, Committee on Government Operations, from Robert A. McConnell, Assistant Attorney General for Legislative Affairs, of April 20, 1984 ("DOJ Letter").
[2] Legislative hearings concerning the act were held on March 27 and 29, 1984.
[3] Section 3551 provides definitions.

stays the award of any contract,[4] absent "urgent and compelling circumstances."[5]

While that automatic stay is in effect, the agency and the Comptroller General proceed with the bid protest. Within twenty-five days after notification of the protest (subject to shortening or lengthening for various reasons),[6] the agency submits "a complete report (including all relevant documents) on the protested procurement." Section 3553(b)(2).[7] Then, the Comptroller General decides the protest, by "determin[ing] whether the solicitation, proposed award, or award complies with statute and regulation." Sections 3552, 3553(a), and 3554(b)(1). He must "issue a final decision concerning a protest within 90 working days." Section 3554(a)(1).[8]

If "the Comptroller General determines that the solicitation, proposed award, or award does not comply with a statute or regulation, the Comptroller General shall recommend that the Federal agency" take one of several steps, such as terminating the contract, issuing a new solicitation, or recompeting the contract. Section 3554(b)(1).[9] Also, the Comptroller General has discretion to declare the protester to be entitled to its costs for filing and pursuing the protest and for bid and proposal preparation, to be paid by the agency. Section 3554(c).

In its challenge to this provision, the Justice Department characterizes the provision as providing the GAO with "the power effectively to block Executive Action. . . ." DOJ Letter at 3. The Justice Department letter states that the Act's stay provision "clearly contemplates the possibility that with respect to some contracts, the agency will simply be put on permanent 'hold' until after GAO has announced its 'recommendation.'" Id. One reason for the Justice Department's assertion is apparently that H.R. 5184, which it analyzed, did not set a 90-day time limit (absent particular circumstances) on Comptroller General consideration; the conference committee set that limit on the statute. In any event, the Department likens the Act's stay to a legislative veto or committee approval provision, citing *INS* v. *Chadha*, 103 S. Ct. 2764 (1983).[10]

[4] "[A] contract may not be awarded in any procurement after the Federal agency has received notice of a protest . . . while the protest is pending." Section 3553(b)(2).

[5] An escape clause allows "[t]he head of the procuring activity . . . [to] authorize the award of the contract (notwithstanding a protest . . . ) . . . upon a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision" on the protest. Section 3553(c)(2)(A).

If the contract has been awarded before notice of a protest, performance ceases, section 3553(d)(1), unless the head of the procuring activity makes a similar written finding about "urgent and compelling circumstances." Section 3553(d)(2).

[6] Section 3554(a)(2) provides an express procedure. Section 3554(a)(3) provides for the Comptroller General to dismiss protests which on their face do not state a valid basis.

[7] Interested parties receive that report and relevant unprivileged documents. Section 3553(f).

[8] The Comptroller General can take longer than 90 days if he "determines and states in writing the reasons that the specific circumstances of the protest require a longer period." Section 3554(a)(1).

[9] An agency which does not fully implement those recommendations within 60 days must so report to the Comptroller General, and he, in turn, reports annually on instances of nonimplementation. Section 3554(e).

[10] The Department also assails the provision allowing the Comptroller General to assess costs to a bid protester of an illegal action as unconstitutional under *Buckley* v. *Valeo*, 424 U.S. 1 (1976).





The Justice Department's analysis strains the plain meaning of the statute in attempting to make it appear improper. Congress has tried to clear and simple mechanism for dealing with the endemic problems of wasteful agency procurement violations. The Act provides for an automatic, nondiscretionary stay of a contract award upon notification of a bid protest. Thus, the statute gives bid protesters, whose protests trigger the automatic stay—not the Comptroller General, who makes no decision regarding a stay—the power to invoke the statutory stay. In essence, based on years of investigations of improper procurement awards, Congress decided that it was better to let bid protesters stay allegedly illegal awards before they occurred so that the matter could be looked into immediately, than to leave it to agencies to give out awards and then, maybe, rectify illegalities later. Obviously, the judgment that such a mechanism should be implemented to get agency procurement onto the lawful track could be made rationally by the Committee on Government Operations, which has spent years studying the problems of the procurement system.

In any event, it is the bid protester who invokes the statute staying the award, and the legislative veto cases, involving decisions by one House of Congress to veto agency decisions, have nothing to do with the matter. Rather than acknowledging that bid protests cause the stay, the Justice Department contends that the statute is a means for the GAO to put agencies "on permanent 'hold.'" This Justice Department analysis predated the 90-day limit placed on the Comptroller General in the statute as enacted, rendering the Justice Department letter obsolete. With the 90-day limit in place, the real authority to stay contract awards temporarily conferred by the statute lies with the bid protester, not the Comptroller General.[11]

The real thrust of the Department's argument is its a historical challenge to the very notion of an independent audit and account-settlement officer addressing contract matters—a challenge plainly inconsistent with the Framers' own constitutional understanding. In its key argument, the Justice Department challenges the GAO's authority "to settle the accounts of the Government, 31 U.S.C. § 3702," contending that "there has been considerable discussion over the years questioning whether this settlement authority is properly lodged in a legislative body like GAO." DOJ Letter at 2 n.2. The Justice Department argument appears to be that "the Comptroller General is properly considered to be an officer of the

[11] Of course, a provision giving such effect to a private bid protest involves no separation of powers problem since the bid protester is not another Branch of the government. See, e.g., *Currin* v. *Wallace*, 306 U.S. 1 (1939).

The conferees on the bill noted emphatically regarding deadline extensions, including extension of the 90-day limit, that they "regard such extensions as exceptional, however, and to be used in unique circumstances only." H.R. Rep. No. 861, 98th Cong., 2d Sess. 1435–36 (1984). If the Justice Department continued to adhere to its view of the statute as a means to make a "permanent 'hold'", that could only be regarded as hyperbole. For occasions in which the Comptroller General takes a longer period than 90 days notwithstanding the conference report language, he must cite "specific circumstances," which would be of importance in any concrete challenge to the statute. To take a likely example, if the Comptroller General's decision takes longer than 90 days only because the agency accused of illegality interposes delays before providing information, or organizes its procurement mechanism to defy swift analysis, then the responsibility for delay may lie with the agency, not the GAO.

Legislative Branch," DOJ Letter at 1, and thus cannot exercise the authority to settle accounts which gave rise to his contract role.

Of course, the Justice Department makes no reference whatsoever to the history of the comptroller function in the government, for that history squarely refutes the Department's views.[12] The First Congress—the Congress with unparallel understanding of the Constitution, based among other factors on its numbering as Members many of the Framers themselves [13]—specifically addressed the need for independent judgment in resolution of the government's accounts, much like any operation must have an independent auditor. By statute, the First Congress established the office of Comptroller of the Treasury, "the great grandparent of the modern Comptroller General,"[14] with the duty to superintend the accounts of the government. James Madison, one of the authors of the Federalist Papers, and the Representative who had successfully led the crucial debate that kept Cabinet officers subject to presidential removal, argued that "there my be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive branch of the Government."[15]

Madison's sound judgment ultimately prevailed in the evolution of the Comptroller General's role. in 1795, Congress made the Comptroller of the Treasury's judgments "final and conclusive," As of March 3, 1795, ch. 48, § 4, 1 Stat. 441, 442, to put the comptroller's functions outside of political will.[16] By 1809, the Comptroller's "independence of status . . . seemed clearly indicated." [17] In 1838, the Supreme Court confirmed the validity of investiture of officers with independent responsibilities: "in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President." *Kendall* v. *United States,* 37 U.S. (12 Pet.) 524 (1838).[18] Ultimately, the Budget and Accounting Act of 1921 implemented the historically-based necessity for independent supervision of the accounts, by vesting the

[12] The Department's vague assertion that "there has been considerable discussion over the years," with the implication that many believe the Comptroller General's authority to settle accounts to be unconstitutional, appears to be an attempt by the Department to manufacture a historical record in its favor where there has been none. Not one source is cited on this point by the Department. Elsewhere, the Department cites the classic study of the GAO by the eminent W.F. Willoughby, Director of the Institute for Government Research and one of the founders of modern public policy studies. W.F. Willoughby, The Legal Status and Functions of the General Accounting Office of the National Government (1927), cited in DOJ Letter at 1 n.1. However, the Department did not wish to cite that key authority on this point, for good reason. Regarding the position that the law establishing the GAO as the agency that would settle accounts was unconstitutional, Willoughby comments disparagingly: "the position [may] be taken that Congress was without constitutional authority to create any such agency. Through this position may be taken, it is hard to see how it can be maintained." Id. at 14. The reasons set forth by Willoughby are those confirmed by the unanimous Supreme Court decision in *Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935).

[13] See *Myers* v. *United States,* 272 U.S. 52 (1926).

[14] F. Mosher, The GAO: The Quest for Accountability in American Government 25 (1979).

[15] 2 Annals of Cong. 612 (1789), noted with approval, *Humphrey's Executor* v. *United States,* 295 U.S. 602, 631 (1935).

[16] It may be fairly conjectured that Congress learned a great deal about improper government procurement, and thus began to understand the necessity for independent auditing judgment, from its very first investigation. That investigation concerned a military disaster largely brought on by faulty procurement. See Chalou, St. Clair's defeat, 1792, in Congress Investigates: 1792–1794 1–18 (A. Schlesinger & R. Bruns eds. 1975).

[17] D. Smith, The General Accounting Office: Its History, Activities and Organization 22 (1927).

[18] For further discussion of the firm historic grounding of such independent officers, see Tiefer, The Constitutionality of Independent Officers as Checks on Abuses of Executive Power, 63 B.U.L. Rev. 59 (1983).



count-settlement function in the Comptroller General who was not subject to Presidential removal.

The constitutional power of the Congress so to provide was confirmed in *Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935), the fundamental authority on this subject, which cited directly to Madison's original observation about the Comptroller, 295 U.S. at 631. Conveniently, in citing *Buckley* v. *Valeo,* supra, the Justice Department avoids mentioning that the Supreme Court expressly reconfirmed its *Humphrey's Executor* holding. "[T]he President may not insist that such functions be delegated to an appointee of his removable at will, *Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935)." *Buckley* v. *Valeo,* supra, 424 U.S. at 141 (emphasis supplied.[19] Also conveniently, the Justice Department avoids mentioning that the Court expressly distinguished between true officers of the House or Senate, who are chosen by their House, and "the Comptroller General [who] is appointed by the President in conformity with the Appointments Clause." *Buckley* v. *Valeo,* 424 U.S. at 128 n.165. The Comptroller General can hardly be equated with a legislative veto which could be voted at will by Congress, when he is neither appointed by the Congress, nor subject to removal by it (absent enactment of a joint resolution); there is nothing in *Chadha* v. *INS,* supra, regarding legislative vetoes, which undermines the validity of independent officers reconfirmed in *Buckley* v. *Valeo.*

## CONCLUSION

Not a shred of historical support has been assembled by the Justice Department for challenging the account-settlement function from which the Comptroller General's contract functions arise. By fundamental American tradition started, and amply justified, by the Framers themselves, the Congress' sound approach to limiting government waste and fraud has been to stand an independent officer over the government's accounts and contracts. *Buckley* v. *Valeo,* supra, expressly validates that tradition, by confirming the validity of an officer appointed by the President but not subject to his removal for the performance of independent functions. The Competition in Contracting Act of 1984 is well within that tradition, particularly considering that the Comptroller General, an independent officer who can be vested with non-legislative functions, is only empowered to make "recommendations" and that the statute's automatic stay feature vests the real authority to stay awards in the bid protester, not the Comptroller General. This statutory response to endemic procurement problems passes constitutional muster.

[19] The Justice Department's contention that in contract inquiries directly related to his auditing function, the Comptroller General cannot award costs, something that could be done by any of the independent agencies validated by *Humphrey's Executor,* is without merit.

## SEPARATE VIEWS OF HON. JOHN N. ERLENBORN AND HON. WILLIAM F. CLINGER, JR.

We join with the Committee in expressing full support for the principle of increased competition in government procurement. Competition, as a general rule, permits the government to take best advantage of the skills and ingenuity of the private sector of the economy. It resilts in the agencies getting the best appropriate goods and services at the lowest possible cost.

We am concerned, however, that in its haste to report out this particular piece of legislation, the Committee has left unanswered several important questions. We pose them here in the hope that, as the bill progresses through the legislative process, others might provide some answers.

1. Competition is not a goal itself, but a means to the goal of efficient and economical procurements. Might the inflexible application of the means occasionally interfere with the achievement of the goal? From the government's perspective, every procurement has two costs, the price of the item and the administrative costs related to the contract. If limiting competition on a particular contract increases the price of the item by a smaller amount than the decrease in administrative costs, wouldn't full and open competition result in a less efficient procurement?

2. The bill clearly links its new procurment requirements with a strengthened bid protest system. Why is interpreting those requirements through case-by-case, judicial-type decisions by independent observers preferable to clarifying them through administrative direction by procurement experts? Isn't it more likely to result in a hodge-podge of narrow rulings, rather than the generalized kind of regulations that would help agencies and contractors understand what rules are applicable?

3. Two of the ways in which the bill strengthens the bid protest system are by preventing (with a narrow exception) contract awards and performance if protests are timely filed, and by permitting the award of attorney's fees to successful protestors. Is the exception so narrow that it would prevent agencies from proceeding with essential procurements? Would the possibility of an award of fees stimulate a host of contract-chasing attorneys? How much is it expected to cost? The bill also permits, with regard to certain procurements, the filing of protests with two separate administrative tribunals. What are agencies supposed to do if the two judges rule in contradictory ways?

4. The Comptroller General has testified that "the bill's tightened competition requirements together with stricter protest requirements could cause delay in the government procurement programs and attendant increase in costs." Exactly what delays and cost might be entailed?





5. The bill sets procurement rules which are to take effect "notwithstanding any other provision of law." What are the laws this legislation affects, and how does the measure change them? The Committee report attempts to answer the first part of this question, but how, without numerous judicial decisions, will agencies and vendors be able to figure out the answer to the second part?

6. The bill creates new officials ("advocates for competition") in the agencies and gives these individuals statutory responsibilities. Is this assignment consistent with the 1983 Office of Procurement Policy Act Amendments' mandate that the head of each agency "designate a senior procurement executive who shall be responsible for management direction of the procurement system of the . . . agency"? As a general principle, should Congress vest subordinate employees, rather than senior officials, with statutory duties?

John N. Erlenborn.
William F. Clinger, Jr.