**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on August 29, 2006)

| | | |
|---|---|---|
| AUTOMATION TECHNOLOGIES, INC., | ) | |
| Plaintiff, | ) | No. 06-599C |
| v. | ) | Judge Horn |
| UNITED STATES, | ) | |
| Defendant. | ) | BID PROTEST |

# PLAINTIFF AUTOMATION TECHNOLOGIES, INC.'S SUPPLEMENTAL MEMORANDUM CONCERNING THE LEGISLATIVE HISTORY OF CICA'S "BEST INTERESTS" OVERRIDE STANDARD

Walter F. Zenner
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7603
Fax: (703) 770-7901

*Counsel of Record for Plaintiff Automation Technologies, Inc.*

*Of Counsel:*

John E. Jensen
Orest J. Jowyk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7900
Fax: (703) 770-7901

Dated: August 29, 2006

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

QUESTION PRESENTED .......... 1

STATUTORY PROVISIONS .......... 2

DISCUSSION .......... 3

I. THE BACKGROUND AND LEGISLATIVE HISTORY OF CICA INDICATE THAT THE "BEST INTERESTS" OVERRIDE PROVISION SHOULD BE INTERPRETED IN A NARROW MANNER AND NOT IN A WAY THAT WOULD RENDER THE STAY PROVISIONS ESSENTIALLY MEANINGLESS .......... 3

A. Overview of the Legislative History of CICA .......... 3

B. The Background of CICA: The Mandate for "Full and Open" Competition .......... 4

C. The Bid Protest and Stay Provisions of CICA as an Enforcement Mechanism .......... 5

D. The Stay Override Provisions of CICA .......... 7

1. The Original Version of the Override Provision .......... 7

2. The Conference Amendment Adding the "Best Interests" Standard to the Override Provision .......... 9

3. GAO's Congressional Testimony Concerning the Override Standard .......... 11

E. Harmonizing the CICA Stay Provisions with the Availability of Court-Ordered Injunctive Relief Before and After CICA .......... 12

CONCLUSION .......... 13

EXHIBITS

1. Index to Legislative History of CICA (as compiled by McKenna Conner & Cuneo)

# TABLE OF AUTHORITIES

Cases

*Ameron, Inc. v. U.S. Army Corps of Engineers*,
787 F.2d 875 (3rd Cir. 1986) ("*Ameron I*") ........ 5, 6

*Ameron, Inc. v. U.S. Army Corps of Engineers*,
809 F.2d 979 (3rd Cir. 1986) ("*Ameron II*") ........ 5, 6-7

*CIGNA Government Services, LLC v. United States*,
70 Fed. Cl. 100 (2006) ........ 3

*KSD, Inc. v. United States*,
No. 05-1229C (Fed. Cl. Aug. 23, 2006) ........ 4

*PGBA, LLC v. United States*,
57 Fed. Cl. 655 (2003) ........ 3

Statutes and Regulations

31 U.S.C. § 3553 ........ 2, 10

Administrative Dispute Resolution Act of 1996 ("ADRA"),
Pub. L. No. 104-320 ........ 12

Competition in Contracting Act of 1984 ........ *passim*

Federal Acquisition Streamlining Act of 1994 ("FASA"),
Pub. L. 103-355, 108 Stat. 3243 (1994) ........ 10

Legislative Bills and Reports

*Competition in Contracting Act of 1984: Hearings on H.R. 5184 Before a Subcommittee of the Committee on Government Operations*,
98th Cong., 2d Sess. (March 27 & 29, 1984) ........ 11

H.R. 5184, 98th Cong., 2d Sess. (Mar. 20, 1984) ........ 7, 8, 10

H.R. Rep. No. 861, 98th Cong., 2d Sess., reprinted in 1984 U.S. Code
Cong. & Admin. News, at 1429, 1435-36 ........ 7, 8, 9, 10

H.R. Rep. No. 1157, 98th Cong., 2d Sess. (Oct. 10, 1984) ........ 6, 8

S. 338, 98th Cong., 2d Sess. (Feb. 23, 1982) ........ 8

<u>Other Authorities</u>

Robert M. Hansen, *CICA Without Enforcement: How Procurement Officials and Federal Court Decisions Are Undercutting Enforcement Provisions of the Competition in Contract Act*, 6 Geo. Mason L. Rev. 131 (1997) .......................... 4, 5

Thomas P. Humphrey & Stephanie V. Corrao, *Changes in the Notice of Award, Debriefing, and Protest Rules After FASA*, Briefing Papers No. 95-10 (Sept. 1995) .......................... 10

Paul Shnitzer, *The 1996 GAO Bid Protest Rules,* Briefing Papers No. 96-13 (Dec. 1996) .......................... 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on August 29, 2006)

| | | |
|---|---|---|
| AUTOMATION TECHNOLOGIES, INC., | ) | |
| Plaintiff, | ) | No. 06-599C |
| v. | ) | Judge Horn |
| UNITED STATES, | ) | |
| Defendant. | ) | BID PROTEST |

**PLAINTIFF AUTOMATION TECHNOLOGIES, INC.'S SUPPLEMENTAL MEMORANDUM CONCERNING THE LEGISLATIVE HISTORY OF CICA'S "BEST INTERESTS" OVERRIDE STANDARD**

Plaintiff Automation Technologies, Inc. ("ATI"), pursuant to the Court's instructions at yesterday's hearing and the subsequent order, hereby submits its supplemental memorandum, due this date, on the legislative history of the CICA automatic stay provisions, particularly as it may elucidate the intended meaning and scope of the "best interests" prong of the CICA override provisions.

## QUESTION PRESENTED

1. Whether the legislative history of CICA demonstrates an intent by Congress to permit procuring agencies to override mandatory post-award CICA stays merely to achieve modest cost savings, and to do so even where the agency's solicitation established a best-value award formula in which price was the least significant evaluation factor?

## STATUTORY PROVISIONS

When a disappointed offeror files a bid protest at GAO within the statutorily prescribed time frames, CICA imposes a mandatory stay of contract performance. *See generally* 31 U.S.C. § 3553(c) (pre-award) & (d) (post-award).

Where the protest is filed before contract award, the agency generally may not award the contract while the protest remains pending. *See* 31 U.S.C. § 3553(c)(1). As an exception, the "head of the procuring activity" may override the stay "upon a written finding that *urgent and compelling circumstances* which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General . . . ." *Id.* § 3553(c)(2)(A) (emphasis added).

Where, as apparently is the case here, the agency has already awarded the contract and the contractor has already begun performance by the time the stay is triggered, the agency must "immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii). In general, the agency may not authorize the contractor to resume performance while the protest is pending. 31 U.S.C. § 3553(d)(3)(B). As an exception, the head of the agency's contracting activity may override the stay upon a written determination that:

> (I) performance of the contract is in the *best interests* of the United States; or
>
> (II) *urgent and compelling circumstances* that significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(i)(I) and (II) (emphasis added).

In short, an agency may override a *pre-award* stay only under the "urgent and compelling circumstances" standard, but may override a *post-award* stay under either the "urgent and compelling circumstances" standard or the "best interests" standard.

## DISCUSSION

### I. THE BACKGROUND AND LEGISLATIVE HISTORY OF CICA INDICATE THAT THE "BEST INTERESTS" OVERRIDE PROVISION SHOULD BE INTERPRETED IN A NARROW MANNER AND NOT IN A WAY THAT WOULD RENDER THE STAY PROVISIONS ESSENTIALLY MEANINGLESS

#### A. Overview of the Legislative History of CICA

The Competition in Contracting Act of 1984 was enacted in July 1984 as Title VII of the Deficit Reduction Act of 1984, Pub. L. No. 98-369. The legislative history of CICA is quite extensive, comprising more than thirty bills, reports, debates, hearings and Congressional statements concerning the legislation apparently first introduced as early as 1982 and ultimately enacted in July 1984. *See* Index to Legislative History of CICA (Exhibit 1 hereto) (as compiled by McKenna Conner & Cuneo). Based on our expedited review of these voluminous materials, it appears that most of the legislative history speaks to CICA's general mandate for "full and open" competition, as well as the then-controversial question of the constitutionality of CICA's bid protest provisions. In contrast, it appears that the legislative history devotes relatively little attention to the automatic stay provisions and even less to the override provisions at issue here, particularly the "best interests" standard, which appeared later than the "urgent and compelling circumstances" standard in the chronology of the development of the legislation.[1]

Nonetheless, the legislative history of the override provisions, along with their statutory structure, practical functioning and co-existence with the availability of injunctive relief in bid

[1] Some of this legislative history, of course, is discussed in *PGBA,* 57 Fed. Cl. 655, 657-58, 660 n.8 (2003), and in *CIGNA Government Services, LLC v. United States*, 70 Fed. Cl. 100, 112 (2006).

protests brought in court, inferentially suggest some conclusions with respect to the intended scope and meaning of the "best interests" standard. In particular, they suggest that the "best interests" standard was not meant to be a catch-all, "kitchen sink" type of provision that would allow procuring agencies to disregard the automatic stay provisions of CICA more or less at will, but rather represented only a narrow exception designed to capture the rare instance in which the continued performance of a contract, though falling just short of presenting "urgent and compelling circumstances," nonetheless somehow affected the vital interests of the United States in a way that justified overriding the presumptive stay that Congress intended.

**B. The Background of CICA: The Mandate for "Full and Open" Competition**

The legislative history of CICA clearly attributes the origin of the Act to Congressional concerns about the rampant nature of costly sole-source contracting by the executive branch, particularly by the Department of Defense ("DOD"), which Congress had pilloried over extravangances such as hammers costing more than $400 a piece. *See* Robert M. Hansen, *CICA Without Enforcement: How Procurement Officials and Federal Court Decisions Are Undercutting Enforcement Provisions of the Competition in Contract Act*, 6 Geo. Mason L. Rev. 131, 132-33 (1997) [hereinafter "*CICA Without Enforcement*"]. As reflected in the legislative history, Congress sought to "stem the persistent and costly use of 'sole source' or noncompetitive contract awards made by federal agencies, particularly in the defense area." *Id.* at 133. To accomplish that goal, Congress generally required the use of "full and open" competition in every procurement, with only a handful of narrow exceptions whose use would have to be fully justified and approved by high-level agency officials. *Id.; see also KSD, Inc. v. United States*, No. 05-1229C (Fed. Cl. Aug. 23, 2006) (referring to the "full and open" competition requirement of CICA and the limited exceptions thereto).

In *Ameron, Inc. v. U.S. Army Corps of Engineers,* 809 F.2d 979 (3rd Cir. 1986) (*"Ameron II"*), one of the few appellate courts to have considered CICA to date described the situation thusly:

> Although competitive bidding is supposed to be the way most government purchases are made, Congress has found procuring officials extremely – and increasingly – reluctant to use competitive bidding as the method of choosing sellers. This reluctance to use competitive bidding has been accompanied by rapid growth in the budgets for procuring agencies. In Congressional discussions regarding CICA Representative Brooks, one of CICA's sponsors, observed that
>
> > [w]hile Federal procurement regulations require agencies to award contracts on a competitive basis, inventive procurement officials within the agencies have found numerous ways to circumvent or get around these requirements altogether . . . . *As a result of not using full and open competition, the Government is spending billions of dollars each year in excessive prices for its goods and services.*

*Id.* at 983-84 (emphasis added) (citing 130 Cong. Rec. H1785 (daily ed. March 20, 1984) (statement of Rep. Brooks)) (other citations omitted).

As one commentator described it, procurement officials had incentives to avoid competitive procurement because of the added burden, complexity and time needed to conduct competitive procurements. *CICA Without Enforcement*, at 136. By enacting CICA, however, Congress sought to change those incentives by making it harder to justify a sole-source award than to conduct a competitive procurement. *Id.* (citations omitted).

### C. The Bid Protest and Stay Provisions of CICA as an Enforcement Mechanism

To enforce the general mandate for "full and open" competition, Congress restructured and formalized the pre-existing GAO bid protest process. *See Ameron, Inc. v. U.S. Army Corps of Engineers,* 787 F.2d 875 (3rd Cir. 1986) ("*Ameron I*"); *CICA Without Enforcement,* at 133. To

give the GAO protest remedy "teeth," Congress incorporated an automatic stay provision. The Third Circuit described the legislative history of this stay provision as follows:

> As an adjunct of its account-settling role, the Comptroller General over the years began to hear protests from disappointed bidders on government contracts. This role was formalized by the Competition in Contracting Act (CICA) in 1984. 31 U.S.C.A. §§ 3551 – 3556 (West Supp. 1985). *CICA was enacted to remedy a major loophole in the long-standing GAO review procedure: by the time the GAO reviewed most bid protests, the protests had become moot because either the contract had been let or the contractor was engaged in performing under the contract.* While GAO regulations provided for a stay of either the granting or performance of the contract in some circumstances, this stay was easily overridden by the contracting agency involved. The result was that most procurements became *faits accomplis* before they could be reviewed. This situation was identified by Congress as a contributing factor to the crisis of waste in federal procurement. In particular, Congress recognized as a problem that of $168 billion in government contracts awarded in fiscal year 1983, only about one-third, $54 billion, was awarded on a competitive basis. *Competition in Contracting Act of 1984:* H.R. Rep. No. 1157, 98th Cong., 2d Sess. 12 (1984). In enacting CICA, Congress attempted to provide effective review of bid challenges, and in the process to encourage competition in contracting.

*Ameron I*, 757 F.2d at 878-79 (emphasis added in third sentence) (citations omitted).

The Third Circuit later expanded on this description as follows:

> A less formal version of the CICA's bid protest procedure had been followed for many years prior to passage of the Act. Before CICA, however, when the Comptroller General decided what relief a protesting bidder should receive, he also took into account the cost to the procuring agency of providing the recommended relief. The cost of awarding a contract to a protesting bidder is of course much higher once the contract has already been awarded to another supplier, and work begun on it. Because procuring agencies were often reluctant to adopt the Comptroller General's recommendation, they frequently responded to the filing of a bid protest, or other form of Congressional concern over how certain resources were being purchased, by rushing to award a contract and begin its execution. This prevented the Comptroller General from even recommending relief that would undo what the procuring agency had done or wanted to do.

*Ameron II*, 809 F.2d at 985 (citing H. Conf. Rep. No. 98-861, to accompany H.R. 4170 (subsequently passed as The Deficit Reduction Act of 1984) (June 23, 1984) at 1436, 1984 United States Code Cong. & Admin. News, at 697, 1445, 2124)) (other citations omitted). The House Conference report described the enhanced GAO bid protest provisions and the stay provisions as follows:

> [CICA is intended] to ensure that if the Comptroller General sustains a protest, such forms of relief as termination, recompetition, or re-award of the contract will be fully considered for recommendation. Agencies in the past have resisted such recommendations on the grounds that the government's *best interest* would not be served by relief measures of this sort because of the added expenses involved. [CICA] is designed to preclude that argument in the future, and thus to avoid prejudicing those relief measures in the Comptroller General's review.

H. Conf. Rep. No. 98-861 (as quoted in *Ameron II*, 809 F.2d at 985 n.4) (emphasis added).

**D. The Stay Override Provisions of CICA**

**1. The Original Version of the Override Provision**

The stay override provisions seem to have appeared first in the House bill that eventually led to the enacted version of CICA. *See* H.R. 5184, 98th Cong., 2d Sess. (Mar. 20, 1984). As set forth there, the override provision did not distinguish between pre-award and post-award overrides and could be based only on "compelling, exigent circumstances," more fully described as follows:

> "(D) An executive agency's senior procurement executive . . . may authorize the award or performance of a contract notwithstanding a protest of which the agency has notice . . . –
>
> "(i) upon a written finding that *compelling, exigent circumstances* which significantly affect *vital interests* of the United States will not permit awaiting the decision of the Comptroller General; and

> "(ii) after the Comptroller General is advised of such finding."

*Id.* (emphasis added).

A House report described this original, pre-conference provision as permitting overrides only in "exceptional" circumstances, stating as follows:

> Section 204(b)(3) [of H.R. 5184] prohibits the agency from awarding or performing a contract which has been protested unless *exceptional* circumstances as defined in the bill exist and the Senior Procurement Executive notifies the Comptroller General.

H.R. Rep. No. 1157, 98th Cong., 2d Sess. (Oct. 10, 1984) (emphasis added).[2]

In contrast to the House bill, the Senate bill that eventually merged into the resulting legislation appears to have focused more on promoting "full and open" competition and does not appear to have addressed GAO bid protests. *See* S. 338, 98th Cong., 2d Sess. (Feb. 23, 1982); *see also* H.R. Rep. No. 861, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S. Code Cong. & Admin. News, at 1435 ("The Senate amendment [to S. 338] contains no provisions regarding the [GAO] bid protest system").

Recognizing that full-and-open competition means more than merely soliciting offers from all qualified sources, however, the Senate bill did "clarif[y] that agencies shall evaluate sealed bids and competitive proposals based solely on the factors specified in the solicitation." H.R. Rep. No. 861, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S. Code Cong. & Admin. News, at 1429. The House bill reflected this as well, as it described itself as "[a] Bill to revise the procedures for soliciting *and evaluating* bids and proposals for Government contracts . . . ." H.R. 5184, at 1 (Mar. 20, 1984) (emphasis added).

---

[2] Although apparently not published until October 1984, following the enactment of CICA in July 1984, the report appears to deal with H.R. 5184 as it existed prior to the conference held between late March and July 1984.

With respect to the GAO bid protest system, the same House report went on to state that:

> the conferees believe that a strong enforcement mechanism is necessary to insure that the mandate for competition is enforced and that vendors wrongly excluded from competing for government contracts receive equitable relief. To accomplish this, the conference substitute adds a new subchapter to Chapter 35 of Title 31, United States Code, which codifies and strengthens the bid protest function currently in operation at the General Accounting Office (GAO). . . .
>
> The conference substitute establishes an enforcement mechanism keyed to the procedures contained in the Senate amendment for solicitation, notice, evaluation and award.

H.R. Rep. No. 861, 98th Cong., 2d Sess., reprinted in 1984 U.S. Code Cong. & Admin. News, at 1435.

**2. The Conference Amendment Adding the "Best interests" Standard to the Override Provision**

The House report also discussed the automatic stay and override provisions, the latter of which the conferees appear to have modified from the override provision appearing in the House bill. As modified, the provision distinguished between pre-award and post-award stays. With respect to the latter, the House report described the provision as follows:

> If a protest is filed within 10 days after award of the contract, performance shall cease and all related activities which may result in additional obligations being incurred by the United States must be suspended, unless the head of the procuring activity informs the Comptroller General that *urgent and compelling circumstances* which significantly affect interests of the United States will not permit waiting for the Comptroller General's decision, or that performance of the contract is in the *best interests* of the United States.

*Id.*, 1984 U.S. Code Cong. & Admin. News, at 1436 (emphasis added). The House report does not appear to describe the origin, purpose or intended scope or meaning of the addition of the

"best interests" standard, ultimately enacted as 31 U.S.C. § 3553(d)(2)(A)(i) (1984) (since amended and now appearing in substantially the same form at 31 U.S.C. § 3553(d)(3)(C)(i)(I)).[3]

The report does, however, go on to describe at least one condition on the ability of procuring agency's to invoke the "best interests" standard:

> Before notifying the Comptroller General that continued performance of a disputed contract is in the government's best interest, however, *the head of the procuring activity should consider potential costs to the government from carrying out relief measures as may be recommended by the Comptroller General if the protest is subsequently sustained.* This is to insure that if the Comptroller General sustains a protest, such forms of relief as termination, re-competition, or re-award of the contract will be fully considered for recommendation. Agencies in the past have resisted such recommendations on the grounds that the government's best interest would not be served by relief measures of this sort because of the added expenses involved. This provision is designed to preclude that argument in the future, and thus to avoid prejudicing those relief measures in the Comptroller General's review.

*Id.* (emphasis added). This condition, of course, reflects the fact that, by awarding a contract, the government takes on additional legal obligations and otherwise changes its position, potentially to its detriment. Here, of course, CBP's override decision does not address such costs. *See* AR, Tab 17, at 236-37.

---

[3] Ten years after the enactment of CICA, Congress enacted the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. 103-355, 108 Stat. 3243 (1994), which made comprehensive changes to federal procurement law. Among other things, FASA amended CICA's bid protest provisions, codified at 31 U.S.C. § 3553, principally to provide for debriefings for disappointed offerors and allow such offerors to obtain an automatic stay following such a debriefing, even if it was beyond the previous time frame of ten days. *See generally* Paul Shnitzer, *The 1996 GAO Bid Protest Rules,* Briefing Papers No. 96-13, at 1 (Dec. 1996); Thomas P. Humphrey & Stephanie V. Corrao, *Changes in the Notice of Award, Debriefing, and Protest Rules After FASA*, Briefing Papers No. 95-10, at 3 (Sept. 1995).

### 3. GAO's Congressional Testimony Concerning the Override Standard

The conference amendment to the CICA stay override provision may relate to comments made by the Comptroller General at hearings held on H.R. 5184 in late March 1984, apparently shortly before the conference. In written comments, the Comptroller General urged Congress to modestly expand the override authority beyond the then-proposed "vital interests" standard. He did so in order to avoid judicial erosion of an unrealistically high standard, testifying as follows:

> Regarding GAO's bid protest function, although there are significant additions, the bill, to a great extent, reflects GAO's current bid procedures.
>
> The bill would preclude an agency from either awarding a contract or continuing with contract performance when a protest is pending before GAO, unless the agency head or the agency's senior procurement executive determines that the *vital interests* of the United States will not permit awaiting GAO's decision.
>
> At present there is no requirement that contract performance be discontinued pending a protest. Although agency procurement regulations limit the authority of the contracting officer to make award while a protest is pending, the contracting officer is authorized to make an award in the face of a protest where he determines that the award would be *advantageous* to the Government.
>
> We think that limiting continuation of the Government's business except where the vital interests of the United States are at stake may be too rigid a standard to apply realistically. *We recognize the bill's purpose*, but are concerned that *an unrealistic standard may ultimately result in necessary dilution of the standard through interpretive decisions*. We would prefer a less rigid standard applied, perhaps, at the agency head level to assure proper consideration.

*Competition in Contracting Act of 1984: Hearings on H.R. 5184 Before a Subcommittee of the Committee on Government Operations,* 98th Cong., 2d Sess. (March 27 & 29, 1984).

### E. Harmonizing the CICA Stay Provisions with the Availability of Court-Ordered Injunctive Relief Before and After CICA

Although it restructured the GAO bid protest process in CICA, Congress left unchanged the ability of contractors to seek and obtain injunctive relief in the federal district courts and in the U.S. Court of Federal Claims (as it is now called). Although since changed in certain respects by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, a contractor, both before and after CICA, could obtain preliminary and permanent injunctive relief against a procuring agency's award based upon a preliminary showing, *inter alia*, that it is likely to succeed on the merits of a claim that the award was arbitrary, capricious, an abuse of discretion, or otherwise contrary to procurement law or regulations. Nothing in CICA or any other provision of law authorizes agencies to "override" such court-ordered injunctions or otherwise proceed with performance of an enjoined contract.

Moreover, our review of the legislative history discloses no reason to believe that Congress, in enacting the "best interests" override provision of CICA, intended the anomaly of providing agencies with a less relaxed regime than that already obtaining in federal court, let alone *carte blanche* to override a CICA stay. To the contrary, CICA appears to have been intended to strengthen the bid protest process and preserve the status quo by imposing meaningful stays of contract performance pending resolution of the triggering GAO bid protest. As the comments of the Comptroller General would suggest, a standard slightly less than "urgent and compelling circumstances" could rationally serve to protect the integrity of the automatic stay by guarding against the judicial erosion of the override standard that might occur if overrides were strictly limited to "urgent and compelling circumstances." To accomplish that end, however, there was and is no need to expand the "best interests" provision so far that it reads the stay provision out of existence.

## CONCLUSION

Absent injunctive relief (or a final declaratory judgment on the merits), ATI will be irreparably harmed by the transition that the agency intends to conduct this Friday, September 1. Indeed, it already appears that ATI has been harmed by the apparent defection of its exclusive teaming partner, Fujitsu, which would be freed from its exclusive agreement by the transition of the contract to DTI. This harm, and others, are precisely what the automatic CICA stay were designed to prevent. Nothing in the legislative history of CICA indicates that this is what Congress had in mind when it added the "best interests" override provision to CICA.

Accordingly, ATI requests that this Court issue a temporary restraining order (pending the issuance of a preliminary injunction) or a preliminary injunction prohibiting the procuring agency from continuing to implement its override decision, or, in the alternative, issue a final declaratory judgment on the merits invalidating the override decision.

Dated: August 29, 2006

Respectfully submitted,

s/ Walter F. Zenner

Walter F. Zenner
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7603
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
*Automation Technologies, Inc.*

*Of Counsel:*

John E. Jensen
Orest J. Jowyk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7900
Fax: (703) 770-7901

# EXHIBIT 1

Index to Legislative History of CICA

(by category and chronologically,
as compiled by McKenna Conner & Cuneo)

# Competition in Contracting Act of 1984
## Pub. L. No. 98-369
## Legislative History
## Table of Contents

**S. 2127**


| Tab | Volume I | Date |
|---|---|---|
| 1 | Pub. L. No. 98-369, 98 Stat. 494, 1175, reprinted in 1984 U.S. CODE CONG. & AD. NEWS | July 18, 1984 |
| | **Reports:** | |
| 2 | S. Rep. No. 665, 97th Cong., 2d Sess. (1982) | November 15, 1982 |
| 3 | S. Rep. No. 50, 98th Cong., 1st Sess. (1983) | March 31, 1983 |
| 4 | S. Rep. No. 297, 98th Cong., 1st Sess. (1983) | November 3, 1983 |
| 5 | H.R. Rep. No. 861, 98th Cong., 2d Sess. (1984) reprinted in 1984 U.S. CODE CONG. & AD. NEWS, 1445, 2109 | June 22, 1984 |
| 6 | H.R. Rep. No. 1157, 98th Cong., 2d Sess. (1984) | October 10, 1984 |
| | **Bills:** | |
| 7 | S. 2127, 97th Cong., 2d Sess. (1982) | February 23, 1982 |
| 8 | S. 338, 98th Cong., 1st Sess. (1983) | February 2, 1983 |
| 9 | S. 338, as reported by the Governmental Affairs Committee | March 23, 1983 |
| 10 | H.R. 2545, 98th Cong., 1st Sess. (1983) | April 13, 1983 |
| 11 | S. 338, as reported by the Senate Armed Services Committee | June 27, 1983 |

| Tab | Volume I (con't) | Date |
| --- | --- | --- |
| | **Bills (con't):** | |
| 12 | H.R. 5184, 98th Cong., 2d Sess. | March 20, 1984 |
| 13 | Committee Print, showing H.R. 5184, as reported by the Subcommittee on Legislation and National Security | April 5, 1984 |

| Tab | Volume II | Date |
| --- | --- | --- |
| | **Debates:** | |
| 14 | Introductory statement by Sen. William Cohen, 128 CONG. REC. S994-998 (daily ed. Feb. 23, 1982) | February 23, 1982 |
| 15 | Statement on S. 2127 by Sen. William Cohen, 128 CONG. REC. S4505-06 (daily ed. May 4, 1982) | May 4, 1982 |
| 16 | Introduction of S. 338 by Sen. William Cohen, 129 CONG. REC. S810 (daily ed. Feb. 1, 1983) | February 1, 1983 |
| 17 | Order for sequential referral | February 2, 1983 |
| 18 | Introduction of H.R. 2545 by Rep. Melvin Price, 129 CONG. REC. H2080 (daily ed. April 13, 1983) | April 13, 1983 |
| 19 | Debate and passage of S. 338, 129 CONG. REC. S15,998-16,014 (daily ed. Nov. 11, 1983) | November 11, 1983 |
| 20 | Referral of S. 338 to the House of Representatives, Committees on Armed Services and Government Operations, 129 CONG. REC. H10,054 (daily ed. Nov. 16, 1983) | November 16, 1983 |
| 21 | Statement of Rep. Jack Brooks, 130 CONG. REC. H1785 (daily ed. March 20, 1984) | March 20, 1984 |

| Tab | Volume II (con't) | Date |
|---|---|---|
| | **Debates (con't):** | |
| 22 | Introduction of H.R. 5184 by Rep. Jack Brooks, 130 CONG. REC. H1787 (daily ed. March 20, 1984) | March 20, 1984 |
| 23 | Adoption of Cohen Amendment No. 3035 into H.R. 2163, the Boat Safety Act 130 CONG. REC. S5020-5027 (daily ed. April 30, 1984) | April 30, 1984 |
| 24 | Statement of Rep. Parren Mitchell, 130 CONG. REC. H7091 (daily ed. June 27, 1984) | June 27, 1984 |
| 25 | Statement of Rep. Frank Horton, 130 CONG. REC. H7102-7103 (daily ed. June 27, 1984) | June 27, 1984 |
| | **Hearings:** | |
| 26 | Competition in the Federal Procurement Process: Hearing before the Senate Committee on Governmental Affairs, 97th Cong., 2d Sess. (1982) | June 29, 1982 |
| 27 | Hearings on H.R. 2545, Defense Procurement Reform Act of 1983 before the Investigations Subcommittee, House Committee on Armed Services, 98th Cong., 1st Sess. (1983) | April 27, September 29, October 19, 1983 |
| 28 | Competition in Contracting Act of 1983: Hearings on S. 338 before the Senate Committee on Armed Services, 98th Cong., 1st Sess. (1983) | June 7, 9, 1983 |
| 29 | Competition in Contracting Act of 1984: Hearings on H.R. 5184 before the Subcommittee on Legislation and National Security, Governmental Operations Committee, 98th Cong., 2d Sess. (1984) | March 27, 29, 1984 |

**Miscellaneous:**

| | | |
|---|---|---|
| 30 | "Less Sole Source More Competition Needed of Federal Agencies' Contracting," (GAO/PLRD 82-40) April 7, 1982 | April 7, 1982 |
| 31 | President's Statement on Signing H.R. 4170 Into Law, 20 WEEKLY PRES. DOC. 1037 (July 18, 1984) | July 18, 1984 |

Competition in Contracting Act of 1984
Pub. L. No. 98-369
Legislative History
Chronological Index

97th Congress

S. 2127

| Tab | | Date |
|---|---|---|
| 7 | S. 2127, 97th Cong., 2d Sess. (1982) | February 23, 1982 |
| 14 | Introductory statement by Sen. William Cohen, 128 CONG. REC. S994-998 (daily ed. Feb. 23, 1982) | February 23, 1982 |
| 30 | "Less Sole Source, More Competition Needed of Federal Agencies' Contracting," (GAO/PLRD 82-40) April 7, 1982 | April 7, 1982 |
| 15 | Statement on S. 2127 by Sen. William Cohen, 128 CONG. REC. S4505-06 (daily ed. May 4, 1982) | May 4, 1982 |
| 26 | Competition in the Federal Procurement Process: Hearing before the Senate Committee on Governmental Affairs, 97th Cong., 2d Sess. (1982) | June 29, 1982 |
| 2 | S. Rep. No. 665, 97th Cong., 2d Sess. (1982) | November 15, 1982 |

98th Congress

S. 338

| | | |
|---|---|---|
| 16 | Introduction of S. 338 by Sen. William Cohen, 129 CONG. REC. S810 (daily ed. Feb. 1, 1983) | February 1, 1983 |
| 8 | S. 338, 98th Cong., 1st Sess. (1983) | February 2, 1983 |
| 17 | Order for sequential referral | February 2, 1983 |
| 9 | S. 338, as reported by the Senate Governmental Affairs Committee | March 23, 1983 |

| Tab | | Date |
|---|---|---|
| 3 | S. Rep. No. 50, 98th Cong., 1st Sess. (1983) | March 31, 1983 |
| 28 | Competition in Contracting Act of 1983: Hearings on S. 338 before the Senate Committee on Armed Services, 98th Cong., 1st Sess. (1983) | June 7, 9, 1983 |
| 11 | S. 338, as reported by the Senate Armed Services Committee | June 27, 1983 |
| 4 | S. Rep. No. 297, 98th Cong., 1st Session (1983) | November 3, 1983 |
| 19 | Debate and passage of S. 338, 129 CONG. REC. S15,998-16,014 (daily ed. Nov. 11, 1983) | November 11, 1983 |
| 20 | Referral of S. 338 to the House of Representatives, Committees on Armed Services and Government Operations, 129 CONG. REC. H10,054 (daily ed. Nov. 16, 1983) | November 16, 1983 |
| 23 | Adoption of Cohen Amendment No. 3035 into H.R. 2163, the Boat Safety Act, 130 CONG. REC. S5020-5027 (daily ed. April 30, 1984) | April 30, 1984 |
| | Passage by Senate of H.R. 4170 the Deficit Reduction Act of 1984, in lieu of H.R. 2163, 130 CONG. REC. S5915-5974 (daily ed. May 17, 1984) (Not included; not relevant to the Competition in Contracting Act) | May 17, 1984 |

**H.R. 2545**

| Tab | | Date |
|---|---|---|
| 10 | H.R. 2545, 98th Cong., 1st Sess. (1983) | April 13, 1983 |
| 18 | Introduction of H.R. 2545 by Rep. Melvin Price, 129 CONG. REC. H2080 (daily ed. April 13, 1983) | April 13, 1983 |

| Tab | | Date |
|---|---|---|
| 27 | Hearings on H.R. 2545, Defense Procurement Reform Act of 1983 before the Investigations Subcommittee, House Committee on Armed Services, 98th Cong., 1st Sess. (1983) | April 27, September 29, October 19, 1983 |

H.R. 5184

| | | |
|---|---|---|
| 12 | H.R. 5184, 98th Cong., 2d Sess. | March 20, 1984 |
| 21 | Statement of Rep. Jack Brooks, 130 CONG. REC. H1785 (daily ed. March 20, 1984) | March 20, 1984 |
| 22 | Introduction of H.R. 5184 by Rep. Jack Brooks, 130 CONG. REC. H1787 (daily ed. March 20, 1984) | March 20, 1984 |
| 29 | Competition in Contracting Act of 1984: Hearings on H.R. 5184 before the Subcommittee on Legislation and National Security, Government Operations Committee, 98th Cong., 2d Sess. (1984) | March 27, 29 1984 |
| 13 | Committee Print, showing H.R. 5184, as reported by the Subcommittee on Legislation and National Security | April 5, 1984 |

H.R. 4170

| | | |
|---|---|---|
| 5 | H.R. Rep. No. 861, conference report on H.R. 4170, 98th Cong. 2d Sess. (1984) reprinted in 1984 U.S. CODE CONG. & AD. NEWS, 1445, 2109 | June 22, 1984 |
| | Agreement by House to H.R. Rep. No. 98-861 130 CONG. REC. H7085-7135 (daily ed. June 27, 1984) (Not included; not relevant to Competition in Contracting Act, except for statements at tabs 24 and 25) | June 27, 1984 |

| Tab | | Date |
|---|---|---|
| 24 | Statement of Rep. Parren Mitchell, 130 CONG. REC. H7091 (daily ed. June 27 1984) | June 27, 1984 |
| 25 | Statement of Rep. Frank Horton, 130 CONG. REC. H7102-7103 (daily ed. June 27 1984) | June 27, 1984 |
| | Agreement of Senate to H.R. Rep. 98-861, report to H.R. 4170, 130 CONG. REC. S8372-8422 (daily ed. June 27, 1984) (Not included; not relevant to Competition in Contracting Act) | June 27, 1984 |
| 1 | Pub. L. No. 98-369, 98 Stat. 494, 1175, reprinted in 1984 U.S. CODE CONG.& AD. NEWS | July 18, 1984 |
| 31 | President's Statement on Signing H.R. 4170 Into Law, 20 WEEKLY COMP. PRES. DOC. 1037 (July 18, 1984) | July 18, 1984 |
| 6 | H.R. Rep. No. 1157, 98th Cong., 2d Sess. (1984) | October 10, 1984 |